No. 23-_____

# In the United States Court of Appeals for the Fifth Circuit

IN RE JEFF LANDRY,
IN HIS OFFICIAL CAPACITY AS THE LOUISIANA ATTORNEY GENERAL, ET AL.

---

## APPENDIX TO PETITION FOR A WRIT OF MANDAMAS

On Petition for a Writ of Mandamus from the
United States District Court
for the Middle District of Louisiana
No. 3:22-cv-00211 (Hon. Shelly D. Dick)

JEFF LANDRY
   *Louisiana Attorney General*
ELIZABETH B. MURRILL
   *Solicitor General*
SHAE MCPHEE
   *Deputy Solicitor General*
MORGAN BRUNGARD
   *Assistant Solicitor General*
ANGELIQUE DUHON FREEL
CAREY TOM JONES
JEFFREY M. WALE
   *Assistant Attorneys General*

JASON B. TORCHINSKY
PHILLIP M. GORDON
EDWARD M. WENGER
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169

OFFICE OF THE ATTORNEY
GENERAL
LOUISIANA DEPARTMENT
  OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70804
*murrille@ag.louisiana.gov*

*Attorneys for the State of Louisiana*

JOHN C. WALSH
SHOWS, CALI & WALSH, L.L.P.
P.O. Box 4046
Baton Rouge, LA 70821
*john@scwllp.com*

PHILLIP J. STRACH
THOMAS A. FARR
ALYSSA M. RIGGINS
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Raleigh, NC 27603
*phillip.strach@nelsonmullins.com*

*Counsel for R. Kyle Ardoin, in his official capacity as Secretary of State*
*of Louisiana*

# TABLE OF CONTENTS

Joint Motion for Status Conference (Doc. 240)…………..……..….. App.001

Defendants' Memo in Response to Plaintiffs' Joint
Motion for Status Conference (Doc. 243)………..……………..…… App.009

Exhibits to Defendants' Memo in Response to Plaintiffs' Joint
Motion for Status Conference (Doc. 245)………..…..……….….... App.029

Minute Entry re Scheduling Conference (Doc. 246)…...….…........ App.044

Order re Preliminary Hearing (Doc. 250)…………..……….…..… App.045

Defendants' Joint Notice of Proposed
Pre-Hearing Schedule (Doc. 255)………..…………….…….…..... App.046

Plaintiffs' Proposed Pre-Hearing Schedule (Doc. 256)……...…. App.071

Emergency Motion to Cancel Hearing on Remedy
and Enter Scheduling Order (Doc. 260)………..…….…………..  App.077

Memo in Opposition to Motion to Cancel
Remedy Hearing (Doc. 263)………………………………..…….  App.097

Plaintiffs' Joint Opposition to Motion to Cancel
Remedy Hearing (Doc. 264)………………………..……..…  App.100

Ruling (Doc. 267)………………………………………..….…..  App.107

Order (Doc. 268)………………………………………..….…..  App.109

Order (Doc. 275)……………………………..………….…....…  App.112

Transcript for PI hearing 05.10.22 (Doc. 213) ...……......…..  App.114

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE,<br><br>       *Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>    *Defendant*. | Civil Action No. 3:22-cv-00211-SDD-RLB |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, TRAMELLE HOWARD,<br><br>       *Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>    *Defendant*. | Civil Action No. 3:22-cv-00214-SDD-RLB |

App.001

## JOINT MOTION FOR STATUS CONFERENCE

NOW INTO COURT, come Plaintiffs Press Robinson, Edgar Cage, Dorothy Nairne, Edwin Rene Soule, Alice Washington, Clee Earnest Lowe, Davante Lewis, Martha Davis, Ambrose Sims, NAACP Louisiana State Conference, and Power Coalition for Equity and Justice (the "Robinson Plaintiffs"), and Edward Galmon, Sr., Ciara Hart, Norris Henderson, and Tramelle Howard (the "Galmon Plaintiffs") to request that this Court set a status conference as soon as is practicable to discuss the resumption of this action following the June 26, 2023 Order of the Supreme Court.  *See* Summary Dispositions, *Ardoin* v. *Robinson*, No. 21-1596 (June 26, 2023).  Under FRCP Rule 16(a), a court may order attorneys to appear for a conference for the purpose of, among other things, "expediting disposition of the action" and "establishing early and continuing control so that the case will not be protracted."

On June 6, 2022, and following a five-day hearing in early May 2022, this Court granted the Plaintiffs' Motion for Preliminary Injunction.  *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759 (M.D. La.).  The Court determined that Louisiana's congressional redistricting map diluted the votes of Black voters in violation of Section 2 of the Voting Rights Act of 1965, and it preliminarily enjoined Defendants from conducting any congressional elections using that map.  *Id.* at 766-67.  The Court established a deadline of June 20, 2022 for the Louisiana Legislature to enact a map compliant with the Court's decision and stated that it would enact a remedial plan if the Legislature failed to do so.  *Id.*

Defendants moved in the Fifth Circuit on June 9, 2022 for a stay pending appeal. The Fifth Circuit initially entered an administrative stay of this Court's injunction and, on June 12, 2022, issued a 33-page opinion denying Defendants' motion for a stay and

App.002

vacating the administrative stay, while also ordering expedited briefing for a merits panel. *See Robinson* v. *Ardoin*, 37 F.4th 208 (5th Cir. 2022).

Although the Governor proclaimed an Extraordinary Legislative Session on June 7, 2022 to allow for the passage of a new congressional map, the Louisiana Legislature failed to timely enact a redistricting plan compliant with this Court's directive. On June 17, 2022, the Court required that the parties submit briefing and proposed remedial maps and scheduled an evidentiary hearing to be held on June 29, 2022 in order to evaluate the proposed maps and facilitate the adoption of a remedial map. ECF No. 206. The same day, Defendants filed an emergency application for a stay and petition for writ pending certiorari with the United States Supreme Court, which was granted on June 28 pending decision by the Supreme Court in *Allen* v. *Milligan*, 599 U.S. __ (2023). The grant of certiorari by the Supreme Court paused proceedings in the Fifth Circuit and in this Court. ECF No. 227.

On June 8, 2023, the Supreme Court issued its decision in *Allen* v. *Milligan*. 599 U.S. __ (2023). The Supreme Court upheld the judgment of the three-judge panel in that case that the Alabama congressional redistricting plan at issue likely violated Section 2 of the Voting Rights Act and reaffirmed the standards that it first adopted in *Thornburg* v. *Gingles* and that this Court applied to the present case. *Id.*

The Supreme Court subsequently issued an Order on June 26, 2023 dismissing the writ of certiorari before judgment as improvidently granted, vacating the stay, and allowing the matter to proceed "in the ordinary course and in advance of the 2024 congressional elections in Louisiana." Summary Dispositions, *Ardoin* v. *Robinson*, No. 21-1596 (June

App.003

26, 2023).  The dismissal of certiorari and lifting of the Supreme Court's stay allows this Court to resume its proceedings regarding the remedial maps.

Accordingly, the Robinson and Galmon Plaintiffs respectfully request that the Court schedule a status conference at its earliest convenience in order to establish a timeline for resuming the process for establishing the remedial maps, including but not limited to (i) entering a schedule for supplemental briefing and remedial maps; and (ii) setting forth a date for an evidentiary hearing to resume consideration of the maps.

Date: June 27, 2023                         Respectfully submitted,

By: */s/John Adcock*
John Adcock
Adcock Law LLC
L.A. Bar No. 30372
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

App.004

Leah Aden (admitted *pro hac vice*)
Stuart Naifeh (admitted *pro hac vice*)
Victoria Wenger (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans
LA. Bar No. 34537
I. Sara Rohani (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Nora Ahmed (admitted *pro hac vice*)
LA. Bar No. 33382
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
msnider@laaclu.org

Tracie L. Washington
LA. Bar No. 25925
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

Robert A. Atkins (admitted *pro hac vice*)
Yahonnes Cleary (admitted *pro hac vice*)
Jonathan H. Hurwitz (admitted *pro hac vice*)
Amitav Chakraborty (admitted *pro hac vice*)
Adam P. Savitt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue Of The Americas, New
York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
ratkins@paulweiss.com
ycleary@paulweiss.com
jhurwitz@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

T. Alora Thomas (admitted *pro hac vice*)
Sophia Lin Lakin (admitted *pro hac vice*)
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
athomas@aclu.org
slakin@aclu.org
sosaki@aclu.org

Sarah Brannon (admitted *pro hac vice*)
American Civil Liberties Union
Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

*Counsel for Robinson Plaintiffs*

5

App.005

J. E. Cullens, Jr.
Andrée Matherne Cullens
S. Layne Lee
WALTERS, PAPILLION, THOMAS,
CULLENS, LLC
12345 Perkins Road, Bldg. One
Baton Rouge, LA 70810
(225) 236-3636

/s/ Abha Khanna
Abha Khanna (admitted *pro hac vice*)
Jonathan P. Hawley (admitted *pro hac vice*)
ELIAS LAW GROUP LLP
1700 Seventh Ave. Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law

Lalitha D. Madduri (admitted *pro hac vice*)
Jacob D. Shelly (admitted *pro hac vice*)
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW Suite 400
Washington, D.C. 20001
(202) 968-4490

*Counsel for Galmon Plaintiffs*

App.006

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, EDGAR CAGE,
DOROTHY NAIRNE, EDWIN RENE
SOULE, ALICE WASHINGTON, CLEE
EARNEST LOWE, DAVANTE LEWIS,
MARTHA DAVIS, AMBROSE SIMS,
NATIONAL ASSOCIATION FOR THE           Civil Action No. 3:22-cv-00211-SDD-RLB
ADVANCEMENT OF COLORED PEOPLE
("NAACP") LOUISIANA STATE
CONFERENCE, AND POWER COALITION
FOR EQUITY AND JUSTICE,
                    *Plaintiffs*,

           v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana.

                    *Defendant*.

EDWARD GALMON, SR., CIARA HART,
NORRIS HENDERSON, TRAMELLE
HOWARD,
                    *Plaintiffs*,        Civil Action No. 3:22-cv-00214-SDD-RLB

           v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana.

*Defendant*.

**ORDER**

App.007

Considering the *Motion for Status Conference* filed by Plaintiffs in the above-captioned case;

**IT IS HEREBY ORDERED** that the motion is GRANTED and a telephonic status conference be set for _____, 2023, at _____.

Signed in Baton Rouge, Louisiana, this _____ day of _____, 2023.

_____
Chief Judge Shelly D. Dick

App.008

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, et al.,

        *Plaintiffs,*

    v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        *Defendant.*

EDWARD GALMON, SR., et al.,

        *Plaintiffs,*

    v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        *Defendant.*

Civil Action No. 3:22-cv-00211-SDD-SDJ

Chief Judge Shelly D. Dick

Magistrate Judge Scott D. Johnson

Consolidated with
Civil Action No. 3:22-cv-00214-SDD-SDJ

## DEFENDANTS' MEMORANDUM IN RESPONSE TO
## PLAINTIFFS' JOINT MOTION FOR STATUS CONFERENCE
## AND JOINT NOTICE REGARDING STATUS CONFERENCE

Plaintiffs' Joint Motion for Status Conference, Doc. 240, asked the Court to hold a status

conference "to establish a timeline for resuming the process for establishing the remedial maps,

including but not limited to (i) entering a schedule for supplemental briefing and remedial maps;

and (ii) setting forth a date for an evidentiary hearing to resume consideration of the maps."

Doc. 240. This morning, Plaintiffs filed a joint notice regarding status conference asking the Court

to restart preliminary injunction proceedings.  Doc. 242 at 3 (asking the Court to accept "weeks"

of new briefing, new maps, and a new evidentiary hearing).  Defendants and Intervenors

(collectively, "Defendants") oppose such a "remedial phase" and oppose restarting the preliminary

App.009

injunction proceedings because it would only inject unnecessary delay into this matter. Defendants further oppose the imposition of a new congressional districting plan on the basis of a preliminary injunction when there is time for a trial on the merits before the 2024 elections. The Court should set this matter for trial on the merits as soon as possible.

While counsel for the defense side of this case will be prepared to more fully explain Defendants' position during the July 12, 2023, telephone status conference, Doc. 241, this memorandum is intended to provide background they believe will be helpful to the Court.

1.      As Defendants recently detailed to the Fifth Circuit, this Court should conduct a trial on the merits and reach a final judgment promptly to allow this case to be resolved before the November 2024 elections. *See* Appellants' July 6, 2023 Ltr., *Robinson v. Ardoin*, No. 22-30333, Doc. 246. This Court's June 6, 2022, preliminary injunction and remedial schedule, *see* Docs. 173, 206, sought to impose a remedy in advance of the November 2022 congressional elections. Those elections have passed, and Plaintiffs no longer need a preliminary injunction and temporary remedy based on a limited record when the next elections to be conducted under the enjoined congressional plan are nearly 16 months away (rather than four months away, as they were when this case was stayed in 2022).

There is sufficient time for a trial on the merits before the end of 2023,[1] with a reasonable pre-trial schedule for fact discovery and additional expert discovery, if the Court acts now to schedule that trial. Plaintiffs cannot argue otherwise. In the related case of *Nairne v. Ardoin* involving Louisiana's legislative plans, the plaintiffs and their counsel—including many of the

---

[1] Indeed, it is possible that a trial as late as January or February 2024 will provide sufficient time for resolution prior to congressional elections in November 2024, but Defendants appreciate the Court's point in *Nairne v. Ardoin* that it wants to work to avoid potential timing issues and try these matters as soon as possible.

App.010

same counsel here—urged this Court to set an expedited trial schedule "to allow for potential relief of a special election in November 2024." Case No. 22-cv-00178, Doc. 89 at 3. Setting aside whether a special election is available to Plaintiffs in the *Nairne* matter (it is not), there *is* a scheduled election for Louisiana's congressional districts on November 5, 2024. The *Nairne* plaintiffs initially advocated for a trial in January 2024, showing they believed it is feasible to hold a trial on the merits 10 months in advance of the November 2024 elections.

The imposition of a preliminary remedial plan now, rather than trying this case before the end of 2023, would be problematic and counterproductive for multiple reasons. First, the Court would impose dramatic mandatory injunctive relief on a preliminary basis (imposing a judicially created congressional district plan on the state) despite a significant change in circumstances since the Court entered its order in June 2022: we now have 16 months before the next election rather than the four months between when this case was stayed and the November 2022 congressional elections.

Second, if the Court were to implement a preliminary remedial plan based on the preliminary injunction and accede to Plaintiffs' wishes to restart the preliminary injunction phase and not try this case before the end of 2023, there likely will not be sufficient time to reach a final judgment and conduct *another* remedial phase in advance of the November 2024 congressional elections. That approach would mark a significant duplication of effort and ensuing waste of resources by both counsel and the Court let alone a sharp departure from this Court's recently expressed wishes in *Nairne* to proceed promptly in order to avoid potential *Purcell* issues. *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Third, Plaintiffs' proposal risks exposing voters to as many as three different congressional plans in three elections (the 2022 elections under the enacted plan, the 2024 elections under a

preliminary remedial plan, and the 2026 elections under potentially yet a third plan), which would work a "needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (citing *Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976)).

Fourth, the status quo here is the challenged plan which was used in the November 2022 election and which governs congressional representation in Louisiana today.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Here, adequate legal remedies exist for Plaintiffs:  they can try the case to conclusion and establish their claim that this status quo should be altered prior to the November 2024 election.

Plaintiffs' reliance on *Canal Auth. of State of Fla. v. Callaway* for the position that a preliminary injunction remedial plan is necessary in this case, some 16 months prior to the next election, ignores that case's rule.  Pls' J. Notice at 5; 489 F.2d 567 (5th Cir. 1974). In *Canal Authority of Florida*, the Fifth Circuit applied a rule of necessity that cannot be satisfied here where there is no need for a status quo-altering remedial injunction pending trial because there is sufficient time to try this case before the next election.  *Id.* at 576.

Finally, such an approach would be inconsistent with the Supreme Court's directive that "the matter proceed before the Court of Appeals for the Fifth Circuit for review in the ordinary course and in advance of the 2024 congressional elections in Louisiana." Summary Dispositions, *Ardoin v. Robinson*, No. 21-1596 (June 26, 2023). The ordinary course in this scenario—nearly 16 months prior to the next election—is to try the case, not to languish in a preliminary-injunction

App.012

phase that is simultaneously moot (the November 2022 elections are past) and unripe (the November 2024 election is not yet an imminent emergency).

2.      This Court need not wait to schedule a trial on the merits while the Fifth Circuit considers Defendants' appeal of the preliminary injunction order. While this Court does not have jurisdiction over matters on appeal, it does have jurisdiction over the merits of this action. *Farmhand, Inc. v. Anel Eng'g Indus., Inc.*, 693 F.2d 1140, 1145–46 (5th Cir. 1982) ("Generally, when an appeal is noticed the district court is divested of jurisdiction; the matter is transferred immediately to the appellate court. The rule, however, is not absolute. The district court maintains jurisdiction as to matters not involved in the appeal, *such as the merits of an action when appeal from a preliminary injunction is taken*, or in aid of the appeal, as by making clerical corrections.") (emphasis added).

3.      In order to try this case on the merits before the end of 2023 while also allowing sufficient time for additional expert and fact discovery, Defendants request that the Court schedule this matter for trial on November 27, 2023.[2] This date is currently reserved for the *Nairne* trial, *see Nairne* Doc. 97, but trying this case should take priority over trying *Nairne* for a number of reasons.

First, the next elections to be conducted under the congressional plan challenged in this action will occur in November 2024, well before any elections that could be impacted by the *Nairne* litigation. The *Nairne* plaintiffs were unsuccessful in their attempt to seek relief for the

---

[2] Defendants maintain their previous arguments that trying any case in November 2023 will be exceedingly difficult for elected officials in light of the upcoming Gubernatorial Primary and General Elections. *See* Doc. 92 at 2–5. Defendants' proposal is based on the Court's prior direction in *Nairne* regarding its availability for trial in the fall of 2023. But to be clear, Defendants would oppose trying both *Nairne* and *Robinson* in November 2023—preparing for and participating in two trials during the election period would be untenable for the Secretary of State, Attorney General, and their staff who have statutory obligations to administer the election and advise election officials throughout every stage of the election process.

2023 elections, *see Nairne* Doc. 96, and the plaintiffs' insistence on an expedited trial date in that case is based on the legally erroneous contention that they could seek special elections in November 2024. *See Nairne* Doc. 92 (explaining that Supreme Court precedent "effectively foreclose[s]" such a remedy). This Court should prioritize trying this action for elections that must occur in November 2024 over an action where the next elections that could be impacted will not occur for four years.

Second, this action is more amenable to an expedited discovery schedule and trial in November than *Nairne*. The congressional plan challenged here contains just six districts, and Plaintiffs seek the creation of just one additional majority-Black district. The *Nairne* plaintiffs, in contrast, challenge two different redistricting plans containing 144 districts, and seek numerous additional majority-Black districts across the state.

Third, and importantly, elections will occur under the districts challenged in *Nairne* in October and November 2023, offering this Court the most probative election data for its analysis. It is imperative that the parties have an opportunity to obtain and analyze the final election results in those districts before trial. *See Nairne* Doc. 92 at 5.[3] As the United States Supreme Court has intimated, a trial should be held after there is evidence of how the challenged law operates in an actual election as opposed to hypothetical, expert witness driven speculation that could later turn out to be incorrect. *Purcell*, 549 U.S. at 5 ("Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality [and] the Court wisely takes action that will enhance the likelihood that [the legal

---

[3] Moving the *Nairne* trial to January 2024 or later is also necessary in light of the *Nairne* plaintiffs' position that 2023 election results could not be admitted at a November 27, 2023, trial because there would be insufficient time for those results to be finalized and analyzed. *See* Jun. 29, 2023 Email from Plaintiffs' Counsel at 6, attached as Exhibit A.

App.014

issues] will be resolved correctly on the basis of historical facts rather than speculation.") (Stevens, J., concurring). While the record in this action needs to be more fully developed, that can occur more quickly than in a case where dozens of districts are at issue and where the most probative elections for a Section 2 analysis—endogenous elections—will be held in the weeks prior to trial.

Defendants respectfully ask the Court to reject Plaintiffs' request to proceed with a remedial process and to instead schedule this matter for trial on the merits for November 27, 2023.

Respectfully submitted,

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com
* *Admitted pro hac vice*

/s/ Erika Dackin Prouty

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

7

App.015

*/s/ John C. Walsh*
John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

*/s/ Phillip J. Strach* * (Lead Counsel)
phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in
his official capacity as Secretary of State of
Louisiana*

**Jeff Landry**
**Louisiana Attorney General**

Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com

Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com
*admitted pro hac vice*

*/s/ Carey Tom Jones*
Elizabeth B. Murrill (LSBA No. 20685)
Solicitor General
Shae McPhee (LSBA No. 38565)
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov
walej@ag.louisiana.gov

App.016

## **CERTIFICATE OF SERVICE**

I certify that on July 12, 2023, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Erika Dackin Prouty
Erika Dackin Prouty (admitted pro hac vice)
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

9

**Prouty, Erika Dackin**

| | |
|---|---|
| **From:** | Sarah Brannon <sbrannon@aclu.org> |
| **Sent:** | Thursday, June 29, 2023 2:31 PM |
| **To:** | McKnight, Katherine L.; Phil Gordon; Thomas-Lundborg, Alora; Stanko, Andrew; Knehans, Dakota; Margulis, David; Dayle Chung; Dayton Campbell-Harris; McDonald, Hallie; Jared Evans; Erickson, Jessica; External - John Adcock; Bahn, Josephine M.; Luis Manuel Rico Román; Megan Keenan; mdeleeuw@cozen.com; Engle-Hardy, Noelle; Nora Ahmed; rsoloman@cozen.com; Ron Wilson; Greenwood, Ruth; Ruth Greenwood; Sara Rohani; Stuart Naifeh; Victoria Wenger; Greenwood, Ruth |
| **Cc:** | Giglio, Amanda; Prouty, Erika Dackin; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W.; Sauceda, Carol; Braden, E. Mark; Raile, Richard; Lewis, Patrick T.; Jason Torchinsky; Andrew Pardue |
| **Subject:** | Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule |

Sorry to not get back to you sooner.  You should go ahead and submit your filing.  We are not going to come to an agreement and we plan to submit our own filing shortly.

We appreciate the Defendants proposed adjustments to the schedule in this matter. But we still think the 6 weeks that Defendants are now requesting to prepare their expert reports is too long and unnecessary.  And therefore, we think we will need to take this issue up with the Magistrate today.

As to the election data, assumed we were discussing election data as opposed to just election results – it is my understanding that just the election results have very little relevancy in this matter.  Additionally, Plaintiffs have considered Defendants' proposal that the parties be allowed to supplemental expert reports with data from the October 14, 2023 and Nov. 18, 2023 elections.  Plaintiffs opposed this request. This would be weeks, if not well over a month, after the close of expert discovery, which under the Defendants proposed schedule would be Sept. 29, 2023.  And in the case of the Nov. 18, 2023 election, less than ten days before trial.  Plaintiffs do not think it is feasible in this time period for the data to be made available, analyzed and appropriately disclosed to opposing counsel before trial.  Furthermore, this additional data is not necessary.  There is other recent election data available currently to all parties.  This is also something we should discuss with the Magistrate.


thanks
Sarah

---

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Thursday, June 29, 2023 2:05 PM
**To:** McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota



**EXHIBIT A**
App. 018

<dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

We are conferring now and should be able to get back to you shortly.

---

**From:** McKnight, Katherine L. <kmcknight@bakerlaw.com>
**Sent:** Thursday, June 29, 2023 1:50 PM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky

&lt;jtorchinsky@HoltzmanVogel.com&gt;; Andrew Pardue &lt;apardue@HoltzmanVogel.com&gt;
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

We write to follow up regarding our e-mail this morning about a proposed schedule in the Nairne matter.  We have not yet heard from you and appreciate that coordination takes time but believe it would be helpful to the Court to have a proposal before the conference this afternoon.  We intend to file the attached by 1:30pm Central to put forward Defendants' proposal for the Court's consideration.  We have included Plaintiffs' June 27 proposed dates in this filing so that the Court can have both proposals before it.  However, if you prefer that we remove Plaintiffs' June 27 proposed dates or edit them in any way to reflect an updated proposal we are happy to do so.

Could you please let us know what you prefer?  If we do not hear from you, we will plan to file this as is.

Thanks very much,

Kate


**Katherine L. McKnight**
Partner

**BakerHostetler**
Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com


---

**From:** McKnight, Katherine L.
**Sent:** Thursday, June 29, 2023 10:14 AM
**To:** Sarah Brannon &lt;sbrannon@aclu.org&gt;; Phil Gordon &lt;pgordon@HoltzmanVogel.com&gt;; Thomas-Lundborg, Alora &lt;tthomaslundborg@law.harvard.edu&gt;; Stanko, Andrew &lt;astanko@cozen.com&gt;; Knehans, Dakota &lt;dknehans@cozen.com&gt;; Margulis, David &lt;dmargulis@cozen.com&gt;; Dayle Chung &lt;dchung@naacpldf.org&gt;; Dayton Campbell-Harris &lt;DCampbell-Harris@aclu.org&gt;; McDonald, Hallie &lt;hmcdonald@cozen.com&gt;; Jared Evans &lt;jevans@naacpldf.org&gt;; Erickson, Jessica &lt;jerickson@cozen.com&gt;; External - John Adcock &lt;jnadcock@gmail.com&gt;; Bahn, Josephine M. &lt;jbahn@cozen.com&gt;; Luis Manuel Rico Román &lt;LRoman@aclu.org&gt;; Megan Keenan &lt;MKeenan@aclu.org&gt;; mdeleeuw@cozen.com; Engle-Hardy, Noelle &lt;nengle-hardy@cozen.com&gt;; Nora Ahmed &lt;Nahmed@laaclu.org&gt;; rsoloman@cozen.com; Ron Wilson &lt;cabral2@aol.com&gt;; Greenwood, Ruth &lt;rgreenwood@law.harvard.edu&gt;; Ruth Greenwood &lt;greenwood@law.harvard.edu&gt;; Sara Rohani &lt;srohani@naacpldf.org&gt;; Stuart Naifeh &lt;snaifeh@naacpldf.org&gt;; Victoria Wenger &lt;vwenger@naacpldf.org&gt;; Greenwood, Ruth &lt;rgreenwood@law.harvard.edu&gt;
**Cc:** Giglio, Amanda &agiglio@cozen.com&gt;; Prouty, Erika Dackin &lt;eprouty@bakerlaw.com&gt;; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. &lt;mmengis@bakerlaw.com&gt;; Sauceda, Carol &lt;csauceda@bakerlaw.com&gt;; Braden, E. Mark &lt;MBraden@bakerlaw.com&gt;; Raile, Richard &lt;rraile@bakerlaw.com&gt;; Lewis, Patrick T. &lt;plewis@bakerlaw.com&gt;; Jason Torchinsky &lt;jtorchinsky@HoltzmanVogel.com&gt;; Andrew Pardue

App.020

&lt;apardue@HoltzmanVogel.com&gt;
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

Thank you for your time yesterday afternoon. Following are updates on Defendants' positions on two items.

**First: Proposed Schedule.** We heard your concerns about timing and have adjusted dates in the following proposal to address concerns raised by Plaintiffs (see column titled Defendants' Meet and Confer Proposal). This adjusted proposal allows more time to conduct expert depositions than the original scheduling order and also ensures the same amount of time to depose fact witnesses (3 weeks). This also builds in time in October between the end of expert discovery and pre-trial deadlines. We made the following adjustments:

1. Moved Defendants' expert disclosure and reports a week earlier, respectively.
2. Delayed the exchange of witness lists by a few days so it post-dates the exchange of Defendants' expert reports and limited it to "Fact Witnesses." We added an additional date for Expert Witness lists due on the same date as the final expert witness reports are exchanged; an Expert Witness List may not be necessary but we wanted to accommodate what we understood to be your interest in exhibit list exchanges prior to the time for depositions.
3. Matched Plaintiffs' proposals for the last three dates leading up to trial.
4. Combined the due date for expert-related motions with the due date for Daubert motions.

Please let us know your position on this proposal so we can determine whether further narrowing is possible and to prepare for this afternoon's conference with the Court.

| Event | Before Stay | Time Between Events in First Scheduling Order | Plaintiffs' 6/27 Proposal | Defendant... Propo... |
|---|---|---|---|---|
| Plaintiffs' Expert Reports | 7/22/2022 | | 6/30/2023 | 6/... |
| Defendants Expert Disclosures | 9/2/2022 | 6 weeks after P reports | 7/6/2023 | 8/... |
| Defendants Expert Reports | 9/9/2022 | 7 weeks after P reports | 7/21/2023 | 8/... |
| Exchange Fact Witness Lists | No date set | | 8/10/2023 | 8/... |
| Plaintiffs' Rebuttal Expert Disclosures | No date set | | 7/25/2023 | 8/... |
| Plaintiffs' Rebuttal Expert Reports | 9/23/2022 | 2 weeks after D reports | 8/4/2023 | 9/... |
| Defendants' Sur-Rebuttal Expert Disclosure | No date set | | 8/8/2023 | 9/... |
| Fact discovery close and file related motions | 10/17/2022 | | 8/31/2023 | 8/... |
| Defendants' Sur-Rebuttal Expert Reports | 10/7/2022 | 2 weeks after P reports | 8/11/2023 | 9/... |
| Exchange Expert Witness Lists | No date set | | | |
| Expert discovery close | 10/21/2022 | 2 weeks after surrebuttals | 9/22/2023 | 9/... |
| Dispositive & Daubert & Expert-related motions | 10/28/2022 | 1 week later | 9/29/2023 | 10/... |
| File pre-trial order | No date set | | 10/20/2023 | 10/... |
| Proposed findings of fact & conclusions of law | 12/12/2022 | 5 weeks prior to trial | 10/27/2023 | 10/... |
| Pre-trial conference | 12/19/2022 | 4 weeks prior to trial | 11/2/2023 | 10/... |
| Trial briefs | 12/23/2022 | 3 weeks prior to trial | 11/13/2023 | 11/... |
| Trial scheduled to begin | 1/17/2023 | | 11/27/2023 | 11/... |

App.021

**Second: Rebuttal and sur-rebuttal expert disclosures.** We can agree to including these dates under the same parameters as defined in the original scheduling order (Dkt. 66). Specifically:

> "Second, the parties discussed at length their positions on the appropriateness, timing, and scope of rebuttal experts. (R. Doc. 52 at 4, 5, 7).Ultimately, the parties agreed that Plaintiffs would be able to "introduce[e] new experts at the rebuttal stage" but only "to rebut expert testimony" offered by Defendant and Intervenors "on topics not covered by Plaintiffs' initial slate of experts." (R. Doc. 52 at 7). Defendant and Intervenors can then offer sur-rebuttal expert reports, but any surrebuttal by Defendant and Intervenors would be limited to those experts first identified by Plaintiffs "at the rebuttal stage." (R. Doc. 52 at 5, 7). Therefore, the Court has included an additional deadline for Defendant and Intervenors to provide sur-rebuttal expert reports."

We look forward to Plaintiffs' position on election data. To be clear, we view the issue of election data (and whether data can be available for expert analysis in a timely manner) as distinct from election results (identification of which candidate won or lost a specific election). We trust this is in alignment with Plaintiffs' understanding based on a comment by Sarah during our call but please let us know if not.

Kate

**Katherine L. McKnight**
Partner



Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com

---

**From:** McKnight, Katherine L.
**Sent:** Wednesday, June 28, 2023 1:42 PM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis,

App.022

Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

We look forward to our meet and confer later today.  For now, we wanted to offer the following proposal which aligns with the amount of time afforded the parties in the original scheduling order.  We can agree to Plaintiffs' proposed dates related to fact discovery but view the original time between events related to expert discovery as necessary in this case.

In addition to the proposed schedule, we would like discuss the following during our meet and confer:

1. **Fall 2023 Election Data**: we expect that Parties may want to make use of election data from October 14 and November 18 elections and we would like to protect the Parties' right to do so to the extent possible given the tight timeframe.

2. **Supplemental Interrogatories**: we understand your proposal for condensing response deadlines for supplemental interrogatories to 14 days and can agree to this shift as long as it applies to all parties.

3. **Written Discovery Responses by Parties**: the Secretary of State and the Attorney General have outstanding written discovery requests that they served on Plaintiffs last year.  At the time the case was stayed, Plaintiffs had 3 days remaining to respond to the SOS written discovery and 11 days to respond to the AG written discovery.  We propose that Plaintiffs serve responses to these written discovery requests within 3 and 11 days of tomorrow's Status Conference: Monday, July 3, 2023 (adding a day for next business day), for response to SOS written discovery and Monday, July 11, 2023, for response to AG written discovery.

| Event | Before Stay | Time Between Events in First Scheduling Order | Plaintiffs' 6/27 Proposal | Defendants' 6/28 Proposal | Time Between Defendants' 6/ |
|---|---|---|---|---|---|
| ert Reports | 7/22/2022 | | 6/30/2023 | 6/30/2023 | |
| ness Lists | No date set | | 8/10/2023 | 8/10/2023 | 21 days before d |
| pert Disclosures | 9/2/2022 | 6 weeks after P reports | 7/6/2023 | 8/11/2023 | 6 weeks after P r |
| pert Reports | 9/9/2022 | 7 weeks after P reports | 7/21/2023 | 8/18/2023 | 7 weeks after P r |
| uttal Expert Disclosures | No date set | | 7/25/2023 | 8/22/2023 | |
| close and file related motions | 10/17/2022 | | 8/31/2023 | 8/31/2023 | |
| uttal Expert Reports | 9/23/2022 | 2 weeks after D reports | 8/4/2023 | 9/1/2023 | 2 weeks after D r |
| ur-Rebuttal Expert Disclosure | No date set | | 8/8/2023 | 9/5/2023 | |
| ur-Rebuttal Expert Reports | 10/7/2022 | 2 weeks after P reports | 8/11/2023 | 9/15/2023 | 2 weeks after P r |
| ry close and file related motions | 10/21/2022 | 2 weeks after surrebuttals | 9/22/2023 | 9/29/2023 | 2 weeks after su |
| Daubert motions | 10/28/2022 | 1 week later | 9/29/2023 | 10/6/2023 | 1 week later |
| rder | No date set | | 10/20/2023 | 10/20/2023 | |
| ngs of fact & conclusions of law | 12/12/2022 | 5 weeks prior to trial | 10/27/2023 | 10/23/2023 | 5 weeks prior to |
| rence | 12/19/2022 | 4 weeks prior to trial | 11/2/2023 | 10/30/2023 | 4 weeks prior to |
| | 12/23/2022 | 3 weeks prior to trial | 11/13/2023 | 11/6/2023 | 3 weeks prior to |
| d to begin | 1/17/2023 | | 11/27/2023 | 11/27/2023 | |

We look forward to discussing.

App.023

Kate

**Katherine L. McKnight**
Partner


Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com

---

**From:** McKnight, Katherine L.
**Sent:** Wednesday, June 28, 2023 9:04 AM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Sarah,

Thank you for your e-mail. Counsel for Defendants will be available to meet and confer this afternoon between 2pm and 4pm (Central)/3pm and 5pm (Eastern) and will look to circulate a proposal before we talk.

Would you pick a time in that window that works for your team and circulate a dial in?

Thanks,

Kate

App.024

**Katherine L. McKnight**
Partner
_____

BakerHostetler

Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com



---

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Tuesday, June 27, 2023 12:08 PM
**To:** Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

[External Email: Use caution when clicking on links or opening attachments.]
Counsel,

As you are aware, we have a scheduling conference in this matter set now for Thursday, June 29, 2023 at 3:00 pm CT before Magistrate Judge Scott D. Johnson.  In anticipation of that conference and to facilitate productive conversations about the schedule in this case, we have drafted a proposed schedule, which is attached here.  And we request to meet and confer with you all to discuss our proposal before the conference with Magistrate Judge Johnson.  Plaintiffs' counsel can be available on Weds, June 28th for a meet and confer.  Please let us know what time would work best for you all.

Thank-you,
Sarah

App.025

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Tuesday, June 20, 2023 11:57 AM
**To:** Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178


Sorry for the oversight.  We will make sure to include these individuals in all future correspondence.


Sarah

---

**From:** Phil Gordon <pgordon@HoltzmanVogel.com>
**Sent:** Tuesday, June 20, 2023 11:32 AM
**To:** Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Sarah Brannon <sbrannon@aclu.org>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>;

WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>;
FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W.
<mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>;
Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky
<jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Nairne, et al. v. Ardoin, et al., No. 22-cv-178

Counsel,

Good morning.

It has come to my attention that there has been correspondence from Plaintiffs in the above captioned matter that
omits a number of counsel for the State. Please add me, Jason Torchinsky, and Andrew Pardue to all future
correspondence regarding this matter.

Thank you,

Phil Gordon



**PRIVILEGED AND CONFIDENTIAL**
This communication and any accompanying documents are confidential and privileged. They are intended for the sole
use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying,
distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any
such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this
communication or otherwise. If you have received this communication in error, please contact me at the above email
address. Thank you.

**DISCLAIMER**
Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is
not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it
sufficient to avoid tax-related penalties. If desired, Holtzman Vogel Baran Torchinsky & Josefiak PLLC would be
pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may
be the subject of a separate engagement letter that would define the scope and limits of the desired consultation
services.

---

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a

App.027

complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

App.028

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with Civil Action No. 3:22-cv-00214-SDD-SDJ |
| v. | |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## EXHIBIT LIST TO DE 243,
## DEFENDANTS' MEMORANDUM IN RESPONSE TO
## PLAINTIFFS' JOINT MOTION FOR STATUS CONFERENCE
## AND JOINT NOTICE REGARDING STATUS CONFERENCE

| *Exhibit* | *Description* |
|---|---|
| Exhibit A | Email from Plaintiffs' Counsel dated June 29, 2023 |

Respectfully submitted,

| | |
|---|---|
| /s/ Michael W. Mengis | /s/ Erika Dackin Prouty |

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com
* *Admitted pro hac vice*

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay
Schexnayder, in his Official Capacity as
Speaker of the Louisiana House of
Representatives, and of Patrick Page Cortez, in
his Official Capacity as President of the
Louisiana Senate*

App.030

*/s/ John C. Walsh*
John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

*/s/ Phillip J. Strach** (Lead Counsel)
phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in
his official capacity as Secretary of State of
Louisiana*

**Jeff Landry**
**Louisiana Attorney General**

Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com


Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com
*admitted pro hac vice*

*/s/ Carey Tom Jones*
Elizabeth B. Murrill (LSBA No. 20685)
Solicitor General
Shae McPhee (LSBA No. 38565)
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov
walej@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I certify that on July 12, 2023, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Michael W. Mengis
Michael W. Mengis
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

App.032

## Prouty, Erika Dackin

| | |
|---|---|
| **From:** | Sarah Brannon <sbrannon@aclu.org> |
| **Sent:** | Thursday, June 29, 2023 2:31 PM |
| **To:** | McKnight, Katherine L.; Phil Gordon; Thomas-Lundborg, Alora; Stanko, Andrew; Knehans, Dakota; Margulis, David; Dayle Chung; Dayton Campbell-Harris; McDonald, Hallie; Jared Evans; Erickson, Jessica; External - John Adcock; Bahn, Josephine M.; Luis Manuel Rico Román; Megan Keenan; mdeleeuw@cozen.com; Engle-Hardy, Noelle; Nora Ahmed; rsoloman@cozen.com; Ron Wilson; Greenwood, Ruth; Ruth Greenwood; Sara Rohani; Stuart Naifeh; Victoria Wenger; Greenwood, Ruth |
| **Cc:** | Giglio, Amanda; Prouty, Erika Dackin; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W.; Sauceda, Carol; Braden, E. Mark; Raile, Richard; Lewis, Patrick T.; Jason Torchinsky; Andrew Pardue |
| **Subject:** | Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule |

Sorry to not get back to you sooner. You should go ahead and submit your filing. We are not going to come to an agreement and we plan to submit our own filing shortly.

We appreciate the Defendants proposed adjustments to the schedule in this matter. But we still think the 6 weeks that Defendants are now requesting to prepare their expert reports is too long and unnecessary. And therefore, we think we will need to take this issue up with the Magistrate today.

As to the election data, assumed we were discussing election data as opposed to just election results – it is my understanding that just the election results have very little relevancy in this matter. Additionally, Plaintiffs have considered Defendants' proposal that the parties be allowed to supplemental expert reports with data from the October 14, 2023 and Nov. 18, 2023 elections. Plaintiffs opposed this request. This would be weeks, if not well over a month, after the close of expert discovery, which under the Defendants proposed schedule would be Sept. 29, 2023. And in the case of the Nov. 18, 2023 election, less than ten days before trial. Plaintiffs do not think it is feasible in this time period for the data to be made available, analyzed and appropriately disclosed to opposing counsel before trial. Furthermore, this additional data is not necessary. There is other recent election data available currently to all parties. This is also something we should discuss with the Magistrate.


thanks
Sarah

---

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Thursday, June 29, 2023 2:05 PM
**To:** McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota

**EXHIBIT A**

App.053

<dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

We are conferring now and should be able to get back to you shortly.

---

**From:** McKnight, Katherine L. <kmcknight@bakerlaw.com>
**Sent:** Thursday, June 29, 2023 1:50 PM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky

App.034

<jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

We write to follow up regarding our e-mail this morning about a proposed schedule in the Nairne matter. We have not yet heard from you and appreciate that coordination takes time but believe it would be helpful to the Court to have a proposal before the conference this afternoon. We intend to file the attached by 1:30pm Central to put forward Defendants' proposal for the Court's consideration. We have included Plaintiffs' June 27 proposed dates in this filing so that the Court can have both proposals before it. However, if you prefer that we remove Plaintiffs' June 27 proposed dates or edit them in any way to reflect an updated proposal we are happy to do so.

Could you please let us know what you prefer? If we do not hear from you, we will plan to file this as is.

Thanks very much,

Kate

**Katherine L. McKnight**
Partner

<span style="color:red">**BakerHostetler**</span>
Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com



---

**From:** McKnight, Katherine L.
**Sent:** Thursday, June 29, 2023 10:14 AM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue

\<apardue@HoltzmanVogel.com\>
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

Thank you for your time yesterday afternoon. Following are updates on Defendants' positions on two items.

**First: Proposed Schedule.** We heard your concerns about timing and have adjusted dates in the following proposal to address concerns raised by Plaintiffs (see column titled Defendants' Meet and Confer Proposal). This adjusted proposal allows more time to conduct expert depositions than the original scheduling order and also ensures the same amount of time to depose fact witnesses (3 weeks). This also builds in time in October between the end of expert discovery and pre-trial deadlines. We made the following adjustments:

1. Moved Defendants' expert disclosure and reports a week earlier, respectively.
2. Delayed the exchange of witness lists by a few days so it post-dates the exchange of Defendants' expert reports and limited it to "Fact Witnesses." We added an additional date for Expert Witness lists due on the same date as the final expert witness reports are exchanged; an Expert Witness List may not be necessary but we wanted to accommodate what we understood to be your interest in exhibit list exchanges prior to the time for depositions.
3. Matched Plaintiffs' proposals for the last three dates leading up to trial.
4. Combined the due date for expert-related motions with the due date for Daubert motions.

Please let us know your position on this proposal so we can determine whether further narrowing is possible and to prepare for this afternoon's conference with the Court.

| Event | Before Stay | Time Between Events in First Scheduling Order | Plaintiffs' 6/27 Proposal | Defendant Propo |
|---|---|---|---|---|
| Plaintiffs' Expert Reports | 7/22/2022 | | 6/30/2023 | 6/ |
| Defendants Expert Disclosures | 9/2/2022 | 6 weeks after P reports | 7/6/2023 | 8/ |
| Defendants Expert Reports | 9/9/2022 | 7 weeks after P reports | 7/21/2023 | 8/ |
| Exchange Fact Witness Lists | No date set | | 8/10/2023 | 8/ |
| Plaintiffs' Rebuttal Expert Disclosures | No date set | | 7/25/2023 | 8/ |
| Plaintiffs' Rebuttal Expert Reports | 9/23/2022 | 2 weeks after D reports | 8/4/2023 | 9/ |
| Defendants' Sur-Rebuttal Expert Disclosure | No date set | | 8/8/2023 | 9/ |
| Fact discovery close and file related motions | 10/17/2022 | | 8/31/2023 | 8/ |
| Defendants' Sur-Rebuttal Expert Reports | 10/7/2022 | 2 weeks after P reports | 8/11/2023 | 9/ |
| Exchange Expert Witness Lists | No date set | | | |
| Expert discovery close | 10/21/2022 | 2 weeks after surrebuttals | 9/22/2023 | 9/ |
| Dispositive & Daubert & Expert-related motions | 10/28/2022 | 1 week later | 9/29/2023 | 10/ |
| File pre-trial order | No date set | | 10/20/2023 | 10/ |
| Proposed findings of fact & conclusions of law | 12/12/2022 | 5 weeks prior to trial | 10/27/2023 | 10/ |
| Pre-trial conference | 12/19/2022 | 4 weeks prior to trial | 11/2/2023 | 10/ |
| Trial briefs | 12/23/2022 | 3 weeks prior to trial | 11/13/2023 | 11/ |
| Trial scheduled to begin | 1/17/2023 | | 11/27/2023 | 11/ |

4

App.036

**Second: Rebuttal and sur-rebuttal expert disclosures.** We can agree to including these dates under the same parameters as defined in the original scheduling order (Dkt. 66). Specifically:

> "Second, the parties discussed at length their positions on the appropriateness, timing, and scope of rebuttal experts. (R. Doc. 52 at 4, 5, 7).Ultimately, the parties agreed that Plaintiffs would be able to "introduce[e] new experts at the rebuttal stage" but only "to rebut expert testimony" offered by Defendant and Intervenors "on topics not covered by Plaintiffs' initial slate of experts." (R. Doc. 52 at 7). Defendant and Intervenors can then offer sur-rebuttal expert reports, but any surrebuttal by Defendant and Intervenors would be limited to those experts first identified by Plaintiffs "at the rebuttal stage." (R. Doc. 52 at 5, 7). Therefore, the Court has included an additional deadline for Defendant and Intervenors to provide sur-rebuttal expert reports."

We look forward to Plaintiffs' position on election data. To be clear, we view the issue of election data (and whether data can be available for expert analysis in a timely manner) as distinct from election results (identification of which candidate won or lost a specific election). We trust this is in alignment with Plaintiffs' understanding based on a comment by Sarah during our call but please let us know if not.


Kate


**Katherine L. McKnight**
Partner



Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com

---

**From:** McKnight, Katherine L.
**Sent:** Wednesday, June 28, 2023 1:42 PM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis,

App.037

Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>

**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Counsel,

We look forward to our meet and confer later today. For now, we wanted to offer the following proposal which aligns with the amount of time afforded the parties in the original scheduling order. We can agree to Plaintiffs' proposed dates related to fact discovery but view the original time between events related to expert discovery as necessary in this case.

In addition to the proposed schedule, we would like discuss the following during our meet and confer:

1. **Fall 2023 Election Data**: we expect that Parties may want to make use of election data from October 14 and November 18 elections and we would like to protect the Parties' right to do so to the extent possible given the tight timeframe.

2. **Supplemental Interrogatories**: we understand your proposal for condensing response deadlines for supplemental interrogatories to 14 days and can agree to this shift as long as it applies to all parties.

3. **Written Discovery Responses by Parties**: the Secretary of State and the Attorney General have outstanding written discovery requests that they served on Plaintiffs last year. At the time the case was stayed, Plaintiffs had 3 days remaining to respond to the SOS written discovery and 11 days to respond to the AG written discovery. We propose that Plaintiffs serve responses to these written discovery requests within 3 and 11 days of tomorrow's Status Conference: Monday, July 3, 2023 (adding a day for next business day), for response to SOS written discovery and Monday, July 11, 2023, for response to AG written discovery.

| Event | Before Stay | Time Between Events in First Scheduling Order | Plaintiffs' 6/27 Proposal | Defendants' 6/28 Proposal | Time Betwee... Defendants' 6/... |
|---|---|---|---|---|---|
| ...ert Reports | 7/22/2022 | | 6/30/2023 | 6/30/2023 | |
| ...ness Lists | No date set | | 8/10/2023 | 8/10/2023 | 21 days before d... |
| ...pert Disclosures | 9/2/2022 | 6 weeks after P reports | 7/6/2023 | 8/11/2023 | 6 weeks after P r... |
| ...pert Reports | 9/9/2022 | 7 weeks after P reports | 7/21/2023 | 8/18/2023 | 7 weeks after P r... |
| ...uttal Expert Disclosures | No date set | | 7/25/2023 | 8/22/2023 | |
| ...close and file related motions | 10/17/2022 | | 8/31/2023 | 8/31/2023 | |
| ...uttal Expert Reports | 9/23/2022 | 2 weeks after D reports | 8/4/2023 | 9/1/2023 | 2 weeks after D r... |
| ...ur-Rebuttal Expert Disclosure | No date set | | 8/8/2023 | 9/5/2023 | |
| ...ur-Rebuttal Expert Reports | 10/7/2022 | 2 weeks after P reports | 8/11/2023 | 9/15/2023 | 2 weeks after P r... |
| ...ry close and file related motions | 10/21/2022 | 2 weeks after surrebuttals | 9/22/2023 | 9/29/2023 | 2 weeks after su... |
| ...Daubert motions | 10/28/2022 | 1 week later | 9/29/2023 | 10/6/2023 | 1 week later |
| ...rder | No date set | | 10/20/2023 | 10/20/2023 | |
| ...ngs of fact & conclusions of law | 12/12/2022 | 5 weeks prior to trial | 10/27/2023 | 10/23/2023 | 5 weeks prior to... |
| ...rence | 12/19/2022 | 4 weeks prior to trial | 11/2/2023 | 10/30/2023 | 4 weeks prior to... |
| | 12/23/2022 | 3 weeks prior to trial | 11/13/2023 | 11/6/2023 | 3 weeks prior to... |
| ...d to begin | 1/17/2023 | | 11/27/2023 | 11/27/2023 | |

We look forward to discussing.

App.038

Kate

**Katherine L. McKnight**
Partner

 **BakerHostetler**

Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com

---

**From:** McKnight, Katherine L.
**Sent:** Wednesday, June 28, 2023 9:04 AM
**To:** Sarah Brannon <sbrannon@aclu.org>; Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** RE: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

Sarah,

Thank you for your e-mail. Counsel for Defendants will be available to meet and confer this afternoon between 2pm and 4pm (Central)/3pm and 5pm (Eastern) and will look to circulate a proposal before we talk.

Would you pick a time in that window that works for your team and circulate a dial in?

Thanks,

Kate

**Katherine L. McKnight**
Partner
_____



**BakerHostetler**

Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1618

kmcknight@bakerlaw.com
bakerlaw.com

---

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Tuesday, June 27, 2023 12:08 PM
**To:** Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov; alyssa.riggins@nelsonmullins.com; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov; phil.strach@nelsonmullins.com; tom.farr@nelsonmullins.com; cassie.holt@nelsonmullins.com; BoutteM@ag.louisiana.gov; JamesM@ag.louisiana.gov; MurrillE@ag.louisiana.gov; BarbalichL@ag.louisiana.gov; WilliamsM@ag.louisiana.gov; john@scwllp.com; FreelA@ag.louisiana.gov; kimk@scwllp.com; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178 - Proposed Pre-Trial Schedule

[External Email: Use caution when clicking on links or opening attachments.]
Counsel,

As you are aware, we have a scheduling conference in this matter set now for Thursday, June 29, 2023 at 3:00 pm CT before Magistrate Judge Scott D. Johnson. In anticipation of that conference and to facilitate productive conversations about the schedule in this case, we have drafted a proposed schedule, which is attached here. And we request to meet and confer with you all to discuss our proposal before the conference with Magistrate Judge Johnson. Plaintiffs' counsel can be available on Weds, June 28th for a meet and confer. Please let us know what time would work best for you all.

Thank-you,
Sarah

App.040

**From:** Sarah Brannon <sbrannon@aclu.org>
**Sent:** Tuesday, June 20, 2023 11:57 AM
**To:** Phil Gordon <pgordon@HoltzmanVogel.com>; Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Ruth Greenwood <greenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>; WilliamsM@ag.louisiana.gov <WilliamsM@ag.louisiana.gov>; john@scwllp.com <john@scwllp.com>; FreelA@ag.louisiana.gov <FreelA@ag.louisiana.gov>; kimk@scwllp.com <kimk@scwllp.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; Sauceda, Carol <csauceda@bakerlaw.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Raile, Richard <rraile@bakerlaw.com>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jason Torchinsky <jtorchinsky@HoltzmanVogel.com>; Andrew Pardue <apardue@HoltzmanVogel.com>
**Subject:** Re: Nairne, et al. v. Ardoin, et al., No. 22-cv-178


Sorry for the oversight.  We will make sure to include these individuals in all future correspondence.


Sarah

---

**From:** Phil Gordon <pgordon@HoltzmanVogel.com>
**Sent:** Tuesday, June 20, 2023 11:32 AM
**To:** Thomas-Lundborg, Alora <tthomaslundborg@law.harvard.edu>; Stanko, Andrew <astanko@cozen.com>; Knehans, Dakota <dknehans@cozen.com>; Margulis, David <dmargulis@cozen.com>; Dayle Chung <dchung@naacpldf.org>; Dayton Campbell-Harris <DCampbell-Harris@aclu.org>; McDonald, Hallie <hmcdonald@cozen.com>; Jared Evans <jevans@naacpldf.org>; Erickson, Jessica <jerickson@cozen.com>; External - John Adcock <jnadcock@gmail.com>; Bahn, Josephine M. <jbahn@cozen.com>; Luis Manuel Rico Román <LRoman@aclu.org>; Megan Keenan <MKeenan@aclu.org>; mdeleeuw@cozen.com <mdeleeuw@cozen.com>; Engle-Hardy, Noelle <nengle-hardy@cozen.com>; Nora Ahmed <Nahmed@laaclu.org>; rsoloman@cozen.com <rsoloman@cozen.com>; Ron Wilson <cabral2@aol.com>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Sara Rohani <srohani@naacpldf.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Victoria Wenger <vwenger@naacpldf.org>; Greenwood, Ruth <rgreenwood@law.harvard.edu>; Sarah Brannon <sbrannon@aclu.org>
**Cc:** Giglio, Amanda <agiglio@cozen.com>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; WaleJ@ag.louisiana.gov <WaleJ@ag.louisiana.gov>; alyssa.riggins@nelsonmullins.com <alyssa.riggins@nelsonmullins.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; JonesCar@ag.louisiana.gov <JonesCar@ag.louisiana.gov>; phil.strach@nelsonmullins.com <phil.strach@nelsonmullins.com>; tom.farr@nelsonmullins.com <tom.farr@nelsonmullins.com>; cassie.holt@nelsonmullins.com <cassie.holt@nelsonmullins.com>; BoutteM@ag.louisiana.gov <BoutteM@ag.louisiana.gov>; JamesM@ag.louisiana.gov <JamesM@ag.louisiana.gov>; MurrillE@ag.louisiana.gov <MurrillE@ag.louisiana.gov>; BarbalichL@ag.louisiana.gov <BarbalichL@ag.louisiana.gov>;

[WilliamsM@ag.louisiana.gov](mailto:WilliamsM@ag.louisiana.gov) <[WilliamsM@ag.louisiana.gov](mailto:WilliamsM@ag.louisiana.gov)>; [john@scwllp.com](mailto:john@scwllp.com) <[john@scwllp.com](mailto:john@scwllp.com)>; [FreelA@ag.louisiana.gov](mailto:FreelA@ag.louisiana.gov) <[FreelA@ag.louisiana.gov](mailto:FreelA@ag.louisiana.gov)>; [kimk@scwllp.com](mailto:kimk@scwllp.com) <[kimk@scwllp.com](mailto:kimk@scwllp.com)>; Mengis, Michael W. <[mmengis@bakerlaw.com](mailto:mmengis@bakerlaw.com)>; Sauceda, Carol <[csauceda@bakerlaw.com](mailto:csauceda@bakerlaw.com)>; Braden, E. Mark <[MBraden@bakerlaw.com](mailto:MBraden@bakerlaw.com)>; Raile, Richard <[rraile@bakerlaw.com](mailto:rraile@bakerlaw.com)>; Lewis, Patrick T. <[plewis@bakerlaw.com](mailto:plewis@bakerlaw.com)>; Jason Torchinsky <[jtorchinsky@HoltzmanVogel.com](mailto:jtorchinsky@HoltzmanVogel.com)>; Andrew Pardue <[apardue@HoltzmanVogel.com](mailto:apardue@HoltzmanVogel.com)>
**Subject:** Nairne, et al. v. Ardoin, et al., No. 22-cv-178

Counsel,

Good morning.

It has come to my attention that there has been correspondence from Plaintiffs in the above captioned matter that omits a number of counsel for the State. Please add me, Jason Torchinsky, and Andrew Pardue to all future correspondence regarding this matter.

Thank you,

Phil Gordon



**PRIVILEGED AND CONFIDENTIAL**
**This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive the attorney-client, accountant-client, or other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above email address. Thank you.**

**DISCLAIMER**
**Any accounting, business or tax advice contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific issues, nor a substitute for a formal opinion, nor is it sufficient to avoid tax-related penalties. If desired, Holtzman Vogel Baran Torchinsky & Josefiak PLLC would be pleased to perform the requisite research and provide you with a detailed written analysis. Such an engagement may be the subject of a separate engagement letter that would define the scope and limits of the desired consultation services.**

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a

App.042

complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

App.043

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MINUTE ENTRY:
JULY 12, 2023
CHIEF DISTRICT JUDGE SHELLY D. DICK

PRESS ROBINSON, ET AL                          CIVIL ACTION

VERSUS
                                               NO. 22-211-SDD-SDJ
KYLE ARDOIN, ET AL

CONSOLIDATED WITH

EDWARD GALMON, SR., ET AL                       CIVIL ACTION

VERSUS
                                               NO. 22-214-SDD-SDJ
KYLE ARDOIN, ET AL


    This matter came on this day for a *Telephone Status Conference*.

    PRESENT:   Sarah E. Brannon, Esq.
                Counsel for Robinson Plaintiffs

                Lalitha D. Madduri, Esq.
                Counsel for Galmon Plaintiffs

                Katherine L. McKnight, Esq.
                Counsel for Defendants

    The parties discussed potential deadlines for proceedings for either the remedy phase of the preliminary injunction or trial on the merits.

    The Court takes this matter under advisement and will issue a scheduling order next week.

* * * * *

C:  CV 36; T: 30 mins

App.044

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, ET AL                                          CIVIL ACTION

VERSUS
                                                              NO. 22-211-SDD-SDJ
KYLE ARDOIN, ET AL

CONSOLIDATED WITH

EDWARD GALMON, SR., ET AL                                      CIVIL ACTION

VERSUS
                                                              NO. 22-214-SDD-SDJ
KYLE ARDOIN, ET AL

## O R D E R

The Court held a telephone status conference on July 12, 2023.

The parties filed Notices of their respective positions regarding the continuation of these proceedings following the stay lifted by the United States Supreme Court.

The Court ORDERS that the preliminary injunction hearing stayed by the United States Supreme Court, and which stay has been lifted, be and is hereby reset to October 3-5, 2023, at 9:00 a.m. in Courtroom Three.

The parties shall meet and confer and jointly submit a proposed pre-hearing scheduling order on or before Friday July 21, 2023.

Signed in Baton Rouge, Louisiana, on July 17, 2023.

_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

App.045

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with |
| v. | Civil Action No. 3:22-cv-00214-SDD-SDJ |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## DEFENDANTS' JOINT NOTICE OF PROPOSED PRE-HEARING SCHEDULE

This notice is filed in response to the Court's Order of July 17, 2023, Doc. 250, which "reset" the remedial preliminary injunction hearing in this case for October 3-5, 2023, and sets forth Defendants' proposed "pre-hearing scheduling order."[1] Defendants appreciate that the Court's Order contemplated this schedule being submitted "jointly" with Plaintiffs. Regrettably, this filing is not joint as the parties could not agree on basic principles about the upcoming hearing.

---

[1] Defendants opposed Plaintiffs' request to resume the remedial phase of the preliminary injunction proceedings, *see* Docs. 240 & 242, and instead urged the Court to schedule a trial on the merits before the end of 2023. *See* Doc. 243. This submission of a proposed schedule is made subject to, and without waiver of, Defendants' opposition to the resumption of remedial preliminary injunction proceedings.

App.046

Put more bluntly, Plaintiffs are attempting a bait-and-switch. During the July 12, 2023, status conference concerning the remedial phase of the preliminary injunction proceedings, Defendants expressed considerable concern about the length of time it would take to prepare for a completely restarted remedial proceeding with new proposed remedial plans. Defendants argued that the Court should instead proceed to a trial on the merits. During the conference, Plaintiffs represented to the Court that they would stand on the proposed remedial plan they jointly submitted on June 22, 2022, and that this case could proceed quickly to a preliminary remedial hearing. By making that representation, Plaintiffs set the bait. The Court granted Plaintiffs' request to resume the remedial proceedings rather than proceed to a trial, over Defendants' objections, and scheduled the hearing for October 3, 2023.

Then came the switch. Plaintiffs have now walked back their representations and seek a schedule that allows them nearly two months to develop and submit *new* remedial plans and that further deprives Defendants of an adequate opportunity to analyze and respond to those plans. For the reasons set forth in this Notice, the Court should hold Plaintiffs to their word, prohibit Plaintiffs from offering new remedial plans, and adopt Defendants' July 21, 2023, modified proposed schedule.

1.     On July 12, 2023, this Court held a telephone status conference, *see* Doc. 250, in response to Plaintiffs' motion requesting the Court resume the process of establishing a remedial plan that had been stayed by the Supreme Court of the United States in June 2022. *See* Doc. 227. After that conference, this Court ordered "that the preliminary injunction hearing stayed by the United States Supreme Court, and which stay has been lifted, be and is hereby reset to October 3-5, 2023." *See* Doc. 250. The court also ordered the parties to "meet and confer and jointly submit a proposed pre-hearing scheduling order on or before Friday July 21, 2023." *Id.*

App.047

The parties met and conferred on Thursday, July 20, 2023. In advance of that meeting, counsel for Defendants sent a proposed schedule to counsel for Plaintiffs on July 19, 2023. *See* Exhibit A at 5, 07/21/2023 Email Correspondence from Counsel for Legislative Intervenors. Defendants designed their proposal around their understanding of the Court's direction to the parties, and on Plaintiffs' representations to the Court, that the remedial phase would proceed based on the proposed remedial plan that Plaintiffs jointly submitted on June 22, 2022, *see* Joint Notice of Proposed Remedial Plan and Memorandum in Support, Doc. 225, pursuant to the Court's June 17, 2022, order. *See* Doc 206.

Defendants' proposal was designed to allow both Plaintiffs and Defendants to obtain and submit additional evidence (expert and factual) concerning the proposed plan, as well as a supplemental prehearing brief. *See* Ex. A at 5. The timing of Defendants' proposal is also reasonable—it contemplates Plaintiffs' supplemental reports to be provided over five weeks after their request to the Court to resume the remedial proceedings, *see* Doc. 240, and provides Defendants' experts with five weeks to respond. The subsequent deadlines for completing depositions, submitting supplemental briefing, and exchanging exhibits and witness lists were proposed based on the understanding that the parties would "pick up where they left off" in June 2022 and would *supplement* the existing record on the existing proposed plan, not wipe the slate clean and restart the remedial phase from scratch. Counsel for Defendants made this clear to Plaintiffs' counsel, stating that under Defendants' proposal, "Plaintiffs' supplemental reports will not be permitted to include any new remedial plans, per Plaintiffs' counsel's representations to the Court during last week's status conference." *See* Ex. A at 5.

2.  But Plaintiffs have refused to honor their representations to the Court of continuing with their existing joint proposed remedial plan, and have instead proposed a schedule that allows

them to submit new proposed plan(s). *See* Ex. A at 2–4. During the parties' July 20, 2023, conference, counsel for Plaintiffs asserted the right to submit new plans and claimed their prior contrary representations were expressly conditioned on this Court scheduling a hearing sooner than October, though defense counsel recalls no such caveat being made. The parties further discussed other aspects of each other's proposed schedules, including but not limited to the timing of disclosure of fact and expert lists and the amount of time Defendants would have to respond to Plaintiffs' expert submissions. (Plaintiffs had proposed giving Defendants just two weeks to respond to Plaintiffs' expert reports, which Plaintiffs had at least seven weeks—measuring from the date Plaintiffs filed their motion on June 27, 2023—to prepare, *see* Ex. A at 3–4).

In an attempt to reach a compromise, Defendants sent Plaintiffs the following modified proposed schedule on the morning of July 21, 2023:

| Defendants' July 21, 2023 Modified Proposed Schedule ||
| --- | --- |
| **Date** | **Deadline** |
| Friday, August 4, 2023 | Plaintiffs' Supplemental Expert Reports Due |
| Friday, ~~August 11, 2023~~ August 18, 2023 | Exchange Fact ~~& Expert~~ Witness Lists |
| Friday, September 8, 2023 | Defendants' Supplemental Expert Reports Due |
| Tuesday, September 12, 2023 | Exchange Supplemental Fact Witness Lists |
| ~~Friday, September 15, 2023~~ Tuesday, September 19, 2023 | Deadline for Fact and Expert Depositions |
| ~~Friday, September 22, 2023~~ Monday, September 25, 2023 | Supplemental Memorandum in Support and Memorandum in Opposition of Proposed Remedial Plan Due |
| Friday, September 29, 2023 | Exchange Final Witness Lists and Copies of Exhibits |
| Tuesday, October 3 to Thursday, October 5, 2023 | Preliminary Injunction Hearing on Remedy |

*See* Exhibit B at 2, 07/21/2023 Email Correspondence from Counsel for Legislative Intervenors.

While Plaintiffs also sent a modified proposed schedule, their proposal still allows Plaintiffs to submit new remedial plans. Importantly, however, Plaintiffs' counsel's clarified[2] that

---

[2] Plaintiffs also noted that they removed initial briefing in support of or in opposition to plans. *See* Ex. A at 2.

Plaintiffs "intend to submit no more than a single joint remedial plan." Plaintiffs' proposed modified schedule is as follows:

| Plaintiffs' July 21, 2023 Modified Proposed Schedule | |
|---|---|
| **Event** | **Plaintiffs' Amended Dates** |
| Deadline for the submission of any proposed plans and supporting expert reports | August 11, 2023 |
| Deadline for parties to exchange fact and expert witness lists | August 11, 2023 |
| Deadline for expert reports in response to any proposed plans | September 5, 2023 |
| Deadline for supplemental witness disclosures | September 8, 2023 |
| Deadline for fact and expert depositions | September 19, 2023 |
| Deadline for prehearing briefs | September 26, 2023 |
| Deadline to exchange copies of exhibits and final witness list | September 29, 2023 |
| Remedial hearing | October 3 to October 5, 2023 |

*See* Ex. A at 2–3.[3]

Because the parties were unable to resolve their fundamental disagreement on Plaintiffs' ability to submit a new remedial plan(s), they could not reach an agreement on a joint proposed pre-hearing schedule to file with the Court. *See* Ex. A at 2.

3. The Court should adopt Defendants' July 21, 2023, modified proposed schedule and reject Plaintiffs' attempt to start the remedial phase over from scratch. There is no reason to allow Plaintiffs to submit a new proposed remedial plan[4] when they urged the Court—over

---

[3] For clarity, this chart omits two columns from the one presented in Plaintiffs' email. The first removed column was the original schedule, and the second was a column Plaintiffs added for "Defendants' Proposed Deadline," because Defendants' modified proposed schedule did not contemplate the same events as Plaintiffs' proposal—among other differences, Defendants' proposal did not include deadlines "for the submission of any proposed plans and supporting expert reports" and required only the exchange of fact witness lists on August 18, 2023, and September 12, 2023.

[4] During the parties' meet and confer, the most Plaintiffs could offer as the reason for new plans was that "a lot has occurred" since they submitted their joint proposed remedial plan in June 2022.

App.050

Defendants' objections—to resume this process and to proceed rapidly based on their existing proposed remedial plan. Plaintiffs submitted that plan over a year ago, supported it with expert reports and briefing, and were ready to proceed to a hearing less than 24 hours before the Supreme Court stayed this action. *See* Doc. 225. Defendants responded (in the extremely compressed five calendar days the Court permitted) with their own evidentiary submission and briefing opposing Plaintiffs' proposed plan.

If Plaintiffs are held to their joint proposed remedial plan, as they represented they would stick to on July 12, 2023, and which is most consistent with the Court's July 17, 2023, Order "resetting" the previous preliminary injunction hearing, then both parties and their experts can be working now to supplement the record on that plan. In fact, Defendants have been preparing based on Plaintiffs' representations and the Court's direction that this case would be proceeding on Plaintiffs' existing joint proposed plan. But, as counsel for Defendants made clear during the July 12, 2023, status conference, if Plaintiffs submit new plan(s), Defendants and their experts would be required to re-do their analyses, which is a significant and time-consuming undertaking. What is more, even under Plaintiffs' modified proposal, Defendants would lose valuable time over the next three weeks while they wait for Plaintiffs' new submission on August 11, 2023, which is still over six weeks after Plaintiffs asked this Court to resume the remedial phase proceedings and time they could have—and likely have been—working on new submissions. Plaintiffs have offered no explanation for their need for this length of time to submit a new plan.

But Plaintiffs did not specify what had "occurred" that required them to scrap the remedial plan they asked the Court to impose on Louisiana just last year. To the extent Plaintiffs seek to offer analyses of 2022 election results, those analyses can be conducted of Plaintiffs' prior joint proposed plan, and cannot serve as the basis for a new plan.

App.051

While Plaintiffs' modified proposal allowed Defendants more time to respond than the two weeks in their initial proposal, Plaintiffs would still only provide Defendants and their experts just 25 calendar days (including Labor Day weekend)[5] to re-do those analyses and responses at the same time that Defendants, and potentially several of the same experts, will be working to meet the Court's deadlines in *Nairne, et al. v. Ardoin*. *See* Case No. 3:22-cv-00178, Doc. 100 (setting August 21, 2023 as the deadline for "Defendant/Intervenors' Sur-Rebuttal Expert Reports," September 1, 2023 as the deadline for "Completing Fact Discovery and Related Motions," September 29, 2023 as the deadline for "Completing Expert Discovery," etc.). There is simply no need to allow Plaintiffs to start over, or to deprive Defendants of a meaningful opportunity to respond and fully develop the record on a proposed plan, as Plaintiffs' proposed schedule demands.

4.      Defendants' proposal is designed to allow the parties to focus their time and resources on supplementing the record on Plaintiffs' joint proposed plan. To be clear, Defendants' supplementation may include new fact and expert witnesses who were not offered during the very expedited remedial phase proceedings that had been scheduled in 2022 before the Supreme Court stay, which only afforded Defendants five days to analyze and respond to Plaintiffs' proposed remedial plan and prevented Defendants from submitting an appropriate expert and factual record. But Defendants' proposal grants Plaintiffs that same latitude. This type of supplementation would focus on Plaintiffs' joint proposed plan, and will allow the Court to evaluate a proposed preliminary remedy in this case based on an appropriately robust record given the enormity of the relief Plaintiffs seek.

---

[5] Defendants strongly object to the introduction of any new remedial plans by Plaintiffs at this stay. Without waiving that objection, if the Court is inclined to allow any new plans, then Defendants request a schedule that allows Defendants and their experts at least 28 days to analyze and respond to those plans.

Defendants respectfully ask the Court to reject Plaintiffs' proposed schedule and to adopt the July 21, 2023, modified proposed schedule set forth by Defendants above. A proposed order is enclosed herewith.

Respectfully submitted,

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com
* *Admitted pro hac vice*

/s/ John C. Walsh

John C. Walsh (Louisiana Bar Roll No. 24903)
john@scwllp.com
**SHOWS, CALI & WALSH, L.L.P.**
P.O. Box 4046
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561

/s/ Erika Dackin Prouty

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

/s/ Phillip J. Strach* (Lead Counsel)

phillip.strach@nelsonmullins.com
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com

App.053

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in
his official capacity as Secretary of State of
Louisiana*

**Jeff Landry
Louisiana Attorney General**

*/s/ Carey Tom Jones*

Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com


Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com
*admitted pro hac vice*

Elizabeth B. Murrill (LSBA No. 20685)
Solicitor General
Shae McPhee (LSBA No. 38565)
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov
walej@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I certify that on July 21, 2023, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Erika Dackin Prouty
Erika Dackin Prouty (admitted pro hac vice)
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with |
| v. | Civil Action No. 3:22-cv-00214-SDD-SDJ |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## [PROPOSED] SCHEDULING ORDER FOR PRELIMINARY INJUNCTION HEARING

The Court, upon consideration of the proposed schedules for the forthcoming October 3-5, 2023, preliminary-injunction hearing submitted by the parties in accordance with the Court's order of July 17, 2023 (ECF No. 250), hereby adopts the following pre-hearing schedule to govern the preliminary-injunction hearing reset for October 3-5, 2023:

| Date | Deadline |
|---|---|
| Friday, August 4, 2023 | Plaintiffs' Supplemental Expert Reports/Disclosures Due |
| Friday, August 18, 2023 | Parties to Exchange Fact Witness Lists |
| Friday, September 8, 2023 | Defendants' Supplemental Expert Reports/Disclosures Due |
| Tuesday, September 12, 2023 | Exchange Supplemental Fact Witness Lists |
| Tuesday, September 19, 2023 | Deadline for Fact and Expert Depositions |
| Monday, September 25, 2023 | Supplemental Memorandum in Support and Memorandum in Opposition of Proposed Remedial Plan Due |
| Friday, September 29, 2023 | Parties to Exchange Final Witness Lists and Copies of Exhibits |

App.056

The parties may not submit new proposed remedial plans. The Court will consider the plan submitted on June 22, 2022, in accordance with its Order of June 17, 2022 (ECF No. 206).

IT IS SO ORDERED.

_____

UNITED STATES DISTRICT JUDGE

# Exhibit A

| From: | Lewis, Patrick T. |
|---|---|
| To: | Lali Madduri; Prouty, Erika Dackin; McKnight, Katherine L.; Phil Strach; Murrill, Elizabeth; Alyssa Riggins; Freel, Angelique; Jones, Carey; Cassie Holt; Jason Torchinsky; Wale, Jeffrey M.; John Branch; Mengis, Michael W.; McPhee, Shae; Tom Farr; Braden, E. Mark; Dallin Holt; john@scwllp.com; Raile, Richard |
| Cc: | Abha Khanna; Jacob Shelly; Jonathan Hawley; Alison (Qizhou) Ge; J. Cullens; S. Layne Lee; Andrée M. Cullens; Savitt, Adam P; Amitav Chakraborty; Jonathan Hurwitz; Leah Aden; Sarah Brannon; Stuart Naifeh; Alora Thomas; Victoria Wenger; Nora Ahmed; Sara Rohani; Sophia LIn Lakin; Jared Evans; John Adcock; tracie.washington.esq@gmail.com; Megan Keenan |
| Subject: | RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule |
| Date: | Friday, July 21, 2023 2:31:57 PM |
| Attachments: | image001.png<br>image002.png<br>image003.png |

Dear Counsel,

Thanks for your email. We appreciate your effort below to address some of the concerns we raised about Plaintiffs' proposed schedule. However, we continue to have a foundational disagreement over Plaintiffs' claimed right to restart the remedial phase of this case with a new plan submission, which was inconsistent with the representations Plaintiffs made to the Court on July 12, 2023, that they would stand on their 2022 remedial plan submission. Your schedule below is entirely designed around a new plan submission, and our schedule is entirely designed around additional evidence concerning Plaintiffs' existing remedial plan submission.

Because of this fundamental disagreement about approach, we will not be able to consent to your proposed schedule. Procedurally, we believe the appropriate next step is to submit our proposed schedules separately, as our differences are not of the type that lend themselves to inclusion in a joint filing. We believe that providing the Court a "joint submission" that consists of different schedules (and explanations for the schedules) would elevate form over substance.

Finally, we ask that Plaintiffs refrain from presenting the Court with the chart below as the summary of the parties' differences. While I understand why you presented the dates in that manner to us for negotiation purposes, if presented to the Court, the chart could inaccurately suggest that Defendants proposed a schedule that included a "submission of new plans" when Defendants did not.

Please let us know if you have any further questions.

Sincerely,

pl

**Patrick Lewis**
Partner

BakerHostetler

Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7096

plewis@bakerlaw.com
bakerlaw.com



---

**From:** Lali Madduri <lmadduri@elias.law>
**Sent:** Friday, July 21, 2023 11:33 AM
**To:** Prouty, Erika Dackin <eprouty@bakerlaw.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Counsel,

See below for an amended proposed schedule. Plaintiffs' updated schedule incorporates changes that reflect the points Defendants raised during yesterday's meet and confer. We've also removed initial briefing in support of in opposition to plans. Plaintiffs can also represent that we intend to submit no more than a single joint remedial plan.

| Event | Defendants' Proposed Deadline | Plaintiffs' Proposed Deadline | Plaintiffs' Amended Dates |
|---|---|---|---|
| Deadline for the submission of any proposed plans and supporting expert reports | August 4, 2023 | August 15, 2023 | August 11, 2023 |
| Deadline for parties to exchange fact and | August 11, 2023 | September 1, 2023 | August 11, 2023 |

| | | | |
|---|---|---|---|
| expert witness lists | | | |
| Deadline for expert reports in response to any proposed plans | September 8, 2023 | August 29, 2023 | September 5, 2023 |
| Deadline for supplemental witness disclosures | | | September 8, 2023 |
| Deadline for fact and expert depositions | September 15, 2023 | September 19, 2023 | September 19, 2023 |
| Deadline for prehearing briefs | September 22, 2023 | September 26, 2023 | September 26, 2023 |
| Deadline to exchange copies of exhibits and final witness list | September 29, 2023 | September 26, 2023 | September 29, 2023 |
| Remedial hearing | October 3 to October 5, 2023 | October 3 to October 5, 2023 | October 3 to October 5, 2023 |

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Lali Madduri
**Sent:** Thursday, July 20, 2023 12:50 PM
**To:** Prouty, Erika Dackin <eprouty@bakerlaw.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia Lin Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Counsel,

See below for Plaintiffs' proposed schedule. Looking forward to discussing this afternoon.

| Event | Defendants' Proposed Deadline | Plaintiffs' Proposed Deadline |
|---|---|---|
| Deadline for the submission of plaintiffs' proposed map, supporting memoranda, and expert reports | Friday, August 4, 2023 | Tuesday, August 15, 2023 |
| Deadline for defendants' responses to plaintiffs' proposed map and expert | Friday, September 8, 2023 | Tuesday, August 29, 2023 |

| | | |
|---|---|---|
| reports | | |
| Deadline for parties to exchange fact and expert witness lists | Friday, August 11, 2023 | Friday, September 1, 2023 |
| Deadline for fact and expert depositions | Friday, September 15, 2023 | Tuesday, September 19, 2023 |
| Deadline for supplemental memoranda in support of or in opposition to the proposed remedial maps | Friday, September 22, 2023 | Tuesday, September 26, 2023 |
| Deadline to exchange final witness lists and copies of exhibits | Friday, September 29, 2023 | Tuesday, September 26, 2023 |
| Remedial hearing | Tuesday, October 3 to Thursday, October 5, 2023 | Tuesday, October 3 to Thursday, October 5, 2023 |

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Lali Madduri
**Sent:** Wednesday, July 19, 2023 5:37 PM
**To:** Prouty, Erika Dackin <eprouty@bakerlaw.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <jcullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia Lin Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Thanks, Erika. We'll send a Teams link for 4-5 tomorrow.

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Prouty, Erika Dackin <eprouty@bakerlaw.com>
**Sent:** Wednesday, July 19, 2023 4:02 PM
**To:** Lali Madduri <lmadduri@elias.law>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <jcullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia Lin Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Dear Counsel,

On behalf of the Defendant/Intervenors, we are available tomorrow between 3:30pm to 5pm ET tomorrow to meet and confer to discuss a proposed pre-hearing schedule.

In preparation for that meet and confer, below is Defendant/Intervenors' proposal for the pre-hearing schedule. To be clear, Plaintiffs' supplemental expert reports will not be permitted to include any new remedial plans, per Plaintiffs' counsel's representations to the Court during last week's status conference.

| Date | Deadline |
|---|---|
| Friday, August 4, 2023 | Plaintiffs' Supplemental Expert Reports Due |
| Friday, August 11, 2023 | Exchange Fact & Expert Witness Lists |
| Friday, September 8, 2023 | Defendants' Supplemental Expert Reports Due |
| Friday, September 15, 2023 | Deadline for Fact and Expert Depositions |
| Friday, September 22, 2023 | Supplemental Memorandum in Support and Memorandum in Opposition of Proposed Remedial Plan Due |
| Friday, September 29, 2023 | Exchange Final Witness Lists and Copies of Exhibits |
| Tuesday, October 3 to Thursday, October 5, 2023 | Preliminary Injunction Hearing on Remedy |

Sincerely,

**Erika Prouty**
Associate

**BakerHostetler**
200 Civic Center Drive | Suite 1200
Columbus, OH 43215-4138
T +1.614.462.4710

eprouty@bakerlaw.com
bakerlaw.com

---

**From:** Lali Madduri <lmadduri@elias.law>
**Sent:** Tuesday, July 18, 2023 5:16 PM
**To:** McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

[External Email: Use caution when clicking on links or opening attachments.]

Counsel,

I am writing on behalf of the Galmon and Robinson Plaintiffs. Per yesterday's Court order, are defense counsel available on Thursday 7/20 between 3 and 5pm ET to meet and confer regarding a pre-hearing schedule?

Thanks,
Lali

**Lali Madduri**
Counsel

**Elias Law Group LLP**

202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

# Exhibit B

| From: | Lewis, Patrick T. |
|---|---|
| To: | Lali Madduri; Prouty, Erika Dackin; McKnight, Katherine L.; Phil Strach; Murrill, Elizabeth; Alyssa Riggins; Freel, Angelique; Jones, Carey; Cassie Holt; Jason Torchinsky; Wale, Jeffrey M.; John Branch; Mengis, Michael W.; McPhee, Shae; Tom Farr; Braden, E. Mark; Dallin Holt; john@scwllp.com; Raile, Richard |
| Cc: | Abha Khanna; Jacob Shelly; Jonathan Hawley; Alison (Qizhou) Ge; J. Cullens; S. Layne Lee; Andrée M. Cullens; Savitt, Adam P; Amitav Chakraborty; Jonathan Hurwitz; Leah Aden; Sarah Brannon; Stuart Naifeh; Alora Thomas; Victoria Wenger; Nora Ahmed; Sara Rohani; Sophia LIn Lakin; Jared Evans; John Adcock; tracie.washington.esq@gmail.com; Megan Keenan |
| Subject: | RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule |
| Date: | Friday, July 21, 2023 11:14:21 AM |
| Attachments: | image001.png<br>image002.png<br>image003.png |

Counsel,

Thank you for your time yesterday to discuss a proposed pre-hearing schedule. As Defendant/Intervenors have explained, we oppose any attempts by Plaintiffs to offer a new remedial plan at this stage and cannot agree to a schedule that allows Plaintiffs to submit new maps and that provides Defendant/Intervenors with just two weeks to respond to brand new maps and analyses.

We have modified our proposal below to reflect Plaintiffs' concern with the timing of identification of witnesses and adjusted the deposition and briefing deadlines to reflect supplementation of fact witness lists:

| Date | Deadline |
|---|---|
| Friday, August 4, 2023 | Plaintiffs' Supplemental Expert Reports Due |
| Friday, ~~August 11, 2023~~ August 18, 2023 | Exchange Fact ~~& Expert~~ Witness Lists |
| Friday, September 8, 2023 | Defendants' Supplemental Expert Reports Due |
| Tuesday, September 12, 2023 | Exchange Supplemental Fact Witness Lists |
| ~~Friday, September 15, 2023~~ Tuesday, September 19, 2023 | Deadline for Fact and Expert Depositions |
| ~~Friday, September 22, 2023~~ Monday, September 25, 2023 | Supplemental Memorandum in Support and Memorandum in Opposition of Proposed Remedial Plan Due |
| Friday, September 29, 2023 | Exchange Final Witness Lists and Copies of Exhibits |
| Tuesday, October 3 to Thursday, October 5, 2023 | Preliminary Injunction Hearing on Remedy |

Please let us know by 2:00 pm ET if Plaintiffs if Plaintiffs agree to this proposed schedule. If Plaintiffs do not agree, we will file a separate notice with the Court setting forth Defendant/Intervenors' proposal.

Sincerely,

pl

**Patrick Lewis**
Partner

---

**BakerHostetler**
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7096

plewis@bakerlaw.com
bakerlaw.com



---

**From:** Lali Madduri <lmadduri@elias.law>
**Sent:** Thursday, July 20, 2023 12:50 PM
**To:** Prouty, Erika Dackin <eprouty@bakerlaw.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins

<alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Counsel,

See below for Plaintiffs' proposed schedule. Looking forward to discussing this afternoon.

| Event | Defendants' Proposed Deadline | Plaintiffs' Proposed Deadline |
|---|---|---|
| Deadline for the submission of plaintiffs' proposed map, supporting memoranda, and expert reports | Friday, August 4, 2023 | Tuesday, August 15, 2023 |
| Deadline for defendants' responses to plaintiffs' proposed map and expert reports | Friday, September 8, 2023 | Tuesday, August 29, 2023 |
| Deadline for parties to exchange fact and expert witness lists | Friday, August 11, 2023 | Friday, September 1, 2023 |
| Deadline for fact and expert depositions | Friday, September 15, 2023 | Tuesday, September 19, 2023 |
| Deadline for supplemental memoranda in support of or in opposition to the proposed remedial maps | Friday, September 22, 2023 | Tuesday, September 26, 2023 |
| Deadline to exchange final witness lists and copies of exhibits | Friday, September 29, 2023 | Tuesday, September 26, 2023 |
| Remedial hearing | Tuesday, October 3 to Thursday, October 5, 2023 | Tuesday, October 3 to Thursday, October 5, 2023 |

App.066

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Lali Madduri
**Sent:** Wednesday, July 19, 2023 5:37 PM
**To:** Prouty, Erika Dackin <eprouty@bakerlaw.com>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Thanks, Erika. We'll send a Teams link for 4-5 tomorrow.

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** Prouty, Erika Dackin <eprouty@bakerlaw.com>

**Sent:** Wednesday, July 19, 2023 4:02 PM
**To:** Lali Madduri <lmadduri@elias.law>; McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** RE: Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

Dear Counsel,

On behalf of the Defendant/Intervenors, we are available tomorrow between 3:30pm to 5pm ET tomorrow to meet and confer to discuss a proposed pre-hearing schedule.

In preparation for that meet and confer, below is Defendant/Intervenors' proposal for the pre-hearing schedule. To be clear, Plaintiffs' supplemental expert reports will not be permitted to include any new remedial plans, per Plaintiffs' counsel's representations to the Court during last week's status conference.

| Date | Deadline |
|---|---|
| Friday, August 4, 2023 | Plaintiffs' Supplemental Expert Reports Due |
| Friday, August 11, 2023 | Exchange Fact & Expert Witness Lists |
| Friday, September 8, 2023 | Defendants' Supplemental Expert Reports Due |
| Friday, September 15, 2023 | Deadline for Fact and Expert Depositions |
| Friday, September 22, 2023 | Supplemental Memorandum in Support and Memorandum in Opposition of Proposed Remedial Plan Due |
| Friday, September 29, 2023 | Exchange Final Witness Lists and Copies of Exhibits |
| Tuesday, October 3 to Thursday, October 5, 2023 | Preliminary Injunction Hearing on Remedy |

Sincerely,

**Erika Prouty**
Associate

**BakerHostetler**
200 Civic Center Drive | Suite 1200
Columbus, OH 43215-4138
T +1.614.462.4710

eprouty@bakerlaw.com
bakerlaw.com



**From:** Lali Madduri <lmadduri@elias.law>
**Sent:** Tuesday, July 18, 2023 5:16 PM
**To:** McKnight, Katherine L. <kmcknight@bakerlaw.com>; Phil Strach <phil.strach@nelsonmullins.com>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; Prouty, Erika Dackin <eprouty@bakerlaw.com>; Alyssa Riggins <alyssa.riggins@nelsonmullins.com>; Freel, Angelique <FreelA@ag.louisiana.gov>; Lewis, Patrick T. <plewis@bakerlaw.com>; Jones, Carey <JonesCar@ag.louisiana.gov>; Cassie Holt <cassie.holt@nelsonmullins.com>; Jason Torchinsky <jtorchinsky@holtzmanvogel.com>; Wale, Jeffrey M. <WaleJ@ag.louisiana.gov>; John Branch <john.branch@nelsonmullins.com>; Mengis, Michael W. <mmengis@bakerlaw.com>; McPhee, Shae <McPheeS@ag.louisiana.gov>; Tom Farr <tom.farr@nelsonmullins.com>; Braden, E. Mark <MBraden@bakerlaw.com>; Dallin Holt <dholt@holtzmanvogel.com>; john@scwllp.com; Raile, Richard <rraile@bakerlaw.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Jacob Shelly <jshelly@elias.law>; Jonathan Hawley <jhawley@elias.law>; Alison (Qizhou) Ge <age@elias.law>; J. Cullens <cullens@lawbr.net>; S. Layne Lee <laynelee@lawbr.net>; Andrée M. Cullens <acullens@lawbr.net>; Savitt, Adam P <asavitt@paulweiss.com>; Amitav Chakraborty <achakraborty@paulweiss.com>; Jonathan Hurwitz <jhurwitz@paulweiss.com>; Leah Aden <laden@naacpldf.org>; Sarah Brannon <sbrannon@aclu.org>; Stuart Naifeh <snaifeh@naacpldf.org>; Alora Thomas <athomas@aclu.org>; Victoria Wenger <vwenger@naacpldf.org>; Nora Ahmed <Nahmed@laaclu.org>; Sara Rohani <SRohani@naacpldf.org>; Sophia LIn Lakin <slakin@aclu.org>; Jared Evans <jevans@naacpldf.org>; John Adcock <jnadcock@gmail.com>; tracie.washington.esq@gmail.com; Megan Keenan <MKeenan@aclu.org>
**Subject:** Robinson v. Ardoin / Galmon v. Ardoin -- Meet and Confer re Pre-Hearing Schedule

[External Email: Use caution when clicking on links or opening attachments.]

Counsel,

I am writing on behalf of the Galmon and Robinson Plaintiffs. Per yesterday's Court order, are defense counsel available on Thursday 7/20 between 3 and 5pm ET to meet and confer regarding a pre-hearing schedule?

Thanks,
Lali

**Lali Madduri**
Counsel
**Elias Law Group LLP**
202-968-4593

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content

of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE,<br><br>     *Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>   *Defendant*. | Civil Action No. 3:22-cv-00211-SDD-RLB |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, TRAMELLE HOWARD,<br><br>     *Plaintiffs*,<br><br>v.<br><br>KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana.<br><br>   *Defendant*. | Civil Action No. 3:22-cv-00214-SDD-RLB |

App.071

**_ROBINSON_ AND _GALMON_ PLAINTIFFS' PROPOSED PREHEARING SCHEDULE**

On July 17, 2023, the Court set a hearing on a remedy under the preliminary injunction entered on June 6, 2022, and ordered that the parties meet and confer and submit a proposed pre-hearing scheduling order. Between July 19 and 21, 2023, the parties exchanged initial proposed schedules, met-and-conferred, and exchanged revised proposals. The parties have not been able to reach consensus on the case schedule. The Plaintiffs propose the following schedule for prehearing discovery, briefing, and exchange of witness and exhibit lists.

| Event | Plaintiffs' Proposed Deadline | Time from Order Setting Hearing Dates |
|---|---|---|
| Submission of proposed plans and expert reports in support | 8/11/2023 | 25 days |
| Exchange of fact and expert witness disclosures | 8/11/2023 | 25 days |
| Submission of responsive expert reports | 9/5/2023 | 50 days |
| Exchange of supplemental witness disclosures | 9/8/2023 | 53 days |
| Deadline for fact and expert depositions | 9/19/2023 | 64 days |
| Prehearing briefs | 9/26/2023 | 71 days |
| Final witness and exhibits lists | 9/29/2023 | 74 days |
| Remedial hearing | 10/3/2023-10/5/2023 | 78 days |

Plaintiffs' proposed schedule allows for any party, including the Defendant or Defendant-Intervenors, to submit a new or amended map along with supporting expert evidence. Consistent with the Court's 2022 remedial orders, the _Robinson_ and _Galmon_ Plaintiffs intend to jointly submit at most one map. Providing Plaintiffs the opportunity to propose a new map will provide for a more robust remedial process by allowing Plaintiffs to incorporate new election data and

App.072

accommodate concerns raised by Defendants in opposition to the initial remedial map Plaintiffs proposed in 2022. Plaintiffs' proposal also allows Defendants a new opportunity to submit a proposed map, consistent with the Court's approach to the remedial proceedings initiated last year.[1]

By contrast, Defendants decline to even contemplate a schedule that accommodates the submission of a new proposed map, despite the two and a half months between the Court's order and the hearing. Defendants have offered no reason as to why the parties should be precluded from offering a new proposed map that takes account of the most recent election data and better addresses concerns raised during last year's remedial proceedings.[2] Under the Court's schedule, there is ample time for the parties to consider new proposed maps; indeed, the two and a half months between the Court's setting of the remedial hearing (July 17) and the hearing itself (October 3) is almost two months more than provided during the initial remedial proceedings last year.

Although Plaintiffs believe the Court's schedule allows for sufficient time for the consideration of new maps, should the Court order that no new maps may be proposed, Plaintiffs respectfully request that the Court also decline to permit additional expert briefing from any party on the original maps. Plaintiffs and Defendants have already submitted expert reports in support of and in opposition to the map Plaintiffs proposed during the June 2022 remedial proceedings, and—with the exception of one deposition of Defendant's expert, which was interrupted by the issuance of the stay from the U.S. Supreme Court—expert depositions are complete. Under this

---

[1] Any schedule the Court adopts that allows for new maps should require all parties—including Defendants, if they choose to do so—to produce their proposed maps and any supporting expert reports by the same deadline—under Plaintiffs' proposed schedule, by August 11, 2023.

[2] Defendants claim that Plaintiffs stated an intention not to alter the remedial map they submitted in June 2022, but Plaintiffs intended only to state that should no further map submissions be permitted, a remedial hearing could be set within a couple of weeks of the status conference on July 12, 2023. The Court has now set the remedial hearing for nearly 2.5 months from today, providing ample time to consider more up-to-date maps.

App.073

alternative proposal, Plaintiffs and Defendants would meet and confer to reschedule the pending expert deposition, schedule an exchange of fact witness lists and depositions of fact witnesses, and set a deadline for pre-hearing briefs.

App.074

Date: July 21, 2023                    Respectfully submitted,


By: /s/Abha Khanna                     By: /s/ John Adcock
Abha Khanna                            John Adcock
Jonathan P. Hawley                     Adcock Law LLC
ELIAS LAW GROUP LLP                    3110 Canal Street
1700 Seventh Ave. Suite 2100           New Orleans, LA 70119
Seattle, Washington 98101              Tel: (504) 233-3125
(206) 656-0177                         jnadcock@gmail.com
akhanna@elias.law
jhawley@elias.law                      Stuart Naifeh (admitted *pro hac vice*)
                                       Leah Aden (admitted *pro hac vice*)
Lalitha D. Madduri                     Victoria Wenger (admitted *pro hac vice*)
Jacob D. Shelly                        NAACP Legal Defense and Educational
ELIAS LAW GROUP LLP                    Fund, Inc.
250 Massachusetts Ave, NW Suite 400    40 Rector Street, 5th Floor
Washington, D.C. 20001                 New York, NY 10006
(202) 968-4490                         Tel: (212) 965-2200
lmadduri@elias.law                     laden@naacplef.org
jshelly@elias.law                      snaifeh@naacpldf.org
                                       vwenger@naacpldf.org
J. E. Cullens, Jr.
Andrée Matherne Cullens                Jonathan H. Hurwitz
S. Layne Lee                           Robert A. Atkins
WALTERS, THOMAS, CULLENS, LLC          Yahonnes Cleary
12345 Perkins Road, Bldg. One          Amitav Chakraborty
Baton Rouge, LA 70810                  Adam P. Savitt
(225) 236-3636                         PAUL, WEISS, RIFKIND, WHARTON &
                                       GARRISON LLP
*Counsel for Galmon Plaintiffs*        1285 Avenue Of The Americas, New
                                       York, NY 10019
                                       Tel.: (212) 373-3000
                                       Fax: (212) 757-3990
                                       jhurwitz@paulweiss.com
                                       ratkins@paulweiss.com
                                       ycleary@paulweiss.com
                                       achakraborty@paulweiss.com
                                       asavitt@paulweiss.com


                                       *Counsel for Robinson Plaintiffs*
                                       (Continued on next page)

App.075

Sarah Brannon
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

R. Jared Evans
I. Sara Rohani (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org


Tracie L. Washington
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

Sophia Lin Lakin
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org

T. Alora Thomas-Lundborg
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu

Nora Ahmed
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
msnider@laaclu.org

*Counsel for Robinson Plaintiffs*

App.076

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | Consolidated with Civil Action No. 3:22-cv-00214-SDD-SDJ |
| v. | |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## EMERGENCY MOTION TO CANCEL HEARING ON REMEDY AND TO ENTER A SCHEDULING ORDER FOR TRIAL

Attorney General Jeff Landry, on behalf of the State of Louisiana, Secretary of State Kyle Ardoin, Clay Schexnayder, Speaker of the Louisiana House of Representatives, and Patrick Page Cortez, President of the Louisiana Senate, each in their respective official capacities (collectively "Defendants") seek an Emergency Motion to Reset Deadlines and Request that this Matter be Set for Trial (hereinafter, "Emergency Motion").

1.

The Court should immediately cancel the currently scheduled remedial proceeding set for October 3rd and set this matter for a trial on the merits with sufficient time for any appeals to be resolved prior to the 2024 congressional elections.

2.

The following are all causing extreme prejudice to Defendants: (1) the delay of over a month and counting for a schedule prior to the remedial hearing on Plaintiffs' motion for preliminary injunction to be set (as well as Plaintiffs' inaction absent a schedule); (2) the failure to set a date or scheduling order for a prompt trial on the merits; and (3) the lack of jurisdiction to commence a remedial proceeding. Defendants require a prompt decision given the impending remedial proceeding.

3.

Defendants sought consent from Plaintiffs for the relief sought herein. Plaintiffs oppose such relief.

4.

Defendants also contemporaneously filed a motion to expedite the decision on this motion, seeking a ruling by September 8, 2023.

5.

Therefore, for the reasons more fully explained in Defendants' memorandum in support, Defendants respectfully request the Court cancel the remedial proceeding currently scheduled for October 3-5 and set this matter for trial on the merits to be conducted with sufficient time for any appeals prior to the 2024 congressional elections.

Dated: August 25, 2023

/s/ John C. Walsh
John C. Walsh, LA Bar Roll No. 24903
**SHOWS, CALL & WALSH, L.L.P**
Batton Rouge, LA 70821
Ph: (225) 383-1461
Fax: (225) 346-5561

/s/ Phillip J. Strach
Phillip J. Strach*
phillip.strach@nelsonmullins.com
    *Lead Counsel for Secretary Ardoin*
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*

2

App.078

john@scwllp.com

john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Ph: (919) 329-3800

* admitted *pro hac vice*

*Counsel for Defendant R. Kyle Ardoin, in his
official capacity as Secretary of State of
Louisiana*

---

/s/ Michael W. Mengis

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com
Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

* *Admitted pro hac vice*

---

/s/ Erika Dackin Prouty

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay
Schexnayder, in his Official Capacity as
Speaker of the Louisiana House of
Representatives, and of Patrick Page Cortez, in
his Official Capacity as President of the
Louisiana Senate*

3

Jeff Landry
Louisiana Attorney General

Jason B. Torchinsky (DC 976033)*
Phillip M. Gordon (DC 1531277)*
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 phone
(540) 341-8809 fax
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
*admitted pro hac vice

*/s/Angelique Duhon Freel*
Elizabeth B. Murrill (LSBA No. 20685)
Shae McPhee (LSBA No. 38565)
Morgan Brungard (CO Bar No. 50265)*
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Jeffrey M. Wale (LSBA No. 36070)
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
freela@ag.louisiana.gov
walej@ag.louisiana.gov
jonescar@ag.louisiana.gov
mcphees@ag.louisiana.gov
brungardm@ag.louisiana.gov

*Counsel for Defendant, State of Louisiana*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 25th day of August 2023, the foregoing has been filed with the Clerk via the CM/ECF system that has sent a Notice of Electronic filing to all counsel of record.

*/s/ Jeffrey M. Wale*
Jeffrey M. Wale

App.080

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PRESS ROBINSON, et al., | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00211-SDD-SDJ |
| v. | |
| | Chief Judge Shelly D. Dick |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |
| EDWARD GALMON, SR., et al., | |
| *Plaintiffs,* | |
| v. | Consolidated with Civil Action No. 3:22-cv-00214-SDD-SDJ |
| R. KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant.* | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION TO CANCEL HEARING ON REMEDY AND TO ENTER A SCHEDULING ORDER FOR TRIAL

Attorney General Jeff Landry, on behalf of the State of Louisiana, Secretary of State Kyle Ardoin, Clay Schexnayder, Speaker of the Louisiana House of Representatives, and Patrick Page Cortez, President of the Louisiana Senate, each in their respective official capacities (collectively "Defendants") present this Memorandum in Support of their Motion to Cancel Hearing on Remedy and to Enter a Scheduling Order for a Trial on the Merits. Due to the fast-approaching hearing, a response by Plaintiffs is respectfully requested by Wednesday, August 30th, and a decision is

respectfully requested by Friday, September 8th. A companion motion for expedited review will be filed shortly after the instant motion.

## RELEVANT BACKGROUND

On July 17, 2023, the Court ordered "that the preliminary injunction hearing stayed by the United States Supreme Court, and which stay has been lifted, be and is hereby reset to October 3-5, 2023, at 9:00 a.m." (ECF No. 250). The Court further directed that "[t]he parties shall meet and confer and jointly submit a proposed pre-hearing scheduling order on or before Friday July 21, 2023." *Id*. The parties met and conferred in good faith and were unable to reach complete agreement with respect to a schedule to govern the remedial proceeding. Therefore, the Plaintiffs and the Defendants each filed their own proposed scheduling orders. *See* (ECF Nos. 255 & 256). Meanwhile, on August 22, 2023, the United States Court of Appeals for the Fifth Circuit set Defendants' appeal of the underlying preliminary injunction order for oral argument on October 6, 2023, *Robinson v. Ardoin*, No. 22-30333 (5th Cir.), the day after the conclusion of the scheduled remedial proceeding.

As of the time of this filing, the Court has yet to issue a scheduling order in this matter despite the proposed schedules being submitted over 35 days ago. Many of the proposed deadlines in Plaintiffs' and Defendants' schedules have now passed.[1] Plaintiffs, for their part, have not sought to press their proposed schedule on the remedy phase and have not yet produced any expert reports or disclosures, or any proposed remedial plans, even though their own proffered deadlines have passed. (ECF No. 255 at 5). Given the significant delay on an already expected schedule,

---

[1] Plaintiffs' proposed schedule had August 11th as the date the parties would submit "any proposed plans" and as the deadline to exchange witness lists. (ECF No. 255 at 5). Defendants, jointly, proposed August 4th as the deadline for Plaintiffs' supplemental expert reports and disclosures and August 18th as the date to exchange fact and witness lists. (ECF No. 255-2 at 1).

App.082

there is simply no longer sufficient time to conduct a remedial hearing on a timeframe sufficient to sure the quality of presentations of counsel and the Court's decision.

The 2022 November Elections have come and gone, which means the premise for the Plaintiffs' twin preliminary injunction motions no longer exists. More to the point, any urgency that there be a remedy *now*, before a trial on the merits, is also gone. The 2024 General Election, however, is on the horizon, which, at roughly fourteen months away, means that the Court has enough time to try this case to a final judgment—if it acts *now* to set a date for trial. This window will close very soon if the Court declines to do so. And declining to do so would transgress the Supreme Court's mandate that this case is to proceed "for review in the ordinary course and in advance of the 2024 congressional elections in Louisiana." *Ardoin v. Robinson*, 143 S. Ct. 2654 (2023). For the reasons that follow, the Court should cancel the upcoming October remedial proceeding and schedule a trial on the merits so that the litigants, and more importantly the people of Louisiana, can have a final resolution of this continuing litigation.

## ARGUMENT

While the Defendants appreciate the Court's efforts to move this case to a speedy resolution, the Defendants' rights to a fair and full hearing no longer permit the proceedings to move along the present path. The prejudice that the impending October 3rd remedial proceeding has to the Defendants' rights cannot be gainsaid. For more than forty years, the Supreme Court has recognized that "where a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 396 (1981). This is true by virtue of the preliminary injunction mechanism (which necessitates expedited, yet *temporary*, resolution, given the specter of a rapidly impending

App.083

irreparable injury), and it is aggravated by the nature of Voting Rights Act litigation (which cannot be resolved without tremendously detailed, and time-consuming, preparation and presentation of expert testimony). Defendants have *never* been given the opportunity to make their case in defense of the enacted maps fully, and denying them the opportunity to do so now, given the ability for them to do so before the 2024 November Elections, would imperil the Defendants' rights and call into question the fundamental fairness of this litigation.

The Defendants are aware that much needs to be accomplished between now and the 2024 November Elections to avoid another round of, among other things, *Purcell* fights and expedited motions practice before this Court. Circumventing a repeat of the chaos leading up to the 2022 November Elections has motivated the Defendants to submit this request on an emergency basis. The gravity of this litigation, the implications of the challenged congressional maps for the 2024 election and Defendants' rights, as well as simple procedural fairness and federalism concerns, should compel the Court to swiftly decide this motion in Defendants' favor.

**I.      There is now insufficient time to conduct a remedial proceeding by October 3rd, and allowing it to proceed would result in a waste of judicial resources.**

The Court's remedial proceeding cannot practically occur as scheduled because none of the lead-up events can occur as *any* of the parties envisioned. With fewer than 6 weeks before a three-day hearing, there still is not a scheduling order, and no order embracing all necessary events can be practically achieved.

The parties each submitted their proposed schedules on July 21st, over a month ago, and no scheduling order has been issued by the Court. In the meantime, many of the parties proposed deadlines have already come and gone without a scheduling order.  Moreover, Plaintiffs have not

App.084

adhered to the case deadlines they themselves proposed.[2] Thus, nothing has happened in this remedial matter since the Supreme Court's order vacated its stay. Defendants have yet to see any disclosures or revised plan(s) from Plaintiffs. Defendants can hardly to begin to mount a cogent defense when they are, at present, completely in the dark as to what plans Plaintiffs will even be proffering and what expert opinions they intend to support them. There is now not enough time for the necessary disclosures and expert reports in advance of the hearing, and if the Court were to conduct it anyway, it would sacrifice the quality of presentations and, by consequence, the quality of any future ruling..

Conversely, the 2024 General Election is roughly fourteen months away. This is *just* enough time to hold a trial on the merits and to allow the appellate process to run its course in advance of those elections. In the expedited, chaotic world of redistricting litigation, the amount of time that the Court has to allow *both* sides to fully and fairly litigate their positions is a luxury that does not often arise, and it should not be squandered.

The Plaintiffs themselves recognize that more robust litigation, certainly beyond the proceedings that occurred during the 2022 preliminary injunction proceedings, is needed. That is why they asked the Court for leeway to engage in "a more robust remedial process by allowing [them] to incorporate new election data[3] and accommodate concerns raised by Defendants in opposition to the initial remedial map Plaintiffs proposed in 2022." (ECF No. 256, at 2-3.) In other words, the Plaintiffs recognize that more work needs to be done to account for the truncated preliminary-injunction proceedings. For its part, the Supreme Court has long recognized that

---

[2] One would assume that, given their desire for a swift remedy, Plaintiffs would be acting of their own volition absent an order from this Court to ensure, for their part, that any remedial proceeding occurs along their preferred timeline. They are not.

[3] The existence of new election data that Plaintiffs themselves wish to rely upon simply underscores the incomplete factual record exists in this case without a trial on the merits.

App.085

redistricting litigation is an especially fact-intensive endeavor. *See Allen v. Milligan*, 143 S. Ct. 1487, 1503 (2023) All of these issues point to the inescapable conclusion that a remedial hearing should be cancelled and a trial set. Yet another rushed proceeding is simply not in the interest of the parties or of substantial justice.

The Defendants would be remiss if they also did not point out that the Plaintiffs' proposed scheduling order, if entered near the time it was filed, would exacerbate tremendously all of the issues the Defendants have identified in this motion. The Plaintiffs have insisted on (1) barreling past a decision on the merits of their claims to the remedial phase, (2) submitting brand-new remedial maps and expert reports, but (3) not providing those materials in time for the Defendants to properly assess and respond to them. These concerns are now further exacerbated by the fact that the parties generally, and the Defendants specifically, have lost *a month* of time to prepare for the remedial hearing that is scheduled less than 6 weeks from now because no scheduling order has been entered and Plaintiffs have sat on their hands instead of voluntarily complying with their proposed deadlines. Any scenario short of cancelling the hearing and setting this matter for trial will result in the abridgement of Defendants' rights and a violation of basic principles of federalism. In no uncertain terms, the Court should prevent this outcome.

The United States Court of Appeals for the Fifth Circuit has set Defendants' appeal of the underlying preliminary injunction order for oral argument on October 6, 2023, *Robinson v. Ardoin*, No. 22-30333 (5th Cir.). That is the day after the conclusion of the scheduled remedial proceeding, which is currently set for October 3-5, 2023. The Fifth Circuit's scheduling of oral argument on October 6 is yet another reason for this Court to cancel the remedial proceedings. The timing of oral argument—just nine days after the conclusion of supplemental briefing the Fifth Circuit requested—suggests the Fifth Circuit is prepared to rule quickly on the merits of the preliminary

App.086

injunction. That forthcoming ruling could have any number of different impacts on this matter, including a reversal which would negate the need for any remedial phase on the preliminary injunction. This Court should instead focus resources on the ultimate merits questions in this case and set this matter for a trial sufficiently in advance of next year's elections. By proceeding forward with a remedy phase on a preliminary injunction order that is currently on appeal, and with a decision from the Fifth Circuit seemingly forthcoming, this Court risks a complete waste of judicial resources at both levels.

## II. Forgoing resolution of the merits via a final trial is fundamentally unfair to Defendants and is disrespectful to basic principles of federalism.

Declining to resolve the merits of the Plaintiffs' Section 2 claims by way of a full trial would inflict further constitutional injury on the Defendants. Defendants have not yet had the opportunity to fully and fairly litigate the merits of its enacted maps, given the remarkably expedited preliminary injunction proceedings that occurred back in late Spring 2022. This alone raises basic fairness concerns if the Court moves past the merits and onto considerations of a remedy.

To be certain, it is error to "improperly equate[] 'likelihood of success' with 'success,'" and it is an even more erroneous error to "ignore[] the significant procedural differences between preliminary and permanent injunctions." *Camenisch*, 451 U.S. at 394. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties *until a trial on the merits can be held*." *Id.* at 395 (emphasis added). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id*. Indeed, "[a] party . . . is not required to prove his case in full at a

App.087

preliminary-injunction hearing, . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id*.

In other words, the merits of this case have not yet been fully and fairly resolved. By treating them as if they had been (i.e., by skipping past a final trial on the merits and moving on to considerations of a remedy), the Court is at risk of prejudicing a State with nearly 3.5 million voters[4] preparing to cast ballots during a 2024 General Election cycle that is likely to see record-level voter turnout. And this is no idle concern. For more than a century, the Supreme Court has held that every defendant must be afforded "an opportunity to present" its defense *and then* to have a "question" *actually* "decided" against it. *Fayerweather v. Ritch*, 195 U.S. 276, 299 (1904).

Neither has occurred here. The Defendants were prevented from fulsomely defending their case by virtue of the expedited preliminary-injunction proceedings, and the resulting preliminary-injunction opinion from the Court did not fully resolve—and as a matter of law, could not have fully resolved—the merits of the Plaintiffs Section 2 claims. Given the limited purpose of a preliminary injunction ("merely to preserve the relative position of the parties until a trial on the merits can be held") they are often considered "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. "[A]t the preliminary injunction stage, the court is called upon to assess the *probability* of the plaintiff's ultimate success on the merits" and "[t]he foundation for that assessment will be more or less secure" depending upon multiple factors, including the pace at which the preliminary proceedings were decided. *Sole v. Wyner*, 551 U.S. 74, 84-85 (2007) (emphasis added). Simply put, deciding that a claim is "likely to succeed" is not the same as "actually litigat[ing] and resolv[ing]" a claim.

---

[4] Louisiana has a voting age population estimate of 3,564,038. Federal Register, Estimates of the Voting Age Population for 2020, https://www.federalregister.gov/documents/2021/05/06/2021-09422/estimates-of-the-voting-age-population-for-2020 (last accessed August 24, 2023).

App.088

*Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). And providing a remedy for a claim that has not yet been "actually litigated and resolved" amounts to a violation of the basic rights of litigants. *Id*.

There is, moreover, the changing legal landscape in the wake of *Allen v. Milligan* and *Students for Fair Admission v. University of North Carolina*, both of which the Supreme Court issued while this case was held in abeyance. In the former, the Supreme Court addressed Section 2 of the Voting Rights Act for the first time in fourteen years, and it clarified how the *Gingles* preconditions apply. Relevant to this case, the Supreme Court elucidated "how traditional districting criteria limit[] any tendency of the VRA to compel proportionality," *id*. at 1509, which means that the district court's reliance (in part) on a proportionality as a legitimate goal is no longer tenable and must be revisited. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 851 (M.D. La. 2022). *Milligan* also emphasized the centrality of communities of interest in the Section 2 analysis, which has featured prominently at every stage of this case. *See* 143 S. Ct. at 1505. And Justice Kavanaugh's concurring opinion in *Milligan* stressed that it is the compactness of the minority community—not solely the compactness of the proposed districts—that must be evaluated. *Id.* at 1518 (Kavanaugh, J., concurring).

The latter case, in turn, changed fundamentally the way in which States may consider race when taking state action. The *Students for Fair Admissions* Court underscored that as race-based legislative acts reach their intended ends, they become obsolete and less likely to survive Equal Protection scrutiny. This principle followed the Court's decision in *Shelby County v. Holder*, which struck as unconstitutional a different Voting Rights Act provision because "[o]ur country has changed, and while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions." 570 U.S. 529, 557 (2013).

App.089

Simply put, the merits of this case (particularly given the changing legal landscape) remain live. So long as they do, there can be no remedy imposed.

## III. The Court has no jurisdiction to proceed with a remedial hearing stemming from a preliminary injunction that is now moot.

Mootness typically arises if an Article III-required injury-in-fact ceases. But it also arises if time has rendered a court unable to *remedy* a purported injury. Injunctive relief, moreover, is necessarily and solely prospective. What matters is that the Plaintiffs are no longer "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). It follows inexorably that the Court has no power to hold a hearing about a remedial injunction if the event purporting requiring the injunction has come and gone. The Plaintiffs filed motions seeking injunctive relief based on their argument that conducting the *2022* November Elections under the auspices of Louisiana's enacted congressional map would inflict an irreparable injury upon them unless the Court granted their requested relief *before* the 2022 November Elections. The 2022 congressional elections, however, were held nine months ago. Because the Court can no longer provide a remedy related to the 2022 November Elections, it has no power to "reset" a previously stayed *remedial* hearing. (ECF No. 250.) Instead, the only option available to the Court is to set a trial date to fully and fairly resolve the merits of their claims.

## CONCLUSION

There is no legally defensible reason to allow the now-moot preliminary-injunction order to control final resolution of the Plaintiffs' claims on the merits. The Court no longer has jurisdiction to issue the relief sought by the Plaintiffs in their preliminary-injunction motions. The truncated timeline under which those motions were adjudicated prejudiced the Defendants' rights, and it would prejudice them further if the Court were to transmogrify its preliminary-injunction "likelihood of success on the merits" conclusion into a final resolution of the Plaintiffs' Section 2

App.090

claims. Finally, the over month long delay (and counting) in setting a schedule and inaction by the Plaintiffs has further prejudiced Defendants such that it is simply not possible to have a remedial hearing.

For all these reasons, the Court should vacate its preliminary-injunction hearing and set a date for a final trial in this matter.

App.091

Respectfully submitted this the 25th day of August, 2023.

/s/ *John C. Walsh*

John C. Walsh, LA Bar Roll No. 24903
**SHOWS, CALL & WALSH, L.L.P**
Batton Rouge, LA 70821
Ph: (225) 383-1461
Fax: (225) 346-5561
john@scwllp.com

/s/ *Phillip J. Strach*

Phillip J. Strach*
phillip.strach@nelsonmullins.com
　　*Lead Counsel for Secretary Ardoin*
Thomas A. Farr*
tom.farr@nelsonmullins.com
John E. Branch, III*
john.branch@nelsonmullins.com
Alyssa M. Riggins*
alyssa.riggins@nelsonmullins.com
Cassie A. Holt*
cassie.holt@nelsonmullins.com
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Ph: (919) 329-3800

* admitted *pro hac vice*

*Counsel for Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana*

/s/ *Michael W. Mengis*

Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

/s/ *Erika Dackin Prouty*

Erika Dackin Prouty*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

App.092

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

* *Admitted pro hac vice*


Jeff Landry
Louisiana Attorney General

Jason B. Torchinsky (DC 976033)*          */s/Angelique Duhon Freel*
Phillip M. Gordon (DC 1531277)*           Elizabeth B. Murrill (LSBA No. 20685)
Holtzman Vogel Baran                      Shae McPhee (LSBA No. 38565)
Torchinsky & Josefiak, PLLC               Morgan Brungard (CO Bar No. 50265)*
15405 John Marshall Highway               Angelique Duhon Freel (LSBA No. 28561)
Haymarket, VA 20169                       Carey Tom Jones (LSBA No. 07474)
(540) 341-8808 phone                      Jeffrey M. Wale (LSBA No. 36070)
(540) 341-8809 fax                        Office of the Attorney General
jtorchinsky@holtzmanvogel.com             Louisiana Department of Justice
pgordon@holtzmanvogel.com                 1885 N. Third St.
*admitted pro hac vice                    Baton Rouge, LA 70804
                                          (225) 326-6000 phone
                                          (225) 326-6098 fax
                                          murrille@ag.louisiana.gov
                                          freela@ag.louisiana.gov
                                          walej@ag.louisiana.gov
                                          jonescar@ag.louisiana.gov
                                          mcphees@ag.louisiana.gov
                                          brungardm@ag.louisiana.gov

                                          *Counsel for Defendant, State of Louisiana*

App.093

## CERTIFICATE OF SERVICE

I hereby certify that, on this 25th day of August 2023, the foregoing has been filed with the Clerk via the CM/ECF system that has sent a Notice of Electronic filing to all counsel of record.

*/s/ Jeffrey M. Wale*
Jeffrey M. Wale

App.094

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, et al.,

          *Plaintiffs,*

     v.

KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        *Defendant.*

EDWARD GALMON, SR., et al.,

          *Plaintiffs,*

     v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State for Louisiana,

        *Defendant.*

Civil Action No. 3:22-cv-00211-SDD-SDJ

Chief Judge Shelly D. Dick

Magistrate Judge Scott D. Johnson

Consolidated with
Civil Action No. 3:22-cv-00214-SDD-SDJ

## ORDER

Before the Court is Defendants' Emergency Motion to Cancel Hearing on Remedy and to
Enter a Scheduling Order for Trial. After considering the motion, the Court is of the opinion it
should be GRANTED.

App.095

IT IS THEREFORE ORDERED that the preliminary injunction hearing currently scheduled to begin on October 3, 2023 is hereby cancelled and a scheduling order setting trial is forthcoming.

Baton Rouge, Louisiana, this _____ day of _____, 2023.

_____
Honorable Judge Shelly D. Dick
UNITED STATES DISTRICT JUDGE
Middle District of Louisiana

App.096

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA**

PRESS ROBINSON, et al., Plaintiffs,               Defendant Case No.: 3:22-CV-00211-SDD-RLB

v.

KYLE ARDOIN, IN HIS OFFICIAL CAPACITY

AS LOUISIANA SECRETARY OF STATE,


EDWARD GALMON, SR., et al., Plaintiffs,          Defendant Case No.: 3:22-CV-00214-BAJ-
                                        RLB

v.

KYLE ARDOIN, IN HIS OFFICIAL CAPACITY

AS LOUISIANA SECRETARY OF STATE


**LOUISIANA LEGISLATIVE BLACK CAUCUS OPPOSITION DEFENDANT STATE OFFICIALS' EMERGENCY MOTION TO CANCEL REMEDY HEARING**

With all due respect to the Attorney General (and candidate for governor) whose name is so prominently displayed in the motion at issue and the memorandum in support of same; Defendants lay a trap for Plaintiffs with this motion.

It may be technically true that if the issues stay perfectly squared up and all parties proceed with deliberate speed the permanent injunction might barely have enough time to be prosecuted to final judgment before the 2024 elections. The problem is that neither deliberate speed nor the issues being squared up are likely events without the existence of a remedy fixed by the Court.

Plaintiffs have established the right to have a remedy in place while the case proceeds. That ruling has been appealed but the 5th Circuit Court of Appeal denied three emergency stay motions due to a lack of strong showing that the appeal had a likelihood of success and has

expedited the appeal of the preliminary injunction to the point that the appeal may be decided before a decision on the remedy.

The Court allowed the Louisiana legislature an opportunity to cure the Voter Rights Act violation and the legislature declined to do so. There will be another legislative session in 2024 before the 2024 elections and intervenor Louisiana Legislative Black Caucus believes that when faced with a loss in the 5th Circuit on the preliminary injunction the legislature will follow the Alabama model. It has been widely reported that after the United States Supreme Court[1] affirmed the determination that the plaintiffs in Alabama established that the plaintiffs would probably prevail in a case remarkably like this one, Alabama then adopted a new congressional district map on July 21, S.B. 5, called "the Livingston Plan." The "Livingston Plan" did not create a second majority minority district and the case remains in litigation.[2] There would be little time in the present case to address a new map adopted by the Louisiana legislature in the 2024 session, making it very possible that the Louisiana 2024 congressional elections would be held using a new, but still illegal map.

If this Court goes forward as scheduled with the hearing on the remedial plan the remedial plan would establish the congressional districts until the Court modifies the order. This protects the rights of the Plaintiffs and avoids the trap.

Respectfully submitted,

Stephen M. Irving
STEPHEN M. IRVING #07170 T.A.
P.O. Box 2108
Baton Rouge, Louisiana 70821
18541 Bayridge Court

---

[1] Allen v. Millican 599 U. S. ____ (6/8/2023)
[2] Singleton v. Allen Case 2:21-cv-01530 (N.D. Ala.)

App.098

Baton Rouge, Louisiana 70817
225-762-2688
Fax 225-752-2663
Steve@steveirvingllc.com
ERNEST L. JOHNSON #07290
3313 Government St.
Baton Rouge, Louisiana 70806
(225) 413-3219
Ernestjohnson@lacapfund.com

CERTIFICATE OF SERVICE

I do certify that on this 38th day of August 2023, the foregoing was electronically filed with the

Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

Stephen M. Irving
STEPHEN M. IRVING #07170 T.A.
P.O. Box 2108
Baton Rouge, Louisiana 70821
18541 Bayridge Court
Baton Rouge, Louisiana 70817
225-762-2688
Fax 225-752-2663
Steve@steveirvingllc.com

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PRESS ROBINSON, EDGAR CAGE, DOROTHY NAIRNE, EDWIN RENE SOULE, ALICE WASHINGTON, CLEE EARNEST LOWE, DAVANTE LEWIS, MARTHA DAVIS, AMBROSE SIMS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP") LOUISIANA STATE CONFERENCE, AND POWER COALITION FOR EQUITY AND JUSTICE, | Civil Action No. 3:22-cv-00211-SDD-RLB |
| *Plaintiffs*, | |
| v. | |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant*. | |
| EDWARD GALMON, SR., CIARA HART, NORRIS HENDERSON, TRAMELLE HOWARD, | |
| *Plaintiffs*, | Civil Action No. 3:22-cv-00214-SDD-RLB |
| v. | |
| KYLE ARDOIN, in his official capacity as Secretary of State for Louisiana, | |
| *Defendant*. | |

**PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' MOTION TO CANCEL HEARING ON REMEDY AND ENTER A SCHEDULING ORDER FOR TRIAL**

NOW INTO COURT come Plaintiffs Edward Galmon, Sr., Ciara Hart, Norris

Henderson, and Tramelle Howard (the "Galmon Plaintiffs") and Press Robinson, Edgar

Cage, Dorothy Nairne, Edwin Rene Soule, Alice Washington, Clee Earnest Lowe, Davante

Lewis, Martha Davis, Ambrose Sims, NAACP Louisiana State Conference, and Power

Coalition (the "Robinson Plaintiffs"), to oppose Defendants' emergency motion to cancel the remedial hearing and schedule trial. The motion reprises several meritless arguments that have already been rejected. These efforts do not warrant an unsolicited motion or emergency briefing, let alone cancelling the scheduled remedial hearing. Defendants' motion should be denied, and the remedial hearing should proceed as scheduled.[1]

In 2022, Louisiana's enacted congressional map wrongfully diluted the votes of Black Louisianians in violation of Section 2 of the Voting Rights Act. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 766 (M.D. La. 2022) (identifying likely violation). To prevent this injustice from repeating in 2024, the urgent priority now is to ensure that a lawful backstop is in place while this case proceeds to final judgment and through any subsequent appeals. The appropriate process to accomplish that, as the Court has already recognized, is to continue expeditiously to a remedial hearing and the adoption of an interim map that satisfies Section 2's commands. *See* Order, ECF No. 250 (resetting preliminary injunction hearing).

Defendants, again, seek to derail this process. Their strategy has consistently been to slow-walk this case, only to later announce that the time for entering relief has run out. *Cf.* Pls.' Joint Opp'n to State Intervs.' Mot. for Ext. of Time at 1, ECF No. 218 (noting Defendants' gambit); *Galmon* Pls.' Resp. to Leg. Intervs.' Mot. for Ext. of Time at 5, ECF No. 192 (same). Defendants should not be permitted to pursue this strategy again. As Defendants acknowledge, additional delays could jeopardize any entry of relief in time for

---

[1] While Plaintiffs maintain that Defendants' Motion for Expedited Consideration, ECF No. 261, attempts to manufacture an emergency where none exists, Plaintiffs are willing to accommodate Defendants' request for speedy briefing by filing this opposition in advance of their proposed deadline. *See id.* ¶ 4 (requesting Plaintiffs' response by Wednesday, August 30).

the 2024 elections. *See* Defs.' Mem. of Law in support of Emergency Mot. ("Mem.") 5, ECF No. 260-1 (asserting there "is *just* enough time to hold a trial on the merits and to allow the appellate process to run its course in advance of" the 2024 elections). That would be unjust, and the way to prevent it is to adopt a provisional remedial map soon—exactly as this Court is on track to do, with the benefit of the hearing scheduled for October.[2]

Defendants erroneously argue, again, that recent Supreme Court caselaw requires a reevaluation of Plaintiffs' liability-phase evidence. *See* Mem. 9–10 (citing *Allen v. Milligan*, 143 S. Ct. 1487 (2023), and *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141 (2023) (*SFFA*)). It does not. *Allen* affirmed a preliminary injunction that closely parallels the one at issue here, and *SFFA* had nothing to do with redistricting. *See* Pls.' Joint Notice Re: Status Conf. at 3–4, ECF No. 242. Notably, the Fifth Circuit recently rejected Defendants' request to remand their appeal for further consideration in light of *Allen* and *SFFA*, and the court of appeals is instead proceeding with argument on October 6, 2023—conveniently timed *after* the remedial hearing scheduled here. *See* Order, *Robinson v. Ardoin*, No. 22-30333 (5th Cir. Aug. 22, 2023).

Defendants also argue, again, that the preliminary injunction is somehow moot. *See* Mem. 10. It is not. *See* Pls.' Joint Notice Re: Status Conf. at 4–5 (explaining the Court enjoined Defendants from conducting *any* congressional election under the enacted map). And they complain, again, that completing the preliminary injunction process would be "unfair," and maybe even unconstitutional. Mem. 7–8. Again, wrong. *See* Pls.' Joint Notice

---

[2] Additionally, there is currently no obstacle to proceeding towards a trial simultaneously with the remedial process or after a provisional remedy is in place. But Defendants have failed to take even the first step toward initiating merits discovery by requesting a discovery conference pursuant to Federal Rule of Civil Procedure 26(f).

Re: Status Conf. at 5–6 (explaining that "while the Court can also move towards a final judgment in this case, there is no basis to reverse the relative positions of the parties achieved through the preliminary injunction or skip over the remedial process necessary to effectuate that injunction"). The Court has already decided that a remedial hearing is appropriate, and repetitive motions for reconsideration—in style or substance—are inappropriate. *Cf.* Pls.' Joint Opp'n to State Intervs.' Mot for Extension of Time at 1–2, (recognizing another instance where Defendants' request for delay mirrored a request denied by the Court 12 days prior).[3]

The only pending question for this Court's resolution, then, is what, if any, additional process is necessary in advance of the October hearing. When the Supreme Court stayed proceedings in this case on June 28, 2022, the parties were on the literal eve of the remedial hearing. Accordingly, the preparation necessary for that hearing had essentially finished: inclined parties had submitted proposed remedial maps and memoranda in support; opposing parties had responded; witnesses and exhibits had been disclosed; expert reports had been served; and Defendants had deposed each of the two experts that Plaintiffs' intended to call at the hearing. *See* Scheduling Order, ECF No. 206.[4] "'[R]esetting' the previous preliminary injunction hearing," as Defendants have urged,

---

[3] Also inappropriate is Defendants' pattern of seeking to usurp this Court's case management authority. *See* Mem. 2 (castigating Court for failing to issue scheduling order); Mot. for Expedited Consideration at 2 (seeking to impose deadline for Court to rule on motion to cancel remedial hearing); Emergency Mot. of Leg. Interv. Defs.-Appellants for Stay Pending Appeal at 1, *Robinson v. Ardoin*, No. 20-303333 (5th Cir. June 9, 2023) (castigating this Court for "t[aking] no action for 24 days" after preliminary injunction hearing); *id.* at 18–19 (similar). It is the parties' responsibility to conform to the Court's judgment about the appropriate schedule, not vice versa.

[4] The deposition of a Defendants' expert was interrupted by the Supreme Court's stay. Plaintiffs are willing to continue to the remedial hearing without completing this deposition.

Defs.' Joint Notice of Proposed Pre-Hearing Schedule at 6—where all that remains is live testimony and argument before the Court—would eliminate any purported prejudice to Defendants and permit the Court to quite literally pick up where this case left off in June 2022.

Defendants' motion should be denied.

Date: August 28, 2023

Respectfully submitted,

By: */s/Abha Khanna*
Abha Khanna (*admitted pro hac vice*)
ELIAS LAW GROUP LLP
1700 Seventh Ave. Suite 2100
Seattle, Washington 98101
(206) 656-0177
akhanna@elias.law

Qizhou Ge (*pro hac vice application forthcoming*)
Jacob D. Shelly (*admitted pro hac vice*)
ELIAS LAW GROUP LLP
250 Massachusetts Ave, NW Suite 400
Washington, D.C. 20001
(202) 968-4490
age@elias.law
jshelly@elias.law

J. E. Cullens, Jr.
Andrée Matherne Cullens
S. Layne Lee
WALTERS, THOMAS, CULLENS, LLC
12345 Perkins Road, Bldg. One
Baton Rouge, LA 70810
(225) 236-3636

*Counsel for Galmon Plaintiffs*

By: */s/Jonathan H. Hurwitz*

Leah Aden (admitted *pro hac vice*)
Stuart Naifeh (admitted *pro hac vice*)
Victoria Wenger (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacplef.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

R. Jared Evans
I. Sara Rohani (admitted *pro hac vice*)
NAACP Legal Defense and Educational
Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
Tel: (202) 682-1300
jevans@naacpldf.org
srohani@naacpldf.org

Nora Ahmed
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Tracie L. Washington
Louisiana Justice Institute
Suite 132
3157 Gentilly Blvd
New Orleans LA, 70122
Tel: (504) 872-9134
tracie.washington.esq@gmail.com

Jonathan H. Hurwitz (admitted *pro hac vice*)
Robert A. Atkins (admitted *pro hac vice*)
Yahonnes Cleary (admitted *pro hac vice*)
Amitav Chakraborty (admitted *pro hac vice*)
Adam P. Savitt (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue Of The Americas, New
York, NY 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990
jhurwitz@paulweiss.com
ratkins@paulweiss.com
ycleary@paulweiss.com
achakraborty@paulweiss.com
asavitt@paulweiss.com

John Adcock
Adcock Law LLC
3110 Canal Street
New Orleans, LA 70119
Tel: (504) 233-3125
jnadcock@gmail.com

Sophia Lin Lakin
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org

Sarah Brannon
American Civil Liberties Union
Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org

T. Alora Thomas-Lundborg
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
(617) 495-5202
tthomaslundborg@law.harvard.edu

*Counsel for Robinson Plaintiffs*

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

PRESS ROBINSON, *et al*

*versus*

KYLE ARDOIN, in his official
capacity as Secretary of State
for Louisiana

CIVIL ACTION

22-211-SDD-SDJ

*consolidated with*

EDWARD GALMON, SR., *et al*

*versus*

KYLE ARDOIN, in his official
capacity as Secretary of State
for Louisiana

CIVIL ACTION

22-214-SDD-SDJ

## <u>RULING</u>

This matter is before the Court on a *Motion to Cancel Hearing on Remedy and to Enter a Scheduling Order for Trial*[1] filed by Defendant, Louisiana Secretary of State Kyle Ardoin, and the Intervenor Defendants, Senate President Page Cortez, Speaker Clay Schexnayder, and Attorney General Jeff Landry. The *Galmon* and *Robinson* Plaintiffs filed a joint *Opposition*,[2] and the Louisiana Legislative Black Caucus separately opposed[3] the *Motion*. For the reasons that follow, the *Motion* is DENIED.

This case has been extensively litigated. The parties have conducted expansive discovery, presented testimony from twenty-one witnesses, introduced hundreds of exhibits into evidence throughout a five-day preliminary injunction hearing, and filed hundreds of pages of

---

[1] Rec. Doc. No. 260.
[2] Rec. Doc. No. 264.
[3] Rec. Doc. No. 263.

App.107

pre- and post-hearing briefing—all of which culminated in this Court's 152-page *Ruling* on liability.[4] On the eve of the remedial hearing, this matter was stayed by the United States Supreme Court.[5] The preparation necessary for the remedial hearing was essentially complete. The parties were ordered to submit proposed remedial maps. The Defendants elected not to prepare any remedial maps. The Plaintiffs disclosed proposed remedial maps; witnesses and exhibits were disclosed; expert reports were disclosed; and Defendants deposed Plaintiffs' identified experts.[6] The only remaining issue is the selection of a congressional district map—a limited inquiry—which has been the subject of disclosure and discovery in the run up to the June 29, 2022 remedy hearing that was stayed on the eve of trial.

The Court finds that based on the remaining issue before it, there is adequate time to update the discovery needed in advance of the hearing to take place October 3–5, 2023. The parties were previously ordered[7] to confer and jointly submit a proposed pre-hearing scheduling order in advance of the October 3, 2023 hearing date but have failed to reach an agreement. Accordingly, the Court will refer this matter to the Magistrate Judge on an expedited basis for the entry of a scheduling order.

**ACCORDINGLY**, **IT IS HEREBY ORDERED** that Defendants' *Motion to Cancel Hearing on Remedy and to Enter a Scheduling Order for Trial*[8] is DENIED. The matter is hereby referred to the Magistrate Judge for an expedited entry of a Scheduling Order.

Signed in Baton Rouge, Louisiana this 29th day of August, 2023.

_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[4] Rec. Doc. No. 173.
[5] Rec. Doc. No. 227.
[6] *See* Rec. Doc. No. 206.
[7] Rec. Doc. No. 250.
[8] Rec. Doc. No. 260.

App.108

# LAMD Using ZoomGov as a Participant



: Join a meeting (use Chrome or IE)
Navigate to room URL: **https://zoomgov.com/my/___**

| | |
|---|---|
| **sdd20** – Hon. Shelly D. Dick |
| **baj20** – Hon. Brian A. Jackson |
| **jwd20** – Hon. John W. deGravelles |
| **rlb20** – Hon. Richard L. Bourgeois, Jr. |
| **ewd20** – Hon. Erin Wilder-Doomes |
| **sdj20** – Hon. Scott D. Johnson |

Launching...

**Opt. 1 Download full client if computer permissions allow. *Allows Gallery video layout***

Please click **Open Zoom Meetings** if you see the system dialog.

If nothing prompts from browser, click here to launch the meeting, or download & run Zoom.



Please enter your name to join the meeting

**Enter Your Full Name, and click Join**

Your Name

| Your Name |
|---|

| Join |
|---|

Participant ID 493428    Conference ID 591 238 4075

**This message will appear, wait for the Host to Admit you to the room.**

Please wait, the meeting host will let you in soon.

OPTION 1: **Join with Computer Audio** (for best audio quality use a headset)
OPTION 2: **Join by Phone Call**



| Meeting ID | Judge |
|---|---|
| 160-0389-3634 | SDD – Chief Judge Shelly D. Dick |
| 160-0389-3692 | BAJ – Judge Brian A. Jackson |
| 160-0389-3568 | JWD – Judge John W. deGravelles |
| 160-0389-3602 | RLB – Magistrate Richard L. Bourgeois |
| 160-0389-3584 | EWD – Magistrate Erin Wilder-Doomes |
| 160-0389-3592 | SDJ – Magistrate Scott D. Johnson |
| 160-0389-3500 | LAMD Court (for testing) |

## Mute your Microphone when not speaking



## On iPhone, iPad or Android:

In advance, Download the ***ZOOM Cloud Meetings*** app from *Apple App Store* or *Google Play Store*.

- You will be sent a meeting URL to connect to the Zoom Call, when clicking the URL on iPhone or Android device it should automatically open in the Zoom App.

Judge Meeting Room Links:

Navigate to the URL provided: https://zoomgov.com/my/sdj20 *(Magistrate Scott D. Johnson)* -

Click "**Join with Video**" or "**Join without Video**"

- Click "**Call using Internet Audio**"

*You should now be connected to the Zoom call.*
*If the meeting URL didn't work, use the following instructions:*

Open ***ZOOM Cloud Meetings*** app on iPhone or Android

- Click **Join a Meeting**
- Enter the **Meeting ID: 160-0389-3592 (SDJ)**
- Click "**Join with Video**" or "**Join without Video**"
- Click "**Call using Internet Audio**"

App.110



## Breakout Room

When being invited to a Breakout Room, click the **Join** button on the pop-up.



To return back to the Main Session, click "Leave Breakout Room."



# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**PRESS ROBINSON, ET AL.**                    **CIVIL ACTION**

**VERSUS**                              **No. 22-211-SDD-SDJ**

**KYLE ARDOIN, in his official capacity
as Secretary of State for Louisiana**

*and*

**EDWARD GALMON, SR., ET AL.**              **CIVIL ACTION**

**VERSUS**                              **No. 22-214-SDD-SDJ**

**KYLE ARDOIN, in his official capacity
as Secretary of State for Louisiana**

---

## ORDER

On August 29, 2023, Chief Judge Dick issued an Order denying Defendant's Motion to Cancel Hearing on Remedy and referring the matter of a pre-hearing scheduling order to Magistrate Judge Johnson. (R. Doc. 267). After hearing from the parties at two status conferences (R. Docs. 271, 272), the Court ordered that the parties submit proposed pre-hearing plans addressing (1) timing of the hearing, (2) whether Plaintiffs would submit a revised remedial map, (3) whether the parties would introduce new expert witnesses, and (4) discovery and briefing schedules. (R. Doc. 272). The Parties submitted separate proposals on September 6, 2023. (R. Doc. 273, Defendant; R. Doc. 274, Plaintiffs).

The parties' proposals both contemplate the remedial hearing's remaining on its scheduled date beginning October 3, 2023. Plaintiffs have decided to forego the opportunity to submit a new remedial plan. And the parties' proposed discovery and briefing dates are the same; however, the

App.112

content of the discovery is not agreed. Namely, Defendant's proposal contemplates *only* Defendant submitting expert reports—both supplemental and new;[1] Plaintiffs' proposal allows for both supplemental and new expert reports from *all* parties. The Court has not contemplated and sees no reason for allowing only one party to submit supplemental and new expert witnesses. Indeed, both parties should have equal opportunity to present updated discovery before the hearing. Accordingly,

      **IT IS ORDERED** that the following pre-hearing deadlines are set:

| | |
|---|---|
| Parties Serve Fact Witness Disclosures | September 14, 2023 |
| Parties Serve Expert Reports (Supplemental and New) | September 15, 2023 |
| Parties Disclose Rebuttal Expert Witnesses | September 18, 2023 |
| Parties Serve Rebuttal Expert Reports | September 28, 2023 |
| Parties File Witnesses and Exhibit Lists | September 29, 2023 |
| Parties File Pre-Hearing Briefs (limit 30 pages per side) | September 29, 2023 |
| Remedial Hearing | October 3-5, 2023[2] |

      Signed in Baton Rouge, Louisiana, on September 7, 2023.

*Scott Johnson*
_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[1] As briefly discussed in the minute entry R. Doc. 271, whether the parties are entitled to new expert witnesses or restricted to supplementing the experts put forth for the original hearing in June 2022 has been a contested issue. At the status conference on September 1, 2023, the Court expressed its inclination to issue a schedule allowing for new experts. (R. Doc. 272).

[2] Date and details set in R. Doc. 250.

App.113

```
1                    UNITED STATES DISTRICT COURT

2                    MIDDLE DISTRICT OF LOUISIANA

3

4   PRESS ROBINSON, ET AL        *       CIVIL ACTION
                                 *
5   VERSUS                       *       NO. 22-211-SDD
                                 *
6   KYLE ARDOIN, ET AL           *       CONSOLIDATED WITH
                                 *
7                                *
    EDWARD GALMON SR., ET AL      *       NO. 22-214-SDD
8                                *
    VERSUS                       *       MAY 10, 2022
9                                *
    KYLE ARDOIN, ET AL           *       VOLUME 2 OF 5
10  * * * * * * * * * * * * * * *

11
               MOTION FOR PRELIMINARY INJUNCTION BEFORE
12                  THE HONORABLE SHELLY D. DICK
                 UNITED STATES CHIEF DISTRICT JUDGE
13

14  APPEARANCES:

15  FOR THE ROBINSON          NAACP LEGAL DEFENSE FUND AND
    PLAINTIFFS:               EDUCATIONAL FUND, INC.
16                            BY:  STUART NAIFEH, ESQ.
                                   KATHRYN SADASIVAN, ESQ.
17                                 VICTORIA WENGER, ESQ.
                                   SARA ROHANI, ESQ.
18                            40 RECTOR STREET, FIFTH FLOOR
                              NEW YORK, NEW YORK 10006
19
                              ADCOCK LAW, LLC
20                            BY:  JOHN ADCOCK, ESQ.
                              3110 CANAL STREET
21                            NEW ORLEANS, LOUISIANA 70119

22                            AMERICAN CIVIL LIBERTIES UNION
                              FOUNDATION VOTING RIGHTS PROJECT
23                            BY:  SARAH E. BRANNON, ESQ.
                                   SAMANTHA OSAKI, ESQ.
24                            915 15TH STREET N.W.
                              WASHINGTON, D.C. 20005
25
```

```
 1                              PAUL, WEISS, RIFKIND, WHARTON &
                                GARRISON, LLP
 2                              BY:  AMITAV CHAKRABORTY, ESQ.
                                     RYAN RIZZUTO, ESQ.
 3                                   ADAM SAVITT, ESQ.
                                1285 AVENUE OF THE AMERICAS
 4                              NEW YORK, NEW YORK 10019

 5   FOR THE GALMON             WALTERS, PAPILLION, THOMAS,
     PLAINTIFFS:                CULLENS, LLC
 6                              BY:  DARREL J. PAPILLION, ESQ.
                                12345 PERKINS ROAD, BUILDING ONE
 7                              BATON ROUGE, LOUISIANA 70810

 8                              ELIAS LAW GROUP, LLP
                                BY:  ABHA KHANNA, ESQ.
 9                              1700 SEVENTH AVE., SUITE 2100
                                SEATTLE, WASHINGTON 98101
10

11                             ELIAS LAW GROUP, LLP
                                BY:  JACOB D. SHELLY, ESQ.
12                                   OLIVIA N. SEDWICK, ESQ.
                                     LALITHA D. MADDURI, ESQ.
13                              10 G STREET N.E., SUITE 600
                                WASHINGTON, D.C. 20002

14   FOR KYLE ARDOIN,           SHOWS, CALI & WALSH, LLP
     IN HIS OFFICIAL            BY:  JOHN C. WALSH, ESQ.
15   CAPACITY AS SECRETARY      628 ST. LOUIS STREET
     OF STATE                   BATON ROUGE, LOUISIANA 70821
16
                                NELSON MULLINS RILEY AND
17                              SCARBOROUGH, LLC
                                BY:  PHILLIP STRACH, ESQ.
18                                   THOMAS A. FARR, ESQ.
                                4140 PARKLAKE AVENUE, SUITE 200
19                              RALEIGH, NORTH CAROLINA 27612

20   FOR THE LOUISIANA          STEPHEN M. IRVING, LLC
     LEGISLATIVE BLACK CAUCUS:  BY:  STEPHEN M. IRVING, ESQ.
21                              111 FLOUNDERS DRIVE, SUITE 700
                                BATON ROUGE, LOUISIANA 70810
22

23                             JOHNSON LAW FIRM
                                BY:  ERNEST L. JOHNSON, ESQ.
24                              3313 GOVERNMENT STREET
                                BATON ROUGE, LOUISIANA 70806
25
```

```
 1                              ARTHUR THOMAS & ASSOCIATES
                                BY:  ARTHUR R. THOMAS, ESQ.
 2                              3313 GOVERNMENT STREET
                                BATON ROUGE, LOUISIANA 70806
 3
     FOR LEGISLATIVE            BAKERHOSTETLER, LLP
 4   INTERVENORS CLAY           BY:  PATRICK T. LEWIS, ESQ.
     SCHEXNAYDER AND PATRICK    127 PUBLIC SQUARE, SUITE 2000
 5   CORTEZ:                    CLEVELAND, OHIO 44114

 6                              BAKERHOSTETLER, LLP
                                BY:  E. MARK BRADEN, ESQ.
 7                                   KATHERINE L. MCKNIGHT, ESQ.
                                1050 CONNECTICUT AVENUE, N.W.,
 8                              SUITE 1100
                                WASHINGTON, D.C. 20036
 9
     INTERVENOR DEFENDANT,      LOUISIANA'S OFFICE OF THE ATTORNEY
10   STATE OF LOUISIANA:        GENERAL
                                BY:  JEFFREY M. WALE, ESQ.
11                                   ANGELIQUE D. FREEL, ESQ.
                                     CAREY TOM JONES, ESQ.
12                              1885 NORTH THIRD STREET
                                BATON ROUGE, LOUISIANA 70802
13
                                HOLTZMAN VOGEL BARAN TORCHINSKY &
14                              JOSEFIAK, PLLC
                                BY:  PHILLIP M. GORDON, ESQ.
15                              15405 JOHN MARSHALL HIGHWAY
                                HAYMARKET, VIRGINIA 20169
16
     OFFICIAL COURT REPORTER:   SHANNON L. THOMPSON, CCR
17                              UNITED STATES COURTHOUSE
                                777 FLORIDA STREET
18                              BATON ROUGE, LOUISIANA 70801
                                SHANNON_THOMPSON@LAMD.USCOURTS.GOV
19                              (225)389-3567

20

21        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
             COMPUTER-AIDED TRANSCRIPTION SOFTWARE
22

23

24

25
```

4

1                          INDEX

2    PLAINTIFFS' WITNESSES:                          PAGE

3    **LISA R. HANDLEY, PH.D.**

4        DIRECT EXAMINATION BY MS. BRANNON           7

5        CROSS-EXAMINATION BY MR. FARR               30

6        REDIRECT EXAMINATION BY MS. BRANNON         54

7    **DOROTHY NAIRNE, PH.D.**

8        DIRECT EXAMINATION BY MS. OSAKI             60

9        CROSS-EXAMINATION BY MR. WALE               71

10   **TRACI BURCH, PH.D. (VIA VIDEOCONFERENCE)**

11       VOIR DIRE BY MR. CHAKRABORTY                79

12       DIRECT EXAMINATION BY MR. CHAKRABORTY       81

13       CROSS-EXAMINATION BY MS. MCKNIGHT           101

14       REDIRECT EXAMINATION BY MR. CHAKRABORTY     121

15   **ALLAN J. LICHTMAN, PH.D. (VIA VIDEOCONFERENCE)**

16       DIRECT EXAMINATION BY MR. HAWLEY            123

17       CROSS-EXAMINATION BY MR. BRADEN             154

18       REDIRECT EXAMINATION BY HAWLEY              171

19   **R. BLAKESLEE GILPIN, PH.D.**

20       VOIR DIRE BY MR. RIZZUTO                    173

21       DIRECT EXAMINATION BY MR. RIZZUTO           175

22       CROSS-EXAMINATION BY MS. MCKNIGHT           184

23   **ASHLEY SHELTON**

24       DIRECT EXAMINATION BY SAVITT                188

25       CROSS-EXAMINATION BY MR. WALE               205

1    **(MAY 10, 2022)**

2    **(CALL TO THE ORDER OF COURT)**

3    **THE COURT:** GOOD MORNING.

4    BE SEATED.

5    OKAY. WELCOME BACK TO DAY TWO. HOPEFULLY, WE

6    WON'T HAVE A SITUATION OF FIRE AND ICE LIKE WE HAD YESTERDAY,

7    AND I'M REFERRING TO THE TEMPERATURE IN THE COURTROOM.

8    OKAY. DO WE KNOW WHAT THE CLOCK -- HOW THE

9    CLOCK REMAINS? DO Y'ALL WANT TO PUT THAT ON THE RECORD SO THAT

10   WE ARE ALL ON THE SAME PAGE?

11   **MS. KHANNA:** YES, YOUR HONOR.

12   **THE COURT:** MS. KHANNA.

13   **MS. KHANNA:** YES. ABHA KHANNA FOR THE PLAINTIFFS.

14   **THE COURT:** GO AHEAD.

15   **MS. KHANNA:** WE'VE AGREED WITH THE DEFENDANTS THAT

16   THE PLAINTIFFS HAVE TAKEN UP 190 MINUTES AND THE DEFENDANTS

17   HAVE TAKEN UP 140 MINUTES.

18   **THE COURT:** PLAINTIFFS 190 AND DEFENDANTS 140?

19   **MS. KHANNA:** YES, YOUR HONOR.

20   **THE COURT:** OKAY. ALL RIGHT. NEXT WITNESS.

21   **MS. BRANNON:** I WANT TO ENTER AN APPEARANCE BECAUSE I

22   HAVEN'T ENTERED AN APPEARANCE YET. SARAH BRANNON FOR THE

23   ROBINSON PLAINTIFFS. B-R-A-N-N-O-N.

24   AND PLAINTIFFS CALL DR. LISA HANDLEY.

25

Case: 23-30642    Document: 3    Page: 122    Date Filed: 09/15/2023

10:32  1                    **LISA R. HANDLEY, PH.D,**

       2    **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

       3         **MS. BRANNON:**  WE HAVE AGREED TO STIPULATE TO THE

       4    EXPERTISE OF THE WITNESSES.  SO I WOULD LIKE TO ASK FOR A

       5    STIPULATION THAT DR. HANDLEY IS AN EXPERT IN -- AN EXPERT

       6    WITNESS IN REDISTRICTING WITH AN EMPHASIS ON RACIALLY POLARIZED

       7    VOTING.

       8                    IS THERE AN AGREEMENT?

       9         **THE COURT:**  IS THERE A STIPULATION?

      10         **MR. FARR:**  HELLO, YOUR HONOR.

      11                    TOM FARR FROM THE LAW FIRM OF NELSON MULLINS.

      12    I'M HERE REPRESENTING THE SECRETARY OF STATE.

      13                    AND WE HAVE NO OBJECTION TO THAT STIPULATION,

      14    YOUR HONOR.

      15         **THE COURT:**  THANK YOU, SIR.

      16         **MS. BRANNON:**  YOUR HONOR, MAY I APPROACH THE WITNESS?

      17         **THE COURT:**  YES.

      18                    AND THE COURT WILL ACCEPT DR. HANDLEY AND ALLOW

      19    OPINION TESTIMONY IN THE AREA OF REDISTRICTING WITH A SPECIALTY

      20    IN RACIALLY POLARIZED VOTING.

      21                    YOU MAY APPROACH.

      22         **MS. BRANNON:**  YOUR HONOR?

      23         **THE COURT:**  YES.

      24         **MS. BRANNON:**  I JUST REALIZED THAT I HAVE SOMEHOW CUT

      25    MY FOOT.

09:37  1              **THE COURT:**  UH-OH.  ARE YOU BLEEDING ALL OVER THE

       2   PLACE?

       3              **MS. BRANNON:**  I AM.

       4              **THE COURT:**  OKAY.  WE ARE GOING TO TAKE --

       5              **MS. BRANNON:**  CAN WE TAKE A FIVE-MINUTE RECESS?

       6              **THE COURT:**  WE CAN.  WE CAN TAKE A RECESS WHILE YOU

       7   CALL EMS.  OKAY.  WE WILL TAKE FIVE MINUTES.  EVERYBODY JUST

       8   RELAX.

       9              **(WHEREUPON, THE COURT WAS IN RECESS.)**

      10              **THE COURT:**  OKAY.  BE SEATED.

      11                  OKAY.  SO THAT BROKE THE ICE.  ALL RIGHT.  ON

      12   THE RECORD.

      13              **MS. BRANNON:**  I'M RECOVERED.

      14              **THE COURT:**  GOOD.  AND IF YOU FEEL LIGHTHEADED FROM

      15   THE LOSS OF BLOOD, WE WILL TAKE ANOTHER RECESS.  MAYBE SOMEBODY

      16   BROUGHT COOKIES.

      17              **MS. BRANNON:**  YEAH.  I THINK I'M OKAY.

      18                  ALL RIGHT.  SO WE ARE GOING TO RETURN.  FOR THE

      19   RECORD, I HAVE GIVEN DR. HANDLEY A BINDER WITH A COPY OF HER

      20   EXPERT MATERIALS IN THIS CASE, AND WE ARE GOING TO WALK THROUGH

      21   ALL OF THOSE AND INTRODUCE THEM AS WE DISCUSS THEM.

      22              **THE COURT:**  OKAY.  PROCEED.

      23                      **DIRECT EXAMINATION**

      24   BY MS. BRANNON:

      25   **Q.**  DR. HANDLEY, DID YOU PREPARE A REPORT IN THIS CASE?

09:42   1    **A.**    SEVERAL, YES.

  2    **Q.**    CAN YOU TURN TO THE FIRST PAGE OF YOUR BINDER.

  3    **A.**    (WITNESS COMPLIED.)

  4    **Q.**    IS THAT A COPY OF THE PRELIMINARY REPORT YOU PREPARED?

  5    **A.**    IT IS.

  6         **MS. BRANNON:**    FOR THE RECORD, DR. HANDLEY'S

  7    PRELIMINARY REPORT IS EXHIBIT PR-12.

  8         **THE COURT:**    RECORD DOCUMENT 41-3.    RIGHT?

  9         **MS. BRANNON:**    YES.

  10         **THE COURT:**    OKAY.

  11    **BY MS. BRANNON:**

  12    **Q.**    DR. HANDLEY, IS YOUR C.V. ATTACHED TO YOUR PRELIMINARY

  13    REPORT?

  14    **A.**    IT IS.

  15    **Q.**    IS THIS A COMPLETE AND ACCURATE SUMMARY OF YOUR BACKGROUND

  16    AND PROFESSIONAL EXPERIENCE?

  17    **A.**    IT IS.

  18    **Q.**    DR. HANDLEY, WHAT DO YOU DO FOR A LIVING?

  19    **A.**    I AM A CONSULTANT AND A --

  20         **THE COURT:**    MA'AM, I THINK YOU MIGHT NEED TO ADJUST

  21    YOUR MIC.    YES, RIGHT THERE, YOUR MIC.    YES, JUST ADJUST IT.

  22         **THE WITNESS:**    JUST PUT IT CLOSER TO MY -- GOT IT.

  23         **THE COURT:**    NOW WE CAN HEAR BETTER.

  24         GO AHEAD.

  25    **BY MS. BRANNON:**

Case: 23-3064   Document: 3   Page: 125   Date Filed: 09/15/2023

09:43   1   Q.   I'LL REPEAT THE QUESTION.  DR. HANDLEY, WHAT DO YOU DO FOR

2   A LIVING?

3   A.   I AM A CONSULTANT BOTH HERE IN THE UNITED STATES AND

4   OVERSEAS.  I AM ALSO A PART-TIME ACADEMIC IN THE U.K.

5   Q.   CAN YOU PROVIDE US SOME EXAMPLES OF SOME OF YOUR CLIENTS

6   FOR YOUR CONSULTING BUSINESS?

7   A.   I HAVE WORKED, AS I MENTIONED, FOR THE U.N.  I'VE WORKED

8   FOR SCORES OF STATES' AND LOCAL JURISDICTIONS.  I'VE WORKED FOR

9   INDEPENDENT REDISTRICTING COMMISSIONS, FOR THE DEPARTMENT OF

10   JUSTICE, FOR SEVERAL CIVIL RIGHTS ORGANIZATIONS, INCLUDING THE

11   ACLU.

12   Q.   CAN YOU BRIEFLY DESCRIBE SOME OF YOUR ACADEMIC WORK THAT

13   YOU HAVE DONE ON THE TOPIC OF REDISTRICTING AND MINORITY VOTE

14   DELUSION?

15   A.   ALMOST ALL OF THE ARTICLES THAT YOU'LL SEE LISTED IN MY

16   C.V. -- THAT INCLUDES BOOKS, ARTICLES FOR PEER-REVIEWED

17   JOURNALS, LAW REVIEW ARTICLES, CHAPTERS IN BOOKS -- DEAL WITH

18   MINORITY REPRESENTATION, VOTING REDISTRICTING WITH THE SUBJECTS

19   OF THIS CASE.

20   Q.   AND HAVE YOU TESTIFIED BEFORE AS AN EXPERT WITNESS?

21   A.   I HAVE.

22   Q.   APPROXIMATELY HOW MANY TIMES HAVE YOU PERFORMED A

23   RACIAL-BLOC VOTING ANALYSIS AS AN EXPERT WITNESS?

24   A.   AS AN EXPERT WITNESS?  SCORES OF TIMES.

25   Q.   AND HAVE YOU BEEN ACCEPTED AS AN EXPERT WITNESS BEFORE TO

09:45  1  TESTIFY ABOUT REDISTRICTING AND RACIALLY POLARIZED VOTING?

2  **A.**  I HAVE.

3  **Q.**  APPROXIMATELY HOW MANY TIMES?

4  **A.**  SCORES.

5  **Q.**  DR. HANDLEY, WHAT WERE YOU ASKED TO DO IN THIS CASE?

6  **A.**  I WAS ASKED TO CONDUCT AN ANALYSIS OF VOTING PATTERNS BY

7  RACE IN LOUISIANA AND TO EVALUATE PROPOSED DISTRICTS -- THAT

8  IS, THE ENACTED PLAN AND SEVERAL ILLUSTRATIVE PLANS -- TO

9  ASCERTAIN THE OPPORTUNITY FOR BLACK VOTERS TO ELECT THEIR

10  CANDIDATES OF CHOICE IN THE PLANS.

11  **Q.**  AND WERE YOU ASKED TO ANALYZE VOTING PATTERNS IN THE STATE

12  OF LOUISIANA SPECIFICALLY?

13  **A.**  YES.  I ANALYZED VOTING PATTERNS STATEWIDE.  I ANALYZED

14  VOTING PATTERNS IN EXISTING CONGRESSIONAL DISTRICTS AND IN THE

15  ENACTED CONGRESSIONAL DISTRICTS.

16  **Q.**  CAN YOU PROVIDE US A GENERAL SUMMARY OF THE OPINIONS THAT

17  YOU REACHED WITH RESPECT TO YOUR ANALYSIS AS TO WHETHER THERE'S

18  RACIALLY POLARIZED VOTING IN LOUISIANA?

19  **A.**  YES.  THERE IS RACIALLY POLARIZED VOTING IN LOUISIANA.

20  THERE IS QUITE STARK RACIALLY POLARIZED VOTING IN LOUISIANA.

21  **Q.**  WHAT'S YOUR DEFINITION OF "RACIALLY POLARIZED VOTING"?

22  **A.**  *THORNBURG V. GINGLES* TELLS US THAT VOTING IS POLARIZED IF

23  BLACK VOTERS AND WHITE VOTERS VOTE DIFFERENTLY.  IN OTHER

24  WORDS, IF BLACK VOTERS VOTING ALONE WOULD ELECT DIFFERENT

25  CANDIDATES THAN WHITE VOTERS VOTING ALONE, THEN THE CONTEST IS

09:46 1    RACIALLY POLARIZED.

2    **Q.**    WHAT STATISTICAL TECHNIQUES DID YOU USE TO ANALYZE WHETHER

3    VOTING IN LOUISIANA IS RACIALLY POLARIZED?

4    **A.**    I USED THREE STANDARD TECHNIQUES:  HOMOGENEOUS PRECINCT

5    ANALYSIS, ECOLOGICAL REGRESSION, AND ECOLOGICAL INFERENCE.

6    TECHNICALLY, I USED ACTUALLY FOUR BECAUSE THERE ARE TWO

7    VARIANTS OF ECOLOGICAL INFERENCE.

8    **Q.**    WE HEARD YESTERDAY SOME OF THE DETAILS ABOUT ECOLOGICAL

9    INFERENCE.  BUT CAN YOU PROVIDE A BRIEF SUMMARY OF HOMOGENEOUS

10    PRECINCT ANALYSIS AND ECOLOGICAL REGRESSION?

11    **A.**    THOSE ARE THE EASY ONES, YES.  HOMOGENEOUS PRECINCT

12    ANALYSIS SIMPLY COMPARES THE VOTING PATTERNS OF PRECINCTS THAT

13    ARE OVERWHELMINGLY ONE RACE COMPARED TO PRECINCTS THAT ARE

14    OVERWHELMINGLY ANOTHER RACE.

15         SO IN THIS CASE, YOU'RE COMPARING PRECINCTS THAT ARE

16    OVERWHELMINGLY WHITE TO PRECINCTS THAT ARE OVERWHELMINGLY

17    BLACK.  IT'S NOT ACTUALLY A STATISTICAL TECHNIQUE.  IT'S SIMPLY

18    COMPARING THESE TWO SETS OF PRECINCTS.  WE CALL IT AN ESTIMATE

19    BECAUSE, OF COURSE, NOT ALL VOTERS LIVE IN HOMOGENEOUS

20    PRECINCTS, AND THE VOTERS WHO LIVE IN HOMOGENEOUS PRECINCTS

21    MIGHT VOTE DIFFERENTLY THAN THE VOTERS WHO LIVE IN MORE DIVERSE

22    PRECINCTS.

23    **Q.**    WHY DO YOU USE ALL THREE METHODS?

24    **A.**    TWO OF THE METHODS HAVE BEEN AROUND FOR A VERY LONG TIME.

25    WHEN *THORNBURG V. GINGLES* WAS DECIDED, HOMOGENEOUS PRECINCT

09:48 1 ANALYSIS AND ECOLOGICAL REGRESSION WERE USED BY THE PLAINTIFF'S
2 EXPERTS, AND THE COURT APPROVED THOSE METHODS.
3 SINCE THEN, ECOLOGICAL INFERENCE WAS DEVELOPED BY A
4 PROFESSOR AT HARVARD BY THE NAME OF GARY KING, AND COURTS HAVE
5 ACCEPTED THAT.
6 NOW, THIS IS THREE DIFFERENT TECHNIQUES TO ARRIVE AT
7 ESTIMATES. IF THE ESTIMATES ARE MORE OR LESS THE SAME, DESPITE
8 USING THREE DIFFERENT TECHNIQUES, WE ARE CERTAIN THAT WE HAVE
9 GRASPED WHAT THE VOTING PATTERNS ARE.
10 **Q.** HAVE COURTS ACCEPTED YOUR EXPERT TESTIMONY USING THESE
11 DIFFERENT STATISTICAL METHODOLOGIES IN VOTING CASES BEFORE?
12 **A.** YES. NOW, AGAIN, ECOLOGICAL INFERENCE IS MORE COMMON.
13 I'VE ONLY BEEN USING THAT FOR MAYBE 20 YEARS, BUT THE OTHERS
14 FOR 40 YEARS. A LONG TIME.
15 **Q.** OKAY. LET'S LOOK AT YOUR ANALYSIS A LITTLE BIT MORE IN
16 DETAIL.
17 **MS. BRANNON:** CAN WE SEE DEMONSTRATIVE EXHIBIT 1.2.
18 **BY MS. BRANNON:**
19 **Q.** DID YOU ANALYZE STATEWIDE ELECTIONS?
20 **A.** I DID ANALYZE STATEWIDE ELECTIONS.
21 **Q.** HOW MANY STATEWIDE ELECTIONS DID YOU ANALYZE?
22 **A.** FIFTEEN STATEWIDE ELECTIONS.
23 **Q.** ARE YOU FAMILIAR WITH THIS TABLE THAT'S DEMONSTRATIVE
24 EXHIBIT 1.2?
25 **A.** YES. THESE ARE THE 15 CONTESTS THAT I ANALYZED.

09:49  1   **Q.**   WHY DID YOU CHOOSE THESE ELECTIONS?

2   **A.**   THESE ARE ALL RECENT ELECTIONS FROM 2015 ON, AND THEY ALL

3   INCLUDE BLACK CANDIDATES.

4   **Q.**   LET'S WALK THROUGH YOUR ANALYSIS OF A STATEWIDE ELECTION.

5       **MS. BRANNON:**  CAN WE SEE DEMONSTRATIVE EXHIBIT 1.3.

6   **BY MS. BRANNON:**

7   **Q.**   DR. HANDLEY, DO YOU RECOGNIZE THIS SPREADSHEET?

8   **A.**   I DO.

9   **Q.**   IS THIS SPREADSHEET PART OF YOUR PRELIMINARY REPORT AS

10   APPENDIX A?

11   **A.**   IT IS.

12   **Q.**   CAN YOU EXPLAIN WHAT THIS SPREADSHEET SHOWS BY WALKING US

13   THROUGH THE PORTION THAT HAS BEEN HIGHLIGHTED?

14   **A.**   YES.  SO THIS IS A PARTICULAR CONTEST.  IN THIS CASE IT'S

15   THE ATTORNEY GENERAL IN 2019, OCTOBER 2019.  YOU CAN SEE THE

16   TWO CANDIDATES:  IKE JACKSON AND JEFF LANDRY.  YOU CAN SEE

17   THEIR PARTY.  YOU CAN SEE THEIR RACE.  AND THE NEXT COLUMN IS

18   THE ACTUAL VOTE THEY RECEIVED.  BELOW THAT IS THE "BLACK

19   TURNOUT" AND THE "WHITE TURNOUT" FIGURES.  AND THEN THE NEXT

20   SET OF FOUR COLUMNS ARE THE ESTIMATES DERIVED BY THE FOUR

21   DIFFERENT TECHNIQUES OF THE PERCENTAGE OF BLACK VOTERS WHO

22   VOTED FOR EACH OF THESE CANDIDATES.

23       SO, FOR EXAMPLE, WE SEE 90.6 IS THE "EI RXC"

24   ESTIMATE; 91.2 IS THE "EI 2X2"; 94 PERCENT IS THE "ER"; AND

25   87.7 IS THE "HOMOGENEOUS PRECINCT" ESTIMATE OF A PERCENTAGE OF

09:51 1 BLACK VOTERS WHO SUPPORTED IKE JACKSON.

2          THEN YOU SEE THE SAME INFORMATION FOR THE WHITE

3 VOTERS.  SO BY "EI RXC," 9.4 PERCENT OF THE WHITE VOTERS

4 SUPPORTED IKE JACKSON; BY "EI 2X2" IT'S 10.1; BY "ER" IT'S 9.2;

5 AND BY "HP" IT'S 12.2.  SO ALL OF THEM ARE QUITE COMPARABLE.

6          FOR EXAMPLE, WE ESTIMATE THAT THE PERCENTAGE OF BLACK

7 VOTERS WHO VOTED FOR JACKSON WAS SOMEWHERE BETWEEN 87.7 PERCENT

8 AND 94 PERCENT.

9          **THE COURT:**  DR. HANDLEY, ONE SECOND.

10          **THE WITNESS:**  YES.

11          **THE COURT:**  SUZIE, WILL YOU HELP HER WITH HER MIC.

12 SEE IF MAYBE WE CAN ADJUST IT WHERE IT'S NOT -- SHE'S JUST

13 GOING TO ADJUST IT.  IT'S FINICKY.

14          **THE WITNESS:**  THE PROBLEM IS THAT I'M LEANING

15 FORWARD.

16          **THE COURT:**  RIGHT.  WHAT WE'LL DO IS SHE WILL JUST

17 SEE IF SHE CAN -- HERE WE HAVE THE -- MR. I.T. IS HERE TOO, SO

18 WE ARE WELL -- WE ARE OVER-PREPARED.

19          THANK YOU, BRANDON.

20          **THE WITNESS:**  THIS IS GOING TO BE TOO FAR AWAY, I

21 BET.  CAN YOU STILL HEAR?  NO.

22          **THE COURT:**  NO.

23          THAT'S BETTER.

24          **THE WITNESS:**  OKAY.  AND NOW IT'S NOT BLOCKING THIS?

25          **THE COURT:**  YOU CAN CERTAINLY -- YES, YOU CAN

09:52 1 CERTAINLY ADJUST IT.  I JUST THOUGHT WE WOULD MAYBE GIVE YOU

2 SOME ASSISTANCE.

3       OKAY.  PLEASE CARRY ON.  I'M SORRY I INTERRUPTED

4 YOU.

5 **BY MS. BRANNON:**

6 **Q.**  DR. HANDLEY, WHAT ARE "CONFIDENCE INTERVALS"?

7 **A.**  SO THE "EI RXC" ESTIMATES AND THEN IN THE COLUMN NEXT TO

8 THAT WE HAVE "CONFIDENCE INTERVALS."  YOU CAN THINK OF THOSE AS

9 SORT OF THE MARGINS OF ERROR THAT YOU SEE IN A SURVEY; THAT WE

10 ARE 95 PERCENT CERTAIN THAT THE TRUE ESTIMATE -- THE ESTIMATE

11 BEING 90.6, THAT THE TRUE ESTIMATE IS SOMEWHERE BETWEEN 90.3

12 AND 90.9.

13 **Q.**  AND WHY DO YOU INCLUDE CONFIDENCE INTERVALS ONLY FOR YOUR

14 "EI RXC" CALCULATION?

15 **A.**  THOSE ARE THE ONLY CONFIDENCE INTERVALS THAT ARE GENERALLY

16 ACCEPTED BY EXPERTS IN MY AREA FOR THESE KINDS OF ESTIMATES.

17 **Q.**  DOES THIS APPENDIX A ALSO PROVIDE INFORMATION ABOUT VOTER

18 TURNOUT?

19 **A.**  IT DOES.  THE ITALICIZED LINES IN THE ATTORNEY GENERAL

20 RACE, IT SAYS, "BLACK TURNOUT/BLACK BVAP."  THAT'S THE

21 PERCENTAGE OF BLACK VOTING AGE POPULATION THAT ACTUALLY TURNED

22 OUT FOR THAT PARTICULAR OFFICE.  AND THE SAME FOR WHITE

23 TURNOUT, OF WHITE VAP.

24       SO 35.2 PERCENT HAVE A BLACK VOTING AGE OF THE

25 ELIGIBLE "BLACK VOTING AGE" POPULATION TURNOUT TO VOTE AND 45.2

09:53 1  PERCENT FOR THE WHITES.

2  **Q.**  WOULD YOU CHARACTERIZE THIS 2019 ATTORNEY GENERAL ELECTION

3  AS A POLARIZED CONTEST?

4  **A.**  I WOULD.

5  **Q.**  WHY?

6  **A.**  THE VAST MAJORITY OF BLACK VOTERS SUPPORTED JACKSON.  IF

7  THEY HAD VOTED ALONE, JACKSON WOULD HAVE WON OVERWHELMINGLY.

8  THE VAST MAJORITY OF WHITE VOTERS SUPPORTED LANDRY.

9  AND IF THEY ALONE HAD VOTED, HE WOULD HAVE WON OVERWHELMINGLY.

10  IN FACT, HE DID WIN.

11  **Q.**  DOES THE RACE OF THE CANDIDATES NEED TO BE DIFFERENT TO

12  DETERMINE IF THERE'S RACIALLY POLARIZED VOTING?

13  **A.**  NO.  THE POINT IS THAT BLACK AND WHITE VOTERS PREFER

14  DIFFERENT CANDIDATES.  NOW, IT SO HAPPENS IN THE CONTEST THAT I

15  LOOKED AT, WITH AT LEAST ONE OR TWO EXCEPTIONS, THE BLACK

16  CANDIDATE WAS THE BLACK-PREFERRED CANDIDATE; THAT IS, THE

17  CANDIDATE PREFERRED BY BLACK VOTERS.  BUT THERE ARE EXCEPTIONS

18  TO THAT IN THE ELECTIONS THAT I LOOKED AT.

19  **Q.**  DOES APPENDIX A SHOW THE SAME TYPE OF DATA FOR THE REST OF

20  THE 14 STATEWIDE ELECTIONS THAT YOU ANALYZED?

21  **A.**  YES.  SO ALL 15 ARE IN THIS, AND I JUST DESCRIBED ONE.

22  THEY ARE ALL READ THE SAME.

23  **Q.**  WHAT, IF ANY, CONCLUSIONS DID YOU REACH ABOUT RACIALLY

24  POLARIZED VOTING IN LOUISIANA IN STATEWIDE ELECTIONS BASED ON

25  YOUR ANALYSIS OF THESE 15 ELECTIONS?

09:55 1   **A.**   ALL 15 CONTESTS WERE POLARIZED. IN EVERY INSTANCE, BLACK

2   VOTERS AND WHITE VOTERS WOULD HAVE ELECTED DIFFERENT CANDIDATES

3   HAD THEY VOTED SEPARATELY.

4   **Q.**   YOU'VE ALREADY EXPLAINED THAT YOU ALSO LOOKED AT VOTING

5   PATTERNS IN CONGRESSIONAL ELECTIONS. WHY?

6   **A.**   COURTS HAVE INDICATED THAT ENDOGENOUS ELECTIONS -- THAT

7   IS, ELECTIONS FOR THE OFFICE AT ISSUE -- ARE MORE PROBATIVE

8   THAN EXOGENOUS ELECTIONS.

9       NOW, IN THIS PARTICULAR CASE YOU ARE LOOKING AT

10   PROPOSED PLANS, SO THERE WERE NO ELECTIONS UNDER IT. BUT

11   CONGRESSIONAL ELECTIONS IN GENERAL WOULD STILL BE MORE

12   PROBATIVE AND WOULD BE PARTICULARLY SO IN LOUISIANA WHERE THE

13   DISTRICTS DIDN'T CHANGE THAT MUCH FROM THE ENACTED PLAN FROM

14   THE CURRENT PLAN.

15       **MS. BRANNON:** CAN WE SEE DEMONSTRATIVE EXHIBIT 1.4.

16   **BY MS. BRANNON:**

17   **Q.**   DO YOU RECOGNIZE THIS TABLE?

18   **A.**   YES. THIS IS A LIST OF THE CONGRESSIONAL ELECTION

19   CONTESTS THAT I LOOKED AT. AGAIN, THIS IS FROM 2016 TO THE

20   MOST RECENT CONTEST, AND THEY WERE CONTESTS THAT INCLUDED BLACK

21   CANDIDATES. THERE WERE NO CONTESTS IN DISTRICT 1 THAT

22   INCLUDED BLACK CANDIDATES.

23   **Q.**   AND IS THE ANALYSIS OF THESE CONGRESSIONAL DISTRICTS

24   DESCRIBED IN YOUR REPORTS?

25   **A.**   YES.

09:56 1      **MS. BRANNON:**  CAN WE SEE DEMONSTRATIVE EXHIBIT 1.5.

2   **BY MS. BRANNON:**

3   **Q.**   DR. HANDLEY, DO YOU RECOGNIZE THIS TABLE?

4   **A.**   YES.

5   **Q.**   WAS THERE A VERSION OF APPENDIX B ATTACHED TO YOUR

6   PRELIMINARY REPORT?

7   **A.**   YES.

8   **Q.**   DID YOU MAKE ANY CORRECTIONS?

9   **A.**   I UPDATED IT BY ADDING THREE ELECTIONS THAT OCCURRED IN

10  2021.  THERE WERE TWO CONGRESSIONAL ELECTIONS IN DISTRICT 2 TO

11  REPLACE CEDRIC RICHMOND, AND THERE WAS AN ELECTION IN DISTRICT

12  5.  AND SO THIS HAS BEEN UPDATED TO INCLUDE THOSE ELECTIONS.

13  I'VE ALSO CHANGED THE DATE OF THE ELECTIONS FROM OCTOBER TO THE

14  CORRECT DATE, WHICH IS NOVEMBER, AND I HAD TO CORRECT ONE OF

15  THE CONFIDENCE INTERVALS BECAUSE OF A TYPO.

16  **Q.**   WAS REVISED APPENDIX B INCLUDED WITH YOUR REBUTTAL REPORT?

17  **A.**   YES.

18       **MS. BRANNON:**  FOR THE RECORD, DR. HANDLEY'S REBUTTAL

19  REPORT IS EXHIBIT PR-87.

20  **BY MS. BRANNON:**

21  **Q.**   DID ANY OF THESE CHANGES IMPACT ANY OF YOUR OPINIONS IN

22  THIS CASE?

23  **A.**   NO.

24  **Q.**   IS THE DATA THAT'S REFLECTED IN REVISED APPENDIX B THAT'S

25  ON THE SCREEN SIMILAR TO THE DATA THAT IS REFLECTED IN APPENDIX

09:57  1   A WE WERE JUST DISCUSSING?

2   **A.**   IF BY "DATA" YOU MEAN PRECINCT INFORMATION THAT IS BOTH

3   THE DEMOGRAPHIC INFORMATION AND THE ELECTION RETURNS, IT'S THE

4   SAME.  IF YOU MEAN READING THE CHARTS, IT'S READ THE SAME AS

5   WELL.

6   **Q.**   YES.  READING THE CHARTS?

7   **A.**   READING THE CHARTS.

8   **Q.**   READING THE CHARTS IS THE SAME METHOD -- THIS CHART WOULD

9   BE READ THE SAME AS APPENDIX A THAT WE HAVE WALKED THROUGH?

10   **A.**   THAT'S CORRECT.

11   **Q.**   OKAY.  WHAT, IF ANY, CONCLUSIONS DID YOU REACH ABOUT

12   VOTING PATTERNS IN CONGRESSIONAL ELECTIONS IN LOUISIANA BASED

13   ON YOUR ANALYSIS?

14   **A.**   THE ELECTIONS IN DISTRICTS 3, 4, 5 AND 6 WERE ALL QUITE

15   POLARIZED.  THE ELECTIONS IN DISTRICT 2, LESS SO.  IN FACT,

16   MOST OF THEM WERE NOT POLARIZED IN DISTRICT 2.

17        **MS. BRANNON:**  CAN WE SEE DEMONSTRATIVE EXHIBIT 1.6.

18   **BY MS. BRANNON:**

19   **Q.**   DR. HANDLEY, DID YOU CONDUCT ANY ANALYSIS OF THE VOTING

20   PATTERNS IN THE NEWLY ENACTED CONGRESSIONAL MAP, WHICH I

21   BELIEVE IS HB1?

22   **A.**   I DID.  NOW, OF COURSE, NO ELECTIONS HAVE ACTUALLY

23   OCCURRED.  SO THIS REFLECTS WHAT ARE CALLED RECOMPILED ELECTION

24   RESULTS USING THE PRECINCTS THAT THE OLD ELECTIONS OCCURRED IN

25   AND SORT OF RE-RUNNING THE ELECTIONS AS THEY WOULD HAVE

09:59 1   OCCURRED IF THEY WOULD HAVE OCCURRED IN THE ENACTED
      2   CONGRESSIONAL DISTRICTS.
      3   **Q.**   DO YOU RECOGNIZE THE TABLES ON THIS DEMONSTRATIVE?
      4   **A.**   YES.
      5   **Q.**   IS THERE A VERSION OF APPENDIX C ATTACHED TO YOUR
      6   PRELIMINARY REPORT?
      7   **A.**   YES.
      8   **Q.**   DID YOU MAKE ANY CHANGES?
      9   **A.**   YES.  SO IT TURNS OUT THAT WE HAD A OLD VERSION OF WHAT'S
     10   CALLED A BLOCK 2 DISTRICT EQUIVALENCY FILE FOR THE ENACTED
     11   PLAN.  AND WHEN WE DISCOVERED THAT IT WAS OLD AND WE NEEDED TO
     12   FIX IT, I THEN IN A BURST OF CAUTION RE-RAN ALL OF THE ANALYSES
     13   FOR THE ENACTED DISTRICTS USING THE NEW BLOCK 2 DISTRICT
     14   EQUIVALENCY.
     15   **Q.**   DOES THIS DEMONSTRATIVE DEMONSTRATE YOUR ORIGINAL APPENDIX
     16   C AND YOUR UPDATED APPENDIX C?
     17   **A.**   THAT'S CORRECT.
     18   **Q.**   DID YOUR NEW ANALYSIS OF CONGRESSIONAL DISTRICTS IN THE
     19   ENACTED PLAN OF CONGRESSIONAL DISTRICT -- THIS IS CONGRESSIONAL
     20   DISTRICT 2.  CORRECT?
     21   **A.**   YES.
     22   **Q.**   DID ANY OF YOUR OPINIONS CHANGE?
     23   **A.**   NO.  THE BLOCK EQUIVALENCY FILE WAS ONLY OFF BY ABOUT TWO
     24   PERCENTAGE OF THE POPULATION.  SO WE MOVED THE TWO PERCENTAGE
     25   INTO THE CORRECT DISTRICTS AND IT CHANGED THE ESTIMATES BARELY,

10:01 1   MAYBE BY A PERCENTAGE POINT IF IT CHANGED THEM AT ALL.  AS YOU

2   CAN SEE, VOTING IS STILL QUITE POLARIZED.

3          **MS. BRANNON:**  AND FOR THE RECORD, THE UPDATED

4   APPENDICES ARE PROVIDED WITH PLAINTIFFS' EXHIBIT PR-92.

5              CAN WE SEE PX-1.7.

6   **BY MS. BRANNON:**

7   **Q.**  DID YOU DO AN ANALYSIS OF THE ENACTED PLAN FOR

8   CONGRESSIONAL DISTRICTS OTHER THAN CONGRESSIONAL DISTRICT 2?

9   **A.**  YES.  I DID LOOK AT VOTING PATTERNS IN ALL OF THE ENACTED

10  DISTRICTS THAT OVERLAID ILLUSTRATIVE DISTRICT 5; THAT IS, THE

11  ADDITIONAL BLACK OPPORTUNITY DISTRICT OFFERED BY THE

12  ILLUSTRATIVE PLAN.  AND AS YOU CAN SEE, IT OVERLAPS DISTRICTS

13  2, 3, 4, 5 AND 6.

14  **Q.**  SO --

15  **A.**  SO THOSE WERE THE -- THOSE WERE THE CONGRESSIONAL

16  DISTRICTS THAT I LOOKED AT.  IT DOES NOT OVERLAP 1, SO I DID

17  NOT LOOK AT 1.

18  **Q.**  AND YOU RECOGNIZE THIS MAP?

19  **A.**  YES.

20  **Q.**  AND IT SHOWS THE OVERLAY YOU WERE JUST DESCRIBING?

21  **A.**  THAT'S CORRECT.

22  **Q.**  OKAY.  DID YOU MAKE ANY FURTHER CHANGES TO YOUR ANALYSIS

23  FOR THE OTHER CONGRESSIONAL DISTRICTS BESIDES CD2?

24  **A.**  DO YOU MEAN BECAUSE OF THE BLOCK EQUIVALENT?

25  **Q.**  YES.

10:02 1   **A.**   I DID, YES.

2   **Q.**   YES.

3   **A.**   I RE-RAN ALL OF THE ANALYSES.

4   **Q.**   AND THOSE ARE ALL INCLUDED IN THE CORRECTED MATERIALS

5   REPORT THAT WE FILED IN THIS CASE?

6   **A.**   THAT'S CORRECT.

7   **Q.**   WHICH, FOR THE RECORD, IS EXHIBIT PR-92.

8         DID ANY OF YOUR OPINIONS CHANGE AS A RESULT OF

9   REDOING THIS ANALYSIS FOR ALL FIVE OF THE CONGRESSIONAL

10   DISTRICTS YOU LOOKED AT?

11   **A.**   NO.  AS I SAID, THE CHANGES WERE MOSTLY LESS THAN A

12   PERCENTAGE POINT, AND VOTING IS STILL VERY POLARIZED IN THESE

13   CONGRESSIONAL DISTRICTS.

14         **MS. BRANNON:**  WE CAN TAKE THIS ONE DOWN.

15   **BY MS. BRANNON:**

16   **Q.**   WHEN CONDUCTING YOUR ANALYSIS OF THESE CONGRESSIONAL

17   DISTRICTS IN THE ENACTED PLAN, WHAT CONCLUSIONS DID YOU REACH?

18   **A.**   VOTING WAS POLARIZED IN ALL OF THE DISTRICTS THAT I LOOKED

19   AT.  THERE WAS SOME VARIATION IN THAT THERE WAS MORE WHITE

20   CROSSOVER VOTE IN ENACTED DISTRICT 2 THAN THERE WAS IN 3, 4, 5

21   AND 6, WHICH WERE QUITE STARKLY POLARIZED.

22   **Q.**   WHAT DO YOU MEAN WHEN YOU SAY "WHITE CROSSOVER VOTING"?

23   **A.**   I'M TALKING ABOUT WHITE VOTERS WHO ARE VOTING FOR THE

24   BLACK-PREFERRED CANDIDATE.

25   **Q.**   LET'S TURN NOW TO YOUR ANALYSIS OF BLACK VOTERS'

Case 23-30642-SDG   Document: 3   Page: 139   Date Filed: 09/15/2023

10:03 1  OPPORTUNITIES TO ELECT CANDIDATES OF THEIR CHOICE IN THE

2  ILLUSTRATIVE MAPS AND THE ENACTED CONGRESSIONAL MAP.

3       DID YOU EVALUATE THE OPPORTUNITY OF BLACK VOTERS TO

4  ELECT THEIR CANDIDATE OF CHOICE IN THE ENACTED MAP?

5  **A.**  I DID.

6  **Q.**  AND WHAT METHODOLOGY DID YOU USE?

7  **A.**  OF COURSE, NO ELECTIONS HAVE ACTUALLY OCCURRED IN EITHER

8  THE ILLUSTRATIVE OR THE ENACTED PLAN, SO I USED -- I RELIED ON

9  WHAT ARE CALLED RECOMPILED ELECTION RESULTS, LOOKING AT HOW

10  PREVIOUS ELECTIONS WOULD HAVE FAIRED, HOW CANDIDATES OF CHOICE

11  IN PREVIOUS ELECTIONS WOULD HAVE FAIRED UNDER THE PROPOSED

12  DISTRICTS.

13  **Q.**  HAVE YOU USED THIS METHOD OF RECOMPILING ELECTION RESULTS

14  WHEN PROVIDING OTHER EXPERT OPINIONS THAT HAVE BEEN ACCEPTED BY

15  COURTS BEFORE?

16  **A.**  YES.

17  **Q.**  WHY DO YOU THINK IT IS USEFUL TO PERFORM THIS EVALUATION?

18  **A.**  THE ONLY WAY TO KNOW IF A PROPOSED PLAN WILL PROVIDE BLACK

19  VOTERS WITH AN OPPORTUNITY TO ELECT THEIR CANDIDATES OF CHOICE,

20  SINCE NO ELECTIONS HAVE OCCURRED, IS TO DO SOMETHING LIKE THIS:

21  TO LOOK AT RECOMPILED ELECTION RESULTS, DETERMINE IF THE

22  BLACK-PREFERRED CANDIDATES WOULD WIN AND HOW MANY ELECTIONS

23  THEY WOULD WIN.

24  **Q.**  DID YOU ALSO PERFORM THIS RECOMPILED ELECTION RESULTS

25  ANALYSIS ON ILLUSTRATIVE MAP 2-A THAT WAS DRAWN BY PLAINTIFFS'

10:05 1   EXPERT, TONY FAIRFAX?

2   **A.**   I DID.

3        **MS. BRANNON:**  CAN WE SEE DEMONSTRATIVE EXHIBIT 1.8.

4   **BY MS. BRANNON:**

5   **Q.**   DO YOU RECOGNIZE THESE TABLES?

6   **A.**   YES.

7   **Q.**   CAN YOU EXPLAIN THE INFORMATION PROVIDED ON THESE TABLES,

8   STARTING WITH THE ENACTED PLAN ON THE RIGHT SIDE OF THE SCREEN?

9   **A.**   YES.  NOW, WHEN YOU ARE TRYING TO FIGURE OUT IF A DISTRICT

10  IS GOING TO PROVIDE BLACK VOTERS WITH AN OPPORTUNITY TO ELECT,

11  THE ELECTIONS THAT YOU WANT TO LOOK AT ARE ELECTIONS IN WHICH

12  BLACK VOTERS AND WHITE VOTERS DISAGREED ON WHO THEY WOULD

13  ELECT.  AND THAT HAPPENS TO BE THE CASE IN ALL 15 ELECTIONS

14  THAT I LOOKED AT.

15       SO HERE WHAT I DID WAS I DETERMINED HOW MANY OF THOSE

16  15 ELECTIONS WOULD THE BLACK-PREFERRED CANDIDATE EITHER WIN

17  WITH THE MAJORITY OF THE VOTE OR WIN ENOUGH VOTES TO GO ON TO

18  THE RUNOFF.  SO THAT'S MY "EFFECTIVENESS SCORE ONE."  IT'S JUST

19  THE PERCENTAGE OF TIMES THE BLACK-PREFERRED CANDIDATE WOULD WIN

20  OR ADVANCE TO THE RUNOFF.

21       THE SECOND COLUMN, THE "EFFECTIVENESS SCORE TWO," IS

22  WHAT WOULD HAPPEN IF THEY MADE IT TO THE RUNOFF AND THERE WERE

23  NOW JUST TWO CANDIDATES; WOULD THEY WIN THE RUNOFF?  AND THIS

24  IS THE PERCENTAGE OF TIMES THAT THEY WOULD WIN THE RUNOFF.

25       SO, FOR EXAMPLE, IN DISTRICT 2 THE BLACK-PREFERRED

10:06   1    CANDIDATE IN ALL 15 CONTESTS WOULD HAVE EITHER WON OR PROCEEDED

      2    TO THE RUNOFF.  AND IN THE TWO-CANDIDATE CONTEST -- LET'S SAY

      3    THEY'VE GONE TO THE RUNOFF -- THEY WOULD HAVE WON IN

      4    100 PERCENT OF THE TIME.

      5             NOW, IN THE OTHER DISTRICTS IN THE ENACTED PLAN,

      6    ALTHOUGH THE BLACK-PREFERRED CANDIDATE IN SOME OF THESE

      7    DISTRICTS WOULD HAVE PROCEEDED TO THE RUNOFF IN ABOUT

      8    25 PERCENT OF THESE ELECTIONS, NONE OF THEM WOULD HAVE ACTUALLY

      9    WON THE RUNOFF.

    10             SO IN THE OTHER DISTRICTS, THE BLACK-PREFERRED

    11    CANDIDATE WOULD NOT HAVE ULTIMATELY PREVAILED IN ANY OF THE

    12    ELECTIONS.

    13    **Q.**   CAN YOU JUST BRIEFLY EXPLAIN TO THE COURT THE UNUSUALNESS

    14    OF LOUISIANA'S VOTING SYSTEM?

    15    **A.**   RIGHT.  SO THIS IS A LITTLE DIFFERENT THAN HOW I USUALLY

    16    DO THIS BECAUSE YOU HAVE A SYSTEM THAT IS -- WELL, IT USED TO

    17    BE UNIQUE.  I THINK MAYBE SOME OTHER STATES ARE ADOPTING IT.

    18    BUT YOU HAVE A PRIMARY SYSTEM THAT INCLUDES BOTH DEMOCRATS AND

    19    REPUBLICANS, AND THE ELECTION MIGHT ACTUALLY END THERE WITHOUT

    20    A GENERAL ELECTION; WHILE IN MOST STATES YOU HAVE -- YOU GO ON

    21    AND YOU HAVE A GENERAL ELECTION WITH TWO CANDIDATES:  A

    22    DEMOCRAT AND A REPUBLICAN.

    23             SOMETIMES HERE YOU GO ON AND YOU HAVE AN ELECTION

    24    WITH TWO REPUBLICANS, SO THAT MAKES IT A LITTLE BIT DIFFERENT.

    25    AND THAT'S WHY I -- THAT'S WHY YOU SEE THESE TWO COLUMNS.

10:08  1    **Q.**   WOULD YOU CHARACTERIZE ANY OF THE CONGRESSIONAL DISTRICTS

2    IN THE ENACTED PLAN OTHER THAN CONGRESSIONAL DISTRICT 2 AS

3    OPPORTUNITY DISTRICTS?

4    **A.**   I WOULD NOT.

5    **Q.**   AND THEN CAN YOU JUST BRIEFLY EXPLAIN THE ANALYSIS THAT IS

6    REFLECTED IN TABLE 2 ON THE LEFT SIDE OF THE MAP ABOUT

7    ILLUSTRATIVE DISTRICT -- ILLUSTRATIVE MAP 2-A?

8    **A.**   SO, AGAIN, I USED EXACTLY THE SAME METHODOLOGY, DID

9    EXACTLY THE SAME THING, BUT THIS TIME YOU CAN SEE THAT DISTRICT

10   2 ALSO 100 PERCENT OF THE TIME THE BLACK-PREFERRED CANDIDATE

11   WINS.  BUT IN DISTRICT 5, 86.7 PERCENT OF THE CONTESTS PRODUCED

12   THE BLACK-PREFERRED CANDIDATE AS WINNING OR PROCEEDING TO THE

13   RUNOFF.  AND THEN 77.8 PERCENT OF THE RUNOFFS THAT ARE

14   TWO-CANDIDATE CONTESTS, THE BLACK-PREFERRED CANDIDATE PREVAILS

15   IN DISTRICT 5.

16   **Q.**   WOULD YOU CHARACTERIZE ANY OF THE CONGRESSIONAL DISTRICTS

17   IN ILLUSTRATIVE MAP 2-A AS OPPORTUNITY DISTRICTS?

18   **A.**   YES.  DISTRICTS 2 AND DISTRICTS -- AND DISTRICT 5 BOTH

19   PROVIDE BLACK VOTERS WITH AN OPPORTUNITY TO ELECT THEIR

20   CANDIDATES OF CHOICE.  THE OTHER DISTRICTS -- 1, 3, 4 AND 6 --

21   DO NOT.

22   **Q.**   IS THE INFORMATION IN TABLE 2 REFLECTED IN YOUR REPORTS IN

23   THIS CASE?

24   **A.**   YES.

25   **Q.**   WHAT CONCLUSIONS, IF ANY, DID YOU DRAW ABOUT THE ABILITY

10:09 1  OF BLACK VOTERS TO ELECT THEIR CANDIDATES OF CHOICE IN THIS

2  ILLUSTRATIVE PLAN VERSUS THE ENACTED PLAN?

3  **A.**  THERE IS ONE BLACK OPPORTUNITY DISTRICT IN THE ENACTED

4  PLAN AND THERE ARE TWO IN THE ILLUSTRATIVE PLAN MARKED MAP 2-A.

5  **Q.**  BRINGING TOGETHER YOUR RACIAL POLARIZATION ANALYSIS AND

6  YOUR EFFECTIVENESS ANALYSIS OF THE ENACTED PLAN AND

7  ILLUSTRATIVE MAPS, HOW DOES THE RACIAL BLOC VOTING IN LOUISIANA

8  AFFECT VOTERS' OPPORTUNITIES TO ELECT THEIR CANDIDATES OF

9  CHOICE?

10  **A.**  BECAUSE VOTING IS RACIALLY POLARIZED, BLACK VOTERS CAN

11  ONLY ELECT THEIR CANDIDATES OF CHOICE IF A DISTRICT IS DRAWN

12  THAT GIVES THEM THIS OPPORTUNITY.

13      **MS. BRANNON:**  PLAINTIFFS WOULD MOVE FOR ADMISSION OF

14  ALL OF DR. HANDLEY'S MATERIALS SUBMITTED IN THIS CASE, WHICH,

15  FOR THE RECORD, IS PR-12, PR-87, PR-91 AND PR-92.

16        **THE COURT:**  ANY OBJECTION?

17        **MR. FARR:**  NO OBJECTIONS, YOUR HONOR.

18        **THE COURT:**  ADMITTED.

19  **BY MS. BRANNON:**

20  **Q.**  DR. HANDLEY, DID YOU ALSO LOOK AT THE EXPERT REPORT OF

21  DEFENDANTS' EXPERT, DR. SOLANKY?  I THINK I'M SAYING THAT

22  CORRECTLY.  SOLANKY?

23      **MR. FARR:**  THAT'S CORRECT.

24  **BY THE WITNESS:**

25  **A.**  I DID.

10:11 1  **BY MS. BRANNON:**

2  **Q.**   DO YOU THINK IT WAS APPROPRIATE FOR DR. SOLANKY TO OFFER

3  CONCLUSIONS ABOUT THE VOTING PATTERNS IN EAST BATON ROUGE FROM

4  THE ANALYSIS OF JUST ONE ELECTION?

5  **A.**   CERTAINLY YOU WOULD LOOK AT A PATTERN OF VOTING OVER MORE

6  THAN ONE ELECTION.  YOU WOULD LOOK AS AT MANY AS YOU COULD.

7        **MS. BRANNON:**  CAN WE SEE DEMONSTRATIVE 1.10.

8  **BY MS. BRANNON:**

9  **Q.**   AND DR. SOLANKY DID AN EVALUATION OF EAST BATON ROUGE

10  PARISH.  CORRECT?

11  **A.**   YES.

12  **Q.**   DO YOU RECOGNIZE THIS MAP?

13  **A.**   YES.

14  **Q.**   DO YOU THINK IT WAS APPROPRIATE THAT DR. SOLANKY LOOKED

15  JUST AT EAST BATON ROUGE PARISH?

16  **A.**   NO.  FOR TWO REASONS:  NO. 1, EAST BATON ROUGE PARISH IS

17  NOT LARGE ENOUGH TO BE ITS OWN CONGRESSIONAL DISTRICT.  THE

18  POPULATION IS TOO SMALL.  YOU HAVE TO ADD NEIGHBORING PARISHES

19  TO IT.  AND AS HE POINTED OUT, THE VOTING PATTERNS IN

20  NEIGHBORING PARISHES IS DIFFERENT.

21        AND NO. 2, YOU CAN SEE FROM THIS MAP THAT IN ANY

22  CASE, EAST BATON ROUGE IS NOT WHOLLY CONTAINED WITHIN ANY

23  CONGRESSIONAL DISTRICTS, EITHER IN THE ENACTED OR THE

24  ILLUSTRATIVE PLANS.  IT IS DIVIDED BETWEEN TWO DISTRICTS.

25  **Q.**   WOULD IT BE POSSIBLE TO DRAW A CONGRESSIONAL DISTRICT JUST

10:12 1 WITH EAST BATON ROUGE PARISH?

2 **A.** NO. THE POPULATION IS TOO SMALL.

3 **Q.** SO EVEN IF DR. SOLANKY'S CONCLUSION WAS CORRECT, THAT THE

4 VOTING PATTERNS IN EAST BATON ROUGE -- ABOUT THE VOTING

5 PATTERNS IN EAST BATON ROUGE, DO YOU THINK THAT THAT ANALYSIS

6 IS RELEVANT TO QUESTIONS ABOUT PERFORMANCE IN AN ILLUSTRATIVE

7 DISTRICT 5?

8 **A.** NO. AGAIN, YOU HAVE TO ADD POPULATION. AS HE, HIMSELF,

9 POINTS OUT, THE POPULATION, THE VOTING PATTERNS IN THE PARISHES

10 NEIGHBORING EAST BATON ROUGE PARISH IS DIFFERENT.

11 **Q.** DID YOU ALSO LOOK AT THE REPORT OF DR. ALFORD?

12 **A.** I DID.

13 **Q.** DID DR. ALFORD OFFER ANY CRITICISM OF THE METHODOLOGY IN

14 YOUR REPORT?

15 **A.** NO.

16 **Q.** DR. ALFORD'S REPORT -- DR. ALFORD, IN HIS REPORT IN

17 ADDRESSING THE CAUSE OF VOTING PATTERNS IN LOUISIANA, DOES AN

18 EVALUATION AS TO WHETHER THERE IS RACIAL -- HOLD ON.

19 **MS. BRANNON:** EXCUSE ME, YOUR HONOR. CAN I START

20 AGAIN?

21 **BY MS. BRANNON:**

22 **Q.** DOES ANY EVALUATION OF WHETHER THERE IS ACTUAL RACIALLY

23 POLARIZED VOTING INVOLVE AN EVALUATION OF THE CAUSES OF THE

24 VOTING PATTERNS THAT HAVE BEEN ANALYZED?

25 **A.** NO. THE VOTING RIGHTS ACT -- I BELIEVE THE VOTING RIGHTS

10:14 1 ACT WAS SPECIFICALLY AMENDED TO FOCUS THE INQUIRY ON THE

2 ELECTORAL CONSEQUENCES OF DIFFERENT VOTING PATTERNS AND TO NOT

3 -- THE REASON FOR THOSE -- INTENT WAS SPECIFICALLY TAKEN OUT OF

4 THE EQUATION, THE INTENT OF THE LEGISLATORS AS WELL AS THE

5 INTENT OF THE VOTERS.

6 **Q.** DO YOU AGREE WITH DR. ALFORD'S SUGGESTION IN HIS REPORT

7 THAT THE FACT THAT BLACK VOTERS SUPPORT DEMOCRATS AND WHITE

8 VOTERS SUPPORT REPUBLICANS IN LOUISIANA MEANS THAT VOTING IS

9 NOT RACIALLY POLARIZED?

10 **A.** WHEN YOU DETERMINE IF VOTING IS RACIALLY POLARIZED, YOU DO

11 IT THE WAY THAT I HAVE DONE IT.  THIS IS THE WAY THAT EXPERTS

12 HAVE DONE IT FOR OVER 50 YEARS.  YOU LOOK AT THE VOTING

13 PATTERNS OF BLACKS AND WHITES AND YOU COMPARE TO SEE IF THEY

14 ARE VOTING FOR THE SAME CANDIDATES OR DIFFERENT CANDIDATES.

15 THIS IS HOW IT IS DONE.  THIS IS HOW YOU DETERMINE IF VOTING IS

16 RACIALLY POLARIZED.

17    **MS. BRANNON:**  NOTHING FURTHER, YOUR HONOR.

18    **THE COURT:**  OKAY.  CROSS.

19    **MR. FARR:**  THANK YOU, YOUR HONOR.

20    CAN EVERYONE HEAR ME?

21    **THE COURT:**  YES, SIR.  DID YOU NEED TO -- DID YOU

22 NEED TO REMAIN SEATED?  I CAN'T REMEMBER.

23      **CROSS-EXAMINATION**

24 BY MR. FARR:

25 **Q.** I WAS JUST GOING TO TELL DR. HANDLEY NICE TO MEET YOU, AND

10:15  1  THROUGH THE GRACIOUSNESS OF HER HONOR -- I'VE GOT A BACK
       2  CONDITION.  SO SHE'S AGREED THAT I CAN EXAMINE YOU FROM COUNSEL
       3  TABLE, AND I'M GRATEFUL TO HER FOR DOING THAT.  PLEASE LET ME
       4  KNOW IF YOU DON'T HEAR MY QUESTIONS, AND I'LL TRY TO REPHRASE
       5  THEM.
       6  **A.**  OKAY.
       7            **THE COURT:**  LET ME ASK THIS.  WOULD IT BE HELPFUL --
       8                 YOU MAY BE SEATED, SIR.  YOU MAY BE SEATED.
       9                 WOULD IT BE HELPFUL TO BE ABLE TO MAKE EYE
      10  CONTACT?  I MEAN, IS THERE SOMEBODY THAT I CAN MOVE AT EITHER
      11  COUNSEL TABLE -- MOVE OUT OF THE WAY, OR DOES IT MATTER?
      12            **MR. FARR:**  I CAN SEE DR. HANDLEY, IF SHE CAN SEE ME.
      13            **THE COURT:**  CAN YOU SEE HER?  CAN YOU SEE?
      14            **THE WITNESS:**  YES.  I DON'T HAVE MY GLASSES ON, BUT
      15  OTHER THAN THAT --
      16            **THE COURT:**  ALL RIGHT.  WELL, THAT'S FINE THEN.
      17            **THE WITNESS:**  -- WE'RE FINE.
      18            **THE COURT:**  I JUST WANT TO MAKE SURE THAT YOU ALL
      19  COMMUNICATE WELL.
      20                 OKAY.  GO AHEAD, SIR.
      21            **MR. FARR:**  THANK YOU SO MUCH, YOUR HONOR.
      22  **BY MR. FARR:**
      23  **Q.**  DR. HANDLEY, WE HAVEN'T MET BEFORE, BUT I'VE REVIEWED SOME
      24  OF YOUR PRIOR TESTIMONY IN SOME CASES THAT INVOLVED OUR FIRM,
      25  AND IT'S AN HONOR TO MEET YOU HERE TODAY.  AND I JUST HAVE A

10:16 1  FEW QUESTIONS FOR YOU.

2  **THE COURT:**  AND STATE YOUR NAME FOR THE COURT

3  REPORTER.  I'M SORRY.  YOU MAY HAVE ALREADY DONE THAT, BUT I

4  MISSED IT.

5  **MR. FARR:**  YES, MA'AM.

6  AGAIN, MY NAME IS TOM FARR.

7  **THE COURT:**  THANK YOU, SIR.

8  GO AHEAD.

9  **MR. FARR:**  AND I'M WITH THE LAW FIRM OF NELSON

10  MULLINS.

11  **THE COURT:**  YES, SIR.

12  **MR. FARR:**  AND I'M HERE REPRESENTING THE SECRETARY OF

13  STATE.

14  **BY MR. FARR:**

15  **Q.**  SO, DR. HANDLEY, WHEN WERE YOU FIRST CONTACTED ABOUT

16  LOUISIANA REDISTRICTING IN THIS CYCLE?

17  **A.**  IT'S DIFFICULT TO SAY.  I WAS WORKING WITH THE ACLU IN

18  ANOTHER COUPLE OF STATES BEFORE WE STARTED TALKING ABOUT

19  LOUISIANA.

20  **Q.**  IT'S NOT A MEMORY TEST, DR. HANDLEY.

21  **A.**  OH, OKAY.  I'M SORRY.  I DON'T REMEMBER EXACTLY WHEN.

22  CERTAINLY LESS THAN A YEAR AGO.

23  **Q.**  OKAY.  WELL, LET'S SEE IF WE CAN CLARIFY THAT A LITTLE BIT

24  WITH SOME QUESTIONS I'LL ASK.

25  DO YOU REMEMBER WHO CALLED YOU ABOUT WORKING ON

10:17 1   LOUISIANA REDISTRICTING?

2   **A.**   NO.

3   **Q.**   WHEN WERE YOU ACTUALLY ENGAGED TO WORK ON LOUISIANA

4   REDISTRICTING?

5   **A.**   OH, THAT'S ALSO A TOUGH QUESTION BECAUSE I'M NOT EVEN SURE

6   THAT I HAVE A CONTRACT WITH THE ACLU WITH LOUISIANA, SO I

7   CAN'T ACTUALLY ANSWER THAT QUESTION.

8   **Q.**   AND DO YOU KNOW WHO ENGAGED YOU?

9   **A.**   NO.

10   **Q.**   OKAY.  YOU DON'T KNOW THE PERSON THAT ENGAGED YOU?

11   **A.**   WELL, I SUPPOSE ULTIMATELY IT WOULD HAVE BEEN DALE HO, AND

12   I HAD CONVERSATIONS WITH HIM EARLIER.  AND THIS IS THE HEAD OF

13   THE VOTING RIGHTS DIVISION -- THE VOTING SECTION OF THE ACLU.

14   **Q.**   YES, MA'AM.  I KNOW MR. HO AND I THINK VERY HIGHLY OF HIM,

15   SO THANK YOU FOR THAT ANSWER.

16        DID YOU DO ANY WORK ON LOUISIANA PRIOR TO THE

17   LOUISIANA LEGISLATIVE PROCESS?

18        **MS. BRANNON:**  YOUR HONOR, I'M JUST GOING TO -- SHE

19   CAN ANSWER THAT QUESTION, BUT I WANT TO PUT AN OBJECTION ON THE

20   RECORD TO THE EXTENT THAT IT'S SEEKING WHAT WE WOULD CONSIDER

21   TO BE WORK PRODUCT LEADING UP TO LITIGATION.  BUT ANYTHING NOT

22   LEADING UP TO LITIGATION, YOU CAN ANSWER.

23        **THE COURT:**  OKAY.  WELL, YOUR OBJECTION IS NOTED.

24   AND IT MAY BE A LITTLE PREMATURE, BUT YOU ARE ON NOTICE THAT

25   SHE THINKS YOU'RE GOING IN THE WRONG DIRECTION, SO THERE YOU

10:18 1   GO.

2           **MR. FARR:**  YOUR HONOR, I'M NOT GOING TO ASK HER ABOUT

3   WORK PRODUCT.  I JUST WANT TO KNOW WHEN SHE STARTED WORKING ON

4   THIS.  AND IT'S RELEVANT TO SOME OTHER ISSUES IN THE CASE,

5   SO...

6           **THE COURT:**  OKAY.  THERE'S NO OBJECTION TO YOUR

7   CURRENT QUESTION, SO IF YOU WANT TO RESTATE IT.

8           **MR. FARR:**  YES, MA'AM.

9           **THE COURT:**  GO AHEAD.

10           **MR. FARR:**  WELL, THANK YOU, YOUR HONOR.

11   **BY MR. FARR:**

12   **Q.**   DR. HANDLEY, DO YOU RECALL WHEN YOU STARTED WORKING ON

13   MATTERS RELATED TO LOUISIANA CONGRESSIONAL REDISTRICTING IN

14   THIS CYCLE?

15   **A.**   (NO ORAL RESPONSE.)

16   **Q.**   LET ME TRY TO HELP A LITTLE BIT.

17   **A.**   SORRY.  I CAN'T REMEMBER.

18   **Q.**   I UNDERSTAND.

19           DID YOU BEGIN -- YOU THINK YOU BEGAN WORKING BEFORE

20   THE LEGISLATIVE PROCESS STARTED?

21   **A.**   I HAVE NO IDEA.  I DON'T KNOW WHEN THE LEGISLATIVE PROCESS

22   STARTED.

23   **Q.**   OKAY.  I HEARD YOU MENTION SOMETHING.  COULD IT HAVE BEEN

24   THAT YOU WERE WORKING ON LOUISIANA REDISTRICTING SOME TIME

25   WITHIN THE LAST YEAR?

10:20 1  **A.**   YES.

2  **Q.**   OKAY.  AND YOU JUST DIDN'T START WHEN THE PLAN WAS

3  ENACTED?

4  **A.**   THAT'S CORRECT.

5  **Q.**   AND DID YOU GIVE ANY INPUT ON YOUR THEORIES AND

6  CALCULATIONS TO THE LEGISLATURE DURING THE LEGISLATIVE PROCESS?

7  **A.**   DID I?  THE LEGISLATURE NEVER CONTACTED ME OR ASKED ME TO

8  DO ANY WORK, NO.

9  **Q.**   BUT YOU DIDN'T VOLUNTARILY GIVE ANY OF YOUR RESEARCH TO

10  THE LOUISIANA LEGISLATURE WHILE THEY WERE CONSIDERING

11  CONGRESSIONAL PLANS?

12  **A.**   I, PERSONALLY?

13  **Q.**   YES.

14  **A.**   NO.

15  **Q.**   DID YOU TALK TO ANYBODY WHO GAVE INFORMATION ABOUT YOUR

16  PLANS OR ANY ADVICE THAT YOU MAY HAVE TRANSMITTED?  DID YOU

17  TALK TO ANYONE WHO MAY HAVE PROVIDED THAT INFORMATION TO THE

18  LOUISIANA LEGISLATURE?

19  **A.**   POSSIBLY.

20  **Q.**   DO YOU KNOW WHO THAT WOULD HAVE BEEN?

21  **A.**   NO.

22  **Q.**   AND DID YOU PERFORM YOUR POLARIZATION STUDIES THAT WE

23  TALKED ABOUT TODAY BEFORE THE PLAN WAS ENACTED?

24  **A.**   IT DEPENDS ON WHAT YOU MEAN BY "ENACTED."

25  **Q.**   WHY DON'T YOU --

10:21 1    **A.**   SO MY UNDERSTANDING IS IT PASSED, BUT THEN IT WAS VOTED
     2    AND THEN IT -- THE VETO WAS OVERRIDDEN.  I ANALYZED THE PLAN
     3    AFTER IT WAS PASSED BY THE LEGISLATURE.
     4    **Q.**   OKAY.  AND YOUR REPORT'S GOT ANALYSIS OF STATEWIDE
     5    POLARIZATION RATES?
     6    **A.**   I'M SORRY.  COULD YOU REPEAT THAT?
     7    **Q.**   YES, MA'AM.
     8         IN READING YOUR REPORT, IT APPEARS THAT YOU HAVE --
     9    YOU'VE DONE POLARIZATION STUDIES ON STATEWIDE ELECTIONS?
    10    **A.**   THAT'S CORRECT.
    11    **Q.**   DID YOU DO THOSE BEFORE THE CONGRESSIONAL PLAN WAS
    12    ENACTED?
    13    **A.**   I DON'T REMEMBER IN TIME.  I'M NOT EXACTLY SURE WHAT YOU
    14    MEAN BY "ENACTED."  I DID IT MOST LIKELY BEFORE THE VETO WAS
    15    OVERRIDDEN.
    16    **Q.**   OKAY.  SO BEFORE THE INITIAL PLAN WAS OVERRIDDEN, YOU
    17    THINK SOME TIME BEFORE THEN YOU DID YOUR STATEWIDE POLARIZATION
    18    STUDIES?
    19    **A.**   I PROBABLY HAD STARTED THEM.
    20    **Q.**   OKAY.  ALL RIGHT.  THANKS.
    21         NOW, I WANT TO ASK YOU SOME QUESTIONS ABOUT WHAT YOU
    22    MEAN BY "POLARIZATION."  AND WE CAN GO TO YOUR REPORT IF THAT
    23    WILL HELP YOU, BUT WHEN I READ YOUR REPORT ON PAGE 1 --
    24         **MR. FARR:**  WHY DON'T WE PULL UP PR-12 ON THE SCREEN.
    25    **BY MR. FARR:**

10:22  1  **Q.**  ARE YOU THERE?

2  **A.**  YES.

3  **Q.**  OKAY.  SO DURING YOUR TESTIMONY YOU SAID SEVERAL TIMES

4  THAT VOTING IN LOUISIANA IS RACIALLY POLARIZED.  IS THAT A FAIR

5  RECITATION?

6  **A.**  YES.

7  **Q.**  AND THEN ON PAGE 1 OF YOUR REPORT YOU MAKE A STATEMENT

8  THAT "VOTING IN THE STATE OF LOUISIANA IS RACIALLY POLARIZED."

9         DO YOU SEE THAT?

10  **A.**  YES.

11  **Q.**  NOW, IF YOU TURN TO PAGE 8, IT LOOKS LIKE IT'S THE SECOND

12  FULL PARAGRAPH WHERE IT SAYS "CONGRESSIONAL ELECTIONS."

13         DO YOU SEE THAT?  DO YOU SEE THAT PARAGRAPH?

14  **A.**  YES, I DO.

15  **Q.**  OKAY.  AND IS IT FAIR TO SAY THAT YOU REPORT THAT

16  ELECTIONS IN THE 2011 VERSION OF CONGRESSIONAL DISTRICT 2 WERE

17  PROBABLY NOT RACIALLY POLARIZED?

18  **A.**  ALTHOUGH THE STATEWIDE ELECTIONS WERE POLARIZED, THE

19  CONGRESSIONAL ELECTIONS -- I THINK IT WAS MOST OF THEM, IF NOT

20  ALL OF THEM -- WERE NOT POLARIZED.

21  **Q.**  OKAY.  SO THAT'S WHERE I WANT TO ASK YOU SOME QUESTIONS,

22  DR. HANDLEY.  YOU'VE BEEN DOING THIS FOR A LONG TIME AND YOU

23  KNOW WAY MORE THAN I DO.  BUT IS THERE A DIFFERENCE BETWEEN

24  LEGALLY SIGNIFICANT RACIALLY POLARIZED VOTING AND JUST SIMPLE

25  POLARIZED VOTING?

10:24  1  **A.**   NOW, I'VE WRITTEN ON THIS.  BUT I'M NOT A LAWYER, SO I

2  DON'T REALLY KNOW THAT YOU WANT ME TO ANSWER THIS.

3  **Q.**   WELL, I'D LIKE YOU TO BECAUSE I THINK YOU'VE EXPLAINED

4  THAT BEFORE.  IS THERE A DIFFERENCE BETWEEN SIGNIFICANT

5  RACIALLY POLARIZED VOTING AND SUBSTANTIAL RACIALLY POLARIZED

6  VOTING?

7  **MS. BRANNON:**  I'M JUST GOING TO OBJECT.  I'M GOING TO

8  OBJECT TO THE EXTENT THAT THAT CALLS FOR A LEGAL CONCLUSION.

9  **MR. FARR:**  YOUR HONOR, I'M JUST ASKING HER FOR HER

10  OPINION AS AN EXPERT IN THE AREA OF RACIAL POLARIZATION, IF SHE

11  UNDERSTANDS THERE'S TWO DIFFERENT TYPES OF RACIAL POLARIZATION.

12  **THE COURT:**  WELL, THE QUESTION ON THE FLOOR RIGHT NOW

13  IS:  IS THERE A DIFFERENCE BETWEEN SIGNIFICANT RACIAL

14  POLARIZATION AND SUBSTANTIAL RACIAL POLARIZATION?  YOU DID

15  REPHRASE YOUR QUESTION.  YOU REMOVED THE WORD "LEGALLY

16  SUFFICIENT," SO I'M GOING TO OVERRULE THE OBJECTION.

17  SO THE QUESTION IS:  IS THERE A DIFFERENCE

18  BETWEEN SIGNIFICANT RACIAL POLARIZATION AND SUBSTANTIAL RACIAL

19  POLARIZATION, IF YOU HAVE AN OPINION ON THAT?

20  **THE WITNESS:**  BETWEEN SIGNIFICANT AND SUBSTANTIAL?

21  **THE COURT:**  ISN'T THAT YOUR QUESTION, SIR?

22  **MR. FARR:**  YES, MA'AM.

23  **THE COURT:**  OKAY.

24  **THE WITNESS:**  I CAN'T THINK OF ONE.

25  **MR. FARR:**  OKAY.  CAN WE PULL UP A DEPOSITION THAT

10:25 1    DR. HANDLEY GAVE IN THE *OHIO PHILIP RANDOLPH INSTITUTE* CASE ON
      2    DECEMBER 12, 2018.
      3    **BY MR. FARR:**
      4    **Q.**   CAN YOU SEE THAT ON YOUR SCREEN, DR. HANDLEY?
      5    **A.**   I CAN.
      6    **Q.**   AND WERE YOU AN EXPERT WITNESS IN THAT CASE?
      7         **THE COURT:**  DO YOU NEED TO KNOW THE CASE AGAIN?
      8         **THE WITNESS:**  I THINK I KNOW WHICH CASE THIS IS.
      9    **BY MR. FARR:**
     10    **Q.**   WELL, IT SAYS IT'S YOUR DEPOSITION ON THE FRONT PAGE.
     11    CORRECT?
     12    **A.**   YES.  I BELIEVE THAT THIS IS MY DEPOSITION.  AND I BELIEVE
     13    I KNOW WHAT CASE IT IS.
     14    **Q.**   YES.  AND DO YOU REMEMBER BEING CROSS-EXAMINED BY MY LAW
     15    PARTNER, PHIL STRACH, IN THAT CASE?
     16    **A.**   I DO NOT.
     17         **MR. FARR:**  OKAY.  WELL, LET'S TURN TO PAGE 104 OF
     18    THAT EXHIBIT.
     19    **BY MR. FARR:**
     20    **Q.**   AND I'LL REPRESENT TO YOU, DR. HANDLEY, THAT THIS IS A
     21    SERIES OF QUESTIONS THAT MY PARTNER, PHIL STRACH, ASKED YOU IN
     22    THIS DEPOSITION.  I'M GOING TO READ THE QUESTION AND I'D LIKE
     23    FOR YOU TO READ THE ANSWER.  WOULD THAT BE ALL RIGHT?
     24         **THE COURT:**  GIVE US A LINE REFERENCE.
     25    **BY MR. FARR:**

10:27 1 **Q.** I'M GOING TO START WITH LINE 21.  ARE YOU READY?

2 **A.** YES.

3 **Q.** SO THE QUESTION IS:

4   "ALL RIGHT.  THANK YOU.

5   "ARE YOU AWARE OF THE DIFFERENCE BETWEEN

6 STATISTICALLY SIGNIFICANT RACIALLY POLARIZED VOTING AND LEGALLY

7 SIGNIFICANT RACIALLY POLARIZED VOTING?"

8   AND YOUR ANSWER IS --

9  **MS. BRANNON:**  YOUR HONOR, I'D LIKE TO OBJECT.  I

10 THINK THIS IS IMPROPER IMPEACHMENT.  I DON'T THINK HE'S LAID A

11 FOUNDATION FOR THE CITATIONS TO THE DEPOSITION QUESTIONS SO

12 FAR.

13  **THE COURT:**  SIR, DO YOU WANT TO RESPOND?  SHE SAYS --

14 DID YOU HEAR HER OBJECTION?

15  **MR. FARR:**  I THINK I DID, YOUR HONOR, AND I DON'T

16 KNOW REALLY WHAT THE SUBSTANCE OF THE OBJECTION IS.  I'M

17 IMPEACHING THE WITNESS ON A PREVIOUS DEFINITION THAT SHE GAVE

18 TO "SIGNIFICANT RACIAL POLARIZATION" VERSUS "SUBSTANTIAL RACIAL

19 POLARIZATION."

20  **THE COURT:**  SHE'S CORRECT.  IT'S IMPROPER FOUNDATION.

21 IT'S IMPROPER IMPEACHMENT.  IT IS NOT A PRIOR INCONSISTENT

22 STATEMENT.  THE QUESTIONS ARE DIFFERENT AND YOU MADE THEM

23 DIFFERENT.  OBJECTION IS SUSTAINED.

24  **MR. FARR:**  YOUR HONOR, MAY I TRY AGAIN?

25  **THE COURT:**  YOU MAY, BUT TAKE THE DEPOSITION DOWN.

Case 2:23-06421-SD Document: 3 Page: 157 Date Filed 09/15/2023

10:28 1    BY MR. FARR:

2    **Q.**    DR. HANDLEY, DO YOU AGREE THAT "SUBSTANTIVELY SIGNIFICANT

3    RACIAL POLARIZATION" MEANS THAT THE MINORITY AND THE WHITES ARE

4    VOTING FOR DIFFERENT CANDIDATES?

5    **A.**    YES.  YES.

6    **Q.**    DO YOU AGREE THAT IT WOULD RISE TO THE LEVEL OF LEGAL

7    SIGNIFICANCE IF THE MINORITY-PREFERRED CANDIDATE USUALLY LOST?

8            **MS. BRANNON:**  AGAIN, YOUR HONOR, I'M GOING TO OBJECT.

9    THAT CALLS FOR A LEGAL CONCLUSION.

10            **MR. FARR:**  I'M NOT ASKING FOR A LEGAL CONCLUSION.

11    I'M ASKING FOR HER -- THE WAY SHE UNDERSTANDS "RACIAL

12    POLARIZATION."

13            **THE COURT:**  BUT THE QUESTION IS:  IS IT LEGALLY

14    SIGNIFICANT?  THAT IS A LEGAL QUESTION.  THAT IS A QUESTION OF

15    A LEGAL OPINION.  THE OBJECTION IS SUSTAINED.

16            **MR. FARR:**  CAN I ASK THE QUESTION AGAIN, YOUR HONOR?

17    I'LL TAKE THE WRONG "LEGAL" OUT.

18            **THE COURT:**  AND YOU DID THAT.  YOU DID THAT AND

19    YOU'RE GOING TO REACH THE SAME RESULT:  YOU'RE GOING TO HAVE

20    IMPROPER IMPEACHMENT.  YOU CAN TRY AGAIN.  BUT IF THE WORD

21    "LEGALLY" IS IN THE PRIOR QUESTION, IT IS -- YOU'RE NOT -- IT'S

22    NOT A PRIOR INCONSISTENT STATEMENT.

23            **MR. FARR:**  I'M SORRY, YOUR HONOR.  I APOLOGIZE.

24            **THE COURT:**  OKAY.  NO WORRIES.  GO AHEAD.

25    BY MR. FARR:

10:29   1   **Q.**   SO MY QUESTION IS:  WOULD POLARIZATION RISE TO THE LEVEL

  2   OF SIGNIFICANT POLARIZATION IF THE MINORITY-PREFERRED CANDIDATE

  3   USUALLY LOST?

  4   **A.**   POLARIZATION IS -- LET'S SEE.  LET'S SEE HOW -- I SUPPOSE

  5   YOU COULD SAY THAT ONE CONTEST BEING POLARIZED IS LESS

  6   SIGNIFICANT THAN MORE CONTESTS BEING POLARIZED.

  7   **Q.**   IF THE WHITE CANDIDATES DID NOT VOTE IN SUFFICIENT NUMBERS

  8   TO DEFEAT THE BLACK CANDIDATE -- PREFERRED CANDIDATE OF CHOICE,

  9   WOULD YOU CONSIDER THAT TO BE SIGNIFICANT RACIAL POLARIZATION?

  10   **A.**   I THINK IT WOULD DEPEND ON THE CIRCUMSTANCES.  SO IF YOU

  11   HAD A DISTRICT THAT -- I CAN'T REALLY ANSWER THAT AS A

  12   HYPOTHETICAL.  COULD YOU GIVE ME --

  13   **Q.**   WELL, LET ME TRY AGAIN.  EXPLAIN WHY YOU CONCLUDED THAT

  14   VOTING IN THE STATE OF LOUISIANA WAS RACIALLY POLARIZED WHILE

  15   ALSO SAYING THAT THE VOTING IN CONGRESSIONAL DISTRICT 2 WAS NOT

  16   RACIALLY POLARIZED.

  17   **A.**   SO IN THE 15 CONTESTS THAT I LOOKED AT STATEWIDE, IN EVERY

  18   CASE THE BLACK AND WHITE VOTERS WOULD HAVE ELECTED DIFFERENT

  19   CANDIDATES.

  20        IN CONGRESSIONAL DISTRICT 2, IN MANY CASES THE WHITE

  21   VOTERS SUPPORTED THE INCUMBENT BLACK CANDIDATE, CEDRIC

  22   RICHMOND.

  23   **Q.**   SO THE WHITE VOTERS IN CONGRESSIONAL DISTRICT 2 DID NOT

  24   VOTE AS A BLOC TO DEFEAT THE BLACK VOTERS' PREFERRED CANDIDATE?

  25   **A.**   IN CONGRESSIONAL DISTRICT 2 WHEN CEDRIC RICHMOND WAS THE

10:31 1   CANDIDATE, THAT'S CORRECT.

2   Q.   OKAY.  AND WHITES ARE A MAJORITY IN CONGRESSIONAL DISTRICT

3   2?

4   A.   I BEG YOUR PARDON?

5   Q.   ARE WHITES THE MAJORITY IN CONGRESSIONAL DISTRICT 2?

6   A.   THEY ARE NOT.

7   Q.   OKAY.  ARE THERE AREAS IN LOUISIANA WHERE THE LEVEL OF

8   POLARIZATION IS HIGHER OR LOWER?

9   A.   THAT THE WHAT -- I'M SORRY.  REPEAT THE QUESTION.

10   Q.   YES, MA'AM.

11        YOU REPORTED ON STATEWIDE POLARIZATION RATES FOR

12   STATEWIDE ELECTIONS.  IS THAT CORRECT?

13   A.   YES.

14   Q.   ARE THERE SOME AREAS OF THE STATE WHERE THE POLARIZATION

15   RATE IS HIGHER THAN IN OTHER AREAS OF THE STATE?

16   A.   IT DEPENDS ON WHAT YOU MEAN BY "POLARIZATION RATES."  YOU

17   MEAN THE NUMBER OF CONTESTS --

18   Q.   NO.

19   A.   -- THAT ARE POLARIZED?  IS THAT WHAT YOU MEAN?

20   Q.   I MEAN THE DIFFERENCE BETWEEN THE NUMBER OF WHITES AND

21   BLACKS WHO VOTE FOR THE BLACK-PREFERRED CANDIDATE OF CHOICE.

22   A.   IT IS THE CASE THAT THERE IS MORE WHITE CROSSOVER VOTE IN

23   CONGRESSIONAL DISTRICT 2 THAN ANYWHERE ELSE THAT I LOOKED IN

24   THE STATE.

25   Q.   AND COULD THERE BE OTHER AREAS OF THE STATE WHERE THE

10:33 1   CROSSOVER VOTE IS HIGHER THAN THE -- THAN THE AVERAGE?

2   **A.**   NOT AT THE CONGRESSIONAL LEVEL OR STATEWIDE.  THERE MAY BE

3   POCKETS.

4   **Q.**   OKAY.  WHEN YOU DID YOUR STUDY ON RACIAL POLARIZATION, YOU

5   DID NOT DO A PARISH-BY-PARISH STUDY ON POLARIZATION RATES?

6   **A.**   THAT'S CORRECT.

7   **Q.**   OKAY.  I'LL MOVE ON TO ANOTHER SUBJECT NOW, DR. HANDLEY.

8       WHEN YOU TALK IN YOUR REPORT ABOUT VOTING AGE

9   POPULATION FOR AFRICAN AMERICANS, ARE YOU REFERRING TO "ANY

10   PART BLACK" VOTING AGE?

11   **A.**   IT DEPENDS.  I REPORT BOTH "ANY PART BLACK" AND THE DOJ

12   DEFINITION OF "BLACK VOTING AGE POPULATION" IN MY REBUTTAL

13   REPORTS AND IN THE SUPPLEMENTAL REPORT.

14       **MR. FARR:**  OKAY.  SO LET'S TURN TO PR-12.

15   **BY THE WITNESS:**

16   **A.**   I'M SORRY.  TO WHAT?

17   **BY MR. FARR:**

18   **Q.**   I'M SORRY, MA'AM.  YOUR INITIAL REPORT, WHICH I THINK IS

19   LABELED PR-12.

20   **A.**   OH, OKAY.

21       **MR. FARR:**  AND COULD YOU TURN TO TABLE 3, WHICH IS ON

22   PAGE 10.

23   **BY MR. FARR:**

24   **Q.**   ARE YOU THERE?

25   **A.**   I AM.

10:35   1   **Q.**   AND YOU SEE ON FOOTNOTE 14, YOU SAY "BLACK VOTING AGE

     2   POPULATION HAS BEEN CALCULATED BY COUNTING ALL PERSONS WHO

     3   CHECK 'BLACK OR AFRICAN AMERICAN' ON THEIR CENSUS FORM."

     4   IS THAT CORRECT?

     5   **A.**   YES.

     6   **Q.**   AND IN MAKING THAT FOOTNOTE, WERE YOU REFERRING TO "ANY

     7   PART BLACK"?

     8   **A.**   YES.

     9   **Q.**   ALL RIGHT.   THANK YOU.

    10          AND USING THE CENSUS CATEGORY "ANY PART BLACK," WOULD

    11   THAT RESULT IN A HIGHER BLACK PERCENTAGE IN DISTRICTS YOU'RE

    12   LOOKING AT THAN IF YOU USE, SAY, SINGLE-RACE BLACK?

    13   **A.**   YES.

    14   **Q.**   NOW, I WANT TO MOVE TO SOME QUESTIONS ABOUT YOUR

    15   APPENDICES.   AND I THINK JUST TO KIND OF REFRESH OR REVIEW A

    16   LITTLE BIT, APPENDIX A WAS YOUR STUDY OF STATEWIDE ELECTIONS.

    17   IS THAT CORRECT?

    18   **A.**   YES.

    19   **Q.**   APPENDIX B WAS YOUR STUDY OF THE PERCENTAGE OF BLACK AND

    20   WHITE VOTES FOR EACH CANDIDATE IN CONGRESSIONAL ELECTIONS FROM

    21   2016 TO 2020?

    22   **A.**   ULTIMATELY, 2021.

    23   **Q.**   OKAY.   THAT WAS IN YOUR REPORT YOU JUST GAVE US.   IS THAT

    24   CORRECT?

    25   **A.**   YES.

10:36 1    **Q.**   ALL RIGHT.  FAIR ENOUGH.

2                  AND THAT WAS UNDER THE PLAN THAT WAS ENACTED IN 2011?

3    **A.**   THE CONGRESSIONAL ELECTIONS WERE, YES.

4    **Q.**   OKAY.  AND THEN APPENDIX C THROUGH G, YOU DO A

5    POLARIZATION STUDY ON ALL OF THE DISTRICTS IN THE PLAN THAT WAS

6    ENACTED IN 2022.  IS THAT CORRECT?

7    **A.**   ALMOST.  I DIDN'T LOOK AT DISTRICT 1.

8    **Q.**   OH, YOU DIDN'T LOOK AT CONGRESSIONAL DISTRICT 1?

9    **A.**   THAT'S CORRECT.

10   **Q.**   I WAS GOING TO ASK YOU, JUST OUT OF CURIOSITY, WHY DIDN'T

11   YOU LOOK AT THAT?

12   **A.**   BECAUSE IT DOESN'T OVERLAP.  IT SUPPLIES NO VOTERS TO

13   ILLUSTRATIVE DISTRICT 5.

14   **Q.**   OKAY.  AND YOU DIDN'T REPORT A SIMILAR ANALYSIS FOR MR.

15   FAIRFAX'S ILLUSTRATIVE PLANS, DID YOU?

16   **A.**   I'M SORRY.  REPEAT THAT.

17   **Q.**   DID YOU DO A SIMILAR REPORT FOR THE ILLUSTRATIVE PLANS

18   THAT MR. FAIRFAX HAS PROPOSED IN THIS CASE?

19   **A.**   A SIMILAR REPORT?  I'M SORRY.

20   **Q.**   YEAH.  AS TO WHAT YOU DID FOR THE 2011 CONGRESSIONAL

21   DISTRICTS.  DID YOU DO SOMETHING LIKE THAT FOR THE DISTRICTS IN

22   MR. FAIRFAX'S ILLUSTRATIVE PLANS?

23   **A.**   NO.

24   **Q.**   YOU DIDN'T REPORT THAT.

25                  DID YOU EVER DO THAT AND NOT REPORT IT?

10:38  1    **A.**    NO.

2    **Q.**    OKAY.  NOW, I WANT TO GO THROUGH SOME TERMS TO GET TO THE

3    QUESTION I WANT TO ASK YOU, DR. HANDLEY.  IS IT FAIR TO SAY

4    THAT A MAJORITY-BLACK DISTRICT, AS THE U.S. SUPREME COURT HAS

5    DEFINED IT, MEANS A DISTRICT WHERE THE "BLACK VOTING AGE"

6    POPULATION IS AN ACTUAL MAJORITY?

7            **MS. BRANNON:**  OBJECTION.  AGAIN, YOUR HONOR, ISN'T

8    THAT A LEGAL CONCLUSION?

9            **THE COURT:**  SIR?

10            **MR. FARR:**  MAY I REPHRASE IT?

11            **THE COURT:**  YOU MAY.

12    **BY MR. FARR:**

13    **Q.**    DR. HANDLEY, HAVE YOU READ THE *BARTLETT* DECISION?

14    **A.**    MANY YEARS AGO.

15    **Q.**    DO YOU RECALL HOW THE COURT DEFINED "MAJORITY-BLACK

16    DISTRICT" IN THAT CASE?

17    **A.**    I BELIEVE SO.

18    **Q.**    AND HOW DID THEY DEFINE IT?

19    **A.**    A MAJORITY-BLACK DISTRICT WOULD BE A BLACK DISTRICT IN

20    WHICH THE VOTING AGE POPULATION WAS MAJORITY BLACK AT LEAST 50

21    PERCENT PLUS ONE PERSON.

22    **Q.**    OKAY.  AND A CROSSOVER DISTRICT IS A -- IS WHAT?

23    **A.**    A CROSSOVER DISTRICT?  YOU'LL HAVE TO TELL ME.

24    **Q.**    OKAY.  IS IT FAIR TO SAY THAT A CROSSOVER DISTRICT IS A

25    DISTRICT WHERE THE BLACK POPULATION IS NOT IN THE MAJORITY BUT

10:39 1    THEY CAN ELECT THEIR PREFERRED CANDIDATE WITH THE HELP OF WHITE

2    CROSSOVER VOTERS?

3    **A.**   I DON'T USE THAT TERM.  I THINK IT MIGHT HAVE COME OUT OF

4    SOME RECENT CASE.  IF YOU WANT TO DEFINE IT THAT WAY, YOU CAN.

5    **Q.**   OKAY.  WELL, ARE THERE DISTRICTS WHERE BLACK VOTERS ARE

6    ABLE TO ELECT THEIR CANDIDATE OF CHOICE EVEN THOUGH THEY ARE

7    NOT IN A MAJORITY?

8    **A.**   YES.

9    **Q.**   AND IN THOSE INSTANCES DO THEY -- IS THE CANDIDATE OF

10   CHOICE ELECTED BECAUSE THERE ARE WHITE VOTERS CROSSING OVER TO

11   HELP ELECT THE BLACK CANDIDATES PREFERRED -- THE BLACK MINORITY

12   GROUP'S PREFERRED CANDIDATE?

13   **A.**   YES.

14   **Q.**   ALL RIGHT.  NOW, HAVE YOU WRITTEN ABOUT SOMETHING CALLED

15   AN EFFECTIVE DISTRICT?

16        **THE COURT:**  I'M SORRY.  I MISSED THAT.  THE WHAT

17   DISTRICT?

18        **MR. FARR:**  I'M SORRY, YOUR HONOR.

19   **BY MR. FARR:**

20   **Q.**   HAVE YOU WRITTEN -- HAVE YOU WRITTEN OR DESCRIBED SOME

21   DISTRICTS AS BEING EFFECTIVE DISTRICTS?

22   **A.**   YES.

23   **Q.**   AND CAN AN EFFECTIVE DISTRICT BE A DISTRICT THAT HAS LESS

24   THAN 50 PERCENT "BLACK VOTING AGE" POPULATION?

25   **A.**   YES.

10:40 1  **Q.** AND AN EFFECTIVE DISTRICT MEANS THAT THE DISTRICT PROVIDES
  2  THE BLACK COMMUNITY WITH AN OPPORTUNITY TO ELECT THEIR
  3  CANDIDATE OF CHOICE. IS THAT CORRECT?
  4  **A.** YES.
  5  **Q.** AND THAT'S -- SO EVEN WHERE THEY'RE NOT A MAJORITY OF THE
  6  DISTRICT IT COULD BE?
  7  **A.** IT COULD BE THE CASE, YES.
  8  **Q.** NOW, IN OTHER CASES, DR. HANDLEY, HAVE YOU EVER DONE
  9  SOMETHING CALLED A FUNCTIONAL ANALYSIS TO DETERMINE WHETHER A
 10  DISTRICT COULD PROVIDE AFRICAN AMERICANS WITH THE OPPORTUNITY
 11  TO ELECT THEIR CANDIDATE OF CHOICE WITH A BLACK PERCENT THAT'S
 12  UNDER 5O PERCENT?
 13  **A.** YES.
 14  **Q.** AND DID YOU DO SUCH A STUDY IN THIS CASE?
 15  **A.** I DID NOT.
 16  **Q.** ALL RIGHT. I WANT TO TURN NOW TO SOME QUESTIONS ABOUT
 17  YOUR REBUTTAL REPORT. AND PLEASE FEEL FREE, MA'AM, TO PULL
 18  THAT UP IN FRONT OF YOU IF IT WOULD BE HELPFUL. I DON'T KNOW
 19  THAT I'M GOING TO BE QUOTING ANY PAGES, BUT FEEL FREE TO
 20  RESPOND TO THAT IF THAT HELPS YOUR TESTIMONY. ALL RIGHT?
 21  **A.** YES.
 22  **Q.** NOW, YOU ARE FAMILIAR WITH THE REPORT THAT DR. LEWIS
 23  SUBMITTED FOR THE DEFENDANTS ANALYZING CROSSOVER VOTING IN THE
 24  ILLUSTRATIVE PLANS?
 25  **A.** I READ DR. LEWIS' REPORT.

10:42 1    Q.    OKAY.  AND JUST FOR THE RECORD, I BELIEVE THAT'S EXHIBIT

2    LEG-2 IS THE REPORT I'M REFERRING TO.

3              SO YOU HAD AN OPPORUNITY TO REVIEW DR. LEWIS' REPORT?

4    A.    I READ DR. LEWIS' REPORT, YES.

5    Q.    AND IN YOUR REBUTTAL REPORTS, CORRECT ME I'M WRONG, BUT AS

6    I UNDERSTAND IT, THE ONLY EXPERTS YOU PROVIDED REBUTTAL

7    TESTIMONY TO ARE DR. SOLANKY AND DR. ALFORD.  IS THAT CORRECT?

8    A.    YES.

9    Q.    AND MORE SPECIFICALLY, YOU DID NOT SUBMIT A REPLY TO DR.

10   LEWIS' REPORT?

11   A.    CORRECT.

12   Q.    SO IF SOMEONE IN THIS CASE ASSERTED THAT DISTRICTS WITH A

13   "BLACK VOTING AGE" POPULATION BELOW 50 PERCENT WILL GIVE THE

14   BLACK COMMUNITY AN EQUAL OPPORTUNITY TO ELECT THEIR PREFERRED

15   CANDIDATES OF CHOICE, YOU HAVE NO BASIS TO DISAGREE WITH THAT

16   STATEMENT, DO YOU?

17   A.    IF YOU MEAN DID DR. LEWIS CONVINCE ME OF THAT, I WOULD

18   HAVE TO DISAGREE WITH YOU.  NO, HE DID NOT CONVINCE ME THAT A

19   DISTRICT WITH LESS THAN 50 PERCENT WAS NECESSARY -- WAS --

20   Q.    BUT YOU, YOURSELF, HAVE NOT DONE A STUDY TO SEE IF A

21   DISTRICT WITH LESS THAN 50 PERCENT WOULD PROVIDE AN EQUAL

22   OPPORTUNITY TO ELECT THE BLACK-PREFERRED CANDIDATE.  IS THAT

23   RIGHT?

24   A.    IN THIS CASE, THAT'S CORRECT.

25   Q.    SO YOU'VE TESTIFIED ABOUT MR. FAIRFAX'S ILLUSTRATIVE

10:43 1    PLANS.  IS THAT RIGHT?

2    **A.**   YES.

3    **Q.**   HAVE YOU STUDIED THE PLANS DRAWN BY MR. COOPER?

4    **A.**   NO.

5    **Q.**   OKAY.  I'LL SKIP THAT.

6         SO LET'S TURN -- I'VE JUST GOT A FEW MORE QUESTIONS,

7    DR. HANDLEY, AND THEN I'LL BE DONE.

8         COULD YOU TURN BACK TO YOUR ORIGINAL REPORT, WHICH IS

9    PR-12, AND I'D LIKE FOR YOU TO LOOK AT TABLE 1 ON PAGE 6.

10         ARE YOU THERE?

11    **A.**   YES.

12    **Q.**   AND YOU SELECTED THE STATEWIDE RACES THAT YOU WOULD STUDY

13    IN YOUR REPORT, AND THOSE 15 RACES ARE LISTED THERE.  IS THAT

14    CORRECT?

15    **A.**   THE 15 RACES LISTED THERE ARE THE CONTESTS THAT I

16    ANALYZED, THAT'S CORRECT.

17    **Q.**   OKAY.  AND YOU DIDN'T INCLUDE GOVERNOR EDWARDS' ELECTION

18    IN 2015 OR 2019.  IS THAT A FAIR STATEMENT?

19    **A.**   THAT'S CORRECT.  THERE WERE NO BLACK CANDIDATES IN THOSE

20    CONTESTS.

21    **Q.**   BUT DO YOU THINK THAT GOVERNOR EDWARDS WAS THE PREFERRED

22    BLACK CANDIDATE OF CHOICE FOR THE BLACK COMMUNITY?

23    **A.**   YES.  I SAW DR. ALFORD'S REPORT THAT PRODUCED DR. PALMER'S

24    NUMBERS, SO YES.

25    **Q.**   OKAY.  AND THEN, ALSO, YOU DIDN'T INCLUDE IN ONE OF THE

10:45 1   RACES YOU STUDIED THE 2016 PRESIDENTIAL ELECTION INVOLVING

    2   SECRETARY CLINTON AND SENATOR CAIN.  IS THAT CORRECT?

    3   **A.**   THAT'S CORRECT.

    4   **Q.**   PLEASE BEAR WITH ME, DR. HANDLEY.  I'M TRYING TO FIND ONE

    5   OF YOUR CHARTS.

    6          **MR. FARR:**  OKAY.  I THINK WE CAN LOOK AT TABLE 4 ON

    7   PAGE 11.

    8   **BY MR. FARR:**

    9   **Q.**   ARE YOU THERE?

   10   **A.**   YES.

   11   **Q.**   AND SO, DR. HANDLEY, IN ORDER TO DETERMINE THE

   12   EFFECTIVENESS OF CONGRESSIONAL DISTRICTS IN THE ENACTED PLAN

   13   AND THEN I THINK MOVING OVER, YOU DID THE SAME THING ON PAGE 13

   14   FOR THE ILLUSTRATIVE PLAN.  IS THAT A FAIR STATEMENT?

   15   **A.**   YES.

   16   **Q.**   AND SO ALL YOU REPORTED IS WHO WON OR LOST THE ELECTION?

   17   **A.**   NO, NOT EXACTLY.  THE PERCENTAGE OF CASES -- THE

   18   PERCENTAGE OF ELECTIONS IN REGARD TO THE FIRST COLUMN IN WHICH

   19   THE BLACK-PREFERRED CANDIDATE EITHER WON OUTRIGHT OR WOULD HAVE

   20   PROCEEDED TO A RUNOFF.

   21   **Q.**   OKAY.  AND THEN WHAT WAS THE SECOND COLUMN?

   22   **A.**   THE PERCENTAGE OF TWO CANDIDATE CONTESTS IN WHICH THE

   23   BLACK-PREFERRED CANDIDATE WON.

   24   **Q.**   OKAY.

   25   **A.**   OBVIOUSLY WITH MORE THAN 50 PERCENT OF THE VOTE.

10:47 1    **Q.**   AND YOU DIDN'T REPORT THE VOTE TOTALS OR THE MARGINS OF

2    VICTORY IN ANY OF THOSE ELECTIONS.  IS THAT A FAIR STATEMENT?

3    **A.**   NO.  IT'S NOT A -- IT'S NOT LISTED IN THESE TABLES, BUT

4    IT'S CERTAINLY LISTED IN MY APPENDIX.

5    **Q.**   OKAY.  I'M SORRY.  I MISSED THAT.  I APOLOGIZE.

6          DID YOU REPORT THE RELATIVE FUNDRAISING BY THE

7    CANDIDATES IN THE ELECTIONS THAT YOU SELECTED?

8    **A.**   DID YOU SAY "FUNDRAISING"?

9    **Q.**   YES.

10   **A.**   NO.

11   **Q.**   HAVE YOU EVER TALKED BEFORE ABOUT IT'S BETTER TO USE A

12   MORE HIGHLY VISIBLE RACE TO CALCULATE RACIALLY POLARIZED VOTING

13   THAN ONE THAT'S NOT VISIBLE?

14   **A.**   I PROBABLY HAVE.  I AGREE WITH THAT STATEMENT.

15   **Q.**   OKAY.  SO WHAT WOULD BE MORE VISIBLE TO JUDGE RACIALLY

16   POLARIZED VOTING:  THE GOVERNOR'S ELECTIONS OR THE SECRETARY OF

17   STATE ELECTION?

18   **A.**   I WOULD USE BOTH.

19   **Q.**   EXCUSE ME?

20   **A.**   I WOULD USE BOTH.  IF THEY HAD A BLACK CANDIDATE, WHY

21   WOULD I HAVE TO CHOOSE ONE OR THE OTHER?

22   **Q.**   WOULD YOU HAVE AN OPINION ON WHICH ONE IS MORE VISIBLE TO

23   THE VOTERS OF LOUISIANA?

24   **A.**   I WOULD NOT, NOT IF ONE, FOR EXAMPLE, INCLUDED A BLACK

25   CANDIDATE AND THE OTHER DID NOT.

10:48  1       **MR. FARR:**  OKAY.  THAT'S ALL, YOUR HONOR.  THANK YOU.

2       **THE COURT:**  ANY REDIRECT?

3       **MS. BRANNON:**  YEAH, JUST SOME BRIEF REDIRECT, YOUR

4  HONOR.

5       **MS. BRANNON:**  FIRST, CAN WE CALL UP DEMONSTRATIVE

6  EXHIBIT 1.11.

7                    **REDIRECT EXAMINATION**

8  **BY MS. BRANNON:**

9  **Q.**   DR. HANDLEY, ARE YOU FAMILIAR WITH THIS TABLE?

10  **A.**   YES.

11  **Q.**   DOES THIS SHOW THE VOTING AGE POPULATION FOR ALL PARTS

12  BLACK AND THEN ALSO THE VOTING AGE POPULATION UNDER THE DOJ

13  DEFINITION IN ILLUSTRATIVE DISTRICT 2?

14  **A.**   YES.

15  **Q.**   WAS YOUR ANALYSIS ANY DIFFERENT ABOUT THE EFFECTIVENESS OF

16  ILLUSTRATIVE DISTRICT 2, DEPENDING ON WHAT DEFINITION YOU USE

17  FOR THE BLACK POPULATION?

18  **A.**   NO.

19  **Q.**   WAS YOUR ANALYSIS ANY DIFFERENT ABOUT THE EFFECTIVENESS OF

20  THE CONGRESSIONAL DISTRICTS ENACTED -- THE ENACTED MAP,

21  DEPENDING ON WHAT DEFINITION OF "BLACK" IS USED?

22  **A.**   NO.

23  **Q.**   AND COUNSEL ASKED YOU ABOUT PERFORMING A FUNCTIONAL

24  ANALYSIS.  WHY DIDN'T YOU PERFORM A FUNCTIONAL ANALYSIS AT THIS

25  TIME IN THIS CASE FOR YOUR REPORT?

10:50 1    **A.**   I DID PERFORM A FUNCTIONAL ANALYSIS.  A FUNCTIONAL

2    ANALYSIS IS SIMPLY LOOKING AT HOW BLACK-PREFERRED CANDIDATES

3    WOULD -- WHETHER THEY WOULD HAVE AN OPPORTUNITY -- WHETHER

4    BLACK VOTERS WOULD HAVE AN OPPORTUNITY TO ELECT CANDIDATES OF

5    CHOICE DEPENDING ON THE VOTING PATTERNS OF BLACKS AND WHITES AS

6    OPPOSED TO JUST THE VOTING AGE POPULATION.  THAT'S WHAT THIS

7    IS, NOT THIS CHART.  WHAT THE EFFECTIVENESS TABLES WERE.

8           **MS. BRANNON:**  WE CAN TAKE THIS CHART DOWN.

9    **BY THE WITNESS:**

10   **A.**   I'M SORRY?

11           **MS. BRANNON:**  WE CAN TAKE THIS DOWN.

12   **BY MS. BRANNON:**

13   **Q.**   AND DID YOU DO THAT FOR AN ANALYSIS OF THE ILLUSTRATIVE

14   PLAN?

15   **A.**   I DID A FUNCTIONAL ANALYSIS OF BOTH THE -- OF SEVERAL

16   ILLUSTRATIVE PLANS, AS WELL AS THE ENACTED PLAN.

17   **Q.**   CORRECT.  AND WE'VE ALREADY DISCUSSED THAT; THAT

18   INFORMATION IS IN YOUR CHART -- IN YOUR REPORT.  CORRECT?

19   **A.**   YES.

20   **Q.**   OKAY.  AND AS PART OF THE -- YOUR ANALYSIS OF THE ENACTED

21   PLAN, DO ANY OF THE POPULATIONS IN THE ENACTED PLAN HAVE A

22   VOTING AGE POPULATION OVER 50 PERCENT BESIDES CONGRESSIONAL

23   DISTRICT 2?

24   **A.**   IN THE ENACTED PLAN?

25   **Q.**   YES, IN THE ENACTED PLAN.

10:51 1    **A.**   NO.

2              **THE COURT:**  UNDER EITHER DEFINITION OR WHICH

3       DEFINITION?

4              **MS. BRANNON:**  UNDER EITHER DEFINITION.

5              **THE COURT:**  OKAY.  THANKS.

6              **THE WITNESS:**  NO.

7       **BY MS. BRANNON:**

8       **Q.**   DO ANY OF THE CONGRESSIONAL DISTRICTS IN THE ENACTED PLAN

9       PERFORM TO ALLOW BLACK VOTERS TO ELECT THEIR CANDIDATE OF

10      CHOICE BESIDES CONGRESSIONAL DISTRICT 2?

11      **A.**   NO.

12             **MS. BRANNON:**  CAN WE TURN BACK TO THE -- APPENDIX C,

13      APPENDIX C, REVISED APPENDIX C.

14                  JUST BEAR WITH ME A MINUTE, YOUR HONOR.

15                  IT IS ILLUSTRATIVE DISTRICT 1 POINT -- EXHIBIT

16      1.6.

17      **BY MS. BRANNON:**

18      **Q.**   AND ACTUALLY, CAN YOU TURN TO REVISED APPENDIX C IN YOUR

19      REPORT, WHICH IS IN YOUR BINDER.

20             **MS. BRANNON:**  AND WE CAN TAKE THIS DOWN.

21                  AND FOR THE RECORD, THAT'S EXHIBIT PR-92.

22      **BY MS. BRANNON:**

23      **Q.**   AND LOOKING AT APPENDIX C THAT'S IN THE REPORT, CAN YOU

24      JUST REFRESH OUR RECOLLECTION AS TO EXACTLY WHAT IS CONTAINED

25      IN THAT DOCUMENT?

10:53 1    **A.**    YOU MEAN CORRECTED APPENDIX C?

2    **Q.**    YES.

3    **A.**    SO THIS IS THE STATEWIDE ELECTIONS RECOMPILED,

4    RECONFIGURED TO CONFORM WITH THE ENACTED DISTRICT BOUNDARIES,

5    AND IT'S A RACIAL-BLOC-VOTING ANALYSIS OF THE FIVE DISTRICTS

6    THAT WOULD CONTRIBUTE VOTERS TO THE ILLUSTRATIVE DISTRICT 2,

7    ILLUSTRATIVE -- ADDITIONAL OPPORTUNITY DISTRICT IN ILLUSTRATIVE

8    PLAN 2 OR PLAN 2-A.

9    **Q.**    IS IT AN EVALUATION OF THE ENACTED PLAN?

10    **A.**    YES.

11    **Q.**    OKAY.  CAN YOU GO THROUGH THAT, REVIEW THAT DOCUMENT.

12          **MS. BRANNON:**    AND MAYBE WE CAN PULL IT UP ON THE

13    SCREEN, APPENDIX C FROM EXHIBIT R-92, PR-92.  KEEP GOING AND

14    THEN KEEP GOING.  THANK YOU.  YEAH, APPENDIX C.  THERE.  THAT'S

15    THE RIGHT THING.

16    **BY MS. BRANNON:**

17    **Q.**    THIS IS FROM YOUR REPORT.  CORRECT?

18    **A.**    YES.

19    **Q.**    OKAY.  CAN YOU EXPLAIN WHETHER ALL OF THESE ELECTIONS ARE

20    POLARIZED OR NOT IN YOUR ANALYSIS OF THE ENACTED PLAN?

21    **A.**    THEY ARE ALL POLARIZED FOR ALL OF THE DISTRICTS, I

22    BELIEVE, INCLUDING DISTRICT 2.  IF YOU COULD TURN THE --

23    THEY'RE ALL POLARIZED FOR ALL ENACTED DISTRICTS, INCLUDING

24    DISTRICT 2.

25    **Q.**    AND WOULD A BVAP OF LESS THAN 50 PERCENT ALLOW BLACK

1  VOTERS TO ELECT THEIR CANDIDATE OF CHOICE IN CONGRESSIONAL

2  DISTRICT 2 IN THE ENACTED PLAN -- OR NOT THE ENACTED PLAN.

3  JUST BASED ON YOUR ANALYSIS, WOULD IT --

4        MS. BRANNON:  LET ME REPHRASE THE QUESTION, YOUR

5  HONOR.

6  **BY MS. BRANNON:**

7  **Q.**  WOULD A BVAP OF LESS THAN 50 PERCENT ALLOW BLACK VOTERS TO

8  ELECT THEIR CANDIDATE OF CHOICE IN CONGRESSIONAL DISTRICT 2?

9  **A.**  I DON'T KNOW.  THE DISTRICT WAS 58 PERCENT.  NOW -- OH, IN

10  ENACTED DISTRICT 2?  IT'S STILL 58 PERCENT.  SO I CAN'T ANSWER

11  THAT FOR THAT.  BUT IN THE ILLUSTRATIVE PLAN, IT'S 50 PERCENT

12  AND IT STILL ALLOWS THE BLACK VOTERS TO ELECT THEIR CANDIDATE

13  OF CHOICE.

14  **Q.**  ALL RIGHT.  DO YOU THINK A BVAP OF LESS THAN 50 PERCENT IN

15  CONGRESSIONAL DISTRICT 2 WOULD ALLOW BLACK VOTERS TO ELECT

16  THEIR CANDIDATE OF CHOICE?

17  **A.**  IT'S POSSIBLE.

18  **Q.**  OKAY.  AND IN LOOKING AT THIS ANALYSIS --

19        MS. BRANNON:  AND MAYBE CAN WE GO BACK TO APPENDIX B,

20  REVISED APPENDIX B, WHICH IS IN EXHIBIT 92 -- 91.

21              SORRY, YOUR HONOR.

22              NO.  CAN WE GO TO EXHIBIT PR-87 AND THEN CAN WE

23  GO TO REVISED APPENDIX B AT THE END OF THIS DOCUMENT.  IS IT

24  NOT THERE?  MAYBE WE DON'T HAVE IT.  THIS IS JUST -- THERE.

25  AND CAN WE GO DOWN TO LOOK AT THE NEXT PAGE.

1  **BY MS. BRANNON:**

2  **Q.**   AND JUST LOOKING AT, FOR EXAMPLE, AT CONGRESSIONAL

3  DISTRICT 3, CAN YOU JUST BRIEFLY DESCRIBE THE WHITE CROSSOVER

4  VOTING THAT YOU FOUND WHEN LOOKING AT CONGRESSIONAL DISTRICT 3?

5  **A.**   SO THE BLACK-PREFERRED CANDIDATE IN 2020 WAS BRYLAND

6  HARRIS.  HE RECEIVED SOMEWHERE BETWEEN 64 AND 69 PERCENT OF THE

7  BLACK VOTE, AND HE RECEIVES SOMEWHERE IN THE NEIGHBORHOOD OF

8  1.726 PERCENT OF THE WHITE VOTE.

9  **Q.**   SO THAT'S A LOW AMOUNT OF WHITE CROSSOVER VOTING?

10  **A.**   THAT'S A VERY LOW AMOUNT OF WHITE CROSSOVER VOTE, YES.

11       **MS. BRANNON:**  YOUR HONOR, I HAVE NO FURTHER

12  QUESTIONS.

13       **THE COURT:**  DR. HANDLEY, YOU MAY STEP DOWN.  THANK

14  YOU, MA'AM.

15       OKAY.  WE'RE GOING TO STAY ON THE RECORD UNTIL

16  11:30.  THE COURT HAS A PRETRIAL CONFERENCE AT 11:30, BUT LET'S

17  PLOW THROUGH.  SO PLEASE CALL YOUR WITNESS.  IF SOMEBODY NEEDS

18  TO USE THE RESTROOM, YOU CAN CERTAINLY -- YOU'RE NOT GOING TO

19  BOTHER ME, BUT LET'S PLOW THROUGH.  HANG ON JUST A MINUTE.

20       ALL RIGHT, MA'AM.

21       **MS. OSAKI:**  GOOD MORNING, YOUR HONOR.

22       I'D LIKE TO ALSO ENTER AN APPEARANCE.  MY NAME

23  IS SAMANTHA OSAKI -- THAT'S O-S-A-K-I -- WITH THE AMERICAN

24  CIVIL LIBERTIES UNION FOR THE ROBINSON PLAINTIFFS.

25       THE ROBINSON PLAINTIFFS WILL NOW CALL DR.

1 | DOROTHY NAIRNE.

2 | **DOROTHY NAIRNE, PH.D.,**

3 | **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

4 | **THE COURT:**  GOOD MORNING, MA'AM.

5 | YOU'LL NEED TO ADJUST THE MIC TO SUIT YOU SO

6 | THAT WE CAN HEAR YOU.

7 | **THE WITNESS:**  OKAY.  GOOD MORNING.

8 | **THE COURT:**  GOOD MORNING.

9 | **THE WITNESS:**  GOOD MORNING.  CAN YOU HEAR ME?

10 | **THE COURT:**  YES, MA'AM.

11 | **THE WITNESS:**  ALL RIGHT.

12 | **DIRECT EXAMINATION**

13 | **BY MS. OSAKI:**

14 | **Q.**  GOOD MORNING, DR. NAIRNE.

15 | **A.**  GOOD MORNING.

16 | **Q.**  TO START, COULD YOU PLEASE STATE YOUR NAME FOR THE COURT.

17 | **A.**  MY NAME IS DOROTHY NAIRNE.

18 | **Q.**  AND HOW DO YOU IDENTIFY RACIALLY, DR. NAIRNE?

19 | **A.**  I AM BLACK.  I AM AFRICAN AMERICAN.

20 | **Q.**  WHAT TOWN AND PARISH DO YOU LIVE IN, DR. NAIRNE?

21 | **A.**  I LIVE IN NAPOLEONVILLE, ASSUMPTION PARISH.

22 | **Q.**  AND HOW LONG HAVE YOU LIVED AT YOUR CURRENT ADDRESS?

23 | **A.**  IT'S A FAMILY HOME THAT I HAVE VISITED ALL MY LIFE, AND

24 | I'VE BEEN THERE FULL-TIME SINCE 2017.

25 | **Q.**  AND BEFORE 2017 HOW LONG HAVE YOU AND YOUR FAMILY TRACED

11:00  1    YOUR ROOTS IN LOUISIANA?

2    **A.**   FOR GENERATIONS.  MY MOTHER'S MOTHER'S MOTHER'S MOTHERS

3    AND FATHERS WERE ENSLAVED HERE IN LOUISIANA IN ASSUMPTION

4    PARISH.

5    **Q.**   COULD YOU PLEASE TELL US BRIEFLY ABOUT YOUR EDUCATION AND

6    CAREER HISTORY, DR. NAIRNE?

7    **A.**   I HAD THE BENEFIT OF GOING TO THE UNIVERSITY OF

8    WISCONSIN -- GO BADGERS -- AND THEN I WENT TO -- I STUDIED

9    JOURNALISM AND AFRICAN-AMERICAN STUDIES.  THEN I LIVED IN

10   ATLANTA AND WENT TO CLARK ATLANTA UNIVERSITY WHERE I HAVE A

11   MASTER'S DEGREE IN AFRICAN-AMERICAN STUDIES AND A PH.D. IN

12   INTERNATIONAL AFFAIRS AND ECONOMIC DEVELOPMENT.

13   **Q.**   AND COULD YOU PLEASE DESCRIBE WHAT YOU CURRENTLY DO FOR A

14   LIVING?

15   **A.**   I HAVE A START-UP BUSINESS HERE IN LOUISIANA THAT IS

16   FOCUSING ON GLASS RECYCLING AND TAKING THE GLASS, TURNING IT

17   INTO SAND AND DOING STORMWATER MANAGEMENT AND MARDI GRAS BEADS

18   SO THAT WE CAN CREATE JOBS FOR PEOPLE COMING OUT OF PRISON.

19   **Q.**   THANK YOU, DR. NAIRNE.

20          DO YOU BELONG TO ANY CIVIC, NONPROFIT OR POLITICAL

21   GROUPS?

22   **A.**   I'M VERY ACTIVE WITH THE NAACP, WITH THE URBAN LEAGUE,

23   WITH CLIMATE -- WOMEN FOR CLIMATE, AND ALSO WITH OTHER START-UP

24   ORGANIZATIONS LIKE FUND 17, AND THERE'S ONE CALLED "FLIGHT AND

25   TOGETHER LOUISIANA" AND "TOGETHER NEW ORLEANS."

11:01 1  **Q.**   SO DO YOU CONSIDER YOURSELF TO BE ACTIVE IN YOUR

2  COMMUNITY?

3  **A.**   I AM VERY ACTIVE.

4  **Q.**   DR. NAIRNE, COULD YOU PLEASE DESCRIBE THE ROLE THAT RACE

5  HAS PLAYED IN YOUR FAMILY SINCE YOUR FAMILY HAS LIVED IN

6  LOUISIANA?

7  **A.**   SO, FIRST, MY GRANDPARENTS WERE ON -- WELL, THEY WERE

8  SHARECROPPERS ON DIFFERENT PLANTATIONS IN ASSUMPTION PARISH.

9  AND SO MY GRANDFATHER COULD READ, SO HE USED TO READ TO ALL OF

10  THE OTHER SHARECROPPERS WHO COULDN'T READ AND ALSO HELPED THEM

11  WITH THEIR MONEY.

12        SO MY GRANDMOTHER USED TO TELL STORIES ABOUT HOW ON

13  THE PLANTATION THEY WOULD PAY WITH JITNEY.  SO THEY WOULD TRY

14  TO PAY PEOPLE DIFFERENT MONEY SO YOU COULD NEVER GET OFF THE

15  PLANTATION.  SO I'VE GOT THAT LONG BACKGROUND WHERE MY

16  GRANDMOTHER ALWAYS WANTED TO GET OFF THE PLANTATION, AND MY

17  MOTHER DID.

18        MY FAMILY -- HER FAMILY POURED INTO HER WHERE SHE WAS

19  ABLE TO GO TO SCHOOL BEYOND THE SIXTH GRADE ALL THE WAY IN NEW

20  ORLEANS, BECAUSE THERE WAS NO SCHOOL IN ASSUMPTION PARISH FOR

21  BLACK CHILDREN.  SO THEY HAD TO WALK FROM GRADES ONE TILL

22  SIXTH, PROBABLY FIVE MILES EACH WAY.  AND THE WHITE CHILDREN,

23  WHO WERE IN A SCHOOL BUS -- ALL OF THESE PUBLIC SCHOOLS.

24  SO MY MOTHER WOULD TELL GROSS STORIES OF BEING SPIT ON FROM THE

25  SCHOOL BUS AND THEN HAVING TO GO ALL THE WAY TO NEW ORLEANS TO

11:03 1  GO TO SCHOOL BEYOND THE SIXTH GRADE.

2  **Q.**  ARE YOU A REGISTERED VOTER, DR. NAIRNE?

3  **A.**  I AM A REGISTERED VOTER.

4  **Q.**  ARE YOU REGISTERED TO VOTE AT YOUR CURRENT ADDRESS?

5  **A.**  YES, I AM.

6  **Q.**  DO YOU REGULARLY VOTE IN CONGRESSIONAL ELECTIONS?

7  **A.**  I VOTE, YES.

8  **Q.**  DO YOU PLAN ON VOTING IN FUTURE CONGRESSIONAL ELECTIONS?

9  **A.**  YES, I DO.

10  **Q.**  THANK YOU.

11      I'D NEXT LIKE TO DISCUSS YOUR INVOLVEMENT WITH THIS

12  CASE.  WHAT MOTIVATED YOU TO BE A PLAINTIFF AND A WITNESS

13  TODAY?

14  **A.**  I GREW UP WITH THE NOTION THAT WHERE MUCH IS GIVEN, MORE

15  IS EXPECTED.  I HAVE BEEN COMPLETELY PRIVILEGED IN HAVING AN

16  EDUCATION AND KNOWING PEOPLE IN ASSUMPTION PARISH IN

17  NAPOLEONVILLE WHO HAVEN'T HAD THOSE OPPORTUNITIES.  SO FOR ME,

18  IT'S A MORAL IMPERATIVE TO GIVE AS MUCH AS I CAN FOR THE PEOPLE

19  WHO LIVE AROUND ME WHO WANT JUSTICE, WHO WANT RACIAL EQUALITY

20  AND WHO WANT OPPORTUNITIES.

21  **Q.**  THANK YOU, DR. NAIRNE.

22      LET'S TALK A LITTLE BIT ABOUT YOUR CURRENT

23  CONGRESSIONAL DISTRICT.  DO YOU KNOW WHAT YOUR CURRENT

24  CONGRESSIONAL DISTRICT IS?

25  **A.**  I AM IN DISTRICT 6.

11:04 1  **Q.**   AND WHO IS YOUR CURRENT REPRESENTATIVE?

2  **A.**   GRAVES, GARRETT GRAVES.

3  **Q.**   WHAT IS YOUR UNDERSTANDING OF YOUR CONGRESSMAN'S RACE?

4  **A.**   HE IS A WHITE MAN.

5  **Q.**   IN GENERAL, DO YOU FOLLOW YOUR CONGRESSMAN'S ACTIONS?

6  **A.**   I FOLLOW HIM AND HAVE CONTACTED HIS OFFICE ON SEVERAL

7  OCCASIONS.

8  **Q.**   IN YOUR AFFIDAVIT YOU NOTE THAT YOU BELIEVE THAT YOUR

9  CONGRESSMAN DOES NOT ADVOCATE FOR YOUR COMMUNITY'S NEEDS.  WHAT

10  DID YOU MEAN BY THAT?

11  **A.**   I'M VERY ACTIVE, AS I'VE STATED, IN MY COMMUNITY AND ALSO

12  PARTICIPATING WIDELY ON ZOOM OR FOR POLICY CONFERENCES, AND I

13  HAVEN'T SEEN HIM AT ANY EVENTS, WHETHER FOR KING DAY,

14  JUNETEENTH DAY, OR JUST TO DISCUSS THE PLIGHT OF THE BLACK

15  COMMUNITY.

16  **Q.**   HAVE YOU SEEN HIM CAMPAIGNING IN YOUR COMMUNITY?

17  **A.**   NO.  NO.  NO.  I HAVE NOT SEEN HIM CAMPAIGNING DURING THE

18  SEVERAL ELECTIONS THAT I'VE BEEN AROUND FOR.

19  **Q.**   THANK YOU, DR. NAIRNE.

20          I'D NOW LIKE TO DISCUSS THE ENACTED MAPS.

21          **MS. OSAKI:**  MAY WE PLEASE PULL UP ENACTED -- THE

22  ENACTED MAP UNDER HB1, WHICH HAS BEEN MOVED IN AS PLAINTIFFS'

23  EXHIBIT PR-15 ON PAGE 48.

24  **BY MS. OSAKI:**

25  **Q.**   DR. NAIRNE, ARE YOU FAMILIAR WITH THIS MAP?

11:05 1    **A.**   YES, I AM.

2    **Q.**   DO YOU KNOW WHICH DISTRICT YOU RESIDE IN UNDER THIS MAP?

3    **A.**   IT'S STILL UNCLEAR.  SO THERE WAS ONE ELECTION WHERE I

4    WENT FROM SCHOOL TO SCHOOL TO SCHOOL LOOKING FOR, YOU KNOW, AM

5    I VOTING?  CAN I VOTE?  WHERE AM I VOTING?  AND THEY TURNED ME

6    AWAY.  SO I LEARNED THAT I WAS IN DISTRICT 6, AND I'M RIGHT

7    THERE ON THE CUSP.  SO SOME OF MY NEIGHBORS VOTE IN DISTRICT 2

8    AND SOME IN DISTRICT 6.  SO IT'S CONFUSING, IT'S CHAOTIC AND

9    AND IT DOESN'T HELP US TO ORGANIZE OR PLAN.

10    **Q.**   WHAT DO YOU MEAN BY "ON THE CUSP"?

11    **A.**   SO MY HOUSE IS LIKE LITERALLY WHERE MY NEIGHBORS ACROSS

12    THE STREET ARE IN DISTRICT 2, SO THEY WERE ABLE TO VOTE BUT I

13    WASN'T.

14          **MS. OSAKI:**  MAY WE PLEASE ZOOM IN ON THAT AREA?  IT'S

15    ASSUMPTION PARISH IN CONGRESSIONAL DISTRICT 6.  THANK YOU.

16    **BY MS. OSAKI:**

17    **Q.**   DR. NAIRNE, BASED ON YOUR LIVED EXPERIENCES, LOOKING AT

18    THIS MAP, WHAT IS YOUR IMPRESSION OF YOUR DISTRICT,

19    CONGRESSIONAL DISTRICT 6?

20    **A.**   SO AS SMALL AS ASSUMPTION PARISH IS, IT'S A BIG LAND MASS

21    BUT SMALL COMMUNITY.  WE'RE NOT ABLE TO ORGANIZE OR ABLE TO

22    MOBILIZE OR ABLE TO VOICE OUR -- AND ORGANIZE OUR VOICE IN

23    ASSUMPTION PARISH.

24    **Q.**   AND COULD YOU DESCRIBE GEOGRAPHICALLY WHAT AREAS YOUR

25    COMMUNITY IN ASSUMPTION PARISH WOULD BE LINKED WITH IN

1 | CONGRESSIONAL DISTRICT 6 OF THIS ENACTED MAP?

2 | **A.**   SURE.  SO A LOT OF THE WORK THAT I DO IS WITH PEOPLE

3 | WITHIN THE RIVER PARISHES:  ST. JOHN, ST. JAMES, ST. CHARLES

4 | AND JEFFERSON AND ORLEANS PARISH.  AND SO WHEN IT COMES TIME TO

5 | DISCUSS CANDIDATES AND VOTING, I'M SILENT.  I HAVE NOTHING TO

6 | SAY BECAUSE THEY ARE IN ONE DISTRICT AND I'M IN ANOTHER.

7 | **Q.**   SO UNDER CONGRESSIONAL DISTRICT 6, YOU'RE THE -- CAN YOU

8 | DESCRIBE SOME OF THE PARISHES THAT YOU WOULD BE LINKED WITH

9 | HERE?

10 | **A.**   SO ST. MARY'S, IBERVILLE, I HAVE ABSOLUTELY NO ALLIANCE

11 | THERE, NO COMMUNITY MEMBERS THERE IN THOSE PARISHES.

12 | **Q.**   I'D LIKE TO TALK A LITTLE BIT MORE ABOUT THAT.  BASED ON

13 | YOUR LIVED EXPERIENCES, HOW WOULD YOU DESCRIBE SOME OF THOSE

14 | COMMUNITIES THAT ARE INCLUDED ALONGSIDE YOURS HERE?

15 | **A.**   SO A LOT OF THE COMMUNITY WORK THAT I DO IS WITH THE RIVER

16 | PARISHES WHERE WE DO A LOT OF WORK AROUND ENVIRONMENTAL JUSTICE

17 | AND RACIAL JUSTICE AND LOOKING AT CANCER ALLEY AND LOOKING AT

18 | JUST WHAT'S HAPPENING WITH PEOPLE'S LIVED EXPERIENCES, AS WELL

19 | AS WITH HIV, WITH CRIME, AND WITH HOW WE IMPROVE EACH OTHER'S

20 | LIVES.

21 |       SO I DON'T WORK WITH PEOPLE WITHIN TERREBONNE OR THE

22 | OTHER PARISHES, SO I'M KIND OF A SORE THUMB STANDING OUT THERE

23 | BECAUSE WE WORK TOGETHER, BUT THEN WE DON'T VOTE TOGETHER.

24 | **Q.**   I SEE.  SO IT SOUNDS LIKE YOU'RE SAYING YOU'RE NOT AS

25 | FAMILIAR WITH THESE -- THAT YOU'RE INCLUDED WITH?

11:07 1   **A.**   YES.

2   **Q.**   OKAY.  NOW, UNDER THIS ENACTED PLAN AND BASED ON YOUR

3   LIVED EXPERIENCES AS A RESIDENT OF CONGRESSIONAL DISTRICT 6, DO

4   YOU BELIEVE YOUR INTERESTS WOULD BE FAIRLY REPRESENTED?

5   **A.**   I DO NOT BELIEVE THAT MY INTERESTS ARE REPRESENTED.

6   **Q.**   AND WHY IS THAT?

7   **A.**   I FEEL LIKE I AM ALIENATED, THAT I DON'T HAVE ASSOCIATIONS

8   IN GROUPS THAT I WOULD WORK WITH.  I WOULD HAVE TO START OVER

9   REALLY TO SEE WHO'S WHERE AND DOING WHAT, GIVEN THIS MAP THAT

10   I'M LOOKING AT RIGHT NOW.

11   **Q.**   THANK YOU, DR. NAIRNE.

12         I'D NOW LIKE TO DISCUSS ONE OF PLAINTIFFS'

13   ILLUSTRATIVE MAPS.

14         **MS. OSAKI:**  COULD WE PLEASE PULL UP ONE OF

15   PLAINTIFFS' ILLUSTRATIVE MAPS, WHICH HAS BEEN MOVED IN AS

16   PLAINTIFFS' EXHIBIT PR-15 ON PAGE 47.

17   **BY MS. OSAKI:**

18   **Q.**   DR. NAIRNE, ARE YOU FAMILIAR WITH THIS MAP?

19   **A.**   YES, I AM.

20   **Q.**   UNDER THIS ILLUSTRATIVE MAP, ARE YOU AWARE OF WHAT

21   DISTRICT YOU LIVE IN?

22   **A.**   I WOULD KNOW WHERE -- I KNOW WHERE I LIVE, BUT I WOULD

23   KNOW WHAT DISTRICT THAT I'M IN, SURE ENOUGH.  ME AND ALL MY

24   NEIGHBORS WOULD BE IN DISTRICT 2, ACCORDING TO THIS MAP.

25         **MS. OSAKI:**  MAY WE PLEASE ZOOM IN TO CONGRESSIONAL

11:09 1 DISTRICT 2 IN THIS ILLUSTRATIVE MAP.  THANK YOU.

2 **BY MS. OSAKI:**

3 **Q.**   DR. NAIRNE, GEOGRAPHICALLY WHAT AREAS WOULD YOU BE LINKED

4 WITH IN THIS CONGRESSIONAL DISTRICT 2 OF THIS ILLUSTRATIVE MAP?

5 **A.**   IN THIS MAP I WOULD BE WITH THE PEOPLE THAT I'M WORKING

6 WITH CURRENTLY, ALONG WITH THE RIVER PARISHES, ALL THE WAY INTO

7 ORLEANS AND JEFFERSON PARISHES.  THIS MAP MAKES SENSE TO ME.

8 **Q.**   DO YOU HAVE ANY PERSONAL CONNECTIONS WITH ANY OF THOSE

9 OTHER PARISHES?

10 **A.**   I HAVE PERSONAL CONNECTIONS:  FAMILY, FRIENDS, COLLEAGUES

11 IN ALL OF THIS -- IN THIS ENTIRE AREA.

12 **Q.**   HOW WOULD YOU DESCRIBE COMMUNITIES IN THESE AREAS, THESE

13 RIVER PARISH AREAS, BASED ON YOUR PERSONAL KNOWLEDGE?

14 **A.**   WE HAVE A SHARED HISTORY.  WE HAVE A SHARED CULTURAL

15 HERITAGE, AND WE WORK TOGETHER TO MAKE IMPROVEMENTS ALONG THIS

16 AREA WITH COMMUNITY DEVELOPMENT WHERE WE'RE DOING WORK AROUND

17 CREATING JOBS FOR PEOPLE, OPPORTUNITIES FOR YOUNG PEOPLE AND

18 TRYING TO IMPROVE OUR HEALTH.

19 **Q.**   WHAT DID YOU MEAN BY THAT, "TRYING TO IMPROVE YOUR

20 HEALTH"?

21 **A.**   THIS AREA IS KNOWN AS CANCER ALLEY AND JUST -- SO I'VE

22 WORKED SOMEWHAT WITH THE CANCER INDEX AND LOOKING AT JUST

23 NEIGHBORS ACROSS THE STREET, NEXT TO ME, EVEN MY OWN MOTHER

24 WHO HAD A TUMOR THE SIZE OF A SOCCER BALL IN HER BELLY.  AND

25 SO, YOU KNOW, JUST CANCER IS EVERYWHERE.  AND, YOU KNOW, IF

11:10 1  IT'S IN MY OWN HOUSE, THEN IS IT IN ME TOO?  SO IT REALLY

2  REQUIRES US TO DO QUITE A BIT OF WORK TOGETHER.

3  **Q.**   SO YOU DESCRIBE SOME OF THE HEALTH INEQUITIES THAT ARE

4  SIMILAR ALONG THE RIVER PARISHES.  WHAT ABOUT INDUSTRIES?  ARE

5  THERE ANY INDUSTRIES THAT ARE SIMILAR ALONG THESE COMMUNITIES?

6  **A.**   WELL, THE SUGARCANE INDUSTRY DEFINED THIS AREA AND THIS

7  REGION, BUT NOW THE SUGARCANE INDUSTRY IS MECHANIZED SO PEOPLE

8  DON'T HAVE THOSE JOBS ANYMORE.  SO THERE'S A LOT OF NOT MUCH TO

9  DO GOING ON IN ASSUMPTION AND ST. JAMES, ST. JOHN AND ST.

10  CHARLES.

11  **Q.**   NOW, UNDER THIS NEW -- UNDER THIS ILLUSTRATIVE PLAN AND

12  BASED ON YOUR LIVED EXPERIENCES, DO YOU BELIEVE THAT YOUR

13  COMMUNITY'S INTEREST WOULD BE FAIRLY REPRESENTED?

14  **A.**   UNDER THIS MAP, YES.

15  **Q.**   WHY IS THAT?

16  **A.**   IT WOULD GIVES US A BASE SO THAT WE CAN MOBILIZE AND SO

17  THAT WE CAN ORGANIZE AND SO THAT WE HAVE ONE COLLECTIVE VOICE

18  AND SO THAT WE WOULD HAVE ACTION TOGETHER SO THAT WE CAN MOVE

19  FORWARD AND IMPROVE NOT JUST OUR COMMUNITIES AND OUR HOUSEHOLDS

20  BUT OUR ENTIRE STATE.

21  **Q.**   BASED ON YOUR LIVED EXPERIENCES AS A LOUISIANIAN, DOES IT

22  MAKE SENSE CULTURALLY, SOCIOECONOMICALLY, HISTORICALLY OR

23  OTHERWISE FOR YOUR COMMUNITY TO FALL UNDER THIS ILLUSTRATIVE

24  MAP'S CONGRESSIONAL DISTRICT 2 ALONGSIDE THESE OTHER RIVER

25  PARISH COMMUNITIES?

11:11 1    **A.**   TO ME IT MAKES COMPLETE SENSE THAT WE ARE IN THIS
2    DISTRICT.
3    **Q.**   THANK YOU.
4         FINALLY, DR. NAIRNE, HOW WOULD YOU FEEL IF A MAP LIKE
5    THIS ILLUSTRATIVE PLAN -- THAT IS, A MAP THAT ENACTS A SECOND
6    MAJORITY-BLACK CONGRESSIONAL DISTRICT -- WERE TO BE ENACTED
7    INTO LAW?
8    **A.**   I KNOW EXACTLY THE HOUSEHOLDS THAT I'M GOING TO KNOCK ON
9    THEIR DOORS, SHOULD THIS HAPPEN.  THERE WERE A NUMBER OF PEOPLE
10   -- SO DURING THE CENSUS AND LEADING UP TO THE ELECTIONS FOR
11   2020, I WAS A BLOCK CAPTAIN FOR "TOGETHER LOUISIANA."  SO THERE
12   WERE A COUPLE OF HOUSEHOLDS THAT I KNOCKED ON THEIR DOORS, AND
13   THEY WERE LIKE, "OH, GOOD.  YOU MEAN CHANGE IS COMING FOR US?"
14   SO THEN WHEN THEY SEE THAT, AWE, CHANGE IS NOT REAL, THEIR
15   HOPES ARE DASHED, THEY FEEL LIKE, "WOW," YET AGAIN
16   DISAPPOINTED.  "YOU LIED TO ME," SOME MAN SAID.  SO IT'S JUST
17   LIKE, "NO, I DIDN'T LIE TO YOU.  THIS PROCESS JUST TAKES A
18   WHILE."
19        SO I KNOW I WOULD GO TO HIS HOME.  THIS IS SOMEBODY
20   I'VE KNOWN ALL MY LIFE.  AND JUST TO SEE THAT, YOU KNOW, HE'S
21   WEATHERED AND WORN OUT, AND JUST TO HAVE HIM HAVE A LITTLE BIT
22   OF HOPE, WOW, WOULD THAT MAKE MY YEAR, MY DAY, MY HOUR.  SO
23   THAT'S WHERE I WOULD GO AND SAY, "LOOK, CHANGE IS COMING, EVEN
24   HERE TO ASSUMPTION PARISH."  SO WE'D HAVE SOME HAPPY PEOPLE WHO
25   WOULD HAVE HOPE AGAIN IN LOUISIANA.

11:13  1  **Q.**   THANK YOU, DR. NAIRNE.

2           **MS. OSAKI:**  NO FURTHER QUESTIONS, YOUR HONOR.

3           **THE COURT:**  CROSS.

4                     **CROSS-EXAMINATION**

5  **BY MR. WALE:**

6  **Q.**   EXCUSE ME.  HI, DR. NAIRNE.  JEFFREY WALE.  I'M AN

7  ATTORNEY FOR THE STATE.  I'LL BE ASKING YOU A FEW QUESTIONS

8  TODAY.

9           DR. NAIRNE, YOU SAID YOU MOVED TO LOUISIANA IN 2017.

10  IS THAT CORRECT?

11  **A.**   YES, IT IS.

12  **Q.**   SO WHERE DID YOU LIVE BEFORE THAT?

13  **A.**   WELL, I LIVED IN SOUTH AFRICA.

14  **Q.**   AND SO WHERE DID YOU GROW UP?  IS THAT WHERE YOU GREW UP,

15  IN SOUTH AFRICA?

16  **A.**   NO.  I GREW UP BETWEEN MILWAUKEE AND ALSO BETWEEN

17  LOUISIANA WHERE I WOULD COME EVERY SUMMER.

18  **Q.**   SO YOU WOULD VISIT LOUISIANA IN THE SUMMER, BUT YOU DIDN'T

19  LIVE HERE FULL-TIME?

20  **A.**   CORRECT.

21  **Q.**   AND SO WHEN DID YOU REGISTER TO VOTE IN LOUISIANA?

22  **A.**   I REGISTERED TO VOTE IN I THINK 2017.

23  **Q.**   AND YOU ARE A REGISTERED DEMOCRAT.  CORRECT?

24  **A.**   YES.

25  **Q.**   AND EARLIER YOU SAID SOMETHING ABOUT BEING CONFUSED ABOUT

11:13 1   WHERE TO VOTE. DID YOU FIND OUT WHERE YOU WERE SUPPOSED TO

2   VOTE?

3   **A.** I DID.

4   **Q.** OKAY. SO YOU'RE AWARE OF THE GEAUX VOTE APP THAT THE

5   SECRETARY OF STATE USES TO LET PEOPLE KNOW WHERE TO VOTE?

6   **A.** YES, I AM.

7   **Q.** OKAY. ALL RIGHT. AND YOU LIVE IN CONGRESSIONAL DISTRICT

8   6 CURRENTLY. CORRECT?

9   **A.** THAT'S CORRECT.

10   **Q.** AND YOUR CURRENT CONGRESSMAN IS CONGRESSMAN GARRETT

11   GRAVES?

12   **A.** YES.

13   **Q.** AND HE IS A REPUBLICAN. CORRECT?

14   **A.** YES.

15   **Q.** AND YOU TESTIFIED EARLIER IN YOUR DECLARATION THAT YOU'RE

16   A HIGHLY ENGAGED VOTER. SO YOU ATTENDED REDISTRICTING

17   WORKSHOPS AROUND THE STATE?

18   **A.** YES, I DID.

19   **Q.** AND YOU'VE WRITTEN LETTERS TO YOUR CONGRESSMAN, TO

20   CONGRESSMAN GRAVES. IS THAT CORRECT?

21   **A.** I WENT TO HIM REGARDING THE ENVIRONMENT, SO YES.

22   **Q.** OKAY. AND YOU'VE SPOKEN ABOUT YOUR ADVOCACY AND YOUR WORK

23   IN THE COMMUNITY. IRRESPECTIVE OF THE RESULTS OF THIS

24   LITIGATION, WILL YOU CONTINUE TO BE ENGAGED WITH ELECTED

25   OFFICIALS WHO REPRESENT YOU?

11:14  1  **A.**   YES, I WILL.

2  **Q.**   AND YOU WILL -- AND REGARDLESS OF WHAT THE MAP LOOKS LIKE

3  -- THE CONGRESSIONAL MAP LOOKS LIKE NOW OR WILL LOOK LIKE, YOU

4  WILL CONTINUE TO ADVOCATE FOR ISSUES YOU CARE DEEPLY ABOUT.

5  CORRECT?

6  **A.**   YES.

7  **Q.**   IN PARAGRAPH 11 OF YOUR DECLARATION YOU STATED THAT YOU

8  HAVE DONATED TO CONGRESSIONAL CANDIDATES.  CAN YOU TELL ME

9  WHICH CANDIDATES YOU'VE DONATED TO?

10  **A.**   I'VE DONATED TO SEVERAL CANDIDATES $5 HERE, $10 HERE.

11  **Q.**   ALL RIGHT.  AND WHAT IS THE AFFILIATION OF THOSE

12  CANDIDATES; THE POLITICAL AFFILIATION?

13  **A.**   SOME ARE INDEPENDENT, A COUPLE OF GREEN PARTY AND A FEW

14  DEMOCRATIC CANDIDATES.

15  **Q.**   ALL RIGHT.  AND DO YOU RECALL, HAVE YOU EVER DONATED TO

16  THE DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE?

17  **A.**   I'M NOT SURE.  HELP ME UNDERSTAND IF I HAVE OR NOT.

18  **Q.**   SURE.  SURE.

19       **MR. WALE:**  YOUR HONOR, IF I MAY, I'M GOING TO BE --

20  NEED TO USE THIS ELMO SYSTEM.

21       **THE COURT:**  YOU CAN USE THE DOCUMENT CAMERA.

22       **MR. WALE:**  THE DOCUMENT CAMERA.

23       **THE COURT:**  SHE'LL TURN IT ON.

24       MR. WALE, TELL US WHAT YOU ARE GOING TO PUT UP

25  THERE BEFORE YOU JUST THROW IT UP THERE.  OKAY?

11:15 1              **MR. WALE:**  OKAY.  YES.

2    **BY MR. WALE:**

3    **Q.**   DR. NAIRNE, I'M GOING TO SHOW YOU A DOCUMENT I PRINTED

4    FROM THE OFFICIAL GOVERNMENT WEBSITE FROM THE FEC, FEDERAL

5    ELECTIONS COMMISSION, IF I CAN.

6              **MR. WALE:**  DO YOU WANT ME TO TURN IT ON AGAIN?

7              **THE COURT:**  IT TAKES A MINUTE TO SWITCH OVER.  JUST A

8    SECOND -- OR MAYBE NOT.

9              **MR. WALE:**  ALL RIGHT.  LET ME TRY IT AGAIN.  LET ME

10   TRY AGAIN.

11   **BY MR. WALE:**

12   **Q.**   DR. NAIRNE, DO YOU REMEMBER DONATING TO A GROUP CALLED

13   "ACT BLUE"?

14   **A.**   I THINK I DID DONATE TO THEM, YES.

15   **Q.**   OKAY.  SO YOU WOULD BELIEVE ME IF I SAID THAT YOU HAD

16   DONATED TO "ACT BLUE" AND THAT CONTAINED AN EARMARK FOR THE

17   DCCC, ALSO KNOWN AS THE "DEMOCRATIC CONGRESSIONAL CAMPAIGN

18   COMMITTEE"?

19   **A.**   (NODDED HEAD.)

20   **Q.**   OKAY.  FANTASTIC.  GOING BACK TO YOUR VOTER REGISTRATION,

21   YOU SAID THAT YOU'RE AN ACTIVE -- YOU'RE A REGULAR VOTER.

22   CORRECT?

23   **A.**   YES.

24   **Q.**   DO YOU EVER MISS AN ELECTION?

25   **A.**   THERE'S SO MANY, BUT I TRY TO VOTE, ESPECIALLY LOCALLY.

11:17 1   **Q.**   SO IT'S POSSIBLE THAT YOU HAVE MISSED A FEW ELECTIONS?

2   **A.**   I'M PRETTY GOOD AT VOTING.

3       **MR. WALE:**  OKAY.  AND SO, AGAIN, WE STILL DON'T HAVE

4   A -- WE'RE STILL LACKING POWER TO THE DOCUMENT CAMERA.

5         **THE DEPUTY CLERK:**  I'M TEXTING HIM.

6         **MR. WALE:**  OKAY.

7   **BY MR. WALE:**

8   **Q.**   AND I WAS GOING TO ASK YOU, DR. NAIRNE, IF YOU REMEMBER

9   VOTING IN THE DECEMBER 2018 ELECTION.  THAT WAS FOR THE

10   LOUISIANA SECRETARY OF STATE.  IT WAS AN ELECTION BETWEEN THE

11   SECRETARY OF STATE, KYLE ARDOIN, AND GWEN COLLINS-GREENUP.

12   **A.**   I DON'T REMEMBER, HONESTLY.

13   **Q.**   YOU DON'T RECALL VOTING IN THAT ELECTION?

14   **A.**   NO.  I DON'T RECALL NOT VOTING BECAUSE THAT WAS A

15   STATEWIDE ELECTION.  CORRECT?

16   **Q.**   CORRECT, THAT WOULD HAVE BEEN A STATEWIDE ELECTION.

17   **A.**   YES.  SO I WOULD NOT HAVE BEEN TURNED AWAY FROM VOTING

18   DURING THAT ELECTION.

19         **THE COURT:**  JUST GIVE US A SECOND, MR. WALE.  SHE IS

20   CONTACTING I.T. TO SEE IF THEY CAN TROUBLESHOOT IT FOR US.

21          DO YOU HAVE ANY OTHER QUESTIONS THAT YOU CAN GO

22   TO?

23         **MR. WALE:**  NO, YOUR HONOR.  I THINK THAT WAS THE

24   CONCLUSION.

25         **THE COURT:**  WELL, LET'S JUST BE PATIENT AND SEE.

11:20

1          **MR. WALE:** SURE.

2          **THE COURT:** ALL RIGHT. HE WILL BE RIGHT UP.

3          **MR. WALE:** ALL RIGHT. IT LOOKS LIKE THERE IS A

4 LIGHT.

5 **BY MR. WALE:**

6 **Q.** SO, DOCTOR -- EXCUSE ME, DR. NAIRNE. I'M GOING TO SHOW

7 YOU A DOCUMENT FROM THE LOUISIANA SECRETARY OF STATE'S OFFICE.

8 I'M GOING TO SEE IF WE CAN -- LET'S SEE -- ZOOM --

9          **THE COURT:** ALL RIGHT. WELL DONE, MS. MCKNIGHT. IF

10 YOU QUIT YOUR DAY JOB, YOU KNOW WHAT YOU CAN DO.

11          **MR. WALE:** THANK YOU.

12 **BY MR. WALE:**

13 **Q.** SO, DR. NAIRNE, I REALIZE THE FIRST LINE OVER HERE IS A

14 LITTLE BIT DIFFICULT TO READ IN SCRIPT, BUT CAN YOU READ THAT

15 FOR US, PLEASE?

16 **A.** SURE. "AS SECRETARY OF STATE OF THE STATE OF LOUISIANA, I

17 DO HEREBY CERTIFY THAT THE ANNEX HERETO IS TRUE AND CORRECT

18 VOTER REGISTRATION INFORMATION FROM THE SECRETARY OF STATE'S

19 DATABASE FOR DOROTHY EVELYN NAIRE." AND THAT'S ME.

20 **Q.** THANK YOU. THANK YOU SO MUCH.

21 **A.** UH-HUH.

22 **Q.** AND SO I'M GOING TO SHOW YOU ANOTHER PAGE IN HERE, AND CAN

23 YOU TELL ME WHAT THE TOP TWO LINES SAY?

24 **A.** "DID NOT VOTE 2021."

25 **Q.** OH, I'M SORRY. AT THE VERY TOP OF THE PAGE.

11:21 1   **A.**   OH, OKAY.  "ASSUMPTION PARISH."

2   **Q.**   AND EVEN FURTHER WHERE IT SAYS --

3   **A.**   "LOUISIANA SECRETARY OF STATE VOTER ELECTION HISTORY

4   REPORT FOR PARISH:  ASSUMPTION."

5   **Q.**   OKAY.  AND YOU SEE ABOUT ABOUT EIGHT ELECTION DATES THERE?

6   **A.**   UH-HUH.

7   **Q.**   AND DO YOU SEE HOW MANY WHERE IT SAYS YOU DID NOT VOTE?

8   **A.**   I SEE.

9   **Q.**   ALL RIGHT.  AND HOW MANY ELECTIONS DID YOU NOT VOTE IN?

10   **A.**   SO I VOTED IN ONE, TWO, THREE, FOUR, FIVE.  I DID NOT VOTE

11   IN NOVEMBER 2021, JULY 2020.  SO I DID NOT VOTE IN THREE

12   ELECTIONS.

13   **Q.**   OKAY.  AND THEN THE ELECTION I WAS ASKING YOU ABOUT IN --

14   I'M SORRY -- IN DECEMBER OF 2018, THAT WAS THE ELECTION THAT

15   WAS DISCUSSED EARLIER BY AN EARLIER EXPERT.  IT WAS BETWEEN THE

16   SECRETARY OF -- IT WAS FOR SECRETARY OF STATE BETWEEN KYLE

17   ARDOIN AND GWEN COLLINS-GREENSUP.  YOU DID NOT VOTE IN THAT

18   ELECTION.  CORRECT?

19   **A.**   WELL, I SEE NOW.

20   **Q.**   YES.  AND KYLE ARDOIN, WHO WON THAT ELECTION, IS THE

21   DEFENDANT IN THIS SUIT.  CORRECT?

22   **A.**   YES.

23   **Q.**   SO YOU DID NOT PARTICIPATE IN THE ELECTION IN WHICH THE

24   DEFENDANT OF THIS SUIT WAS ELECTED?

25   **A.**   OKAY.

11:22 1    **Q.** ALL RIGHT. THAT'S ALL THE QUESTIONS I HAVE. THANK YOU

2    VERY MUCH.

3            **THE COURT:** ANY REDIRECT?

4            **MS. OSAKA:** NO REDIRECT, YOUR HONOR. THANK YOU.

5            **THE COURT:** OKAY. YOU MAY STEP DOWN. THANK YOU FOR

6    YOUR HELP TODAY, MA'AM.

7            OKAY. WE ARE GOING TO BE IN RECESS UNTIL 1:30.

8            **THE LAW CLERK:** THE COURT IS NOW IN RECESS.

9            **(WHEREUPON, THE COURT WAS IN RECESS.)**

10            **THE COURT:** OKAY. BE SEATED.

11            GOOD AFTERNOON, EVERYONE.

12            WE ARE BACK ON THE RECORD.

13            I TELL YOU WHAT, WHILE YOU DO THAT, WHY DON'T WE

14    JUST SAY WHO WE ARE CALLING AS OUR NEXT WITNESS. HE NEEDS TO

15    PUT IT ON THE RECORD. GO AHEAD. PUT IT ON THE RECORD WHO YOUR

16    NEXT WITNESS IS AND WHO YOU ARE, SIR.

17            **MR. CHAKRABORTY:** GOOD AFTERNOON, YOUR HONOR.

18            OUR NEXT WITNESS IS DR. TRACI BURCH.

19            AND MAKING MY FIRST APPEARANCE TODAY, I AM

20    AMITAV CHAKRABORTY ON BEHALF OF THE ROBINSON PLAINTIFFS.

21            **THE COURT:** OKAY. THEN WE WILL WAIT ON THE ZOOM.

22            DR. BURCH, CAN YOU HEAR US? NOT YET. CAN YOU

23    HEAR US? DR. BURCH, CAN YOU HEAR US? YOU NEED TO UN-MUTE

24    YOURSELF I THINK, MA'AM.

25            **THE WITNESS:** CAN YOU HEAR ME NOW?

01:40  1              **THE COURT:**  YES.

2                   OKAY.  YOUR WITNESS, SIR.

3              **MR. CHAKRABORTY:**  THANK YOU, JUDGE.

4              **THE COURT:**  WAIT.  WE NEED TO SWEAR HER IN.  I'M

5     SORRY.

6                          **TRACI BURCH, PH.D.,**

7     **HAVING BEEN DULY SWORN, TESTIFIED VIA VIDEOCONFERENCE AS**

8     **FOLLOWS:**

9              **THE COURT:**  NOW YOUR WITNESS.

10             **MR. CHAKRABORTY:**  THANK YOU.

11                          **VOIR DIRE**

12    **BY MR. CHAKRABORTY:**

13    **Q.**   GOOD AFTERNOON.

14    **A.**   GOOD AFTERNOON.

15    **Q.**   CAN YOU PLEASE STATE YOUR FULL NAME FOR THE RECORD.

16    **A.**   DR. TRACI BURCH.

17    **Q.**   AND WHAT IS YOUR EDUCATIONAL BACKGROUND, DR. BURCH?

18    **A.**   I AM -- I FIRST COMPLETED MY UNDERGRADUATE WORK AT

19    PRINCETON WHERE I MAJORED IN POLITICS AND GOT A CERTIFICATE IN

20    AFRICAN-AMERICAN STUDIES, AND I FINISHED MY PH.D. AT HARVARD.

21    IT WAS A CRIMINAL DEGREE PROGRAM IN GOVERNMENT AND SOCIAL

22    POLICY.

23    **Q.**   AND WHAT IS YOUR CURRENT OCCUPATION?

24    **A.**   CURRENTLY, I AM ASSOCIATE PROFESSOR OF POLITICAL SCIENCE

25    AT NORTHWESTERN, AS WELL AS A RESEARCH PROFESSOR AT THE

01:41 1 | AMERICAN BAR FOUNDATION.

2 | **Q.** AND HOW LONG HAVE YOU BEEN A PROFESSOR, DR. BURCH?

3 | **A.** SINCE 2007.

4 | **Q.** WHAT ARE YOUR PRINCIPAL AREAS OF RESEARCH?

5 | **A.** SORRY. MY PRINCIPAL AREAS OF RESEARCH INCLUDE POLITICAL

6 | BEHAVIOR, POLITICAL PARTICIPATION, BARRIERS TO VOTING AND RACE

7 | AND ETHNIC POLITICS. AND I ALSO FOCUS ON THE WAYS THAT

8 | INTERACTION WITH THE GOVERNMENT CAN AFFECT ALL OF THOSE THINGS

9 | SUCH AS PARTICIPATION. AND I SPECIFICALLY HAVE FOCUSED ON HOW

10 | INTERACTIONS WITH THE CRIMINAL JUSTICE SYSTEM CAN AFFECT

11 | SPECIFIC AREAS.

12 | **Q.** THANK YOU.

13 | AND HAVE YOU BEEN PUBLISHED ON ANY OR ALL OF THESE

14 | SUBJECTS?

15 | **A.** YES, I HAVE BEEN.

16 | **Q.** HAVE YOU PREVIOUSLY SERVED AS AN EXPERT WITNESS?

17 | **A.** YES. I HAVE TESTIFIED AT TRIAL IN FOUR CASES AND AT A

18 | DEPOSITION IN AN ADDITIONAL CASE.

19 | **Q.** DID ANY OF THOSE CASES IN WHICH YOU TESTIFIED INVOLVE

20 | CLAIMS BROUGHT UNDER THE VOTING RIGHTS ACT?

21 | **A.** YES.

22 | **Q.** AND WAS YOUR TESTIMONY CREDITED OR ACCEPTED BY THE COURT

23 | IN EACH OF THOSE CASES IN WHICH YOU TESTIFIED?

24 | **A.** YES.

25 | **MR. CHAKRABORTY:** YOUR HONOR, PURSUANT TO FEDERAL

01:43 1    RULE OF EVIDENCE 702 AND THE STIPULATION BETWEEN THE PARTIES,

2    THE ROBINSON PLAINTIFFS WOULD LIKE TO PROFFER DR. BURCH AS AN

3    EXPERT IN POLITICAL BEHAVIOR, POLITICAL PARTICIPATION, AND

4    BARRIERS TO VOTING.

5           **THE COURT:**  ALL RIGHT.  IS THERE ANY OBJECTION?

6           **MS. MCKNIGHT:**  NO OBJECTION, YOUR HONOR.

7           **THE COURT:**  OKAY.  DR. BURCH WILL BE ACCEPTED AND MAY

8    GIVE OPINION TESTIMONY IN THE AREAS OF POLITICAL BEHAVIOR,

9    POLITICAL PARTICIPATION, AND BARRIERS TO VOTING.  CORRECT?

10          **MR. CHAKRABORTY:**  YES, YOUR HONOR.

11          **THE COURT:**  OKAY.  YOU MAY PROCEED.

12               **DIRECT EXAMINATION**

13    **BY MR. CHAKRABORTY:**

14    **Q.**  DR. BURCH, DID YOU SUBMIT AN EXPERT REPORT AS PART OF YOUR

15    WORK IN THIS CASE?

16    **A.**  I DID.

17        AND COULD YOU EXCUSE ME FOR A MINUTE?  I JUST NEED TO

18    SHUT MY WINDOW.

19        SORRY.  THANK YOU.  YES, I DID.

20    **Q.**  NO WORRIES AT ALL.

21        **MR. CHAKRABORTY:**  I'D LIKE TO BRING UP ON THE SCREEN

22    -- AND JUST LET US KNOW IF YOU ARE NOT ABLE TO SEE IT -- WHAT

23    HAS BEEN PREMARKED AS PR-14.

24        **THE COURT:**  I DON'T KNOW THAT YOU CAN SCREEN SHARE.

25        **THE DEPUTY CLERK:**  YES.  WE ARE SUPPOSED TO BE ABLE

01:44 1  TO.

2  **THE COURT:** YOU CAN. OKAY. I'M GOING TO LET YOU --

3  DISREGARD MY TECHNICAL INPUT.

4  **BY MR. CHAKRABORTY:**

5  **Q.** SORRY, DR. BURCH. JUST GIVE US ONE SECOND.

6  **THE DEPUTY CLERK:** IT SHOULD BE WORKING.

7  **BY MR. CHAKRABORTY:**

8  **Q.** DR. BURCH, ARE YOU ABLE TO SEE A REPORT ON YOUR SCREEN?

9  **A.** NOT YET.

10  **THE DEPUTY CLERK:** OKAY. LET'S SEE. LET ME CALL HIM

11  REAL QUICK.

12  **(OFF-RECORD DISCUSSION.)**

13  **THE COURT:** OKAY. I.T. IS COMING. IS THERE ANY WAY

14  THAT YOU CAN DO A LITTLE BIT WITH DR. BURCH UNTIL I.T. GETS

15  HERE?

16  **MR. CHAKRABORTY:** I CAN GO THROUGH A COUPLE OF

17  QUESTIONS, YOUR HONOR.

18  **THE COURT:** ALL RIGHT. GREAT. THANKS.

19  **BY MR. CHAKRABORTY:**

20  **Q.** DR. BURCH, JUST JUMPING BACK INTO IT FOR A BRIEF BIT

21  BEFORE WE FIX THE TECHNICAL DIFFICULTIES, DID YOU SUBMIT AN

22  EXPERT REPORT AS PART OF YOUR WORK IN THIS CASE?

23  **A.** I DID.

24  **Q.** I'LL SHOW YOU MOMENTARILY WHAT HAS BEEN PREMARKED AS

25  PR-14, AND IT WILL BE YOUR EXPERT REPORT. WHAT DID YOU SET OUT

01:48 1  TO EVALUATE IN YOUR EXPERT REPORT?

2  **A.**   SO IN MY EXPERT REPORT I WAS ASKED TO EVALUATE THE SENATE

3  FACTORS RELEVANT TO THIS CASE IN LOUISIANA, PARTICULARLY SENATE

4  FACTORS 5, 6, 7, 8 AND 9.

5  **Q.**   THANK YOU.

6       AND WHAT MATERIALS DID YOU RELY ON TO REACH YOUR

7  CONCLUSIONS ABOUT THOSE FACTORS?

8  **A.**   A WIDE VARIETY OF MATERIALS, INCLUDING MY OWN ANALYSIS OF

9  THE CENSUS DATA SUCH AS THE DATA FROM THE 2020 CENSUS AND THE

10  AMERICAN COMMUNITY SURVEY, VARIOUS AGENCY REPORTS, THE

11  SCHOLARLY LITERATURE, THE LEGISLATIVE RECORD, INCLUDING

12  HEARINGS, VIDEO HEARINGS AND TESTIMONIES IN THE ROADSHOWS,

13  OTHER DOCUMENTS SUCH AS AMENDMENTS AND BILLS THAT WERE

14  SUBMITTED, VARIOUS NEWS REPORTS AND OTHER PUBLIC SPEECHES BY

15  PUBLIC OFFICIALS.

16  **Q.**   THANK YOU, DR. BURCH.

17       I'D JUST LIKE TO PAUSE THERE UNTIL WE FIX THE ISSUES.

18       **THE COURT:**  DO YOU THINK SHE'S GOT A COPY OF HER

19  REPORT THAT SHE COULD LOOK AT WHILE YOU EXAMINE HER?  BECAUSE I

20  HAVE HER REPORT HERE, I CAN FOLLOW ALONG.

21       **MR. CHAKRABORTY:**  WE DO.  AND I BELIEVE DR. BURCH

22  DOES, BUT WE WERE GOING TO BRING UP A DEMONSTRATIVE.

23       **THE COURT:**  OH.  HERE HE COMES.  HELP IS ON THE WAY,

24  DR. BURCH.  GIVE US A MINUTE.

25       **MS. MCKNIGHT:**  COUNSEL AND YOUR HONOR, WE'RE GOING TO

01:52 1   LOG INTO ZOOM AT THE SAME TIME TO TRY TO AVOID DUPLICATION OR A

2   DELAY LATER ON, JUST SO YOU KNOW.

3        **THE COURT REPORTER:**  I HAVE NO IDEA WHAT YOU ARE

4   SAYING.

5        **MS. MCKNIGHT:**  WE ARE GOING TO TRY TO LOG INTO ZOOM

6   AT THE SAME TIME TO AVOID A DELAY LATER ON.  THANK YOU.

7        **THE WITNESS:**  ALL RIGHT.  I'VE GOT IT.

8   **BY MR. CHAKRABORTY:**

9   **Q.**   THANK YOU FOR YOUR PATIENCE, DR. BURCH.

10        SO I'D LIKE TO JUMP BACK RIGHT INTO IT, AND I KNOW

11   YOU WERE JUST TALKING A MINUTE AGO ABOUT THE SENATE FACTORS

12   THAT YOU EXAMINED.  ARE THOSE FACTORS DISPLAYED BEFORE YOU ON

13   THE SCREEN?

14   **A.**   YES, THEY ARE.

15   **Q.**   AND JUST AS A REMINDER TO THE COURT AND EVERYBODY HERE,

16   WHICH FACTORS WERE THOSE?

17   **A.**   SO I REVIEWED SENATE FACTOR 5, THE EXTENT TO WHICH MEMBERS

18   OF THE MINORITY GROUP ARE SUFFERING FROM THE EFFECT OF

19   DISCRIMINATION IN AREAS SUCH AS SOCIOECONOMIC STATUS AND HEALTH

20   THAT AFFECT PARTICIPATION; SENATE FACTOR 6, RACIAL APPEALS IN

21   POLITICAL CAMPAIGNS; FACTOR 7, WHICH IS MINORITY-GROUP

22   REPRESENTATION IN PUBLIC OFFICE; FACTOR 8, WHICH IS ABOUT

23   WHETHER THERE'S A LACK OF RESPONSIVENESS OF ELECTED OFFICIALS

24   TO THE PARTICULARIZED NEEDS TO THE GROUP; AND FACTOR 9, WHICH

25   IS WHETHER THE STATE OF THE POLICY OR PRACTICE, IT WOULD

01:55 1  DICTATE THE REDISTRICTING MAP THAT'S PENDING.

2  **Q.**   THANK YOU, DR. BURCH.

3       I'D LIKE TO START WITH SENATE FACTOR 5.  WHICH

4  SPECIFIC AREAS OF DISPARITY DID YOU EVALUATE AS PART OF THIS

5  FACTOR?

6  **A.**   I EXAMINED EDUCATION AND OTHER ASPECTS OF SOCIOECONOMIC

7  STATUS, SUCH AS EMPLOYMENT AND INCOME.  I LOOKED AT HEALTH, I

8  LOOKED AT PRESIDENTS AND HOUSING, AND I ALSO EXAMINED THE

9  CRIMINAL JUSTICE SYSTEM.

10  **Q.**   THANK YOU.

11       DR. BURCH, I'D LIKE TO BEGIN BY TALKING ABOUT

12  EDUCATION.

13       **MR. CHAKRABORTY:**  MATTHEW, CAN YOU PLEASE TURN TO THE

14  NEXT SLIDE.

15  **BY MR. CHAKRABORTY:**

16  **Q.**   DR. BURCH, WHAT DOES THIS SLIDE DISPLAY?

17  **A.**   SO THIS SLIDE DISPLAYS A COUPLE OF THE CHARTS FROM MY

18  REPORT IN WHICH I AM DOCUMENTING CONTEMPORARY DISPARITIES IN

19  EDUCATION.  AND ON THE LEFT, THIS SLIDES SHOWS THE DIFFERENCE

20  IN SCORES ON STANDARDIZED TESTS FOR LOUISIANIANS WHO ARE IN THE

21  EIGHTH GRADE OVER TIME AND FOR EACH MAP -- AND FOR EACH GRAPH

22  -- I'M SORRY -- THE TOP ONE IS FOR MATHEMATICS AND THE BOTTOM

23  ONE IS FOR READING.  AND WHITE STUDENTS ARE AT THE TOP IN THE

24  RED DOTS, AND THE BLUE CROSSES ARE BLACK STUDENTS.

25       AND AS YOU CAN SEE HERE, THERE'S A PERSISTENT GAP

01:57 1 OVER TIME IN TERMS OF THE STUDENTS' SCORES ON THESE
2 STANDARDIZED ACHIEVEMENT TESTS, AND THAT GAP IS PRETTY
3 PERSISTENT AND CONSISTENT OVER TIME.
4 **Q.**   AND WHAT'S DISPLAYED ON THE RIGHT HERE?
5 **A.**   AND SO ON THE RIGHT, AS YOU CAN SEE HERE, THIS IS JUST
6 PART OF ONE OF THE CHARTS THAT I HAVE THAT SHOWS EDUCATIONAL
7 ATTAINMENT BY RACE FOR ADULTS AGE 25 AND OLDER.  AND WHITE
8 LOUISIANIANS ARE MUCH MORE LIKELY TO HAVE EARNED A BACHELOR'S
9 DEGREE OR HIGHER THAN BLACK LOUISIANIANS.
10 **Q.**   THANK YOU, DR. BURCH.
11       BASED ON THESE SELECTED EXAMPLES AND OTHERS CITED IN
12 YOUR REPORT, WHAT WERE YOUR CONCLUSIONS ABOUT THE EXISTENCE AND
13 EXTENT OF EDUCATIONAL DISPARITIES THAT EXIST IN LOUISIANA
14 BETWEEN BLACK AND WHITE POPULATIONS?
15 **A.**   YES.  SO I CONCLUDED THAT THERE WERE STILL GREAT
16 DISPARITIES IN EDUCATION AND EDUCATIONAL ATTAINMENT BETWEEN
17 BLACK AND WHITE LOUISIANIANS, NOT JUST RELATED TO THESE FACTORS
18 THAT I STATED HERE, BUT ALSO WITH RESPECT TO PERSISTENT
19 SEGREGATION IN EDUCATION AS WELL.  AND THOSE FACTORS -- THOSE
20 DISPARITIES ARE DRIVEN BY BOTH HISTORICAL AND CONTEMPORARY
21 DISCRIMINATION IN THE EDUCATIONAL SYSTEM.
22 **Q.**   THANK YOU.
23       **MR. CHAKRABORTY:**  NEXT SLIDE PLEASE, MATTHEW.
24 **BY MR. CHAKRABORTY:**
25 **Q.**   DR. BURCH, WHAT DOES THIS SLIDE SHOW?

01:59 1    **A.**   SO THIS SLIDE SHOWS MORE EVIDENCE OF DISPARITIES WITH

2    RESPECT TO SOCIOECONOMIC STATUS BETWEEN BLACK AND WHITE

3    LOUISIANIANS.  AND CONSISTENT WITH THE PRIOR SET OF GRAPHS,

4    WHITE LOUISIANIANS ARE SHOWN HERE IN THE PINKISH RED, AND BLACK

5    LOUISIANIANS ARE SHOWN HERE IN THE TEAL.  AND AS YOU CAN SEE ON

6    ALL OF THESE FACTORS, BLACK LOUISIANIANS ARE WORSE OFF THAN

7    WHITE LOUISIANIANS.  UNEMPLOYMENT RATE -- THE UNEMPLOYMENT RATE

8    HAS NEARLY DOUBLED.

9           FOR BLACK LOUISIANIANS, FAMILY POVERTY IS NEARLY

10   THREE TIMES AS HIGH FOR BLACK LOUISIANIANS THAN FOR WHITE

11   LOUISIANIANS.  WHITE HOUSEHOLDS -- LOUISIANA HOUSEHOLDS ON

12   AVERAGE, MEDIAN HOUSEHOLD INCOME IS TENS OF THOUSANDS OF

13   DOLLARS HIGHER THAN  THAT FOR BLACK LOUISIANA HOUSEHOLDS.

14          AND THERE'S DEFINITELY A DISPARITY IN TERMS OF HAVING

15   ACCESS TO A VEHICLE.  BLACK HOUSEHOLDS ARE MORE THAN FOUR TIMES

16   -- OR ABOUT FOUR TIMES AS LIKELY -- SORRY -- MORE THAN THREE

17   TIMES AS LIKELY -- ALMOST FOUR TIMES AS LIKELY TO LACK ACCESS

18   TO A VEHICLE THAN WHITE HOUSEHOLDS.

19   **Q.**   AND SO, AGAIN, BASED ON THIS RESEARCH AND OTHERS CITED IN

20   YOUR REPORT, WHAT WERE YOUR CONCLUSIONS ABOUT SOCIOECONOMIC

21   DISPARITIES BETWEEN BLACK AND WHITE LOUISIANIANS?

22   **A.**   AGAIN, I CONCLUDED THAT THERE ARE SIGNIFICANT

23   SOCIOECONOMIC DISPARITIES THAT PERSIST TODAY AND THAT THOSE

24   DISPARITIES ARE RELATED TO BOTH CONTEMPORARY AND HISTORICAL

25   DISCRIMINATION AGAINST BLACK LOUISIANIANS.

02:00 1  **Q.**  THANK YOU.

2        **MR. CHAKRABORTY:**  NEXT SLIDE, PLEASE.

3  **BY MR. CHAKRABORTY:**

4  **Q.**  DR. BURCH, WHAT INFORMATION IS DISPLAYED ON THIS SLIDE?

5  **A.**  SO THIS SLIDE SHOWS SOME OF THE INFORMATION THAT I WROTE

6  ABOUT WITH RESPECT TO DISPARITIES IN HOUSING.

7  **Q.**  AND WHAT TYPES OF EXAMPLES OR DISPARITIES DID YOU EXAMINE

8  IN YOUR ANALYSIS OF THIS FACTOR OR OF THIS ISSUE?

9  **A.**  SO, IN PARTICULAR, I LOOKED AT DISPARITIES IN RESIDENCES

10  AND WHERE PEOPLE LIVE, BECAUSE IT'S SO IMPORTANT TO POLITICS

11  AND POLITICAL PARTICIPATION.  AND SO HERE YOU CAN SEE IN THE

12  MAP ON THE LEFT, I HAVE A HISTORICAL MAP THAT WAS USED BY THE

13  HOMEOWNERS LOAN CORPORATION SINCE THE 1930S AND 1940S IN

14  SEVERAL CITIES IN LOUISIANA THAT -- AND THIS MAP WAS USED TO

15  DETERMINE LENDING AND THE RISK OF LENDING.  RED AREAS TYPICALLY

16  ARE THOSE THAT WERE HIGH RISK AND NOT SUITABLE FOR LENDING, AND

17  THOSE ALSO HAPPENED TO BE NEIGHBORHOODS WHERE BLACK PEOPLE

18  LIVED.

19        AND SO LOOKING AT THESE MAPS AND THESE AREAS OF

20  SEGREGATION AND -- AND HISTORICAL MAPS OF DISADVANTAGED

21  CONTINUES TO THE PRESENT DAY, AS YOU CAN SEE ON THE LEFT, WHERE

22  IT SHOWS THAT THERE ARE STILL METRO AREAS AND CITIES IN

23  LOUISIANA THAT ARE HIGHLY -- MARKED BY HIGH SEGREGATION BY

24  RACE.  AND THAT INCLUDES NEW ORLEANS, THE NEW ORLEANS-METAIRIE

25  METRO AREA, BATON ROUGE, SHREVEPORT, LAFAYETTE AREA AND LAKE

02:02 1  CHARLES; AND THOSE CITIES AND OTHERS ARE HIGHLY SEGREGATED BY
      2  RACE AS WELL.
      3  **Q.**   THANK YOU, DR. BURCH.
      4        ARE THERE -- AND CAN GOVERNMENT POLICIES AFFECT -- I
      5  KNOW YOU JUST TALKED ABOUT THE RED LINE UP HERE.  BUT CAN
      6  GOVERNMENT POLICIES AFFECT THE LEVEL AND PLACEMENT OF
      7  SEGREGATION BETWEEN BLACK AND WHITE LOUISIANIANS IN HOUSING?
      8  **A.**   YES.  EVEN CONTEMPORARY POLICIES OF JUST ZONING AND
      9  DECISIONS ON WHERE AND HOW TO BUILD, ESPECIALLY -- I CITE AN
     10  EXAMPLE IN MY REPORT OF DECISIONS ABOUT HOW TO REBUILD AFTER
     11  KATRINA; THAT COUPLED WITH OTHER ISSUES, SUCH AS SEEING THE
     12  PACE AT WHICH DISASTER RELIEF WAS GIVEN, IN EFFECT, THE ABILITY
     13  OF BLACK PEOPLE TO REBUILD IN AREAS THAT HAVE BEEN HURT BY
     14  NATURAL DISASTERS, FOR EXAMPLE.  SO THESE AREAS -- SO HOUSING
     15  ESPECIALLY CAN MATTER IN SEVERAL AREAS.
     16  **Q.**   THANK YOU.
     17        **MR. CHAKRABORTY:**  PLEASE TURN TO THE NEXT SLIDE,
     18  PLEASE, MATTHEW.
     19  **BY MR. CHAKRABORTY:**
     20  **Q.**   DR. BURCH, WHAT'S ON THIS SLIDE?
     21  **A.**   SO THESE -- THIS SLIDE DISCUSSES SEVERAL OF THE
     22  DISPARITIES IN HEALTH THAT I TALKED ABOUT IN MY REPORT.  IN
     23  PARTICULAR, WE CAN SEE HERE IN THE LEFT CHART THAT MORTALITY
     24  FOR BLACK LOUISIANIANS FROM DISEASES SUCH AS CANCER,
     25  CARDIOVASCULAR DISEASE AND DIABETES IS HIGHER THAN THAT OF

02:04 1    THOSE MORTALITY RATES FOR WHITE LOUISIANIANS.

2              OVERALL, AS IN THE SECOND SLIDE, THE DISPARITIES IN

3    HEALTH TRANSLATE INTO A DISPARITY IN LIFE EXPECTANCY.  SO ON

4    AVERAGE, WHITE LOUISIANIANS, WHITE LOUISIANA MEN ARE ABOUT --

5    EXPECTED TO LIVE ABOUT SEVEN YEARS LONGER THAN BLACK LOUISIANA

6    MEN.

7              AND WITH RESPECT TO WOMEN, YOU SEE A SIMILIAR -- A

8    LARGE GAP AS WELL.  WHITE LOUISIANA WOMEN ARE EXPECTED TO LIVE

9    ABOUT FIVE YEARS LONGER THAN BLACK LOUISIANA WOMEN.

10             INFANT AND CHILD MORTALITY FOR BLACK VERSUS WHITE

11   LOUISIANA CHILDREN IS HIGHER AS WELL.

12   **Q.**   AND CAN ENVIRONMENTAL FACTORS CONTRIBUTE TO RACIAL HEALTH

13   DISPARITIES SUCH AS THESE?

14   **A.**   YES.  SO IN MY REPORT I TALK A LOT ABOUT BOTH THE FACT

15   THAT NATURAL DISASTERS CAN HAVE DIFFERENTIAL EFFECTS AND HAVE

16   HAD DIFFERENTIAL EFFECTS IN TERMS OF MORTALITY ON BLACK VERSUS

17   WHITE LOUISIANIANS.  AND I ALSO TALK ABOUT DISPARITY RELATED TO

18   EXPOSURE TO POLLUTION, PARTICULARLY IN THE AREA OF LOUISIANA

19   KNOWN AS CANCER ALLEY, WHICH IS BETWEEN BATON ROUGE AND NEW

20   ORLEANS.  AND RESEARCH HAS SHOWN THAT FOR BLACK RESIDENTS

21   LIVING IN THOSE AREAS, THAT HIGHER EXPOSURE TO ENVIRONMENTAL

22   POLLUTION AND THE LIKE IS RELATED TO HIGHER RATES OF COVID-19,

23   ASTHMA AND CANCER.

24   **Q.**   THANK YOU.

25             SO ON THIS TOPIC WOULD YOU SAY THAT BLACK

02:06 1  LOUISIANIANS HAVE WORSE HEALTH OUTCOMES OVERALL THAN WHITE

2  LOUISIANIANS?

3  **A.**  YES.

4  **MR. CHAKRABORTY:**  NEXT SLIDE.

5  **BY MR. CHAKRABORTY:**

6  **Q.**  DR. BURCH, WHAT DOES THIS SLIDE DISPLAY INFORMATION

7  REGARDING?

8  **A.**  SO THIS SLIDE DISCUSSES DISPARITIES WITH RESPECT TO THE

9  CRIMINAL JUSTICE SYSTEM IN LOUISIANA.  AND AS YOU CAN SEE FROM

10  THE GRAPH ON THE LEFT, BLACK LOUISIANIANS REMEMBER ABOUT --

11  ABOUT A THIRD OF LOUISIANA'S OVERALL POPULATION BUT ARE

12  OVERREPRESENTED AMONG PRISONS, PROBATION AND PAROLE

13  POPULATIONS.  IN FACT, BLACK REPRESENTATION IN LOUISIANA'S

14  PRISON AND PAROLE POPULATION IS DOUBLE THAN REPRESENTATION IN

15  THE OVERALL POPULATION.

16  **Q.**  AND SO WHAT ARE YOUR CONCLUSIONS ABOUT THE KINDS OF

17  DISPARITIES THAT EXIST BETWEEN BLACK AND WHITE LOUISIANIANS IN

18  THE REALM OF CRIMINAL JUSTICE?

19  **A.**  THAT THERE ARE DRAMATIC DISPARITIES IN INVOLVEMENT WITH

20  THE CRIMINAL JUSTICE SYSTEM BETWEEN BLACK AND WHITE

21  LOUISIANIANS, WITH BLACK LOUISIANIANS BEING MUCH WORSE OFF.

22  AND THESE FACTORS, THESE DISPARITIES CAN'T BE EXPLAINED BY JUST

23  CRIME RATES ALONE AND, IN FACT, ARE RELATED TO -- STUDIES HAVE

24  SHOWN THAT THERE ARE BOTH HISTORICAL AND CONTEMPORARY

25  DISCRIMINATION IN CRIMINAL JUSTICE FACED IN LOUISIANA.

02:07  1   **Q.** AND JUST TO CONFIRM -- I KNOW YOU JUST MENTIONED IT FOR

2   CRIMINAL JUSTICE THERE, BUT WOULD YOU SAY THAT ALL OF THE

3   DISPARITIES YOU'VE TALKED ABOUT TODAY -- YOU KNOW, EDUCATION,

4   HEALTH, SOCIOECONOMIC STATUS, AND CRIMINAL JUSTICE -- ALL ARE

5   TIED TO HISTORICAL TRENDS BUT ALSO ARE EXHIBITED CURRENTLY AND

6   ARE EXISTING DISPARITIES?

7   **A.** YES. SO FOR ALL OF THE DISPARITIES THAT I MENTIONED, THE

8   RESEARCH SHOWS THAT BOTH HISTORICAL DISCRIMINATION AS WELL AS

9   CONTEMPORARY DISCRIMINATION BY THE STATE AND OTHER FACTORS

10   CONTRIBUTES TO THOSE DISPARITIES.

11   **Q.** AND, FINALLY, LAST QUESTION ON THIS FACTOR, DR. BURCH.

12   ALL OF THESE DISPARITIES, HOW DO THEY AFFECT POLITICAL

13   PARTICIPATION OF BLACK LOUISIANIANS IN THE STATE?

14   **A.** SO IF -- AND I DISCUSS IT FOR EACH FACTOR SEPARATELY IN MY

15   REPORT. BUT OVERALL IF YOU THINK ABOUT THE FACT THAT POLITICAL

16   SCIENTISTS THINK ABOUT THE DECISION TO PARTICIPATE IN POLITICS,

17   IN EFFECT, A RATIONAL CHOICE, WE THINK THAT VOTERS WEIGH COSTS

18   AND BENEFITS. THESE DISPARITIES IN THESE FACTORS TEND TO MAKE

19   VOTING MUCH MORE COSTLY.

20       SO WITH RESPECT TO EDUCATION, FOR INSTANCE, IT'S MUCH

21   MORE DIFFICULT FOR SOMEONE TO FIGURE OUT HOW TO NAVIGATE

22   BUREAUCRACY AND THE LIKE IF THEY HAVE LOWER EDUCATIONAL

23   ATTAINMENT. IT'S DIFFICULT FOR PEOPLE TO GET TO A POLLING

24   PLACE IF THEY DON'T HAVE ACCESS TO A VEHICLE OR IN A HOUSEHOLD

25   THAT DOESN'T HAVE ACCESS.

02:09 1      THE CRIMINAL JUSTICE SYSTEM AFFECTS POLITICAL

2  PARTICIPATION BECAUSE OF FELONY DISENFRANCHISEMENT LAWS.

3  PEOPLE AREN'T ALLOWED TO VOTE IF THEY ARE SERVING A SENTENCE IN

4  PRISON, FOR INSTANCE.  AND SO ALL OF THESE FACTORS ARE BOTH --

5  ARE INTERRELATED BUT ALSO DEFINITELY HAVE AN EFFECT ON

6  POLITICAL PARTICIPATION.  AND THE LITERATURE SHOWS THAT QUITE

7  CLEARLY.

8  **Q.**   THANK YOU, DR. BURCH.

9      **MR. CHAKRABORTY:**  I'D LIKE TO MOVE ON -- NEXT SLIDE,

10  PLEASE, MATTHEW.

11  **BY MR. CHAKRABORTY:**

12  **Q.**   I'D LIKE TO MOVE ON TO ASK YOU ABOUT YOUR ANALYSIS OF

13  RACIAL APPEALS IN POLITICAL CAMPAIGNS.  AND BEFORE WE ACTUALLY

14  GET TO WHAT'S ON THIS SLIDE, WHAT IS A RACIAL APPEAL?

15  **A.**   SO A RACIAL APPEAL IN A POLITICAL CAMPAIGN IS AN ASPECT OF

16  EITHER A SPEECH OR A CAMPAIGN AD, FOR INSTANCE, THAT WOULD

17  PRIME VOTERS TO THINK ABOUT RACIAL CONCERNS WHEN MAKING

18  DECISIONS ABOUT CANDIDATES IN POLITICS.  AND THOSE CAN BE

19  EITHER IMPLICIT, WHICH MEANS THAT RACE ISN'T MENTIONED BUT YOU

20  COULD SEE CODE WORDS OR BLACK EXEMPLARS, FOR EXAMPLE, THAT

21  WOULD PRIME A -- STILL PRIME A VOTER TO THINK ABOUT RACE WHEN

22  MAKING POLITICAL DECISIONS; OR THEY COULD BE EXPLICIT, WHICH

23  MEANS THAT THEY REFER NOT SPECIFICALLY TO RACE OR RACIALLY.

24  **Q.**   AND BASED ON YOUR EXPERIENCE AND REVIEW OF THE RELEVANT

25  LITERATURE, ARE SUCH APPEALS EFFECTIVE AT -- OR DO THEY AFFECT

02:10 1   VOTER BEHAVIOR?

2   **A.**   YES.  RACIAL APPEALS, BOTH IMPLICIT AND EXPLICIT, HAVE

3   BEEN SHOWN TO BOTH HEIGHTEN THE WAY THAT VOTERS PAY ATTENTION

4   TO OR THINK ABOUT RACE AND CAN ALSO AFFECT HOW VOTERS THINK

5   ABOUT CANDIDATES AND MAKE EVALUATIONS.

6   **Q.**   DID YOU EXAMINE RACIAL APPEALS IN LOUISIANA?

7   **A.**   YES.  I LOOKED AT THE RECENT STATEWIDE CAMPAIGN AND

8   SPECIFICALLY AT THE 2019 GUBERNATORIAL ELECTIONS.

9   **Q.**   AND WHAT DID YOU CONCLUDE ABOUT THIS RACE?

10   **A.**   I FOUND EVIDENCE OF SEVERAL OF -- SORRY.  I'M GETTING

11   FEEDBACK.  I FOUND EVIDENCE OF SEVERAL CAMPAIGN ADS THAT --

12   AND STATEMENTS THAT COULD BE CHARACTERIZED AS RACIAL APPEALS.

13   **Q.**   CAN YOU LEAD US THROUGH SOME OF THOSE EXAMPLES?

14   **A.**   YES.  SO A PROMINENT ONE -- I HAVE STILLS TAKEN HERE FROM

15   A CAMPAIGN AD THAT WAS RUN BY THE EDDIE RISPONE FOR GOVERNOR

16   CAMPAIGN, AND IN IT THERE ARE SEVERAL ASPECTS THAT CALIENDO AND

17   MCLLWAIN SAY CHARACTERIZE RACIAL APPEALS.

18        SO, FOR INSTANCE, YOU HAVE THERE IN THE MIDDLE

19   PICTURE MUGSHOTS OF BLACK -- (UNINTELLIGIBLE DUE TO TECHNICAL

20   DIFFICULTIES) THAT ACTIVATE A PARTICULAR STEREOTYPE, SUCH AS

21   BLACK CRIMINALITY.  YOU HAVE IMAGES OF THE CANDIDATE WITH ALL

22   WHITE CONSTITUENTS, AND ALSO YOU HAVE THE USE OF LANGUAGE SUCH

23   AS "SANCTUARY CITY" AND "CRIME" THAT HAVE BEEN SHOWN IN

24   PARTICULAR TO CRIME, RACIAL ATTITUDE AMONG VOTERS.

25   **Q.**   THANK YOU, DR. BURCH.

02:12 1           WHAT WERE YOUR CONCLUSIONS ABOUT THE EXISTENCE OF

2  RACIAL APPEALS AS THEY EXIST IN LOUISIANA?

3  **A.**   BASED ON THE SEVERAL EXAMPLES THAT I FOUND FROM THAT VERY

4  RECENT CAMPAIGN, THAT RACIAL APPEALS ARE -- THAT THERE ARE

5  STILL RACIAL APPEALS THAT CHARACTERIZE LOUISIANA POLITICAL

6  CAMPAIGNS.

7  **Q.**   THANK YOU.

8           **MR. CHAKRABORTY:**  NEXT SLIDE, MATTHEW.

9  **BY MR. CHAKRABORTY:**

10  **Q.**   I'D LIKE TO ASK YOU ABOUT YOUR EXAMINATION OF SENATE

11  FACTOR 7, WHICH IS THE EXTENT TO WHICH BLACK LOUISIANIANS HAVE

12  BEEN ELECTED TO PUBLIC OFFICE.  WHICH ELECTED OFFICES DID YOU

13  EVALUATE IN REACHING YOUR CONCLUSIONS?

14  **A.**   I EVALUATED SEVERAL OFFICES, AS WELL AS OFFICES AT THE

15  STATE AND LOCAL LEVELS AS WELL.

16  **Q.**   LET'S START AT THE FEDERAL LEVEL.  WHAT DID YOU FIND WITH

17  RESPECT TO FEDERAL POSITIONS AND BLACK REPRESENTATION IN THOSE?

18  **A.**   AS SHOWN UP HERE, I FOUND THAT THERE HAVE BEEN -- SINCE

19  RECONSTRUCTION, NO BLACK SENATORS AND ONLY FOUR BLACK

20  LOUISIANIANS ELECTED TO CONGRESS AT THE FEDERAL LEVEL.

21  **Q.**   AND WHAT ABOUT STATE AND MUNICIPAL POSITIONS?

22  **A.**   SIMILARLY, THERE HAVE BEEN NO BLACK GOVERNORS OR

23  LIEUTENANT GOVERNORS IN LOUISIANA.  AND WITH RESPECT TO THE

24  STATE LEGISLATURE CURRENTLY, ABOUT A QUARTER OF STATE

25  LEGISLATIVE SEATS ARE HELD BY BLACK MEMBERS.  LOUISIANA MAYORS

02:14 1    ARE LESS THAN A QUARTER OF ALL BLACK -- BLACK MAYORS ARE LESS

2    THAN A QUARTER OF ALL LOUISIANA MAYORS.  STATE COURT JUDGES ARE

3    ABOUT 20.1 PERCENT OF ALL STATE COURT JUDGES.  AND A QUARTER OF

4    THE ELECTED BESE BOARD MEMBERS ARE BLACK AS WELL.

5    **Q.**    THANK YOU.

6         WHAT WERE YOUR CONCLUSIONS FROM YOUR ANALYSIS OF THIS

7    FACTOR OF THE EXTENT OF THE REPRESENTATION OF BLACK

8    LOUISIANIANS IN PUBLIC OFFICE?

9    **A.**    GIVEN THE FACT THAT BLACK LOUISIANIANS ARE ABOUT A THIRD

10   OF THE POPULATION, AND IN EACH OF THOSE OFFICES IT'S LESS THAN

11   -- NO -- OR NONE OF THE OFFICES THAT I EXAMINED DID BLACK --

12   REPRESENTATION OF BLACK LOUISIANIANS REACH A THIRD OF THAT --

13   THAT BODY OR THAT GROUP.

14   **Q.**    THANK YOU.

15        **MR. CHAKRABORTY:**  NEXT SLIDE, PLEASE.

16   **BY MR. CHAKRABORTY:**

17   **Q.**    DR. BURCH, DID YOU LOOK AT THE RESPONSIVENESS OF ELECTED

18   OFFICIALS TO THE NEEDS OF BLACK LOUISIANIANS?

19   **A.**    I DID.

20   **Q.**    AND WHICH SOURCES OF EVIDENCE DID YOU LOOK TO AS PART OF

21   THAT ANALYSIS?

22   **A.**    I LOOKED AT MY EXAMINATION OF -- THAT I CONDUCTED FOR

23   SENATE FACTOR 5, AS WELL AS REALLY THE VOICES OF BLACK

24   LOUISIANIANS THEMSELVES AS REPRESENTED IN THE ROADSHOWS.

25   **Q.**    I KNOW WE ALREADY COVERED YOUR SENATE FACTOR 5 EVIDENCE.

02:15 1  WHAT DID YOU LEARN FROM THE LATTER ABOUT YOUR REVIEW OF THE

2  TESTIMONY FROM THESE ROADSHOWS?

3  **A.**  CONSISTENTLY ACROSS DIFFERENT AREAS OF THE STATE, BLACK

4  LOUISIANIANS STOOD UP AT THESE ROADSHOWS AND DISCUSSED THEIR

5  CONCERNS ABOUT RACE AND REPRESENTATION IN THEIR STATE AND

6  TALKED ABOUT HOW THEY FELT ABOUT IT AND DISCRIMINATED AGAINST.

7      I HAVE SOME EXAMPLES HERE THAT ARE PULLED FROM MY

8  REPORT WHICH COMES FROM THE ROADSHOWS WHERE PEOPLE STOOD UP AND

9  TALKED ABOUT HOW THEY FELT AS THOUGH THEY WEREN'T -- THEY WERE

10  OVERLOOKED, THEY WEREN'T REPRESENTED FAIRLY, AND THEY WERE

11  CONCERNED ABOUT THE LACK OF REPRESENTATION AND CONCERN FOR

12  ISSUES THAT AFFECTED THEM AND POLICIES THAT WOULD HELP THEM

13  THROUGHOUT THE STATE.

14  **Q.**  THANK YOU.

15      AND SO WHAT WERE YOUR CONCLUSIONS, BASED ON THESE

16  SOURCES THAT YOU REVIEWED, OF THE RESPONSIVENESS OF ELECTED

17  OFFICIALS TO THE NEEDS OF BLACK LOUISIANIANS?

18  **A.**  THAT BASED ON THE POLICIES AND THE PERSISTENT GAPS THAT I

19  FOUND WITH RESPECT TO MY EXAMINATION OF SENATE FACTOR 5, AS

20  WELL AS BASED ON THE VOICES OF BLACK LOUISIANIANS THEMSELVES,

21  THAT BLACK LOUISIANIANS FELT AS THOUGH ELECTED OFFICIALS WERE

22  NOT BEING RESPONSIVE TO THEM.

23  **Q.**  THANK YOU, DR. BURCH.

24      **MR. CHAKRABORTY:**  NEXT SLIDE, MATTHEW.

25  **BY MR. CHAKRABORTY:**

02:17 1    **Q.**    DR. BURCH, DID YOU LOOK AT SENATE FACTOR 9?

2    **A.**    I DID.

3    **Q.**    AND WHAT IS SENATE FACTOR 9?

4    **A.**    SENATE FACTOR 9 EXAMINES WHETHER THE LEGISLATURE'S PROPER

5    JUSTIFICATION EXISTING FOR HB1 AND SB5 ARE TENUOUS.

6    **Q.**    AND WHICH SOURCES OF EVIDENCE DID YOU EXAMINE IN ORDER TO

7    DRAW CONCLUSIONS ON THIS FACTOR?

8    **A.**    I LOOKED AT THE LEGISLATIVE RECORD, THE HEARINGS, THE

9    FLOOR DEBATES, THE ROADSHOWS, THE BILLS AND AMENDMENTS

10    THEMSELVES, AND I ALSO EXAMINED SOME OTHER PUBLIC STATEMENTS BY

11    LEGISLATORS.

12    **Q.**    AND HAVE YOU CONDUCTED THIS SORT OF ANALYSIS BEFORE THIS

13    REVIEW OF LEGISLATIVE RECORDS EITHER IN YOUR ACADEMIC WORK OR

14    IN OTHER CASES?

15    **A.**    YES, BOTH.

16    **Q.**    SO BASED ON YOUR REVIEW OF LEGISLATIVE STATEMENTS, WHAT

17    ARE YOUR CONCLUSIONS ABOUT THIS FACTOR?

18    **A.**    SO I CONCLUDED THAT THERE WERE SEVERAL FACTORS THAT I LAID

19    OUT IN MY REPORT THAT WERE ADVANCED AND VARIOUS POINTS AS

20    IMPORTANT OR JUSTIFICATIONS THAT THE LEGISLATURE WAS

21    CONSIDERING WHEN DISCUSSING HB1 AND SB5.  THOSE WOULD BE TO --

22    THAT MINIMIZING THE POPULATION DEVIATION ACROSS DISTRICTS,

23    ISSUES SUCH AS KEEPING PARISHES -- PARISHES AND PRECINCTS

24    TOGETHER AND SPLITTING FEWER -- NO -- NOT SPLITTING PRECINCTS

25    AND SPLITTING PARISHES COMPACTNESS.

02:18 1        THEY DID SAY AT FIRST THAT THEY WERE INTERESTED IN

2    THESE TRADITIONAL LEGISLATIVE PRINCIPLES.  HOWEVER, WHEN THEY

3    WERE PRESENTED WITH MAPS THAT PERFORMED BETTER ON THOSE

4    TRADITIONAL LEGISLATIVE PRINCIPLES THAT DID NOT HAVE -- THAT

5    CONTAINED TWO MAJORITY-MINORITY DISTRICTS, THEY EITHER IN THE

6    RECORD BACKED AWAY FROM SOME OF THOSE TRADITIONAL LEGISLATIVE

7    PRINCIPLES OR SAID THAT THEY WERE LESSENED.

8    **Q.**   THANK YOU.

9        CAN YOU -- I THINK YOU BRIEFLY TOUCHED ON IT.  CAN

10   YOU PROVIDE JUST ONE EXAMPLE OF SUCH A SHIFT IN JUSTIFICATION

11   PERHAPS ON THE SLIDE?

12   **A.**   YES.  SO, FOR INSTANCE, WITH RESPECT TO THE POPULATION

13   DEVIATION, HERE CHAIRMAN STEFANSKI IS ONE OF SEVERAL EXAMPLES

14   THAT I LIST TALKING ABOUT MAKING THE POPULATIONS AS EQUAL AS

15   POSSIBLE ACROSS THE DISTRICTS AND GETTING DOWN TO AS CLOSE TO

16   THE NEAREST PERSON AS POSSIBLE TO THE IDEAL POPULATION OF THE

17   DISTRICT.  WHEN -- LATER IN THE PROCESS WHEN PRESENTED, I

18   BELIEVE, BY -- IN AMENDMENT 88, AS WELL AS IN AMENDMENT 91,

19   WITH MAPS THAT WERE ACTUALLY LOWER POPULATION DEVIATION BUT

20   CONTAINED TWO MAJORITY-MINORITY DISTRICTS, FOR INSTANCE, THEN

21   YOU SEE STATEMENTS BACKING AWAY FROM THOSE -- A COMMITMENT

22   SAYING THAT, WELL, IT'S NOT -- YOU KNOW, YES, THIS MAP IS LOWER

23   IN TERMS OF POPULATION DEVIATION, BUT THAT'S NOT THE -- YOU

24   KNOW, THAT'S NOT AS IMPORTANT AS -- THAT'S NOT THE THING THAT

25   IS -- THAT MATTERS, LIKE THIS DIFFERENCE ISN'T AS IMPORTANT.

```
02:20  1    Q.   THANK YOU.
       2             MR. CHAKRABORTY:   CAN WE TAKE THE DEMONSTRATIVE DOWN
       3    AND PUT UP WHAT HAS PREMARKED AS PR-89.
       4    BY MR. CHAKRABORTY:
       5    Q.   DR. BURCH, I'D LIKE TO CLOSE BY ASKING YOU A COUPLE OF
       6    QUESTIONS ABOUT YOUR SUPPLEMENTAL REPORT.
       7             DO YOU RECOGNIZE THIS DOCUMENT?
       8    A.   YES.
       9    Q.   AND WHAT IS IT?
      10    A.   IT IS THE SUPPLEMENT REPORT THAT I SUBMITTED.
      11    Q.   WHAT DOES YOUR SUPPLEMENTAL REPORT EXAMINE?
      12    A.   I WAS ASKED TO EXAMINE THE RELATIONSHIP BETWEEN RACE
      13    PARTISANSHIP.
      14    Q.   AND WHAT DID YOU REVIEW IN ORDER TO REACH YOUR CONCLUSIONS
      15    ON THIS TOPIC?
      16    A.   THE SCHOLARLY LITERATURE, AS WELL AS SOME -- AND AS WELL
      17    AS AN EXAMINATION OF REGISTRATION PATTERNS, PARTY REGISTRATION
      18    BY RACE IN LOUISIANA.
      19    Q.   AND BASED ON YOUR REVIEW, DID YOU REACH ANY CONCLUSIONS
      20    ABOUT THE HISTORICAL LINK BETWEEN RACE AND PARTY AND/OR THE
      21    CONTEMPORARY RELATIONSHIP BETWEEN THE TWO?
      22    Q.   YES.  SO THE LITERATURE ITSELF TENDS TO LOCATE THE LINK;
      23    THAT THERE IS A LINK BETWEEN RACE, RACIAL ATTITUDES AND
      24    PARTISANSHIP.  AND THE CONTEMPORARY -- OR THE CURRENT
      25    INSTANTIATION OF THAT STARTS WITH THE ALIGNMENT -- THE
```

02:22 1   REALIGNMENT OF PARTIES BEGINNING IN THE NEW DEAL AND

2   SOLIDIFYING IN THE 1960'S AS A RESULT OF CIVIL RIGHTS.  AND

3   OVER TIME THAT REALIGNMENT, PARTICULARLY THE REALIGNMENT OF

4   WHITE SOUTHERNERS AWAY FROM THE DEMOCRATIC PARTY INTO THE

5   REPUBLICAN PARTY, IS A HALLMARK OF POLITICS BETWEEN THE CIVIL

6   RIGHTS ERA THROUGH 2000'S.

7           MOREOVER, I CAN SAY THAT THERE IS GROWING, STRONG

8   EVIDENCE IN THE LITERATURE THAT THAT RELATIONSHIP BETWEEN

9   PARTISANSHIP AND RACE AND RACIAL ATTITUDES IS GETTING STRONGER

10  AND HAVE BEEN GETTING STRONGER SINCE 2008.  ANY PHENOMENA OR

11  THE DATA SHOWN AS WELL AS THE RESEARCH SHOWS THAT THE TRENDS

12  ARE HAPPENING IN LOUISIANA AS WELL.

13  **Q.**   THANK YOU, DR. BURCH.

14          **MR. CHAKRABORTY:**  YOUR HONOR, AT THIS TIME I'D LIKE

15  TO INTRODUCE PR-14 AND PR-89 INTO EVIDENCE.  THEY ARE DR.

16  BURCH'S MAIN AND SUPPLEMENTAL EXPERT REPORTS.

17              **THE COURT:**  ANY OBJECTION?

18          **MS. MCKNIGHT:**  NO OBJECTION.

19          **THE COURT:**  ADMITTED.

20          **MR. CHAKRABORTY:**  NO FURTHER QUESTIONS, YOUR HONOR.

21          **THE COURT:**  CROSS-EXAMINATION.

22          **MR. CHAKRABORTY:**  THANK YOU, DR. BURCH.

23                      **CROSS-EXAMINATION**

24  BY MS. MCKNIGHT:

25  **Q.**   GOOD AFTERNOON, DR. BURCH.

02:23 1            I'M NOT SURE IF YOU CAN SEE ME?

2   **A.**   YES, I CAN SEE YOU.

3   **Q.**   I'M SORRY. THIS IS A BIT AWKWARD. IT'S AN HONOR TO MEET

4   YOU. I'LL HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON. I'M

5   SORRY I CAN'T LOOK YOU IN YOUR FACE.

6   **A.**   I'M JUST GRATEFUL YOU GUYS WERE ABLE TO ACCOMMODATE ME.

7   **Q.**   ABSOLUTELY. SO, DR. BURCH, I'D LIKE TO START WITH

8   SOMETHING YOU'VE WRITTEN IN THE PAST, WHICH IS THAT "VOTERS IN

9   A GIVEN RACIAL OR ETHNIC GROUP CANNOT BE ASSUMED TO SHARE

10   POLICY PREFERENCES."

11            YOU WROTE THAT, DIDN'T YOU?

12   **A.**   YOU'LL HAVE TO SHOW IT TO ME.

13       **MS. MCKNIGHT:** OKAY. LET'S BRING UP -- THIS WOULD BE

14   BURCH 1, MR. WILLIAMSON.

15   **BY MS. MCKNIGHT:**

16   **Q.**   DO YOU RECALL WRITING A BOOK TITLED *CREATING A NEW RACIAL*

17   *ORDER*?

18   **A.**   YES. I -- THAT WAS MY CO-AUTHORED BOOK.

19   **Q.**   OKAY. AND THAT -- I THINK I'LL WAIT TO BRING UP THE COVER

20   OF THE BOOK FOR YOU, DR. BURCH.

21   **A.**   UH-HUH.

22       **MS. MCKNIGHT:** AND I THINK MR. WILLIAMSON JUST NEEDS

23   TO SHARE HIS SCREEN.

24       **THE COURT:** MS. MCKNIGHT, CAN YOU GIVE ME THE QUOTE

25   AGAIN. IT'S VOTERS --

02:25  1              MS. MCKNIGHT:  SURE.

       2                   "VOTERS IN A GIVEN RACIAL OR ETHNIC GROUP CANNOT

       3  BE ASSUMED TO SHARE POLICY PREFERENCES."

       4              THE COURT:  THANK YOU.

       5              MS. MCKNIGHT:  HOLD ON ONE MOMENT, YOUR HONOR.

       6              THE COURT:  IT'S OKAY.  WE'RE GOING TO BE PATIENT

       7  TODAY.

       8              MS. MCKNIGHT:  THANK YOU, YOUR HONOR.

       9  BY MS. MCKNIGHT:

      10  Q.   DR. BURCH, WE HAVE BEFORE YOU AN ELECTRONIC VERSION OF

      11  YOUR BOOK TITLED *CREATING A NEW RACIAL ORDER*.

      12       DO YOU SEE THAT?

      13  A.   I DO.

      14              MS. MCKNIGHT:  OKAY.  AND IF WE CAN FLIP TO THE NEXT

      15  PAGE, HERE'S THE COPYRIGHT PAGE FOR THAT BOOK.

      16  BY MS. MCKNIGHT:

      17  Q.   DOES THIS LOOK RIGHT TO YOU, DR. BURCH?  COPYRIGHT 2012 BY

      18  PRINCETON UNIVERSITY PRESS?

      19  A.   YES.

      20  Q.   OKAY.  AND NOW, DR. BURCH, THIS IS AN ELECTRONIC VERSION,

      21  SO YOU CAN SEE AT THE BOTTOM THERE ARE A NUMBER OF PAGES

      22  BECAUSE IT'S ELECTRONIC.  BUT IF WE TURN TO THE NEXT PAGE, WE

      23  WILL FIND THE QUOTE -- THE PAGE WITH YOUR QUOTE ON IT.  I'M NOT

      24  -- I'VE HIGHLIGHTED THE SECTION FOR YOU TO SEE.  ARE YOU ABLE

      25  TO READ THAT, DR. BURCH?

02:26 1    A.    YES.

2    Q.    OKAY.  SO, DR. BURCH, THANK YOU FOR YOUR PATIENCE.  IN THE

3    HIGHLIGHTED SECTION, IT'S THREE LINES DOWN:  "VOTERS IN A GIVEN

4    RACIAL OR ETHNIC GROUP CANNOT BE ASSUMED TO SHARE POLICY

5    PREFERENCES."

6          DO SEE THAT?

7    A.    OH, WAIT.  I'M SORRY.  YOU WERE -- I'M SORRY.  YOU PUT

8    SOMETHING OVER THE WHOLE QUOTE THAT -- IF YOU COULD JUST REMOVE

9    THAT BOTTOM LINE SO I CAN SEE IT.

10   Q.    SURE.

11   A.    OH, YES.  THAT IS DEFINITELY WHAT I THOUGHT IT SAID.

12         MS. MCKNIGHT:  OKAY.  AND WE CAN TAKE THAT DOWN.

13   BY MS. MCKNIGHT:

14   Q.    DOES THAT REFRESH YOUR RECOLLECTION THAT YOU'VE WRITTEN IN

15   THE PAST THAT "VOTERS IN A GIVEN RACIAL OR ETHNIC GROUP CANNOT

16   BE ASSUMED TO SHARE POLICY PREFERENCES"?

17   A.    YES.  I AGREE WITH THAT.

18   Q.    OKAY.  AND NOW YOUR REPORT IN THIS CASE DOES NOT EXAMINE

19   WHETHER A BLACK VOTER IN RURAL LOUISIANA WILL VOTE THE SAME WAY

20   AS A BLACK VOTER IN URBAN BATON ROUGE, FOR EXAMPLE.  CORRECT?

21   A.    NO.  I EXAMINED RESEARCH THAT LOOKED AT VOTING PATTERNS BY

22   RACE.

23   Q.    OKAY.  AND YOUR REPORT DOES NOT EXAMINE WHITE CROSSOVER

24   VOTING; THAT IS, WHITE VOTERS WHO VOTE FOR THE CANDIDATES OF

25   CHOICE OF BLACK VOTERS.  CORRECT?

02:28  1    **A.**   NO.  I'M LOOKING AT BOTH PARTY REGISTRATION AS WELL AS

    2  OTHER PEOPLE'S RESEARCH INTO THOSE KINDS OF QUESTIONS.

    3    **Q.**   OKAY.  NOW, TURNING TO YOUR REPORT, THIS IS PR-14 AT PAGE

    4  25 THROUGH 28.

    5          **MS. MCKNIGHT:**  AND, MR. WILLIAMSON, WE CAN JUST GO TO

    6  PAGE 25, THE HEADER OF THE SECTION.  OH, PARDON ME.  I THINK

    7  YOU NEED TO GO TO PR-14, PAGE 25.  UNFORTUNATELY, THE NUMBERS

    8  ARE DIFFERENT.  THERE YOU GO.

    9  **BY MS. MCKNIGHT:**

  10    **Q.**   SO, DR. BURCH, I HEARD YOU TESTIFY ON DIRECT THAT YOU

  11  BELIEVED THERE ARE STILL RACIAL APPEALS THAT CHARACTERIZE

  12  ELECTIONS IN LOUISIANA.  DID I HEAR YOU RIGHT?

  13    **A.**   YES.

  14    **Q.**   OKAY.  SO IN REVIEWING THE SECTION "SENATE FACTOR 6:

  15  RACIAL APPEALS IN CAMPAIGNS," OVER THE PAST 30 YEARS YOU

  16  IDENTIFIED ONLY ONE CANDIDATE WHO MADE A RACIAL APPEAL IN AN

  17  ELECTION.  CORRECT?  AND THAT CANDIDATE --

  18    **A.**   NO.  COULD YOU SWITCH TO -- COULD YOU GO TO THE NEXT PAGE,

  19  PLEASE.

  20    **Q.**   SURE.

  21    **A.**   SO I HAVE BOTH -- DURING THIS GUBERNATORIAL CAMPAIGN IN

  22  THE MIDDLE, I AM TALKING ABOUT EDDIE RISPONE HERE.  BUT ALSO IF

  23  YOU GO TO THE NEXT PAGE, I ALSO HAVE HERE RACIAL APPEALS THAT

  24  TARGETED -- THAT WERE RUN BY THE LOUISIANA REPUBLICAN PARTY AS

  25  -- FOR INSTANCE, THE QUOTATION AT THE BOTTOM OF THAT PAGE,

02:30 1  IT'S ACTUALLY FROM THE PARTY, NOT FROM EDDIE RISPONE.

2              AND THEN ON THE NEXT PAGE IS ANOTHER RACIAL APPEAL

3  THAT WAS MADE BY A DIFFERENT CANDIDATE.

4  **Q.**   OKAY.  LET'S TURN TO THE NEXT PAGE SO I CAN UNDERSTAND

5  WHAT YOU MEANT BY THAT THIRD EXAMPLE.

6  **A.**   UH-HUH.

7  **Q.**   AND SO THE THIRD EXAMPLE WAS WHICH OTHER CANDIDATE, DR.

8  BURCH?

9  **A.**   SO HERE CONROD APPEL WAS TALKING ABOUT THAT -- MAKING THE

10 APPEAL THAT AFRICAN AMERICANS SHOULD SUPPORT REPUBLICANS RATHER

11 THAN DEMOCRATS BECAUSE OF ISSUES REGARDING RACIAL -- CONCERNS

12 ABOUT RACIAL --

13 **Q.**   OKAY.  AND GOING BACK A PAGE, THOSE RACIAL APPEALS HAD TO

14 DO WITH THE CANDIDATE FOR GOVERNOR RISPONE.  IS THAT RIGHT?

15 **A.**   I THINK THAT THE ONE FOR -- THE SECOND ONE WAS PROBABLY

16 MORE GENERAL BUT PROBABLY REFERRED IN GENERAL TO SUPPORT OF

17 BLACK PEOPLE FOR THE DEMOCRATIC PARTY.

18 **Q.**   SO I JUST WANT TO MAKE SURE I UNDERSTAND, THOUGH.  THE

19 SECOND ONE HERE I'M SEEING REFERENCES TO CANDIDATE RISPONE HERE

20 IN THE 2019 GUBERNATORIAL RACE.  ARE YOU REFERRING TO SOMETHING

21 ELSE?

22 **A.**   NO.  WHAT I'M SAYING HERE IS THAT IN THE RNC, THE

23 LOUISIANA GOP QUOTATION IS WITH RESPECT TO JOHN BEL EDWARDS,

24 BUT THE QUOTE ON THE NEXT PAGE IS MORE GENERAL.

25 **Q.**   I SEE.  AND SO ARE YOU AWARE OF WHETHER CANDIDATE RISPONE

02:32 1   WON OR LOST HIS ELECTION?

2   **A.**   I BELIEVE HE LOST.

3   **Q.**   AND DO YOU KNOW WHETHER THE LAST TWO ELECTIONS FOR

4   GOVERNOR, WHETHER THE CANDIDATE OF CHOICE FOR BLACK VOTERS WON?

5   **A.**   YES.  JOHN BEL EDWARDS DID WIN.

6   **Q.**   NOW LET'S TURN TO ANOTHER SENATE FACTOR, SENATE FACTOR 9.

7   NOW, I UNDERSTAND THAT SENATE FACTOR 9, YOU STUDIED WHETHER THE

8   LEGISLATURE'S RATIONALE FOR DRAWING ITS CONGRESSIONAL PLAN WAS

9   SUPPORTED BY THE EVIDENCE OR IF IT WAS -- QUOTE/UNQUOTE --

10   "TENUOUS."  IS THAT RIGHT?

11   **A.**   IS THAT AN EXACT QUOTATION FROM SOMEWHERE?

12   **Q.**   WELL, THE WORD "TENUOUS" IS A QUOTE FROM THE SENATE FACTOR

13   9.  IS THAT RIGHT?

14   **A.**   YES.

15   **Q.**   OKAY.  AND SO IN DOING YOUR WORK ON THIS REPORT FOR SENATE

16   FACTOR 9, YOU DEVELOPED AN OPINION THAT THE LEGISLATURE'S

17   RATIONALE FOR DRAWING ITS CONGRESSIONAL PLAN WAS TENUOUS.

18   CORRECT?

19   **A.**   I DON'T KNOW IF I USED THOSE EXACT WORDS.  CAN YOU SHOW ME

20   WHERE I SAID THAT EXACTLY?

21   **Q.**   WELL, LET ME STEP BACK.  IS IT YOUR POSITION THAT THEIR

22   RATIONALE WAS NOT TENUOUS?

23   **A.**   MY POSITION IS THAT THE RATIONALE WAS NOT SUPPORTED BY

24   EVIDENCE OR THAT THEY WOULD BACK OFF CERTAIN RATIONALE, BUT I

25   DON'T BELIEVE I EVER SAID THAT IT WAS TENUOUS OR NOT.

02:34 1    Q.   OKAY.  WELL, I THINK -- I THINK IT MAY MAKE SENSE TO JUST

2    GET TO FACTOR 9 SO YOU CAN UNDERSTAND MY QUESTIONS.  YOU'VE

3    WRITTEN A VERY THOROUGH REPORT.  I JUST WANT TO MAKE SURE WE'RE

4    UNDERSTANDING EACH OTHER.

5         **MS. MCKNIGHT:**  SO IF WE WOULD TURN TO PR-14, PAGE

6    P-32.

7    **BY MS. MCKNIGHT:**

8    Q.   AND SO HERE YOU BEGIN YOUR SECTION ON SENATE FACTOR 9:

9    "TENUOUSNESS."

10        DO YOU SEE THAT?

11   A.   I DO.

12   Q.   OKAY.  AND HERE YOU WRITE THAT THE SPONSORS AND ADVOCATES

13   OF TWO BILLS PROVIDED SEVERAL JUSTIFICATIONS, AND YOU GO ON

14   TO SHOW THAT YOU BELIEVE THAT THE PROFFERED JUSTIFICATIONS LACK

15   SUPPORT.  IS THAT RIGHT?

16   A.   EMPIRICAL SUPPORT?  YES.

17   Q.   OKAY.  AND NOW IN PREPARING YOUR REPORT, YOU STUDIED THE

18   LEGISLATIVE RECORD RELATED TO REDISTRICTING THIS YEAR IN ORDER

19   TO DEVELOP YOUR CONCLUSIONS.  RIGHT?

20   A.   I DID.

21   Q.   IN FACT, STUDYING LEGISLATIVE HISTORY IS PART OF YOUR

22   RESEARCH PRACTICE.  YOU'VE IDENTIFIED IT IN ANOTHER PART OF

23   YOUR REPORT IN YOUR BACKGROUND.  CORRECT?

24   A.   YES.

25   Q.   OKAY.  AND LET ME STEP BACK.  WHEN STUDYING A LEGISLATIVE

02:36  1 | RECORD TO UNDERSTAND LEGISLATIVE INTENT, YOU DON'T WANT TO

2 | CHERRY-PICK CERTAIN PIECES OF THE RECORD AND IGNORE LEGISLATIVE

3 | PRIORITIES THAT HAVE BEEN REPEATEDLY STATED, BECAUSE YOU WANT

4 | GET A FULL PICTURE OF THE RECORD.

5 |          WOULD YOU AGREE WITH THAT?

6 | **A.**   YES.

7 | **Q.**   AND YOUR REPORT QUOTES FROM THE LEGISLATIVE RECORD.

8 | CORRECT?

9 | **A.**   YES.

10 | **Q.**   YOU REVIEWED THE STATE GOVERNMENT AFFAIRS COMMITTEE

11 | HEARINGS.  CORRECT?

12 | **A.**   YES.

13 | **Q.**   AND YOU REVIEWED THE FLOOR DEBATES.  CORRECT?

14 | **A.**   I DID.

15 | **Q.**   AND DURING THE COMMITTEE HEARINGS AND FLOOR DEBATES, THE

16 | LEGISLATURE REPEATEDLY DESCRIBED THE PLAN AS A CONTINUITY OF

17 | REPRESENTATION PLAN.  ISN'T THAT RIGHT?

18 | **A.**   NOT "REPEATEDLY."  THAT ACTUALLY STARTED TO ENTER THE

19 | RECORD AT THE END, AND I BELIEVE I DO HAVE QUOTATIONS TO THAT

20 | EFFECT IN THE REPORT.

21 | **Q.**   OKAY.  LET'S START WITH WHERE YOU HAVE A QUOTATION TO THAT

22 | EFFECT IN THE REPORT, AND THEN WE'LL GET TO "REPEATEDLY."  SO

23 | COULD YOU IDENTIFY WHERE IN YOUR REPORT YOU HAVE THOSE

24 | QUOTATIONS?

25 | **A.**   SO I'M GOING TO REFER -- I'M GOING TO -- I HAVE MY REPORT

02:37 1 HERE.

2 **Q.** GREAT.

3 **A.** SO I'M GOING TO FLIP THROUGH IT AND I'LL POINT YOU TO IT.

4 **Q.** TAKE YOUR TIME.

5 **A.** SO ON PAGE 39 I HAVE SOME INFORMATION TO THAT EFFECT.

6       **MS. MCKNIGHT:** MR. WILLIAMSON, WOULD YOU MIND TURNING

7 TO PAGE 39 SO WE CAN ALL FOLLOW ALONG.

8 **BY MS. MCKNIGHT:**

9 **Q.** IS THIS THE PAGE 39 YOU'RE REFERRING TO OR IS IT THE

10 EXHIBIT NUMBER BELOW?

11 **A.** IT'S THE -- YES. THIS IS PAGE 39, THAT'S CORRECT.

12 **Q.** GREAT. OKAY.

13 **A.** SO I WRITE HERE, DURING THE -- I BELIEVE IT'S THE FLOOR

14 DEBATE, WHICH MIGHT BE THE ONE -- WHICH I THINK MIGHT BE THE

15 FINAL PACKAGED ONE, OR CLOSE TO IT, WHERE REPRESENTATIVE MAGEE

16 WAS PRESENTING THE BILL THAT DAY. HE SAID THAT "THE PRIMARY

17 CRITERION FOR DRAWING THE CONGRESSIONAL DISTRICTS HAD BECOME"

18 -- QUOTE -- "TO HONOR THE TRADITIONAL BOUNDARIES AS BEST AS

19 POSSIBLE TO CREATE THIS MAP WE BELIEVE IS LEGAL." AND SO HE --

20 AND THEN LATER ON IN THAT MOMENT, HE SAID THAT "HB1 WAS

21 DESIGNED TO" -- QUOTE -- "MAINTAIN TRADITIONAL BOUNDARIES."

22       SO, YES. SO I DO TALK ABOUT THE FACT THAT THAT HAD

23 BECOME A PRIORITY BY ME CITING THAT.

24 **Q.** OKAY. SO YOU QUOTE -- YOU QUOTE REPRESENTATIVE MAGEE, BUT

25 WHERE DO YOU TALK ABOUT THAT AS BECOMING A PRIORITY?

02:39 1   **A.**   SO ON PAGE 39 I SAID, "BY THE END OF THE PROCESS, THE

2   SUPPORTERS OF HB1 IN PARTICULAR HAD SHIFTED THEIR LEGISLATIVE

3   PRIORITIES.  INSTEAD OF COMPACTNESS OR OTHER MEASURES,

4   REPRESENTATIVE MAGEE SAID THE PRIMARY CRITERION FOR DRAWING THE

5   CONGRESSIONAL DISTRICTS HAD BECOME" -- QUOTE -- "TO HONOR THE

6   TRADITIONAL BOUNDARIES AS BEST AS POSSIBLE TO CREATE THIS MAP

7   WE BELIEVE IS LEGAL.  REPRESENTATIVE MAGEE SAID THE DRAFTERS OF

8   HB1 PRIORITIZED THE TRADITIONAL BOUNDARIES AFTER LOOKING AT ALL

9   THE OTHER CRITERIA THEY COULD HAVE USED."

10   **Q.**   OKAY.  AND DO YOU KNOW WHEN THE LEGISLATIVE REDISTRICTING

11   SESSION BEGAN IN LOUISIANA?

12   **A.**   YOU MEAN WITH THE ROADSHOWS AND EVERYTHING ELSE?

13   **Q.**   THE LEGISLATIVE REDISTRICTING SESSION.

14   **A.**   I MEAN, SO THEY STARTED HOLDING ROADSHOWS AND HEARINGS

15   BACK IN 2021.  BUT IF YOU MEAN SUCH AS WHEN THE FLOOR DEBATES

16   STARTED?

17   **Q.**   CORRECT.

18   **A.**   THAT WAS IN FEBRUARY OF '21.

19   **Q.**   OKAY.  WOULD YOU HAVE ANY REASON TO DISAGREE WITH ME IF I

20   TOLD YOU IT WAS FEBRUARY 2ND?

21   **A.**   I ACCEPT THAT.  THAT'S FINE.

22   **Q.**   OKAY.  SO JUST TO TIE THIS OFF, IS THIS THE ONLY PLACE

23   WHERE YOU REFERENCED TRADITIONAL BOUNDARIES ON PAGE 39 OF YOUR

24   REPORT?

25   **A.**   LET ME SEE.  THERE MAY BE SOME OTHER AREAS IN WHICH I TALK

02:41 1  ABOUT REFERENCES TO TRADITIONAL BOUNDARIES, BUT THAT'S THE ONE

2  THAT COMES TO MIND.

3  **Q.**  OKAY.  NONE OTHERS COME TO YOUR MIND AT THIS MOMENT?

4  **A.**  IN THE REPORT --

5  **Q.**  YES.

6  **A.**  -- AS FAR THAT BEING A PRIORITY?  NO.  AGAIN, THEY HAD --

7  IN EACH PLACE THEY STARTED OUT WITH A LIST OF PRIORITIES UP

8  UNTIL THE END.  NO. 1 WAS ALWAYS THE ENGAGEMENTS; THAT THEY

9  WOULD ALSO TALK ABOUT COMMUNITIES OF INTEREST AND OTHER KINDS

10  OF -- AND THE OTHER TRADITIONAL REDISTRICTING PRINCIPLES THAT

11  I'VE TALKED ABOUT.

12  **Q.**  OKAY.

13  **A.**  AGAIN, THE PRIORITIES -- AS I SAID HERE, THE PRIORITIES

14  BY THE END OF THE LEGISLATIVE SESSION SHIFTED TO WHEN THEY WERE

15  THEN EMPHASIZING A PERIOD TO -- THE PRIMARY -- THE PRIMARY

16  CRITERION WAS NOW HONORING TRADITIONAL BOUNDARIES.

17  **Q.**  I SEE.

18  **A.**  SO, AGAIN, THAT PRIORITY SHIFTED.

19  **Q.**  I SEE.  SO SINCE YOU'RE CONCERNED ABOUT THE END OF THE

20  PROCESS, LET'S GO TO THE BEGINNING OF THE LEGISLATIVE SESSION

21  ON REDISTRICTING AND BRING UP PR -- WELL, BEFORE I DO, LET ME

22  SHARE WITH YOU:  THE PARTIES HAVE STIPULATED TO TRANSCRIPTS OF

23  CERTAIN HEARINGS AND COMMITTEE HEARINGS AND FLOOR SESSIONS.

24  AND SO WHAT I'M ABOUT TO BRING UP FOR YOU IS AN EXHIBIT THAT IS

25  A TRANSCRIPT THAT HAS BEEN PREPARED BY PLAINTIFFS OF THE

02:42   1    SPECIAL SESSION SGA COMMITTEE TRANSCRIPT DATED FEBRUARY 2,

      2    2022.

      3          **MS. MCKNIGHT:**   WE ARE GOING TO PULL UP PR-52 AT PAGE

      4    7.

      5    **BY MS. MCKNIGHT:**

      6    **Q.**    AND NOW, DR. BURCH, I'M LOOKING AT LINES 9 THROUGH 16.

      7    **A.**    UH-HUH.

      8    **Q.**    AND I'LL OFFER FOR YOU THAT THE SPEAKER DURING THIS

      9    HEARING IS PRESIDENT OF THE SENATE, PAGE CORTEZ, AND HERE HE

    10    STATES:

    11          "THE THIRD TENET OR PRINCIPLE WAS AS BEST POSSIBLE TO

    12    MAINTAIN THE CONTINUITY OF REPRESENTATION.   WHAT DO I MEAN BY

    13    THAT?   IT MEANS THAT IF YOUR DISTRICT ELECTED YOU AND YOU'VE

    14    DONE A GOOD JOB, THEY ALSO HAVE A RIGHT TO REELECT YOU.

    15    CONVERSELY, YOU DON'T GET TO CHOOSE WHO YOUR POPULATION IS,

    16    THEY CHOOSE YOU.   IF YOU DIDN'T DO A GOOD JOB, THEY HAVE THE

    17    RIGHT TO UNELECT YOU."

    18          DO YOU SEE THAT?

    19    **A.**    I DO.

    20    **Q.**    AND DOES THAT REFRESH YOUR RECOLLECTION ABOUT WHETHER THE

    21    LEGISLATURE IDENTIFIED CONTINUITY OF REPRESENTATION ON THE

    22    FIRST DAY OF THE LEGISLATIVE SESSION ON REDISTRICTING?

    23    **A.**    YES.   I SAID I COULD RECALL THAT.   BUT, AGAIN, AS YOU SEE

    24    HERE IN THE QUOTATION YOU CITED, IT'S NOT THE TOP PRIORITY,

    25    IT'S THE THIRD.   SO AS I SAID BEFORE, THOSE PRIORITIES SHIFTED.

02:44 1   Q.   I SEE.

2            MS. MCKNIGHT:   WELL, LET'S GO DOWN TO LINES 23

3   THROUGH 25 ON THIS SAME PAGE.

4   BY MS. MCKNIGHT:

5   Q.   SO THIS READS, BY PRESIDENT CORTEZ:

6            "SO THE NEXT PRINCIPLE THAT I TRIED TO ADHERE TO WAS

7   WITH SOMETHING YOU ALL HEARD ON THE ROADSHOW MANY TIMES CALLED

8   COMPACTNESS."

9            SO DOES THIS REFRESH YOUR RECOLLECTION ABOUT WHETHER

10  PRESIDENT CORTEZ AND THE LEGISLATURE DISCUSSED CONTINUITY OF

11  REPRESENTATION BEFORE THEY EVEN ADDRESSED COMPACTNESS ON THE

12  FIRST DAY OF THE LEGISLATIVE SESSION ON REDISTRICTING?

13  A.   YES, THEY DID.

14  Q.   OKAY.  THANK YOU.

15           WE'RE GOING TO PULL UP ANOTHER EXHIBIT FOR YOU.  THIS

16  EXHIBIT IS A TRANSCRIPT STIPULATED TO BY BOTH PARTIES TO THE

17  SPECIAL SESSION SGA COMMITTEE TRANSCRIPT DATED FEBRUARY 3,

18  2022.  IT'S EXHIBIT PR-54 AT PAGE 4.  AND HERE I'M STARTING AT

19  LINE 13 AND GOING DOWN INTO THE NEXT PAGE, LINE 1.

20           DR. BURCH, WE'LL HIGHLIGHT IT FOR YOU AND THEN LET US

21  KNOW IF YOU NEED US TO ZOOM IN AT ALL.

22           I'M GOING TO READ THE FIRST LINE AND THEN PARAPHRASE

23  THE REST.  I WILL LEAVE THIS UP SO YOU CAN HAVE A CHANCE TO

24  REVIEW IT, BUT HERE I'LL REPRESENT TO YOU THAT THE SPEAKER IS

25  CHAIRWOMAN OF THE SENATE REDISTRICTING EFFORT, SENATOR HEWITT.

02:46 1 AND SHE SAID ON THE FLOOR OR IN THIS COMMITTEE AT THE TIME:

2   "WE'VE TALKED ABOUT CONTINUITY REPRESENTATION A LOT

3 IN THESE HEARINGS, AND WE HEARD AGAIN AT THE ROADSHOW ONE OF

4 THE KIND OF THE TALKING POINTS WAS ELECTED OFFICIALS SHOULD NOT

5 CHOOSE THEIR VOTERS.  VOTERS SHOULD CHOOSE THEIR ELECTED

6 OFFICIALS.  AND TO THAT AGAIN, I WOULD RESPOND BY SAYING I

7 RESPECT THE VOTERS IN THIS STATE AND KNOW THAT THEY ARE IN THE

8 BEST POSITION TO VOTE AN ELECTED OFFICIAL IN OR OUT OF OFFICE

9 BASED ON THEIR PERFORMANCE."

10   DR. BURCH, DOES THIS REFRESH YOUR RECOLLECTION ABOUT

11 WHETHER THE LEGISLATURE CONSIDERED THE NOTION OF CONTINUITY OF

12 REPRESENTATION EARLY IN THE REDISTRICTING SESSION?

13 **A.**   I NEVER SAID THEY DIDN'T CONSIDER IT EARLY.  I SAID THAT

14 IT WASN'T THE TOP PRIORITY.  SO IF YOU LOOK AT THE -- AGAIN,

15 YOU DIDN'T SHOW ME WHAT -- LIKE BEFORE, YOU DIDN'T SHOW ME WHAT

16 CAME BEFORE THAT AND IN WHAT ORDER THEY TALKED ABOUT CONTINUITY

17 OF REPRESENTATION.  SO I DON'T REALLY KNOW IF THIS -- SO I

18 CAN'T REALLY -- SO I DON'T REALLY KNOW IF I DISAGREE WITH WHAT

19 I SAID BEFORE IN THE SENSE THAT THEY PRIORITIZED EVERYTHING

20 EARLY ON AND THEN SHIFTED THEIR PRIORITIES LATER.

21 **Q.**   I SEE.  AND SO LET ME DO ONE MORE EXAMPLE, DR. BURCH, AND

22 THEN WE CAN START MOVING ON.

23   **MS. MCKNIGHT:**  IF WE COULD BRING UP PR-71.

24 **BY MS. MCKNIGHT:**

25 **Q.**   DR. BURCH, THIS IS A SPECIAL SESSION SENATE FULL FLOOR

02:47 1   DEBATE DATED FEBRUARY 8, 2022.  AND, AGAIN, THIS IS A SENATE
2   FULL FLOOR DEBATE, AND I'M LOOKING AT LINE 16 THROUGH THE NEXT
3   PAGE ON LINE 4.  BUT WE CAN JUST START ON PAGE -- SORRY -- ON
4   PAGE 88 AT LINE 16.
5           AND SO HERE -- I'LL JUST READ THE FIRST FEW LINES.
6           "THE NEXT PRINCIPLE, PRESERVE THE CORE OF THE PRIOR
7   DISTRICTS TO ENSURE CONTINUITY OF REPRESENTATION.  YOU KNOW, WE
8   HEARD MANY TIMES ON THE ROADSHOW AND THE PRESIDENT SPOKE TO
9   THIS A LITTLE BIT EARLIER ON THE BILL" -- AND THEN IT GOES ON
10  TO REITERATE POINTS ABOUT VOTERS BEING ABLE TO VOTE IN OR OUT
11  THEIR ELECTED OFFICIALS.
12          DO YOU SEE THAT, DR. BURCH?
13  **A.**  I DO.
14  **Q.**  OKAY.  AND WOULD IT SURPRISE YOU TO KNOW THAT THE PHRASE
15  "CONTINUITY" APPEARS MORE THAN 35 TIMES IN 13 DAYS OF
16  TRANSCRIPTS IN THIS CASE?
17  **A.**  NO.
18  **Q.**  OKAY.  SO IN REVIEWING THESE HEARING TRANSCRIPTS THAT ARE
19  DATED FEBRUARY 2, FEBRUARY 3, FEBRUARY 8, AND THAT YOU ARE NOT
20  SURPRISED THAT "CONTINUITY" WAS REFERENCED MORE THAN 35 TIMES
21  IN 13 DAYS OF LEGISLATIVE TRANSCRIPTS, DOES THAT REFRESH YOUR
22  RECOLLECTION ABOUT THE FACT THAT THE LEGISLATURE REPEATEDLY
23  DESCRIBED THE PLAN AS A CONTINUITY OF REPRESENTATION PLAN?
24  **A.**  AGAIN, IT'S NOT -- I NEVER SAID THAT I DIDN'T RECALL THAT
25  THEY TALK ABOUT CONTINUITY OF REPRESENTATION.  WHAT I SAID IS

02:49 1    THAT THAT PRIORITY SHIFTED ACROSS TIME.  EVEN THOSE QUOTES --
2    THE LAST QUOTATION YOU SHOWED ME, IT BEGAN WITH "THE NEXT," AS
3    IF THAT WASN'T THE FIRST THING THEY TALKED ABOUT.  AND AS I
4    SAID HERE, BY THE TIME WE GET TO THE END, THAT TRADITIONAL
5    REDISTRICTING PRINCIPLES ASPECT WAS WHAT -- WHAT THEY ARRIVED
6    ON IS THE LAST -- IS THE TOP PRIORITY.  BUT THAT WAS ONLY AFTER
7    ALL OF THE OTHER ONES, SUCH AS COMPACTNESS.  AND EVEN EXAMPLES
8    THAT I GAVE ON DIRECT, THE ABSOLUTE DEVIATION WAS AGAIN
9    SUPPLANTED BY -- OR PLANS THAT HAD TWO MAJORITY-MINORITY
10   DISTRICTS ACTUALLY PERFORMED BETTER ON THOSE METRICS.
11            SO I STAND BY WHAT I WROTE IN MY REPORT:  THAT,
12   AGAIN, THAT -- THOSE PRIORITIES SHIFTED, AND BY THE END, THAT
13   HAD BECOME -- AS THOSE QUOTATIONS YOU SHOWED ME, THOSE WERE --
14   EARLY ON THEY WERE TALKING ABOUT OTHER PRINCIPLES BEFORE THEY
15   ACTUALLY GOT TO CONTINUITY OF REPRESENTATION.
16   Q.  I SEE.  AND EVEN IF IT WAS A THIRD PRINCIPLE ON THE VERY
17   FIRST DAY OF THE REDISTRICTING SESSION, YOU DID NOT EXAMINE
18   CONTINUITY OF REPRESENTATION AND WHETHER THE LEGISLATURE
19   FULFILLED THEIR GOAL OF CONTINUITY OF REPRESENTATION.  CORRECT?
20   A.  I LOOKED AT BOTH THE PLAN THAT WAS THERE AS WELL AS THE
21   OLD PLAN.  AND, OF COURSE, THE BOUNDARIES HAD TO CHANGE A
22   LITTLE BIT.  BUT AS FAR AS WHETHER THEY GOT AS CLOSE AS
23   POSSIBLE TO THE OLD BOUNDARIES, NO, I DIDN'T LOOK AT THAT.  AND
24   I DON'T BELIEVE THERE WAS ANY DISCUSSION AS FAR AS WHETHER THAT
25   WAS THE PLAN THAT, FOR INSTANCE, CHANGED -- LEAST CHANGED THE

02:51 1    BOUNDARIES OUT OF ALL OF THE PLANS THAT WERE AVAILABLE.

2                  SO IT WASN'T -- SO IT'S NOT IN MY REPORT AS A

3    REFLECTION, AS A ISSUE IN THE SENSE THAT THEY DIDN'T REALLY

4    COMPARE BILLS BASED ON, YOU KNOW, WHETHER THAT WAS A STATEMENT

5    IN TERMS OF LIKE HOW CLOSELY THAT PLAN CAME THAN, SAY, A

6    DIFFERENT BILL THAT THEY MIGHT HAVE CONSIDERED.

7    **Q.**   I SEE.  SO I'LL REPRESENT TO YOU THAT WE HAVE EXPERTS IN

8    THIS CASE WHO HAVE SUBMITTED REPORTS THAT THE CORE-RETENTION

9    SCORE IN THIS PLAN HAS BEEN CALCULATED TO BE 96 PERCENT.  I'LL

10   ALSO REPRESENT TO YOU THAT THAT IS A HIGHER SCORE THAN ANY OF

11   PLAINTIFFS' ILLUSTRATIVE PLANS.

12                 MY QUESTION TO YOU RELATES TO THE SENATE FACTOR OF

13   TENUOUSNESS.  I UNDERSTOOD FROM YOUR EARLIER TESTIMONY THAT YOU

14   WERE TRYING TO UNDERSTAND THE LEGISLATURE'S PRIORITIES IN

15   DRAWING ITS PLAN AND TRYING TO STUDY WHETHER THOSE PRIORITIES

16   PLAYED OUT IN THE ULTIMATE PLAN THAT WAS PASSED.  I UNDERSTOOD

17   FROM YOUR TESTIMONY JUST NOW THAT YOU DID NO EXAMINATION OF

18   CONTINUITY OF REPRESENTATION IN YOUR REPORT.  CORRECT?

19   **A.**   RIGHT.  THAT'S NOT -- THOSE FIGURES AREN'T IN THE RECORD.

20   **Q.**   OKAY.  AND YOU DID NOT CONCLUDE IN YOUR REPORT THAT THE

21   LEGISLATURE'S RATIONALE TO DRAW A CONTINUITY OF REPRESENTATION

22   PLAN WAS -- QUOTE/UNQUOTE -- "TENUOUS."  RIGHT?

23   **A.**   NO.  I SAID THAT THOSE PLANS LACKED EMPIRICAL SUPPORT AND

24   THE REFERENCES THAT YOU JUST MADE AREN'T IN THE RECORD.

25   **Q.**   OKAY.  BUT YOU WOULD AGREE WITH ME THAT THE REFERENCES I

02:53 1   JUST MADE TO THE LEGISLATURE DESCRIBING CONTINUITY OF

2   REPRESENTATION AS A GOAL, THOSE ARE IN THE RECORD.  CORRECT?

3   **A.**   YES.  IN THE WAY THAT I DESCRIBED.

4   **Q.**   AND I'M GOING TO SHARE A FACT WITH YOU.  TELL ME IF YOU

5   AGREE OR DISAGREE OR HAVE KNOWLEDGE ABOUT IT.  THE PRIOR PLAN

6   DRAWN IN 2011 WAS PRE-CLEARED BY PRESIDENT OBAMA'S DEPARTMENT

7   OF JUSTICE.  CORRECT?

8   **A.**   THAT WAS IN THE RECORD.

9   **Q.**   SO YOU WOULD AGREE WITH ME THAT THAT'S A FACT?

10   **A.**   YES.

11   **Q.**   NOW, IN THIS CASE YOU DID NOT STUDY WHETHER THE SO-CALLED

12   "TENUOUSNESS" WAS DUE TO POLITICAL AS OPPOSED TO RACIAL

13   CHOICES.  CORRECT?

14   **A.**   THE ONLY REFERENCES THAT I HAVE IN THIS SECTION WITH

15   RESPECT TO RACE ARE I DO HAVE A DISCUSSION ABOUT THE EXTENT TO

16   WHICH THERE WAS RESISTANCE TO DRAWING ON TWO MAJORITY-MINORITY

17   DISTRICTS; AND ALSO I REFERENCE RACE WHEN I TALK ABOUT

18   ASSERTIONS THAT THE SENATORS AND MEMBERS OF THE HOUSE MADE WITH

19   RESPECT TO WHAT THEY THOUGHT ABOUT MINORITY VOTING OR THE

20   PERFORMANCE OF MINORITY ISSUES.

21   **Q.**   OKAY.  SO I THINK YOU ANSWERED A DIFFERENT QUESTION AND SO

22   PARDON ME FOR REPEATING.  I BELIEVE IT IS JUST A YES-OR-NO

23   QUESTION.  YOU DID NOT STUDY WHETHER THE SO-CALLED

24   "TENUOUSNESS" THAT YOU FOUND WAS DUE TO POLITICAL AS OPPOSED TO

25   RACIAL CHOICES.  CORRECT?

02:55 1  **A.**   YES.  I BELIEVE I TALKED ABOUT WAYS IN WHICH THEY WERE

2  DISCUSSING RACE.

3  **Q.**   OKAY.  WE'LL MOVE ON.

4       DR. BURCH, YOU BELIEVED THAT THE LEGISLATURE SHOULD

5  HAVE DRAWN MAPS IDENTIFYING BLACK VOTERS AS A COMMUNITY OF

6  INTEREST.  CORRECT?

7  **A.**   I BELIEVE WHAT I WROTE IS THAT BLACK VOTERS AND OTHER

8  PEOPLE THEMSELVES SAID THAT THEY CONSTITUTED A COMMUNITY OF

9  INTEREST.

10  **Q.**   OKAY.  IS IT YOUR POSITION THAT THE LEGISLATURE COULD USE

11  RACE AS A PROXY FOR A TRADITIONAL DISTRICTING CRITERION?

12  **A.**   IT'S MY UNDERSTANDING THAT BASED ON THE NEED TO ENSURE

13  REPRESENTATION, THAT THE LEGISLATURE HAS TO CONSIDER RACE.

14  **Q.**   OKAY.  BUT YOU DON'T HAVE AN UNDERSTANDING ABOUT WHETHER

15  RACE CAN BE USED AS A PROXY FOR TRADITIONAL DISTRICTING

16  CRITERION?

17  **A.**   I NEVER MADE THAT POINT.  THE ONLY POINT THAT I'M MAKING

18  IS THAT ON THE RECORD THAT WAS BROUGHT UP ON THE RECORD.  AND

19  ACTUALLY, I BELIEVE I HAVE SOME POINTS AT WHICH THE LEGISLATORS

20  AGREED.  SO MY CONCERN THERE WAS REALLY JUST TO PUT ON THE

21  RECORD THAT THIS WAS DISCUSSED.

22  **Q.**   OKAY.  THANK YOU VERY MUCH, DR. BURCH.  I HAVE NO FURTHER

23  QUESTIONS.

24       **THE COURT:**  REDIRECT?

25       **MR. CHAKRABORTY:**  YES, YOUR HONOR.  BRIEFLY.

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
| 02:57  | 1  | REDIRECT EXAMINATION                                        |
|        | 2  | BY MR. CHAKRABORTY:                                         |
|        | 3  | Q.   DR. BURCH, JUST A COUPLE OF BRIEF QUESTIONS.           |
|        | 4  | MR. CHAKRABORTY:  CAN WE PULL UP PR-52, MATTHEW, AND        |
|        | 5  | CAN WE PLEASE TURN TO PAGE 7.                               |
|        | 6  | BY MR. CHAKRABORTY:                                         |
|        | 7  | Q.   DR. BURCH, THAT MIDDLE AREA THERE, "THE THIRD TENET OR |
|        | 8  | PRINCIPLE," DO YOU RECOGNIZE THAT AS THE PORTION THAT MS.   |
|        | 9  | MCKNIGHT WAS REFERENCING EARLIER WITH YOU?                  |
|        | 10 | A.   YES.                                                  |
|        | 11 | Q.   GREAT.  THANK YOU.                                     |
|        | 12 | MR. CHAKRABORTY:  CAN WE PLEASE TURN TO PAGE 5.             |
|        | 13 | BY MR. CHAKRABORTY:                                         |
|        | 14 | Q.   AND DO YOU SEE, DR. BURCH, AT THE VERY TOP OF THIS PAGE|
|        | 15 | WHERE IT READS "LET'S START WITH SENATE BILL 1 OFFERED BY   |
|        | 16 | PRESIDENT CORTEZ"?                                          |
|        | 17 | A.   I DO.                                                 |
|        | 18 | Q.   AND THEN YOU SEE PRESIDENT CORTEZ, THE SENATE PRESIDENT,|
|        | 19 | START HIS REMARKS THAT ULTIMATELY LEAD ONTO THE PORTIONS THAT|
|        | 20 | MS. MCKNIGHT READ OUT TO YOU?                               |
|        | 21 | A.   YES, I DO.                                             |
|        | 22 | Q.   AND DO YOU HAVE ANY REASON TO DOUBT THAT SENATE BILL 1 |
|        | 23 | ACTUALLY DEALS WITH STATE LEGISLATIVE REDISTRICTING?        |
|        | 24 | A.   WELL, YES.  NOT SB5.                                   |
|        | 25 | Q.   RIGHT.  IT DOES NOT GO WITH CONGRESSIONAL REDISTRICTING,|

02:59 1   SUCH AS HB1 AND SB5?

2   **A.**   THAT'S RIGHT.

3   **Q.**   AND DID ANYTHING YOU COVER, ANY OF THE EXAMPLES YOU

4   COVERED WITH MS. KNIGHT, DID ANY OF THOSE CHANGE YOUR BASIC

5   CONCLUSION ON SENATE FACTOR 9 THAT THE JUSTIFICATIONS PUT

6   FORWARD BY THE LEGISLATORS WERE TENUOUS?

7   **A.**   NO.  NOTHING THAT I PUT FORWARD HERE CHANGES WHAT I WROTE.

8   **Q.**   THANK YOU.  NO FURTHER QUESTIONS.

9           **THE COURT:**  OKAY.  THANK YOU, DR. BURCH.

10              LET'S TAKE A 15-MINUTE RECESS.

11          **THE LAW CLERK:**  ALL RISE.

12              COURT IS NOW IN RECESS.

13          **(WHEREUPON, THE COURT WAS IN RECESS.)**

14          **THE COURT:**  BE SEATED.

15              NEXT WITNESS.

16          **MR. HAWLEY:**  GOOD AFTERNOON, YOUR HONOR.

17              MAKING MY FIRST APPEARANCE, I'M JONATHAN HAWLEY.

18   H-A-W-L-E-Y.  I REPRESENT THE GALMON PLAINTIFFS.  AND

19   PLAINTIFFS NEXT CALL DR. ALLAN LICHTMAN, WHO WILL BE JOINING US

20   VIA ZOOM.

21          **MR. HAWLEY:**  GOOD AFTERNOON, DR. LICHTMAN.

22          **THE WITNESS:**  GOOD AFTERNOON.

23              **ALLAN J. LICHTMAN, PH.D.,**

24   **HAVING BEEN DULY SWORN, TESTIFIED VIA VIDEOCONFERENCE AS**

25   **FOLLOWS:**

03:24  1          **MR. HAWLEY:**  AND CAN YOU HEAR ME OKAY, DR. LICHTMAN?

2          **THE WITNESS:**  I HEAR YOU FINE.  I'M A LITTLE DEAF, SO

3     SPEAK SLOWLY AND CLEARLY.

4          **MR. HAWLEY:**  I WILL DO THAT.

5               YOUR HONOR, THE GALMON PLAINTIFFS WISH TO TENDER

6     DR. LICHTMAN AS AN EXPERT IN AMERICAN POLITICS, AMERICAN

7     POLITICAL HISTORY, VOTING RIGHTS AND QUALITATIVE AND

8     QUANTITATIVE SOCIAL SCIENCE ANALYSIS.

9          **THE COURT:**  ANY OBJECTION?

10          **MR. BRADEN:**  MY NAME IS MARK BRADEN, DEFENDANT

11     INTERVENORS FOR THE LEGISLATURE.

12               AND WE HAVE NO OBJECTIONS.

13          **THE COURT:**  DR. LICHTMAN WILL BE ACCEPTED BY THE

14     COURT IN THE FIELDS OF AMERICAN POLITICS, AMERICAN POLITICAL

15     HISTORY, VOTING RIGHTS AND QUALITATIVE AND QUANTITATIVE SOCIAL

16     SCIENCES, AND DR. LICHTMAN MAY PROVIDE OPINION TESTIMONY IN

17     THOSE FIELDS.

18          **MR. HAWLEY:**  THANK YOU, YOUR HONOR.

19                         **DIRECT EXAMINATION**

20     BY MR. HAWLEY:

21     **Q.**   DR. LICHTMAN, WOULD YOU PLEASE STATE YOUR FULL NAME FOR

22     THE RECORD.

23     **A.**   ALLAN J. LICHTMAN.  THAT'S A-L-L-A-N, J-PERIOD,

24     L-I-C-H-T-M-A-N.

25               I'M GETTING AN ECHO.

03:26 1  Q.  WE ARE OKAY ON OUR END, DR. LICHTMAN.  CAN YOU HEAR ME?

2         THE COURT:  MR. HAWLEY, WOULD YOU LIKE TO TURN THE

3  PODIUM?

4         MR. HAWLEY:  NO.  AS LONG AS --

5  BY MR. HAWLEY:

6  Q.  CAN YOU STILL HEAR ME OKAY, DR. LICHTMAN?

7  A.  I HEAR YOU FINE NOW.

8         THE COURT:  OKAY, DR. LICHTMAN.

9         THE WITNESS:  I'M STILL GETTING AN ECHO.  MAYBE IF I

10 TURN MY COMPUTER --

11        THE COURT:  TURN YOURS DOWN MAYBE.

12        THE WITNESS:  -- VOLUME DOWN A LITTLE, THAT MIGHT

13 HELP AND MAYBE I CAN STILL HEAR YOU.  LET ME TRY.

14        ALL RIGHT.  LET'S TRY IT NOW.

15 BY MR. HAWLEY:

16 Q.  OKAY, DR. LICHTMAN.  HOW ABOUT NOW?

17 A.  MUCH BETTER.

18 Q.  OKAY.  THANK YOU.

19        DR. LICHTMAN, YOU'VE BEEN RETAINED AS AN EXPERT FOR

20 THE GALMON PLAINTIFFS.  IS THAT CORRECT?

21 A.  YES.

22 Q.  AND YOU PREPARED --

23 A.  YES.

24 Q.  THANK YOU.

25        AND YOU PREPARED A REPORT IN THIS CASE?

03:26 1    **A.**  YES.

2        **MR. HAWLEY:**  FOR THE RECORD, THAT IS EXHIBIT GX-03,

3    WHICH IS RECORD DOCKET NO. 48.

4    **BY MR. HAWLEY:**

5    **Q.**  DR. LICHTMAN, DO YOU HAVE A COPY OF YOUR INITIAL REPORT IN

6    FRONT OF YOU NOW?

7    **A.**  I DO.

8    **Q.**  AND YOU ALSO PREPARED A REBUTTAL REPORT IN THIS CASE.

9    CORRECT?

10    **A.**  CORRECT.

11        **MR. HAWLEY:**  AND FOR THE RECORD, THAT IS EXHIBIT

12    GX-31, RECORD DOCUMENT 120-4.

13    **BY MR. HAWLEY:**

14    **Q.**  DR. LICHTMAN, DO YOU HAVE A COPY OF YOUR REBUTTAL REPORT

15    WITH YOU AS WELL?

16    **A.**  YES.

17    **Q.**  AND, DR. LICHTMAN, IS YOUR C.V. INCLUDED IN YOUR REPORT?

18    **A.**  YES.

19        **MR. HAWLEY:**  AND I'LL ALSO SAY FOR THE RECORD THAT IS

20    PAGE 99 OF GX-3, AGAIN, RECORD DOCUMENT 48.

21    **BY MR. HAWLEY:**

22    **Q.**  DR. LICHTMAN, IS YOUR C.V. A COMPLETE AND ACCURATE SUMMARY

23    OF YOUR BACKGROUND AND PROFESSIONAL EXPERIENCE?

24    **A.**  YES.

25    **Q.**  I'D LIKE TO ASK YOU JUST A FEW BRIEF QUESTIONS ABOUT THAT.

03:27 1    COULD YOU PLEASE SUMMARIZE YOUR EDUCATIONAL BACKGROUND.

2    **A.**    I GRADUATED IN 1967 WITH A B.A. FROM BRANDEIS UNIVERSITY

3    IN HISTORY, BUT I HAD BEEN A SCIENCE MAJOR FOR THREE YEARS

4    BEFORE TURNING TO HISTORY MY SENIOR YEAR, WHICH MAY EXPLAIN MY

5    INTEREST IN SOCIAL SCIENCE AND QUANTITATIVE METHODOLOGY.  I

6    THEN GOT MY PH.D. FROM HARVARD UNIVERSITY IN 1973 WITH A

7    SPECIALTY IN AMERICAN POLITICAL HISTORY AND QUANTITATIVE

8    METHODS.

9    **Q.**    WHERE ARE YOU CURRENTLY EMPLOYED?

10    **A.**    I WAS EMPLOYED AT THE AMERICAN UNIVERSITY IN WASHINGTON,

11    D.C..  AND I'M NOT SURE IF I'M PLEASED OR EMBARRASSED TO SAY,

12    NEXT YEAR WILL BE MY 5OTH YEAR OF SERVICE.

13    **Q.**    AND I ASSUME THAT MEANS YOU'RE TENURED?

14    **A.**    I HAVE BEEN TENURED SINCE ABOUT 1980.  IN 2011 I WAS

15    APPOINTED DISTINGUISHED PROFESSOR.  THAT'S NOT SOMETHING I MADE

16    UP.  IT'S A UNIVERSITY RANK.  IT'S A RANK ABOVE FULL PROFESSOR.

17    THERE ARE ONLY A HANDFUL OF US OUT OF MANY HUNDREDS OF FACULTY

18    MEMBERS AT THE UNIVERSITY.

19    **Q.**    AND WHAT ARE YOUR PRINCIPAL AREAS OF RESEARCH?

20    **A.**    I WOULD SAY AMERICAN POLITICS, AMERICAN POLITICAL HISTORY,

21    VOTING RIGHTS, QUANTITATIVE METHODS, QUALITATIVE METHODS,

22    POLITICAL PREDICTION.

23    **Q.**    HAVE YOU PREVIOUSLY SERVED AS AN EXPERT WITNESS IN VOTING

24    RIGHTS CASES?

25    **A.**    PROBABLY CLOSE TO A HUNDRED.  AND IF YOU COUNT CIVIL

03:29  1   RIGHTS CASES IN GENERAL, NORTH OF 110.
       2   **Q.**   AND DO THOSE INCLUDE REDISTRICTING CASES?
       3   **A.**   YES.
       4   **Q.**   HAVE YOU SERVED AS AN EXPERT IN REDISTRICTING CASES IN
       5   LOUISIANA?
       6   **A.**   YES.
       7   **Q.**   AND DOES THAT INCLUDE THE *TERREBONNE PARISH* LITIGATION?
       8   **A.**   YES.
       9   **Q.**   IN THAT CASE DID YOU UNDERTAKE A SENATE FACTORS ANALYSIS.
      10   **A.**   I DID.
      11   **Q.**   AND DID THE COURT IN THAT CASE CREDIT YOUR SENATE FACTORS
      12   ANALYSIS?
      13   **A.**   IT DID.
      14   **Q.**   AND HAVE OTHER COURTS PREVIOUSLY CREDITED AND RELIED ON
      15   YOUR ANALYSIS?
      16   **A.**   NOT EVERY TIME, OF COURSE, WHEN YOU'VE BEEN IN OVER 110
      17   CASES, BUT MOST OF THE TIME, INCLUDING THE UNITED STATES
      18   SUPREME COURT IN ITS LANDMARK 2016 DECISION IN THE TEXAS
      19   CONGRESSIONAL REDISTRICTING CASE *LULAC VERSUS PERRY*.  THE COURT
      20   RELIED ON MY WORK, MY ANALYSIS IN DOING SOMETHING QUITE
      21   UNUSUAL; AND THAT IS, IT INVALIDATED A DISTRICT, A
      22   CONGRESSIONAL DISTRICT, IN SOUTHWEST TEXAS BASED ON MY WORK, ON
      23   THE GROUNDS THAT IT DILUTED THE VOTES OF HISPANICS.
      24   **Q.**   DR. LICHTMAN, WHAT WERE YOU ASKED TO DO IN THIS CASE?
      25   **A.**   I WAS ASKED TO EXAMINE THE NINE SENATE FACTORS THAT RELATE

03:30 1   TO THE TOTALITY OF CIRCUMSTANCES IN THE STATE OF LOUISIANA

2   FACING THE OPPORTUNITIES FOR AFRICAN-AMERICAN VOTERS TO

3   PARTICIPATE FULLY IN THE POLITICAL PROCESS AND TO ELECT

4   CANDIDATES OF THEIR CHOICE.  AND I WAS ALSO ASKED TO RESPOND TO

5   ANY MATERIAL PRESENTED BY DEFENDANTS.

6   **Q.**   AND WHAT METHODOLOGY DID YOU EMPLOY AS PART OF THAT

7   ANALYSIS?

8   **A.**   I EMPLOYED STANDARD METHODOLOGIES IN MY FIELDS OF RESEARCH

9   OVER ALL THESE MANY DECADES.  I ANALYZE SOURCES LIKE SURVEYS,

10   SCHOLARLY ARTICLES, BOOKS, JOURNALISTIC ARTICLES, GOVERNMENTAL

11   REPORTS, DEMOGRAPHIC INFORMATION, ELECTIONS RETURNS AND SIMILAR

12   DATA TO REACH MY CONCLUSIONS, AND I APPLIED QUANTITATIVE

13   METHODS.  IN THIS CASE MOSTLY FAIRLY SIMPLE QUANTITATIVE

14   METHODS; FOR EXAMPLE, JUST LOOKING AT THE PERCENTAGE

15   DIFFERENCES TO GAUGE RACIALLY POLARIZED VOTING IN LOUISIANA OR

16   JUST LOOKING AT PERCENTAGE AND NUMERICAL DIFFERENCES TO GAUGE

17   SOCIOECONOMIC DISPARITIES BETWEEN AFRICAN AMERICANS AND WHITES

18   IN LOUISIANA.

19         AND THEN, OF COURSE, LIKE ANY HISTORIAN, I ANALYZED

20   DOCUMENTARY MATERIALS.  I'VE WRITTEN A BOOK ON HISTORICAL

21   METHODOLOGIES.

22   **Q.**   AND WHAT ARE YOUR OVERALL CONCLUSIONS?

23   **A.**   MY OVERALL CONCLUSIONS ARE THAT ESSENTIALLY ALL OF THE

24   NINE SENATE FACTORS APPLY IN THE STATE OF LOUISIANA

25   CONTEMPORARILY TO IMPEDE THE OPPORTUNITIES FOR AFRICAN-AMERICAN

03:32   1    VOTERS TO PARTICIPATE FULLY IN THE POLITICAL PROCESS AND TO

  2    ELECT CANDIDATES OF THEIR CHOICE.  AND I ALSO FIND THAT THESE

  3    ARE NOT ISOLATED FACTORS SEPARATED INTO WATERTIGHT

  4    COMPARTMENTS, BUT THAT ONE FACTOR SYNERGISTICALLY INFLUENCES

  5    THE OTHER TO EXPAND THE IMPEDIMENTS THAT I'VE DISCUSSED.

  6    **Q.**   DID YOU READ THE EXPERT REPORTS SUBMITTED BY THE

  7    DEFENDANTS IN THESE CONSOLIDATED CASES?

  8    **A.**   I DID.

  9    **Q.**   AND DID ANYTHING IN THOSE REPORTS CHANGE YOUR CONCLUSIONS

10    ABOUT THE SENATE FACTORS IN LOUISIANA?

11    **A.**   NOT ONLY DID NOTHING IN THOSE REPORTS CHANGE MY

12    CONCLUSIONS, THEY STRENGTHENED MY CONCLUSIONS.  NONE OF THE

13    REPORTS DIRECTLY ADDRESSED THE SENATE FACTORS OR EVEN MENTION

14    MY REPORT BY NAME.  NONE OF THE INFORMATION PRESENTED IN MY

15    REPORT WAS REFUTED BY ANY OF THE EXPERT REPORTS SUBMITTED ON

16    BEHALF OF DEFENDANTS.

17          TWO OF THE EXPERT REPORTS -- ONE BY DR. ALFORD AND

18    ONE BY MR. HEFNER AND ONE BY MISTER -- I HOPE I GET HIS NAME

19    RIGHT -- SOLANKY -- INDIRECTLY ADDRESSED SOME OF MY -- TWO OF

20    MY SENATE FACTORS, 2 AND 9.  AND TO THE EXTENT THERE WAS

21    INFORMATION IN THOSE REPORTS, IT BOLSTERED WHAT I FOUND.

22    **Q.**   DR. LICHTMAN, RATHER THAN GO THROUGH YOUR TWO REPORTS IN

23    DETAIL, I'D LIKE TO COVER JUST SOME OF THE KEY POINTS AND THE

24    KEY AREAS OF YOUR ANALYSIS AND CONCLUSIONS, AND WE'LL START

25    WITH SENATE FACTOR 1.

03:34

1          DOES THE STATE OF LOUISIANA HAVE A HISTORY OF VOTING

2   DISCRIMINATION AGAINST ITS BLACK CITIZENS?

3   **A.**    IT NOT ONLY HAS A HISTORY, IT HAS AN ONGOING HISTORY.  AND

4   THAT HISTORY RELATES NOT JUST TO DIRECT VOTER DISCRIMINATION --

5   FOR EXAMPLE, THE USE OF AT-LARGE ELECTIONS OR THE AVAILABILITY

6   OF POLLING PLACES FOR AFRICAN AMERICANS -- BUT IT ALSO RELATES

7   RIGHT UP TO THE PRESENT OF DISCRIMINATION IN THREE AREAS THAT

8   SIGNIFICANTLY TOUCH UPON AND IMPACT VOTING; THAT IS, LAW

9   ENFORCEMENT.  DISCRIMINATION IN LAW ENFORCEMENT SIGNIFICANTLY

10  IMPACTS VOTING, FOR A COUPLE OF REASONS.  NO. 1, LOUISIANA HAS

11  SOME PRETTY STRICT FELON DISENFRANCHISEMENT LAWS:  YOU CAN'T

12  VOTE WHILE YOU'RE INCARCERATED; YOU CAN'T VOTE FOR FIVE YEARS

13  WHILE YOU'RE ON PAROLE OR PROBATION; AND THERE'S NO AUTOMATIC

14  RESTORATION OF YOUR VOTING RIGHTS AFTER FIVE YEARS.  YOU HAVE

15  TO GO THROUGH A PROCESS.

16          SECONDLY, AS I POINT OUT IN MY REPORT, ONCE YOU'VE

17  BEEN INCARCERATED, YOUR INTEGRATION INTO A FULLY FUNCTIONING

18  MEMBER OF SOCIETY, INCLUDING A VOTING MEMBER AND POLITICAL

19  PARTICIPATION, BECOMES ALL THAT MUCH MORE DIFFICULT.

20          THE SECOND AREA WOULD BE THE AREA OF EDUCATION.  AND

21  ALL THE SCHOLARLY RESEARCH INDICATES EDUCATION IS A PRIME

22  DETERMINATE OF POLITICAL PARTICIPATION.  AND, OF COURSE, LEVELS

23  AND PROFICIENCY IN EDUCATION AFFECT ALMOST EVERYTHING IN THE

24  COURSE OF THE LIFE CYCLE.  A DEFICIENT EDUCATION IN

25  PROFICIENCY, DEFICIENT EDUCATIONAL ATTAINMENT CONTRIBUTES TO

03:35 1 OTHER SOCIOECONOMIC FACTORS WHICH HAVE AN IMPACT ON VOTING.

2          FINALLY, THERE IS RACIAL SEGREGATION.  AND THE

3 LITERATURE I CITE IN MY REPORT INDICATES THAT SEGREGATION

4 PERPETUATES CYCLES OF POVERTY.  IT EXPANDS, IT MULTIPLIES

5 SOCIOECONOMIC DISPARITIES THAT HAVE A DIRECT IMPACT ON THE

6 ABILITY OF AFRICAN AMERICANS IN LOUISIANA TO PARTICIPATE IN THE

7 POLITICAL PROCESS AND TO ELECT CANDIDATES OF THEIR CHOICE.

8 **Q.**  ON THE TOPIC OF DISCRIMINATORY VOTING PRACTICES, IN

9 PARTICULAR, YOU MENTIONED JUST NOW AT-LARGE JUDICIAL ELECTIONS

10 AND CLOSING OF POLLING PLACES.  ARE THOSE EXAMPLES OF EFFORTS

11 THAT HAVE CONTINUED INTO THE PRESENT DAY?

12 **A.**  THAT'S CORRECT.  THOSE ARE EXAMPLES THAT CONTINUE INTO THE

13 21ST CENTURY AND WE CAN ALSO TALK ABOUT AS ACTUALLY DOING THE

14 CONTEXT OF ANOTHER FACTOR, WHAT I BELIEVE TO BE THE

15 DISCRIMINATORY REDISTRICTING PLAN ADOPTED IN POST-2010.

16 **Q.**  LET'S MOVE ON TO SENATE FACTOR 2.

17          DR. LICHTMAN, DOES LOUISIANA HAVE RACIALLY POLARIZED

18 VOTING?

19 **A.**  LOUISIANA, AS I DOCUMENT IN MY REPORT, HAS EXTREME

20 RACIALLY POLARIZED VOTING; THAT IS, AFRICAN AMERICANS VOTE

21 ALMOST UNANIMOUSLY FOR DEMOCRATIC CANDIDATES, AND REPUBLICANS

22 IN VERY SUBSTANTIAL PERCENTAGES BLOC VOTE AGAINST THOSE

23 CANDIDATES OF CHOICE OF AFRICAN-AMERICAN VOTERS.  AND THIS

24 RACIAL DIVIDE BETWEEN BLACKS AND WHITES VOTING DEMOCRATIC AND

25 REPUBLICAN IS INEXTRICABLY TIED TO RACE.  PARTY LABELS BY

03:37 1   THEMSELVES ARE MEANINGLESS.  THEY ARE JUST LABELS.  WHAT

2   MATTERS IS WHAT THOSE LABELS REPRESENT.

3        WE KNOW FOR THE 19TH CENTURY AND WELL INTO THE 20TH

4   CENTURY BLACKS IN THE SOUTH ARE VOTING REPUBLICAN, THE PARTY OF

5   LINCOLN, AND WHITES WERE VOTING DEMOCRATIC, THE PARTY OF

6   REDEMPTION.  THAT CHANGED PARTICULARLY AFTER THE VOTING RIGHTS

7   ACT OF 1965.  IT WASN'T AN IMMEDIATE PROCESS, BUT OVER TIME AND

8   CERTAINLY UP TO OUR OWN TIME, THE PARTY IMAGES AND

9   REPRESENTATIONS SHIFTED:  DEMOCRATS CAME TO REPRESENT THE PARTY

10  OF CIVIL RIGHTS AND BLACK INTERESTS, AND REPUBLICANS THE

11  OPPOSITE.  I DOCUMENT THIS CHANGE IN MANY WAYS IN MY REPORT.

12       FIRST OF ALL, I CITE SCHOLARLY LITERATURE ON WHAT

13  THEY CALL THE CO-JOINING OF RACE AND PARTY IN RECENT YEARS.

14       SECONDLY, I LOOK AT POLITICAL LEADERSHIP, AND I LOOK

15  AT TWO ADVOCACY GROUPS:  THE NAACP, THE OLDEST BLACK ADVOCACY

16  GROUP IN THE COUNTRY, AND THE LEADERSHIP CONFERENCE ON CIVIL

17  AND HUMAN RIGHTS.  AND THEY HAVE LEGISLATIVE SCORECARDS TO WHAT

18  EXTENT LEGISLATORS REPRESENT BLACK AND MINORITY INTERESTS.  AND

19  THEY BOTH SHOW THE SAME THING:  THAT THERE IS EXTREME

20  POLARIZATION BETWEEN THE POSITIONS TAKEN BY REPUBLICAN LEADERS

21  LEGISLATIVELY IN THE CONGRESS AND THE POSITIONS TAKEN BY

22  DEMOCRATIC LEADERS.  IT'S EXTREME POLARIZATION, AS I DOCUMENT

23  IN MY REPORT, THAT MATCHES THE EXTREME POLARIZATION OF THE

24  VOTING OF -- VOTING OF BLACKS AND WHITES.

25       SECOND, A THIRD AREA I LOOK AT IS THE RANK AND FILE;

03:39 1    THAT IS, WHAT ARE THE ATTITUDES WITH RESPECT TO RACE OF

2    LOUISIANIANS WHO ARE REPUBLICANS AND DEMOCRATS.  AND, AGAIN, I

3    FIND EXTREME POLARIZATION ON ISSUES SQUARELY RELATED TO RACE,

4    AND I DOCUMENT THIS IN TWO RESPECTED STUDIES:  THE COOPERATIVE

5    CONGRESSIONAL ELECTION STUDY, A STANDARD SOURCE, AND HERE IN

6    LOUISIANA, THE REILLY CENTER STUDY.  AND I ASK DIFFERENT

7    QUESTIONS, BUT THEY COME TO THE SAME ANSWER.  AGAIN, IT'S THE

8    POLARIZATION REFLECTING THE POLARIZATION IN THE VOTE.

9         FINALLY -- AND THIS IS IMPORTANT -- I LOOK AT THE

10    ACTUAL RESULTS OF ELECTIONS.  REPUBLICANS ARE QUITE DOMINANT IN

11    LOUISIANA, WINNING ALMOST ALL STATEWIDE ELECTIONS, WINNING

12    ESSENTIALLY ALL LEGISLATIVE ELECTIONS IN WHITE DISTRICTS.  AND

13    WHAT IS CONSISTENT WITH MY FINDINGS IS THAT REPUBLICANS IN ALL

14    OF THESE AREAS HAVE NOT SPONSORED ANY WINNING BLACK REPUBLICAN

15    CANDIDATES.  ALL OF THE STATEWIDE EXECUTIVE OFFICES ARE HELD BY

16    WHITES.  BOTH U.S. SENATE OFFICES THAT ARE VOTED STATEWIDE ARE

17    HELD BY WHITES.  WHITES WIN IN THE WHITE-MAJORITY DISTRICTS IN

18    THE STATE HOUSE OF REPRESENTATIVES AND IN THE STATE SENATE.

19         I EVEN DRILLED DOWN TO A MORE FINE-GRAIN LEVEL, THE

20    LEVEL OF MAYORAL ELECTIONS; THAT IS, I LOOKED AT MAYORAL

21    ELECTIONS IN MUNICIPALITIES OF 10,000 OR MORE IN LOUISIANA, AND

22    NO BLACKS ARE ELECTED IN ANY MAJORITY-WHITE MUNICIPALITY; ONLY

23    BLACKS ARE ELECTED IN MAJORITY-BLACK MUNICIPALITIES.  AND THERE

24    ARE NO BLACK REPUBLICANS.  SO I DOCUMENT THIS AT THE LEVEL OF

25    SCHOLARSHIP, AT THE LEADERSHIP LEVEL, AT THE RANK-AND-FILE

03:41  1  LEVEL, AT THE LEVEL OF THE ACTUAL RESULTS OF ELECTIONS.

2  **Q.**   ULTIMATELY, DR. LICHTMAN, AS BETWEEN RACE AND PARTY, WHICH

3  DO YOU CONSIDER TO BE THE DRIVING CAUSAL MECHANISM OF

4  LOUISIANA'S POLARIZED VOTING?

5  **A.**   THE DRIVING MECHANISM IS CLEARLY RACE, AS I EXPLAINED.

6  PARTY BY ITSELF DOESN'T EXPLAIN ANYTHING.  AS I SAID, AT ONE

7  TIME RACIAL VOTING PATTERNS WERE REVERSED.  IT IS BECAUSE OF

8  WHAT THE PARTIES REPRESENT THAT I DOCUMENT IN SO MANY WAYS

9  THAT'S DRIVING THE VOTING.

10         IN OTHER WORDS, BLACKS ARE VOTING DEMOCRATIC IN

11  LOUISIANA; WHITES ARE VOTING REPUBLICAN.  AND THIS IS NOT

12  UNIQUE TO LOUISIANA, BY THE WAY.  NOT IN SPITE OF RACE BUT

13  BECAUSE OF RACE.  RACE IS AT THE CENTER OF ALL OF THIS.

14         I ALSO CITE A SCHOLARSHIP BY DR. GRUMBACH, EXPLAINING

15  HOW RACE IS AT THE CENTER OF REPUBLICAN POLITICAL STRATEGY THAT

16  COMES DOWN TO THE --

17  **Q.**   YOU MENTIONED THAT YOU READ THE REPORTS SUBMITTED BY DR.

18  ALFORD IN THIS CASE.  CORRECT?

19  **A.**   CORRECT.

20  **Q.**   DID ANYTHING IN DR. ALFORD'S REPORT CHANGE YOUR

21  CONCLUSIONS ABOUT RACIALLY POLARIZED VOTING IN LOUISIANA?

22  **A.**   NO.  IT STRENGTHENED IT.  LET ME EXPLAIN.  ALL OF THE

23  ANALYSES THAT DR. ALFORD PERFORMED SHOWED THE SAME THING MY

24  REPORT SHOWED:  EXTREME POLARIZATION BETWEEN AFRICAN AMERICANS

25  AND WHITES IN TERMS OF BLACKS VOTING DEMOCRATIC; WHITES VOTING

03:43 1    REPUBLICAN IN VERY LARGE MAJORITIES.

2              NOW, DR. ALFORD STATES OR AT LEAST IMPLIES THAT THE

3    DRIVING FORCE IS PARTY, NOT RACE, BUT HE STOPS COLD THERE.  HE

4    NEVER EXPLAINS OR ATTEMPTS TO JUSTIFY THAT CONCLUSION.  HE

5    DOESN'T LOOK AT MY ANALYSIS HISTORY, DOESN'T LOOK AT MY

6    ANALYSIS OF LEADERS, DOESN'T LOOK AT MY ANALYSIS OF RANK AND

7    FILE, DOESN'T LOOK AT MY ANALYSIS OR ANY ANALYSIS IN THESE

8    AREAS OF THE ACTUAL RESULTS OF ELECTIONS.

9              IN FACT, WHAT'S INTERESTING AND TELLING IS DR. ALFORD

10   LOOKS AT, I BELIEVE, SOMETHING LIKE 28 REPUBLICAN CANDIDACIES

11   IN HIS ANALYSIS, AND NOT ONE OF THOSE REPUBLICAN CANDIDACIES

12   INVOLVED A BLACK CANDIDATE.  DR. ALFORD ALSO IGNORES THAT PART

13   OF MY INITIAL REPORT THAT LOOKS AT WHETHER OR NOT RACE AND

14   INFLUENCE VOTING WHEN THE POLAR PARTY IS NOT AN ISSUE.

15             I LOOKED AT THE 2008 PRIMARY, DEMOCRATIC PRIMARY,

16   WHERE OVERWHELMINGLY BLACKS PARTICIPATE; AND THAT INVOLVED

17   BARACK OBAMA, THE AFRICAN AMERICAN, AGAINST HILLARY CLINTON,

18   THE WHITE CANDIDATE, AND A FEW OTHER MINOR CANDIDATES.  AND

19   WHAT I FOUND WAS THAT AFRICAN AMERICANS VOTED 86 PERCENT FOR

20   OBAMA; ONLY 30 PERCENT OF WHITES VOTED FOR OBAMA.  SO WITHIN

21   THE SAME PARTY IT WAS A SHARP RACIAL SPLIT.

22             I ALSO LOOKED AT THE SUBSEQUENT 2008 GENERAL

23   ELECTIONS AND FOUND THAT BLACK DEMOCRATS VOTED 98 PERCENT FOR

24   OBAMA, BUT WHITE DEMOCRATS ONLY VOTED 38 PERCENT FOR OBAMA.  SO

25   WHEN THERE ISN'T THE CRITICALLY AND INEXTRICABLY INVOLVED

03:45 1   POLAR PARTY, YOU CAN SEE VOTERS RESPONDING ON RACE.  AGAIN, DR.
      2   ALFORD DOES NOT CONSIDER THOSE RESULTS OR PRESENT ANY
      3   COMPARABLE RESULTS OF HIS OWN.
      4   **Q.**   MOVING TO SENATE FACTOR 3, DR. LICHTMAN, DOES LOUISIANA
      5   EMPLOY ANY VOTING PRACTICES THAT ENHANCE THE OPPORTUNITY FOR
      6   DISCRIMINATION?
      7   **A.**   IT DOES.  IT EMPLOYES ONE OF THEM THAT'S EXPLICITLY
      8   LISTED UNDER SENATE FACTOR 3; AND THAT IS, THE USE OF THE
      9   MAJORITY-VOTE REQUIREMENT IN SUBSEQUENT RUNOFF ELECTIONS.
     10   **Q.**   WHAT AFFECT DOES THE MAJORITY-VOTE REQUIREMENT HAVE ON
     11   BLACK AND BLACK-PREFERRED CANDIDATES?
     12   **A.**   WHAT IT MEANS IS EVEN IF A BLACK CANDIDATE GETS A
     13   PLURALITY IN THE FIRST ROUND AS A RESULT OF A SPLIT AMONG MORE
     14   THAN ONE AMBITIOUS WHITE CANDIDATE, THAT DOES NOT ELECT THAT
     15   BLACK CANDIDATE BUT, RATHER, THAT BLACK CANDIDATE HAS TO FACE
     16   OFF ONE-ON-ONE AGAINST A WHITE CANDIDATE.  AND CLEARLY IN --
     17   STATEWIDE IN LOUISIANA WHERE WHITE VOTERS DOMINATE, IN THAT
     18   KIND OF CONTEST THE AFRICAN-AMERICAN CANDIDATE HAS LITTLE
     19   CHANCE OF WINNING.  AND I GAVE THREE EXAMPLES OF THAT IN MY
     20   REPORT.
     21   **Q.**   WHAT ARE THOSE THREE RECENT EXAMPLES?
     22   **A.**   YEAH.  WE HAVE THE 2015 ELECTION FOR LIEUTENANT GOVERNOR.
     23   THE BLACK CANDIDATE WON THE FIRST ROUND BY THREE PERCENTAGE
     24   POINTS, SO IT WAS CLOSE BUT NOT EYELASH, AND THE CANDIDATE LOST
     25   55/45 IN THE RUNOFF.

03:47 1           WE HAD A 2017 ELECTION FOR TREASURER.  A BLACK
2    CANDIDATE WON THE FIRST ROUND EVEN MORE DECISIVELY BY SEVEN
3    POINTS AND WAS DEFEATED EVEN MORE DECISIVELY IN THE RUNOFF
4    56/44.
5           FINALLY, WE HAVE THE 2018 SPECIAL ELECTION FOR
6    SECRETARY OF STATE.  THE BLACK CANDIDATE DIDN'T WIN THE FIRST
7    ROUND BUT CAME REALLY CLOSE, CAME WITHIN 10,000 VOTES OR SO,
8    BUT GOT TROUNCED IN THE RUNOFF:  59 PERCENT TO 41 PERCENT.
9    **Q.**   WHEN WAS THE MAJORITY-VOTE REQUIREMENT ADOPTED IN
10   LOUISIANA?
11   **A.**   IT WAS FIRST ADOPTED IN 1975.  AND THE MOST FAMOUS RUNOFF,
12   OF COURSE, WAS IN 1991 BETWEEN THE KU KLUX KLAN CANDIDATE,
13   DAVID DUKE, AND I THINK IT WAS EDWIN EDWARDS WHO WAS AGAINST
14   HIM.
15   **Q.**   SO WAS THE MAJORITY-VOTE REQUIREMENT ADOPTED IN RESPONSE
16   TO THE U.S. SUPREME COURT'S *FOSTER* DECISION?
17   **A.**   NO.  IT WAS ADOPTED MORE THAN TWO DECADES BEFORE.  AND, AS
18   I SAID, KIND OF A HIGHLIGHT RUNOFF ELECTION THAT GOT MAJOR
19   NATIONAL ATTENTION OCCURRED SEVERAL YEARS BEFORE THAT IN 1991.
20   **Q.**   MOVING TO SENATE FACTOR 4, DR. LICHTMAN, WHAT ARE YOUR
21   FINDINGS ON CANDIDATE SLATING IN LOUISIANA'S CONGRESSIONAL
22   ELECTIONS?
23   **A.**   WELL, I FOUND SOMETHING RATHER INTERESTING; THAT THE WAY
24   LOUISIANA SET UP ITS CONGRESSIONAL REDISTRICTING PLAN, IT KIND
25   OF MADE SLATING IRRELEVANT AND UNAVAILING FOR BLACK CANDIDATES;

03:48 1   THAT IS, IN DISTRICT 2, WHICH IS OVERWHELMING PACKED WITH

2   BLACKS AND DEMOCRATS, SLATING IS IRRELEVANT.  IT'S GOING TO

3   ELECT A BLACK DEMOCRAT; WHEREAS, IN THE FIVE OTHER DISTRICTS

4   THAT ARE OVERWHELMINGLY WHITE AND REPUBLICAN, SLATING IS

5   EQUALLY IRRELEVANT BECAUSE A BLACK CANDIDATE HAS NO CHANCE,

6   ESSENTIALLY, TO WIN IN DISTRICTS THAT ARE R PLUS 20 OR MORE,

7   ACCORDING TO STANDARD POLITICAL ANALYSIS BY THE -- THAT'S THE

8   PARTISAN VOTING INDEX THAT MEASURES PARTISAN STRENGTH OF THE

9   DISTRICT.  AND IT'S IN MY REPORT.

10   **Q.**   NEXT IS SENATE FACTOR 5.  DR. LICHTMAN, WHAT EFFECT DOES

11   THE HISTORY OF DISCRIMINATION YOU DESCRIBED BEFORE HAVE ON

12   BLACK LOUISIANIANS TODAY?

13   **A.**   IT HAS PROFOUND EFFECTS ON BLACK LOUISIANIANS TODAY.  I

14   DOCUMENT IN MY REPORT THAT THERE ARE MAJOR TODAY SOCIOECONOMIC

15   DISPARITIES BETWEEN AFRICAN AMERICANS AND WHITES IN LOUISIANA,

16   AND THAT EXTENDS TO ALMOST EVERY AREA OF SIGNIFICANCE FOR

17   PEOPLE'S LIVES AND FOR POLITICAL PARTICIPATION IN VOTING.  IT

18   EXTENDS TO INCOME, TO UNEMPLOYMENT, TO POVERTY, TO DEPENDENCE

19   UPON WELFARE, TO HOMEOWNERSHIP, TO THE AVAILABILITY OF

20   VEHICLES, THE AVAILABILITY OF BROADBAND INTERNET.  IT EXTENDS

21   TO EDUCATIONAL ATTAINMENT AND EDUCATIONAL PROFICIENCY, ALL OF

22   THESE BETWEEN AFRICAN AMERICANS AND WHITES IN LOUISIANA IN THE

23   PRESENT DAY, AND IT EXTENDS TO VARIOUS MEASURES OF HEALTH AS

24   WELL.

25   **Q.**   AND DO THESE INEQUITIES IMPACT BLACK POLITICAL

03:50 1  PARTICIPATION?

2  **A.**   YES.  AS I EXPLAINED IN MY REPORT, FIRST OF ALL, THEY --

3  AND THIS ISN'T THE ONLY ONE.  BUT FIRST OF ALL -- AND THE MOST

4  OBVIOUS -- IS THAT THEY IMPACT THE PARTICIPATION RATES OF

5  BLACKS VERSUS WHITES IN TERMS OF TURNOUT.  AND I PRESENT DATA

6  IN MY REPORT SHOWING DIFFERENTIALS BETWEEN BLACK AND WHITE

7  TURNOUT IN RECENT ELECTIONS IN LOUISIANA THAT COULD EXTEND INTO

8  THE DOUBLE DIGITS, AND THAT HASN'T REALLY AMELIORATED ITSELF IN

9  RECENT ELECTIONS.  OTHER INFORMATION PRESENTED BY ONE OF THE

10  EXPERTS FOR DEFENDANTS BOLSTERS THAT.

11  **Q.**   ARE YOU REFERRING TO THE REPORT OF DR. SOLANKY AND HIS

12  VOTER TURNOUT STATISTICS?

13  **A.**   I AM.  DR. SOLANKY PRESENTS TWO TABLES ON VOTER TURNOUT.

14  I THINK THEY ARE TABLES 2 AND 4 IN HIS REPORT.  ONE OF THE

15  TABLES LOOKS AT STATEWIDE TURNOUT AND FINDS SUBSTANTIAL

16  DISPARITIES, LIKE I DID, BETWEEN BLACKS AND WHITES IN THEIR

17  TURNOUT RATES.

18       SIMILARLY, HE LOOKED AT EVERY CONGRESSIONAL DISTRICT,

19  ALL SIX OF THEM, AND FOUND THAT INVARIABLY IN EVERY ONE OF

20  THOSE SIX CONGRESSIONAL DISTRICTS, BLACK TURNOUT LAGGED WHITE

21  TURNOUT SOMETIMES UP INTO THE DOUBLE DIGITS.

22  **Q.**   IS REDUCED POLITICAL PARTICIPATION DEMONSTRATED IN OTHER

23  WAYS?

24  **A.**   YES.  AS I EXPLAIN IN MY REPORTS, A LACK OF RESOURCES, A

25  LACK OF EDUCATIONAL PROFICIENCY AND ATTAINMENT IMPEDES

03:52 1    PARTICIPATION IN OTHER WAYS.  I GIVE TWO EXAMPLES.  ONE IS
2          LOBBYING A PUBLIC OFFICIAL.  IT'S VERY IMPORTANT FOR
3          PARTICIPATING IN THE POLITICAL PROCESS AND INFLUENCING THE
4          OUTCOMES WHICH, AS WE'VE SEEN, ARE QUITE DIFFERENT WITH WHITES
5          AND BLACKS IN LOUISIANA.  AND I PRESENT SURVEY DATA SHOWING
6          THAT WHITES ARE SUBSTANTIALLY MORE LIKELY IN LOUISIANA TO
7          CONTACT PUBLIC OFFICIALS; AGAIN, A REFLECTION OF ALL OF THESE
8          MANY SOCIOECONOMIC DIFFERENCES.
9              THE SECONDARY AREA IS POLITICAL CONTRIBUTIONS.  NOT
10         SURPRISINGLY, THE DISPARITY IN RESOURCES EVIDENT BETWEEN BLACKS
11         AND WHITES IN LOUISIANA MANIFESTS ITSELF.  AND, AGAIN, I
12         PRESENT SURVEY DATA, RECENT SURVEY DATA, ON THIS THAT WHITES
13         ARE FAR MORE LIKELY THAN BLACKS TO MAKE POLITICAL
14         CONTRIBUTIONS.  AND, OF COURSE, I DIDN'T ACTUALLY PRESENT
15         TABLES ON THIS, BUT IT CERTAINLY MAKES SENSE THAT GROUPS THAT
16         HAVE LOWER LEVELS OF EDUCATION, FEWER RESOURCES, MAKES IT MORE
17         DIFFICULT TO FIND CANDIDATES TO RUN AND TO RUN POLITICAL
18         CAMPAIGNS.
19             SO WHILE TURNOUT IS THE MOST OBVIOUS, THERE ARE OTHER
20         VERY IMPORTANT WAYS IN WHICH THESE DISPARITIES REFLECTED
21         DISCRIMINATION IMPACT THE ABILITY OF AFRICAN AMERICANS IN
22         LOUISIANA TO PARTICIPATE FULLY IN THE POLITICAL PROCESS AND
23         ELECT CANDIDATES OF THEIR CHOICE.
24             **MR. HAWLEY:**  MR. MARTINSON, COULD WE PLEASE PULL UP
25         PAGE 85 OF GX-3.

03:54 1   **BY THE WITNESS:**

2   **A.**   WOW, I ACTUALLY SEE IT.

3   **BY MR. HAWLEY:**

4   **Q.**   EXCELLENT.  DR. LICHTMAN, DOES THIS TABLE LOOK FAMILIAR TO

5   YOU?

6   **A.**   IT DOES.  IT'S RIGHT FROM THE APPENDIX OF MY REPORT.

7   **Q.**   AND WHAT DOES IT SHOW?

8   **A.**   IT SHOWS THAT IN CRITICAL AREAS, ACCORDING TO THE U.S.

9   NEWS, STATE RANKINGS -- THESE ARE NOT AN OUTLIER FOR YOUR OTHER

10   RANKING TO GET SIMILAR ANSWERS.  IN CRITICAL AREAS ARE VERY

11   IMPORTANT TO A GROUP THAT'S VULNERABLE LIKE AFRICAN AMERICANS

12   AND HAS THE BURDEN OF VERY SIGNIFICANT SOCIOECONOMIC

13   DISPARITIES.  NOT ONLY ARE THEY FACING THESE PRESENT DAY

14   DISPARITIES, BUT THEY ARE DEALING WITH A STATE THAT RANKS AT OR

15   NEAR THE BOTTOM IN CRITICAL AREAS:  45TH IN HEALTH CARE; 48TH

16   IN EDUCATION; 49TH IN ECONOMY; 50TH IN OPPORTUNITY; 48TH IN

17   INFRASTRUCTURE; 50TH IN CRIME AND CORRECTIONS; 43RD IN FISCAL

18   STABILITY; 50TH IN QUALITY OF LIFE; 50TH OVERALL.  THIS SHOWS

19   THE IMPEDIMENTS FACED BY AFRICAN AMERICANS IN LOUISIANA, AND IT

20   ALSO DOCUMENTS THE PRESENT-DAY RAMIFICATIONS OF THE HISTORICAL

21   AND ONGOING DISCRIMINATION IN LOUISIANA.

22   **Q.**   THANK YOU.

23        **MR. HAWLEY:**  AND, MR. MARTINSON, WE CAN PULL DOWN

24   GX-3.

25   **BY MR. HAWLEY:**

03:55 1   **Q.**   MOVING TO SENATE FACTOR 6, DR. LICHTMAN, HAVE LOUISIANA'S

     2   POLITICAL CAMPAIGNS BEEN MARKED BY RACIAL APPEALS?

     3   **A.**   YES.  THEY HAVE BEEN MARKED BY BOTH SUBTLE AND OVERT

     4   RACIAL APPEAL.  AND ALMOST ALL MY EXAMPLES EXCEPT FOR MAYBE ONE

     5   ARE 21ST CENTURY EXAMPLES.  I'M NOT GOING BACK TO THE OLD ERA

     6   OF JIM CROW.  THE OTHER ONE WAS FROM THE 1990'S.  AND THESE

     7   EXAMPLES GO ALL THE WAY UP TO 2022.  AND THEY DON'T JUST

     8   INVOLVE FRENCH CANDIDATES.  THEY'RE TALKING ABOUT SOME OF THE

     9   LEADING REPUBLICAN POLITICIANS IN THE STATE OF LOUISIANA:

   10   DAVID VITTER, MIKE FOSTER, STEVE SCALISE, ONE OF THE MEMBERS OF

   11   THE REPUBLICAN LEADERSHIP; U.S. REPRESENTATIVE MIKE JOHNSON;

   12   U.S. SENATOR JOHN KENNEDY, AS WELL AS IMPORTANT REPUBLICAN

   13   AFFILIATED ORGANIZATIONS IN THE STATE OF LOUISIANA.

   14   **Q.**   IS IT SAFE TO SAY, THEN, THAT RACIAL APPEALS HAVE BEEN

   15   EMPLOYED BY WINNING CAMPAIGNS IN LOUISIANA?

   16   **A.**   ABSOLUTELY.  DAVID VITTER EMPLOYED THIS IN 2010, AND HE

   17   CERTAINLY HAD A WINNING CAMPAIGN.  STEVE SCALISE HAS

   18   CONSISTENTLY BEEN WINNING IN LOUISIANA.  MIKE JOHNSON IS A

   19   SITTING U.S. REPRESENTATIVE.  JOHN KENNEDY IS A SITTING U.S.

   20   SENATOR.

   21   **Q.**   MOVING NOW TO SENATE FACTOR 7, HAVE BLACK LOUISIANIANS

   22   HISTORICALLY BEEN ELECTED TO PUBLIC OFFICE?

   23   **A.**   NOT HISTORICALLY AND --

   24   **Q.**   DR. LICHTMAN?

   25   **A.**   I'M SORRY.  I LOST YOUR QUESTION THERE.  SOMEHOW THE

03:58 1 │ TECHNOLOGY FAILED AND YOU BLACKED OUT.

2 │ **Q.**   PERHAPS IT WAS ME AND NOT THE TECHNOLOGY, SO I'LL GO AHEAD

3 │ AND ASK IT AGAIN.

4 │        HAVE BLACK LOUISIANANS HISTORICALLY BEEN ELECTED TO

5 │ PUBLIC OFFICE?

6 │ **A.**   NOT HISTORICALLY, REALLY, SINCE RECONSTRUCTION AND NOT AT

7 │ PRESENT.

8 │ **Q.**   IS THERE A DISPARITY BETWEEN THE BLACK SHARE OF

9 │ LOUISIANA'S POPULATION AND THEIR REPRESENTATION IN CONGRESS AND

10 │ THE STATE LEGISLATURE?

11 │ **A.**   YES.  WHEN YOU LOOK AT THE VOTING REPRESENTATION OF BLACKS

12 │ IN LOUISIANA, IT'S A LITTLE BIT NORTH OF 31 PERCENT, AND

13 │ THERE'S A WIDE DISPARITY IN TERMS OF BLACK REPRESENTATION.

14 │ NOW, I WANT TO BE CLEAR.  I'M NOT MAKING A LEGAL CONCLUSION

15 │ HERE.  IN FACT, THROUGHOUT MY TESTIMONY IN THE REPORT, I'M

16 │ NEVER MAKING LEGAL CONCLUSIONS.  TO THE EXTENT I LOOK AT THINGS

17 │ LIKE BRIEFS OR COURT DECISIONS, SO THE SUBSTANCE, NOT TO DRAW A

18 │ LEGAL CONCLUSION.

19 │        SO I'M NOT LEGALLY SAYING AT ALL THAT ANY GROUP,

20 │ INCLUDING AFRICAN AMERICANS, MUST HAVE PROPORTIONAL

21 │ REPRESENTATION.  I AM SIMPLY RESPONDING TO THE IMPACT OF THIS

22 │ QUERY, WHICH IS TO CONSIDER THE EXTENT TO WHICH BLACK

23 │ REPRESENTATIVES HAVE BEEN ELECTED TO PUBLIC OFFICE IN

24 │ LOUISIANA.  AND THERE IS A VAST DISCREPANCY BETWEEN BLACK

25 │ VOTING AGE POPULATION AND BLACK REPRESENTATION.

03:59 1    NO BLACK IS ELECTED TO ANY STATEWIDE EXECUTIVE OFFICE

2 IN THE STATE OF LOUISIANA. THAT'S ZERO PERCENTAGE. NO BLACK

3 IS ELECTED STATEWIDE TO A U.S. SENATE POSITION. THAT IS A ZERO

4 PERCENTAGE.

5    WHEN YOU LOOK AT THE STATE LEGISLATURE, BLACKS ARE

6 UNDER-REPRESENTED BY SOMETHING LIKE FOUR TO NINE IN THE SENATE,

7 AND HOUSE SEATS ARE ONLY BEING ELECTED IN MAJORITY-BLACK

8 DISTRICTS, WHICH REALLY SHUTS OFF AND LIMITS THEIR ABILITY TO

9 EXPAND THEIR REPRESENTATION. AND IN TERMS OF SUPREME COURT AND

10 OTHER JUDICIAL POSITIONS IN LOUISIANA, BLACKS ARE ALSO

11 SUBSTANTIALLY UNDER-REPRESENTED.

12    AND AS I MENTIONED -- AND SAME THING IN -- AS I

13 MENTIONED PREVIOUSLY, THESE ARE NOT BLACK REPUBLICANS. DESPITE

14 THE POLITICAL STRENGTH OF REPUBLICANS, THEY ARE NOT ELECTING

15 BLACK REPUBLICANS.

16 **Q.** DR. LICHTMAN, HAVE ANY BLACK CANDIDATES BEEN ELECTED TO

17 STATEWIDE OFFICE SINCE RECONSTRUCTION?

18 **A.** NOT THAT I AM AWARE OF.

19 **Q.** MOVING NOW TO SENATE --

20 **A.** I THINK THERE WERE FIVE DURING RECONSTRUCTION AND NONE

21 SINCE.

22 **Q.** THANK YOU.

23    MOVING TO SENATE FACTOR 8, BASED ON YOUR ANALYSIS,

24 HAS THE STATE OF LOUISIANA BEEN RESPONSIVE TO THE NEEDS OF ITS

25 BLACK CITIZENS?

04:01 1    **A.**   WELL, I LOOKED AT RESPONSIVENESS IN FIVE AREAS THAT ARE

2    FUNDAMENTAL AND ESPECIALLY IMPORTANT TO A GROUP LIKE AFRICAN

3    AMERICANS THAT ALREADY BEARS THE BURDEN OF SOCIOECONOMIC

4    DISPARITIES IN THINGS LIKE INCOME, POVERTY, EDUCATION,

5    HOMEOWNERSHIP.  I ALSO LOOKED AT EDUCATION, I LOOKED AT HEALTH

6    CARE, I LOOKED AT ECONOMIC OPPORTUNITY, AND I LOOKED AT

7    ENVIRONMENTAL POLLUTION AND FOUND THAT IN ALL OF THOSE FIVE

8    AREAS, THE STATE HAS NOT BEEN RESPONSIVE TO THE PARTICULARIZED

9    NEEDS OF ITS AFRICAN-AMERICAN RESIDENTS.

10    **Q.**   AND ARE THESE INEQUITIES IN SOME CASES CAUSED BY OFFICIAL

11    GOVERNMENT POLICY?

12    **A.**   ABSOLUTELY.  AS I POINT OUT IN MANY OF THESE AREAS, ALL OF

13    THESE ISSUES ARE PART AND PARCEL OF GOVERNMENT POLICIES,

14    GOVERNMENT POLICY WITH REGARD TO POLLUTING INDUSTRIES IN

15    HEAVILY BLACK AREAS OR THE LONG DELAY IN ADOPTING MEDICAID

16    EXPANSION, SOMETHING CRITICAL TO THE HEALTH OF AFRICAN

17    AMERICANS, AND SO MANY FAILURES IN THE CRIMINAL JUSTICE, JUST

18    TO CITE A FEW EXAMPLES.

19    **Q.**   DR. LICHTMAN, WOULD YOU CONSIDER THESE FINDINGS TO BE

20    EITHER LIMITED OR SUBJECTIVE?

21    **A.**   THEY'RE CERTAINLY NOT LIMITED.  THESE ARE AREAS OF

22    FUNDAMENTAL IMPORTANCE TO A VULNERABLE GROUP LIKE AFRICAN

23    AMERICANS, AND THEY'RE THE KINDS OF THINGS SOCIAL SCIENTISTS

24    WOULD LOOK AT.  THE WELL-BEING AND LIFE CHANCES OF AFRICAN

25    AMERICANS ARE FUNDAMENTALLY AFFECTED BY CRIMINAL JUSTICE,

04:03 1    HEALTH CARE, EDUCATION, ECONOMIC OPPORTUNITY, AND ALL THE
      2    PROBLEMS I DOCUMENT FOR HEALTH WITH ENVIRONMENTAL POLLUTION.
      3    AND THEY'RE NOT SUBJECTIVE; THAT IS, FOR EACH OF THESE FIVE
      4    AREAS, I PROVIDE SPECIFIC INFORMATION.  I JUST DON'T THROW OUT
      5    OPINION.
      6         AND IT IS RELEVANT, I THINK, THAT -- AS WITH THE REST
      7    OF MY REPORT, NO EXPERT FOR DEFENDANTS CHALLENGE ANY OF THE
      8    INFORMATION THAT I PROVIDED UNDER FACTOR 8 IN MY INITIAL
      9    REPORT.
     10    **Q.**  LASTLY, DR. LICHTMAN, SENATE FACTOR 9.  CAN THE ABSENCE
     11    OF A SECOND BLACK-OPPORTUNITY CONGRESSIONAL DISTRICT BE
     12    JUSTIFIED BY CORE RETENTION?
     13    **A.**  CORE RETENTION IS A CRITERIA -- CRITERION OF CHOICE.  IT'S
     14    NOT LEGALLY REQUIRED.  IT'S NOT LIKE ONE-PERSON, ONE-VOTE FOR
     15    CONFORMITY WITH THE VOTING RIGHTS ACT.
     16         AS A GENERAL MATTER, STATES CERTAINLY COULD ADOPT
     17    THAT AS ONE OF THEIR REDISTRICTING CRITERIA, BUT HERE'S THE
     18    PROBLEM.  HERE IN LOUISIANA, BY ADOPTING THAT -- BECAUSE WE
     19    JUST HEARD AS KIND OF A FUNDAMENTAL CRITERION, REDISTRICTING
     20    THAT FREEZES IN THE EXISTING PACKING AND CRACKING UNDER THE
     21    PREVIOUS PLAN; THAT IS, THE PREVIOUS PLAN, AS I EXPLAINED AT
     22    LENGTH IN MY REPORT, PACKS AFRICAN AMERICANS INTO CONGRESSIONAL
     23    DISTRICT 2, FAR BEYOND WHAT IS NECESSARY FOR AFRICAN AMERICANS
     24    TO ELECT CONGRESS, PERSONS OF THEIR CHOICE, AND THEN CRACKS
     25    AFRICAN AMERICANS IN THE OVERWHELMINGLY WHITE REPUBLICAN

04:05 1    DISTRICT SO THEY HAVE NO CHANCE WHATSOEVER.  NO MATTER HOW
        2    UNHAPPY THEY MIGHT BE WITH THEIR WHITE REPUBLICAN
        3    REPRESENTATIVES, THEY HAVE NO CHANCE TO VOTE THEM OUT OF
        4    OFFICE.  THEY ARE FREEZING IN THE INEQUITIES THAT YOU HAD
        5    PREVIOUSLY ESTABLISHED.
        6         IN FACT, IF CORE RETENTION WAS THE FUNDAMENTAL
        7    TALISMAN FOR REDISTRICTING AS OPPOSED TO OTHER REQUIREMENTS,
        8    THEN THERE NEVER WOULD HAVE BEEN A REMEDY FOR A DISCRIMINATORY
        9    REDISTRICTING PLAN.  YOU WOULD JUST BE REPLICATING THAT PLAN
        10   OVER AND OVER AND OVER AGAIN LIKE YOU ARE DOING HERE.
        11   **Q.**   DR. LICHTMAN, ARE YOU AWARE THAT THE PREVIOUS 2011
        12   CONGRESSIONAL PLAN WAS PRE-CLEARED BY THE U.S. DEPARTMENT OF
        13   JUSTICE?
        14   **A.**   ABSOLUTELY.  BUT ALL THAT MEANS IS THAT THE PLAN WAS NOT
        15   RETROGRESSIVE; THAT IS, IT DID NOT GO TO ZERO AFRICAN AMERICAN
        16   OPPORTUNITY DISTRICTS, AS OBJECTION LETTERS IN THE JUSTICE
        17   DEPARTMENT MAKE IT CRYSTAL CLEAR ARE LETTERS NOT INTERPOSING AN
        18   OBJECTION.  A PRE-CLEARANCE DOES NOT MEAN THAT A PLAN IS FREE
        19   OF VIOLATING THE VOTING RIGHTS ACT.  IT SIMPLY MEANS THAT THE
        20   PLAN WAS NOT RETROGRESSIVE WITH RESPECT TO THE PREVIOUS PLAN.
        21   **Q.**   CAN THE CURRENT CONGRESSIONAL PLAN BE JUSTIFIED BY AN
        22   INTEREST IN COMPACTNESS?
        23   **A.**   ABSOLUTELY NOT.  AS I POINT OUT IN MY ORIGINAL REPORT, BY
        24   FREEZING IN ESSENTIALLY THE SAME DISTRICT THAT YOU HAD IN THE
        25   POST-2010 REDISTRICTING PLAN, YOU ARE FREEZING IN PLACE A

04:07 1   DISTRICT THAT CANNOT BE JUSTIFIED ON THE TRADITIONAL GROUND OF

2   COMPACTNESS.

3            IN FACT, THE DISTRICT IS HIGHLY NONCOMPACT, AS I

4   EXPLAINED IN MY REPORT.  IT REACHES OUT A LONG FINGER.  IT IS

5   -- HAS VARIOUS OBTRUSIONS THAT ARE NOT SMOOTH OR SYMMETRICAL.

6   AND, IN FACT, IT CLOSELY REPRESENTS FROM WAY BACK WHEN ELBRIDGE

7   GERRY -- SALAMANDER -- THAT BROUGHT ON THE TERM

8   "GERRYMANDERING" IN THE FIRST PLACE.

9            SO THERE'S NOTHING ABOUT THIS DISTRICT THAT'S FROZEN

10   IN PLACE THAT COULD BE JUSTIFIED BY CREATING A COMPACT

11   DISTRICT.  AND THAT'S NOT SURPRISING WHEN YOU ARE PACKING

12   AFRICAN AMERICANS INTO A DISTRICT AND THEN CRACKING THEM

13   ELSEWHERE.  IT'S NOT SURPRISING THAT THE DISTRICT DOES NOT

14   CONFORM WITH COMPACTNESS.  YOU KNOW, YOU CONCEIVABLY IN ANOTHER

15   STATE, IN OTHER CIRCUMSTANCES YOU COULD HAVE A COMPACT DISTRICT

16   THAT PACKED THAT, BUT NOT HERE.  THAT'S NOT WHAT WAS DONE AND

17   THE PLAN CANNOT BE JUSTIFIED ON THAT BASIS.

18   **Q.**  AND JUST TO CLARIFY, THE DISTRICT YOU'RE REFERRING TO

19   THERE IS THE SECOND CONGRESSIONAL DISTRICT, THE MAP'S

20   MAJORITY-BLACK CONGRESSIONAL DISTRICT?

21   **A.**  THAT'S CORRECT.  IT'S OVERWHELMINGLY BLACK, OVERWHELMINGLY

22   DEMOCRATIC.  IT'S THE PACKED DISTRICT.  AND IN ALL THE OTHER

23   DISTRICTS ARE THE --

24   **Q.**  IS THE CURRENT BLACK VOTING AGE POPULATION OF THAT

25   DISTRICT NEEDED FOR BLACK VOTERS THERE TO ELECT THEIR PREFERRED

04:08 1 CANDIDATES?

2 **A.** ABSOLUTELY NOT. IT'S WAY BEYOND WHAT IS NECESSARY FOR

3 BLACKS TO ELECT CANDIDATES OF THEIR CHOICE. I THINK AN

4 ANALYSIS THAT I PRESENTED IN MY REPORT SAID THE FOURTH HIGHEST

5 BLACK POPULATION IN THE COUNTRY. AFRICAN AMERICANS WERE

6 WINNING THAT DISTRICT BY AN AVERAGE OF 80 PERCENT OR MORE. NO

7 CHANCE THAT AN AFRICAN-AMERICAN CANDIDATE OF CHOICE WOULD NOT

8 WIN THAT DISTRICT.

9 AS I SAID, THE COOK POLITICAL REPORT IN TERMS OF

10 THEIR PARTISAN VOTER INDEX THAT MEASURES PARTISAN STRENGTH HAS

11 THAT DISTRICT ABOUT A D PLUS 25. THAT MEANS IT'S 25 PERCENT

12 MORE -- 25 PERCENTAGE POINTS MORE THAN THE AVERAGE DEMOCRATIC

13 VOTE IN THE LAST TWO PRESIDENTIAL ELECTIONS, BOTH OF WHICH WERE

14 MAJORITY DEMOCRATIC.

15 AND SO -- AND IF YOU LOOK ALSO NATION-WIDE, AS I

16 POINT OUT IN MY REPORT, BLACK CANDIDATES OF CHOICE ALMOST

17 INVARIABLY WIN IN DISTRICTS THAT ARE EVEN BELOW 50 PERCENT,

18 THAT ARE 40 TO 50 PERCENT. AND THE REASON IS FAIRLY SIMPLE:

19 THAT IN THE 40 PERCENT RANGE, BLACKS DOMINATE THE DEMOCRATIC

20 PRIMARY, GET TO NOMINATE A CANDIDATE OF THEIR CHOICE. THEY

21 THEN VOTE OVERWHELMINGLY FOR THAT CANDIDATE IN THE GENERAL

22 ELECTION. AND YOU DON'T NEED MUCH IN THE WAY OF WHITE

23 CROSSOVER THEN FOR THAT CANDIDATE TO WIN IN A DISTRICT THAT'S

24 WITHIN THE 40 PERCENT RANGE.

25 **Q.** DR. LICHTMAN, DID YOU REVIEW THE REPORT PREPARED BY MR.

04:10  1  HEFNER IN THIS CASE?

2  **A.**   I DID.

3  **Q.**   AND HOW DOES MR. HEFNER ATTEMPT TO ANALYZE COMMUNITIES OF

4  INTEREST?

5  **A.**   YEAH.  MR. HEFNER INDICATES IN HIS REPORT THAT HE CAN'T

6  GIVE US A HARD-AND-FAST OBJECTIVE SPECIFIC DEFINITION OF WHAT

7  CONSTITUTES A COMMUNITY OF INTEREST.  IN FACT, HE SAYS TO A

8  GREAT EXTENT, UP TO THE PERCEPTIONS OF THE PEOPLE, THAT YOU ARE

9  LOOKING AT IN A GIVEN AREA, HE JUST TICKS OFF SOME GENERAL

10  BOXES LIKE POLITICS, ECONOMY, CULTURE, RESIDENCES, OCCUPATION.

11  THEN IN ORDER TO ANALYZE COMMUNITIES OF INTEREST IN THE

12  EXISTING PLAN, I PRESUME -- THOUGH HE DOESN'T ADDRESS MY REPORT

13  TO SAY THAT IT WASN'T TENUOUS BECAUSE OF RESPECTED COMMUNITIES

14  OF INTEREST, HE LOOKS AT FIVE BROAD REGIONS.  HIS REGIONS ARE

15  MUCH TOO BROAD TO ANALYZE WHAT'S GOING ON WITHIN A

16  CONGRESSIONAL DISTRICT, WHICH, OF COURSE, CUTS ACROSS THESE

17  REGIONS.

18       IN ADDITION, IT'S NOT GOOD ENOUGH TO LOOK AT REGIONS

19  AS COMPARED TO ONE ANOTHER BECAUSE THEY ARE SO BIG:  FIVE OF

20  THEM FOR THE WHOLE STATE.  YOU'VE GOT TO LOOK WITHIN.  THIS IS

21  THE STANDARD SOCIAL SCIENCE WITHIN DIFFERENCES AS COMPARED TO

22  BETWEEN DIFFERENCES.

23       SO I TOOK, FOR EXAMPLE, ONE OF HIS REGIONS ANCHORED

24  IN THE CITY OF NEW ORLEANS AND I LOOKED AT THE EXTENT TO WHICH

25  BLACKS AND WHITES IN THE CITY OF NEW ORLEANS, ACCORDING TO HIS

04:12 1    CRITERIA, BASICALLY CONSTITUTE A COMMUNITY OF INTEREST AND OF

2    COURSE, THEY DON'T SHARE A COMMON HISTORY OF DISCRIMINATION.

3    THEY DON'T SHARE A COMMON ANCESTRY.  THEY DON'T SHARE COMMON

4    POLITICS OR POLITICAL VALUES.  THEY DON'T -- LET'S SEE.  THEY

5    DON'T HAVE THE SAME OCCUPATIONS.

6            AND I DRILLED FURTHER.  I LOOKED AT DO THEY SHARE THE

7    SAME RESIDENCE AND DO THEY GO TO THE SAME SCHOOLS BEYOND ALL OF

8    THESE OTHER FACTORS?  IN OTHER WORDS, TO WHAT EXTENT ARE THEY

9    REALLY INTEGRATED WITHIN THE CITY OF NEW ORLEANS AS A

10   COMMUNITY.  AND I LOOKED AT MEASURES OF SEGREGATION AND FOUND

11   THAT MEASURES OF SEGREGATION WERE QUITE EXTREME IN NEW ORLEANS.

12   MORE THAN 60 PERCENT OF BLACKS WOULD HAVE TO RELOCATE TO CREATE

13   INTEGRATION, AND THAT THERE WAS ALSO SIMILAR LACK OF

14   INTEGRATION FROM THE SCHOOL.

15           SO WHEN YOU LOOK AT THE CITY OF NEW ORLEANS, AN

16   ANCHOR IN ONE OF HIS FIVE REGIONS, WE SEE BLACKS AND WHITES

17   HAVE VERY LITTLE IN COMMON TO CONSTITUTE WITHIN THAT REGION A

18   COMMUNITY OF INTEREST.

19   **Q.**   AND DID MR. HEFNER SHOW THAT BLACK AND WHITE LOUISIANIANS

20   IN THE FIVE MAJORITY-WHITE DISTRICTS IN THE CONGRESSIONAL MAP

21   SHARE COMMONALITIES?

22   **A.**   NO.  HIS ANALYSIS COULDN'T POSSIBLY SHOW THAT BECAUSE,

23   AGAIN, IT'S BASED UPON THESE BROAD REGIONAL -- THESE REGIONAL

24   AREAS WHICH CONGRESSIONAL DISTRICTS CUT ACROSS AND WHERE HE

25   DOESN'T ANALYZE WITHIN AS OPPOSED TO BETWEEN.

04:14 1        SO I LOOKED AT THE COMMONALITY BETWEEN WHITES AND

2  BLACKS ACROSS LOUISIANA.  AND, AGAIN, THEY DON'T HAVE COMMON

3  ANCESTRY; THEY DON'T HAVE COMMON POLITICS; THEY DON'T HAVE

4  COMMON EXPERIENCE IN HISTORY DISCRIMINATION; THEY DON'T HAVE

5  COMMONALITY IN TERMS OF THE FAILURE OF THE STATE TO MEET THEIR

6  PARTICULARIZED NEEDS.  I ALSO LOOKED AT RESIDENTIAL AND SCHOOL

7  SEGREGATION ACROSS LOUISIANA AND FOUND THAT BLACKS AND WHITES

8  DON'T LIVE TOGETHER; THEY DON'T GO TO THE SAME SCHOOLS.

9        I ALSO LOOKED AT A VARIETY OF OTHER INDICATORS

10  HIGHLIGHTED BY MR. HEFNER.  I FOUND THAT ACROSS LOUISIANA

11  BLACKS AND WHITES DON'T HAVE THE SAME FAMILY STRUCTURE; THEY

12  DON'T HAVE THE SAME LEVELS OF INCOME OF POVERTY OR DEPENDENCE

13  UPON WELFARE PROGRAMS OR UNEMPLOYMENT; THEY DON'T LIVE IN THE

14  SAME KINDS OF HOMES, WITH AFRICAN AMERICANS FAR MORE LIKELY TO

15  BE RENTERS THAN HOMEOWNERS; THEY DON'T HAVE THE SAME ACCESS TO

16  VEHICLES OR BROADBAND INTERNET; THEY DON'T HAVE THE SAME

17  EDUCATIONAL ATTAINMENT; THEY DON'T HAVE THE SAME EDUCATIONAL

18  PROFICIENCY; AND THEY DON'T WORK IN THE SAME JOBS OR

19  OCCUPATIONS.

20        SO THERE IS NO BASIS FOR -- DR. ALFORD DOESN'T

21  ANALYZE IT BY LOOKING DEEPER.  THERE IS NO BASIS FOR CLAIMING

22  THAT IN THESE FIVE WHITE-REPUBLICAN-DOMINATED DISTRICTS THAT

23  THE AFRICAN AMERICANS IN THOSE DISTRICTS SHARE A COMMUNITY OF

24  INTEREST WITH WHITES.

25  **Q.**  AT THE END OF THE DAY, DR. LICHTMAN, HOW MANY OF THE

04:15 1  SENATE FACTORS SUPPORT A FINDING OF VOTE DILUTION IN LOUISIANA?

2  **A.**   ESSENTIALLY ALL OF THEM WHEN YOU LOOK AT THE WAY I

3  ANALYZED THE SLATING FACTOR.  AND IT'S IMPORTANT TO UNDERSTAND

4  -- I THINK I ALLUDED TO EARLIER IN MY TESTIMONY THAT THESE

5  FACTORS DO NOT OPERATE IN ISOLATION.  THEY ARE SUITED JUST --

6  THEY COMBINE TO IMPEDE THE OPPORTUNITIES FOR AFRICAN AMERICANS

7  TO PARTICIPATE IN THE POLITICAL PROCESS AND ELECT CANDIDATES OF

8  THEIR CHOICE.

9       SO HISTORICAL AND ONGOING DISCRIMINATION LEADS TO

10  SOCIOECONOMIC DISPARITIES, WHICH, IN TURN, LEAD TO IMPEDIMENTS

11  FOR AFRICAN AMERICANS TO PARTICIPATE IN THE POLITICAL PROCESS

12  AND ELECT CANDIDATES OF THEIR CHOICE; SOME TO THE MAJORITY-VOTE

13  RUNOFF REQUIREMENT CONTRIBUTES TO THAT.  AND, IN TURN, THAT

14  CONTRIBUTES TO A LACK OF REPRESENTATION IN A GOVERNMENT

15  DOMINATED BY WHITES AT EVERY LEVEL IN LOUISIANA, WHICH, IN

16  TURN, LEADS TO THE FAILURE OF THE STATE TO MEET THE

17  PARTICULARIZED NEEDS OF AFRICAN AMERICANS AND, IN TURN, LEADS

18  TO THE ADOPTION OF A REDISTRICTING PLAN THAT FREEZES IN PLACE A

19  PLAN THAT PACKS AFRICAN AMERICANS INTO A NON-COMPACT DISTRICT

20  AND THEN CRACKS AFRICAN AMERICANS INTO OTHER DISTRICTS WHERE

21  THEY HAVE NO CHANCE TO ELECT CANDIDATES OF THEIR CHOICE.

22  STANDARD VOTE DILUTION, PACKING AND CRACKING.  SO YOU CAN'T

23  JUST LOOK AT THESE FACTORS IN ISOLATION.  YOU HAVE TO SEE HOW

24  THEY -- ONE IMPACTS ANOTHER.

25  **Q.**   THANK YOU, DR. LICHTMAN.

04:17  1          MR. HAWLEY:  YOUR HONOR, I'D LIKE TO MOVE EXHIBITS

       2   GX-3 AND GX-31 INTO EVIDENCE.  THOSE ARE DR. LICHTMAN'S INITIAL

       3   REPORT AND HIS REBUTTAL EXPERT REPORT.

       4          THE COURT:  IS THERE ANY OBJECTION?

       5          MR. BRADEN:  NO OBJECTIONS, YOUR HONOR.

       6          THE COURT:  OKAY.

       7          MR. HAWLEY:  THANK YOU.  NO FURTHER QUESTIONS AT THIS

       8   TIME.

       9          THE COURT:  THE EXHIBITS ARE ADMITTED.

      10              CROSS-EXAMINATION, SIR?

      11                     **CROSS-EXAMINATION**

      12   **BY MR. BRADEN:**

      13   **Q.**   MY NAME IS MARK BRADEN.

      14   **A.**   I LOST YOU.  I DON'T KNOW WHAT HAPPENED.

      15   **Q.**   I'VE GOT YOU, BUT YOU --

      16          **THE COURT:**  WE STILL HAVE YOU.  JUST A MOMENT.

      17          **THE WITNESS:**  I DON'T SEE YOU, FOR SOME REASON.

      18          **THE COURT:**  OUR CAMERA MAY BE -- JUST GIVE US A

      19   SECOND.  THERE WE GO.

      20              IS THAT BETTER?

      21          **THE WITNESS:**  MUCH BETTER.  THANK YOU.

      22          **THE COURT:**  OKAY.  SPELL YOU LAST NAME, COUNSEL.

      23          **MR. BRADEN:**  B-R-A-D-E-N.

      24          **THE COURT:**  THANK YOU, SIR.

      25          **MR. BRADEN:**  FIRST NAME IS MARK.

04:18  1              **THE COURT:**  THANK YOU.

2              **MR. BRADEN:**  THANK YOU.

3                     AND I REPRESENT THE DEFENDANT INTERVENING

4        LEGISLATIVE GROUP.

5        **BY MR. BRADEN:**

6        **Q.**   DR. LICHTMAN, GOOD TO SEE YOU AGAIN.

7        **A.**   GOOD TO SEE YOU AGAIN.  ALWAYS A PLEASURE.

8        **Q.**   THANK YOU.

9                I'M SORRY THAT YOU ARE NOT ABLE TO ATTEND IN PERSON.

10       WE CERTAINLY WOULD HAVE ENJOYED YOUR TESTIMONY IN PERSON HERE

11       RATHER THAN REMOTE.

12       **A.**   THANK YOU.

13       **Q.**   I WILL TRY NOT TO ASK TOO MUCH -- FILL UP TOO MUCH OF THE

14       REST OF YOUR AFTERNOON, BUT I DO HAVE SOME SPECIFIC QUESTIONS.

15       IF WE COULD GO TO YOUR REPORT AND PAGE 28 OF YOUR REPORT.

16             **MR. BRADEN:**  IF WE COULD BRING THAT UP.  THAT'S GX-3

17       OR 003.  AND IF WE COULD GO TO PAGE 28.

18       **BY THE WITNESS:**

19       **A.**   OKAY.

20       **BY MR. BRADEN:**

21       **Q.**   I BELIEVE YOU JUST TESTIFIED TO THIS, BUT LET ME JUST

22       SIMPLY CONFIRM.  YOU TESTIFIED AS TO WHITE CROSSOVER VOTING

23       EARLIER, I BELIEVE?

24       **A.**   I TESTIFIED BOTH TO BLACK COHESION AND WHITE CROSSOVER

25       VOTING, THAT'S CORRECT.

04:20 1    **Q.**   OKAY.  SO ON YOUR REPORT HERE YOU ARE PROJECTING IN SOME

2    RACES WHITE CROSSOVER IN EXCESS OF 25 PERCENT, OF MORE THAN A

3    QUARTER?

4    **A.**   I'M NOT PROJECTING.  THESE ARE THE EXIT POLL RESULTS

5    SUBSEQUENT TO THE ELECTION.  THEY ARE NOT A PROJECTION ON THESE

6    ELECTIONS.

7    **Q.**   OKAY.  THAT'S CORRECT.

8           AND YOU HAVE A CHART SHOWING THIS TOO, I BELIEVE?

9    **A.**   SURE.

10   **Q.**   THIS WOULD BE CHART 1?

11   **A.**   SURE.  DO YOU WANT TO GO TO THAT?

12   **Q.**   WE SHOULD ABSOLUTELY GO TO THAT.

13          **MR. BRADEN:**   IF WE COULD BRING THAT UP.

14   **BY THE WITNESS:**

15   **A.**   WHAT PAGE?

16   **BY MR. BRADEN:**

17   **Q.**   I BELIEVE THAT IS OO68, CHART 1.

18   **A.**   GOT IT.

19   **Q.**   SO IT'S YOUR VIEW THAT THE RECORD SHOWS WHITE CROSSOVER

20   VOTING RANGING FROM 20 PERCENT TO 26 PERCENT IN THE THREE

21   ELECTIONS ON THE CHART?

22   **A.**   THAT'S CORRECT.

23   **Q.**   OKAY.  AND YOU ALSO BELIEVE -- IF YOU GO TO PAGE 62 OF

24   YOUR REPORT.  AND I ALSO BELIEVE YOU JUST TESTIFIED TO THIS,

25   BUT LET ME JUST SIMPLY CONFIRM IT -- THAT THE BLACK CANDIDATE

04:21 1  OF CHOICE CAN WIN IN A DISTRICT AS LOW AS 40 PERCENT MINORITY

2  POPULATION?

3  **A.**  IN THE 40 PERCENT RANGE.  YOU KNOW, MAYBE NOT QUITE AT 40,

4  BUT CERTAINLY IN -- BELOW 50 PERCENT, IN THE 40 PERCENT RANGE,

5  ABSOLUTELY.  AND THE CROSSOVER AND COHESION NUMBERS BEAR THAT

6  OUT.  SAY YOU HAD 45 PERCENT AFRICAN-AMERICAN VOTERS IN A

7  DISTRICT -- I CAN DO THE MATH FOR YOU AS SOON AS I GET ON MY --

8  **Q.**  PLEASE DO.

9  **A.**  YEAH.  OKAY.  SO WE GOT 45 PERCENT TIMES 95, THAT'S 42.75.

10  THEN WE CAN ROUND THAT OFF TO 43 TO MAKE IT EASY.  OKAY.  AND

11  THEN WE HAVE 55 PERCENT NONBLACK.  AND BY THE WAY, THE NONBLACK

12  WOULD INCLUDE NOT JUST WHITES.  YOU GOT TO UNDERSTAND THAT.

13  **Q.**  UH-HUH.

14  **A.**  IT WOULD ALSO INCLUDE HISPANICS AND OTHERS.  BUT LET'S

15  JUST ASSUME IT'S JUST WHITES AND IT'S 25 PERCENT.  SO THAT'S

16  13.75 AND ROUND IT OFF.  TO MAKE IT SIMPLE, AN EVEN 13.  THAT'S

17  56 PERCENT FOR THE BLACK CANDIDATE OF CHOICE.

18  **Q.**  OKAY.  SO IF I UNDERSTAND THOSE NUMBERS RIGHT, THERE WOULD

19  BE NO COMPELLING NEED FOR THE STATE OF LOUISIANA TO CREATE

20  DISTRICTS OF MORE THAN 50 PERCENT TO ELECT A BLACK CANDIDATE OF

21  CHOICE IN CONGRESSIONAL RACES?

22  **A.**  WELL, YOU HAVE TO DO THE DISTRICT-SPECIFIC ANALYSIS.  THIS

23  IS JUST GENERIC, BUT IF YOU COULD -- IN MY VIEW -- AND THIS IS

24  GENERIC.  I HAVEN'T DONE THE DETAILED DISTRICT-SPECIFIC

25  ANALYSIS.  BUT, FOR EXAMPLE, IN MY NORTH CAROLINA TESTIMONY IN

04:23 1   THE *COVINGTON* CASE WHERE THE COURT ACCEPTED IT, I POINTED OUT

2   INDEED AFRICAN-AMERICAN CANDIDATES COULD WIN IN THE 40 PERCENT

3   RANGE.  AND THAT WAS A PARTICULARIZED ANALYSIS OF EACH

4   DISTRICT.  BUT I CERTAINLY WOULDN'T RULE OUT IF THE STATE COULD

5   CREATE TWO DISTRICTS THAT ARE 45 PERCENT AFRICAN AMERICAN IN

6   THEIR VOTING AGE POPULATION, GIVEN THAT THERE'S GOING TO BE

7   HISPANICS AND OTHERS IN THAT DISTRICT WHO DO TEND TO VOTE

8   DEMOCRATIC.  AND, AGAIN, DEPENDING UPON THE DISTRICT'S SPECIFIC

9   ANALYSIS, THAT COULD GIVE AFRICAN AMERICANS AN OPPORTUNITY TO

10   ELECT CANDIDATES OF THEIR CHOICE.  BUT, AGAIN, I'M SPEAKING

11   GENERICALLY.

12   **Q.**   THANK YOU.

13        DR. LICHTMAN, WHEN WERE YOU FIRST CONTACTED ABOUT

14   WORKING ON LOUISIANA CONGRESSIONAL REDISTRICTING THIS CYCLE?

15   **A.**   I REALLY DON'T REMEMBER.  I'VE BEEN INVOLVED IN MAYBE TEN

16   CASES IN THIS POST-20' --

17   **Q.**   I CAN SYMPATHIZE.

18   **A.**   SEVERAL MONTHS AGO, AT LEAST.

19   **Q.**   OKAY.  DO YOU KNOW IF YOU WERE WORKING ON THIS PRIOR TO

20   THE LEGISLATIVE SESSION THAT RESULTED IN THE PASSAGE OF THE

21   FIRST PLAN AND SECOND PLANS OR THE VETO OVERRIDE PLAN?  DO YOU

22   --

23   **A.**   REFRESH ME.  IS THIS FEBRUARY OF 2022?

24   **Q.**   YEAH, FEBRUARY.  WERE YOU WORKING IN FEBRUARY ON IT?

25   **A.**   I'M SURE I WAS WORKING IN FEBRUARY.

04:25
| | |
|---|---|
| 1 | **Q.**  OKAY.  AND DO YOU KNOW WHO CONTACTED YOU IN REGARDS TO |
| 2 | THAT? |
| 3 | **A.**  THE ALLIANCE ATTORNEYS. |
| 4 | **Q.**  OKAY.  AND DID YOU PLAY ANY ROLE OR PROVIDE ANY |
| 5 | INFORMATION TO THE LEGISLATURE DURING THE PROCESS? |
| 6 | **A.**  NO. |
| 7 | **Q.**  OKAY.  SO IS THIS A LITTLE LIKE DÉJÀ VU WITH YOU?  WEREN'T |
| 8 | YOU AN EXPERT WITNESS IN THE 1990'S ON LOUISIANA CONGRESSIONAL |
| 9 | REDISTRICTING? |
| 10 | **A.**  OH, MY GOD, THAT WAS -- I DON'T REMEMBER IT VERY WELL, BUT |
| 11 | THAT WAS ONE OF THOSE SHORT BASES WHERE I WAS WORKING FOR THE |
| 12 | UNITED STATES DEPARTMENT OF JUSTICE, AND I THINK IT WAS A VERY |
| 13 | DIFFERENT -- I DON'T REMEMBER IT REALLY WELL.  IT WAS 30 YEARS |
| 14 | AGO. |
| 15 | **Q.**  OH, OKAY. |
| 16 | **A.**  I'M PRETTY MUCH SURE I WAS WORKING FOR JUSTICE, AND I |
| 17 | DON'T THINK WE WERE PLAINTIFFS, BUT I DON'T REMEMBER. |
| 18 | **THE COURT:**  OKAY.  SHE WASN'T ABLE TO TAKE ANY OF |
| 19 | THAT TESTIMONY. |
| 20 | DR. LICHTMAN, IS THERE A POSSIBILITY THAT YOU |
| 21 | ARE INTERFERING MAYBE WITH YOUR MICROPHONE OR SOMETHING, |
| 22 | BECAUSE WE -- THE COURT REPORTER -- NONE OF US COULD MAKE OUT |
| 23 | ANY OF THAT, ANY OF YOUR LAST ANSWER. |
| 24 | **THE WITNESS:**  OH, I DIDN'T DO ANYTHING.  I CAN TURN |
| 25 | IT DOWN MORE IF YOU WANT. |

04:26  1           **THE COURT:**  NO.  I DON'T THINK IT'S --

2            **THE WITNESS:**  I'M 75 AND TECHNOLOGICALLY CHALLENGED.

3  DO YOU WANT ME TO REPEAT THAT TESTIMONY, YOUR HONOR?

4            **THE COURT:**  YES, SIR.  AND IT SEEMS BETTER, SO MAYBE

5  THE VOLUME HELPED.

6              **THE WITNESS:**  ALL RIGHT.  LET ME TRY AGAIN.

7              **THE COURT:**  IF YOU HAVE TROUBLE HEARING --

8              **THE WITNESS:**  AND LET ME KNOW IF IT WORKS.

9              **THE COURT:**  OKAY.

10            **THE WITNESS:**  I'LL TRY TO REPLICATE IT.

11            **THE COURT:**  IF YOU HAVE --

12  **BY THE WITNESS:**

13  **A.**    SO AS I SAID, THAT WAS --

14            **THE COURT:**  IF YOU HAVE --

15  **BY THE WITNESS:**

16  **A.**    -- 30 YEARS AGO.  I DON'T REMEMBER IT REAL WELL, BUT I DO

17  REMEMBER I WAS HIRED, I BELIEVE, BY THE UNITED STATES

18  DEPARTMENT OF JUSTICE TO DEFEND THEIR POLICIES, AND I DON'T

19  BELIEVE THAT WE WERE PLAINTIFFS IN THAT CASE.  WE MIGHT HAVE

20  BEEN DEFENDANTS.  YOU KNOW, LIKE THAT WHOLE ROUND OF POST --

21  **BY MR. BRADEN:**

22  **Q.**    YOU DON'T --

23  **A.**    DEFENDANTS HAD VERY LITTLE CHANCE.

24  **Q.**    MIGHT YOU HAVE BEEN HIRED BY THE DEMOCRAT LEADERSHIP OF

25  THE STATE:  THE STATE, THE GOVERNOR, THE LEGISLATURE, THE

04:27 1 DEFENDANTS IN THE CASE?

2 **A.** ANYTHING IS POSSIBLE. I KNOW FOR SOME OF THOSE CASES I

3 WAS HIRED BY JUSTICE.

4 **Q.** OKAY.

5 **A.** I DON'T REMEMBER, BECAUSE IT WAS 30 YEARS AGO, WHO I WAS

6 HIRED BY IN THIS CASE.

7 **Q.** OKAY.

8 **A.** I KIND OF ASSUMED IT WAS JUSTICE, BUT I DON'T RECALL.

9 **Q.** I WOULD REPRESENT TO YOU AND TO THE COURT, MY

10 UNDERSTANDING IS THAT YOU WERE AN EXPERT FOR THE DEFENDANTS,

11 WHICH WAS THE STATE OF LOUISIANA. AT LEAST THAT'S THE WAY I --

12 **A.** I KNOW I REPRESENTED DEFENDANTS.

13 **Q.** YEAH.

14 **A.** I DON'T KNOW IF I WAS HIRED BY THE STATE OF LOUISIANA OR

15 BY JUSTICE.

16 **Q.** OKAY.

17 **A.** BUT I WON'T ARGUE WITH YOU.

18 **Q.** YEAH.

19 **A.** BECAUSE I DON'T HAVE A RECOLLECTION.

20 **Q.** SO DO YOU --

21 **A.** SO WHATEVER YOU SAY, I'M NOT GOING TO DISPUTE IT.

22 **Q.** DO YOU REMEMBER THAT YOU WERE ARGUING ON BEHALF OF A PLAN,

23 A 1990'S PLAN, THAT HAD SEVEN DISTRICTS OF WHICH TWO WERE BLACK

24 AND FIVE WHITE MAJORITY?

25 **A.** I DON'T REMEMBER. I DON'T REMEMBER THAT DETAIL.

04:28 1   **Q.**   OKAY.

2   **A.**   BUT, AGAIN, IF YOU WANT TO REPRESENT THAT --

3   **Q.**   OKAY.

4   **A.**   -- I'M NOT GOING TO ARGUE, BUT I DON'T RECALL THE SPECIFIC

5   COMPOSITION.  WHEN YOU SAY TWO ARE BLACK, DOES THAT MEAN

6   MAJORITY BLACK?

7   **Q.**   YES.

8   **A.**   OR 40 PERCENT BACK?  I DON'T REMEMBER.

9   **Q.**   YEAH, TWO BLACK MAJORITY.  THERE WERE -- THERE WERE MORE

10   CONGRESSIONAL DISTRICTS IN LOUISIANA, ONE MORE IN THAT CYCLE.

11   SO AT THAT TIME MY UNDERSTANDING OF READING THE RECORD IS THAT

12   YOU WERE WORKING AS AN EXPERT FOR THE DEFENDANTS TRYING TO

13   DEFEND THE TWO BLACK DISTRICTS IN THE SEVEN-DISTRICT PLAN AND

14   THAT THE COURT HELD THAT THE PLAN WAS AN UNCONSTITUTIONAL

15   RACIAL GERRYMANDER.  DOES THAT RING ANY BELLS WITH YOU?

16   **A.**   NOT ALL OF IT, BUT DEFINITELY I KNOW WE LOST THAT CASE.

17   **Q.**   YEAH.

18   **A.**   LIKE ALL THOSE OTHER CASES, YEAH.

19   **Q.**   YEAH.

20   **A.**   THAT'S ALL I REMEMBER.  I DON'T REMEMBER THE DETAILS OF

21   THE PLAN, BUT I DON'T DISPUTE YOU.

22   **Q.**   YEAH.  AND NOW YOU ARE WITH THE COURT HERE WITH THE

23   PLAINTIFFS WHO ARE ARGUING FOR TWO BLACK SEATS IN A SIX-MEMBER

24   DISTRICT PLAN.  CORRECT?

25   **A.**   I'VE NOT EXAMINED ANY PLANS PRESENTED BY PLAINTIFFS, BUT I

04:29 1  PRESUME THAT'S WHAT WE'RE DOING.

2  **Q.**   OKAY.  AND YOU DON'T REMEMBER WHETHER OR NOT THE COURT IN

3  THE *HAYS* CASE VERSUS THE STATE OF LOUISIANA IN 1993 -- YOU

4  DON'T REMEMBER WHETHER OR NOT THE COURT CREDITED YOUR

5  TESTIMONY?

6  **A.**   I'M SURE THEY DIDN'T, SINCE WE LOST THE CASE.

7  **Q.**   YEAH.

8  **A.**   NORMALLY WHEN YOU LOSE A CASE, THE COURT DOES NOT CREDIT

9  YOUR TESTIMONY.  BUT THAT'S ALL I REMEMBER THAT WE LOST.

10  **Q.**   YEAH.  IF WE COULD -- MAYBE I CAN -- MAYBE I CAN REFRESH

11  YOUR RECOLLECTION.

12      **MR. BRADEN:**  IF WE GO TO -- IF WE CAN BRING UP A COPY

13  OF THE *HAYS VERSUS STATE OF LOUISIANA*.  IT'S AT 839, F. SUPP

14  1188.

15  **BY MR. BRADEN:**

16  **Q.**   I WISH I COULD HAND YOU A COPY OF IT, BUT I BELIEVE WE CAN

17  BRING IT UP ON THE SCREEN.  AND JUST REALLY QUICKLY, I BELIEVE

18  THERE'S A FOOTNOTE 48 AT PAGE 1203.  SO IF YOU COULD TAKE A

19  MINUTE AND LOOK AT PARAGRAPH 48 -- OR FOOTNOTE 38 AND SEE

20  WHETHER OR NOT THAT REFRESHES YOUR RECOLLECTION AS TO THE

21  COURT'S VIEW ON YOUR TESTIMONY.

22  **A.**   I DON'T SEE IT.  I'M SORRY.  I JUST SEE THE HEADING.

23  **Q.**   OKAY.  THERE'S A FOOTNOTE 48.  I HAVE IT ON -- I BELIEVE

24  IT'S PAGE --

25      **MR. BRADEN:**  WERE YOU ABLE TO BRING UP THE PAGE?

04:31 1 IT'S 46 OF 50.  I'M SORRY.

2 **BY MR. BRADEN:**

3 **Q.**   I'M LOOKING AT THIS.  I HAVE IT IN MY HAND AND IT DOESN'T

4 DO YOU ANY GOOD.  I PRINTED A COPY OUT HERE FOR YOU, BUT IT

5 DOESN'T DO MUCH GOOD TO TRY TO HAND YOU A PRINTED COPY OVER

6 ZOOM.  THERE WE GO.  THAT'S FOOTNOTE 48.

7 **MR. BRADEN:**  AND COULD YOU JUST HIGHLIGHT IT FOR HIM

8 AND BRING IT UP AND MAKE IT LARGER.  HE HAS PROBABLY THE SAME

9 EYESIGHT THAT I DO.

10 **BY THE WITNESS:**

11 **A.**   NOW I CAN SEE IT.

12 **BY MR. BRADEN:**

13 **Q.**   OKAY.  GREAT.  AND IT'S EASY TO PICK OUT.  THERE'S A

14 COUPLE OF REFERENCES TO YOU, WHICH I'LL GET IT ITALICIZED.

15 **A.**   LET ME READ IT.

16 **Q.**   YEP.

17 **A.**   BECAUSE I DON'T REMEMBER IT.

18 **Q.**   GREAT.

19 **A.**   I'M SURE THIS WILL HELP REFRESH MY MEMORY, BUT I NEED A

20 MINUTE OR TWO.

21 **Q.**   OH, ABSOLUTELY.

22 **A.**   I'M OLD AND SLOW.

23 **Q.**   ABSOLUTELY.

24 **A.**   GOT IT.

25 **Q.**   OKAY.

04:32   1   **A.**   IT DOESN'T REFRESH MY MEMORY PARTICULARLY, BUT I
    2   UNDERSTAND WHAT THEY'RE SAYING.
    3   **Q.**   OKAY.
    4   **A.**   SO YOU CAN ASK ME QUESTIONS ABOUT IT.  IT'S PRETTY
    5   SELF-EXPLANATORY.
    6   **Q.**   AND THEN IT SHOULD BE I BELIEVE CLEAR THAT THE COURT
    7   REJECTED YOUR EXPERT TESTIMONY IN SUPPORT OF A PLAN WITH TWO
    8   BLACK SEATS.  AM I CORRECT?
    9   **A.**   RIGHT.  BUT THAT'S THE EXACT OPPOSITE OF WHAT HE HAVE HERE
  10   WHERE IT'S DEFENDANTS WHO HAVE PACKED BLACKS INTO A SINGLE
  11   DISTRICT FAR BEYOND WHAT WAS NECESSARY TO ELECT BLACK
  12   CANDIDATES OF CHOICE.  SO I DON'T SEE HOW THIS CRITICISM -- AND
  13   I'M NOT DISPUTING WHAT THE COURT SAYS -- RELATES TO THE CURRENT
  14   SITUATION IN LOUISIANA.
  15       **THE COURT:**  COUNSEL, MR. HAWLEY IS ABOUT TO
  16   INTERNALLY COMBUST.
  17       **MR. HAWLEY:**  OH, SORRY, YOUR HONOR.  MR. BRADEN, CAN
  18   I --
  19       **THE DEPUTY CLERK:**  COULD YOU GET TO THE MICROPHONE,
  20   PLEASE?
  21       **THE COURT:**  MR. HAWLEY, WE CAN'T HEAR YOU.
  22       **MR. HAWLEY:**  I'M SORRY.  I WAS JUST ASKING MR. BRADEN
  23   FOR A COPY OF THE DEMONSTRATIVE THAT HE'S USING.  THANK YOU,
  24   YOUR HONOR.
  25       **THE COURT:**  EMERGENCY AVERTED.  YOU MAY CONTINUE.

04:33 1  BY MR. BRADEN:

2  Q.   AND SO YOU DON'T REMEMBER THE HOLDING IN THIS CASE

3  REJECTING THE PLAN AS A RACIAL GERRYMANDER; IT HAD TWO BLACK

4  SEATS?  YOU JUST DON'T HAVE ANY RECOLLECTION OF THAT?

5  A.   I DO REMEMBER THE STATE LOST THE CASE.  I DON'T REMEMBER

6  THE DETAILS OR THE FINDING, BUT IT PROBABLY WAS RACIAL

7  GERRYMANDERING.

8  Q.   OKAY.

9  A.   AND I THINK IT'S THE SAME CASE AS WHAT THE STATE IS DOING

10  NOW.

11  Q.   IF YOU CAN'T REMEMBER, WE'LL JUST MOVE ON FROM THERE.

12       IN YOUR REPORT IN THIS CASE DO YOU PROVIDE ANY

13  GEOGRAPHIC ANALYSIS SHOWING WHETHER OR NOT THE BLACK POPULATION

14  HAS BECOME MORE COMPACT IN THE CASE OR GEOGRAPHICALLY

15  CONCENTRATED SINCE THE 1990'S?  IS THE GEOGRAPHY --

16  A.   I'VE NOT ANALYZED PLANS IN THIS CASE.

17  Q.   OKAY.  IT'S REALLY MORE OF A --

18  A.   SO I CAN'T ANSWER THAT QUESTION ONE WAY OR THE OTHER.  YOU

19  WOULD HAVE TO ASK THE PLAN DRAWERS.

20  Q.   OKAY.  I REALLY WASN'T ASKING YOU ABOUT THE PLANS.  I WAS

21  ASKING YOU ABOUT THE DISPERSION OF THE BLACK POPULATION IN THE

22  STATE OF LOUISIANA.  DO YOU HAVE ANY FAMILIARITY WITH THAT?

23  A.   I DIDN'T LOOK AT THAT.

24  Q.   OKAY.  AND JUST LET ME USE MARYLAND AS AN EXAMPLE.  AND SO

25  MAYBE THIS WILL ENABLE YOU TO ANSWER THE QUESTION AS TO WHETHER

04:35 1    THERE'S BEEN A CHANGE IN THAT.  IN MARYLAND THE BLACK
      2    POPULATION IS ESSENTIALLY CONCENTRATED IN ONE OR TWO URBAN
      3    AREAS, DEPENDING ON HOW YOU DEFINE "URBAN AREAS":  THE
      4    WASHINGTON-BALTIMORE CORRIDOR, AND THE REST OF THE STATE IS
      5    PREDOMINANTLY WHITE?
      6    **A.**   WASHINGTON --
      7    **Q.**   -- BALTIMORE.
      8    **A.**   IT'S NOT QUITE THE CORRIDOR BECAUSE YOU HAVE IN THE
      9    WASHINGTON SUBURBS TWO VERY LARGE COUNTIES:  PRINCE GEORGE'S
     10    COUNTY AND MONTGOMERY COUNTY, WHICH ARE NOT NECESSARILY THE
     11    CORRIDOR.  AND PRINCE GEORGE'S COUNTY IS VERY HEAVILY BLACK.
     12    AND WHILE MONTGOMERY COUNTY IS NOT MAJORITY BLACK, IT HAS A
     13    VERY SUBSTANTIAL BLACK POPULATION AS WELL.  AND IT'S VERY BIG.
     14    IT'S GOT OVER A MILLION PERSONS IN LARGE GEOGRAPHIC.  SO IT'S
     15    CERTAINLY NOT TRUE THAT IN MY HOME STATE THE AFRICAN-AMERICAN
     16    POPULATION IS VERY NARROWLY CONCENTRATED IN CONFINED
     17    GEOGRAPHICAL AREAS.
     18    **Q.**   SO YOU WOULDN'T -- YOU DON'T BELIEVE THAT A MAJORITY OF
     19    THE BLACK POPULATION IN MARYLAND LIVES IN WHAT WOULD BE
     20    CONSIDERED EITHER URBAN OR SUBURBAN AREAS?
     21    **A.**   YOU KNOW, MONTGOMERY COUNTY YOU CAN CALL URBAN.  IT'S
     22    REALLY SUBURBAN.  CERTAINLY THERE IS A CORRELATION BETWEEN
     23    GEOGRAPHIC AREA AND BLACK POPULATION, ABSOLUTELY.  THERE
     24    CERTAINLY IS A DEGREE OF CONCENTRATION THERE THAT CAN AFFECT
     25    THE DRAWING OF DISTRICTS.

04:37 1    Q.   AND SO --

2    A.   BUT IT'S NOT JUST CONFINED TO A VERY NARROWLY

3    CIRCUMSCRIBED CITY.

4    Q.   AND SO YOU DON'T -- I'M GOING TO WASTE YOUR TIME HERE FOR

5    JUST A SECOND.  YOU DON'T UNDERSTAND OR NOT -- YOU DIDN'T OPINE

6    IN ANY WAY THAT LOUISIANA IS DIFFERENT THAN MANY OTHER STATES

7    IN THE SENSE THAT IT HAS LARGE URBAN BLACK POPULATIONS IN A

8    COUPLE OF LOCATIONS BUT VERY DISPERSED RURAL BLACK POPULATIONS

9    IN VIRTUALLY EVERY PARISH IN THE STATE?

10   A.   I CAN'T ANSWER YOUR QUESTION BECAUSE, AS I TOLD YOU,

11   THAT'S BEYOND THE SCOPE OF MY REPORTS --

12   Q.   BEYOND THE SCOPE.

13   A.   -- OF MY EXPERTISE.

14   Q.   SO DO YOU HAPPEN TO KNOW HOW MANY BLACK ELECTED OFFICIALS

15   THERE ARE IN THE STATE?

16   A.   NOT FOR EVERY JURISDICTION.  BUT I CAN TELL YOU THERE IS

17   NONE STATEWIDE, NONE IN THE U.S. SENATE, ONE IN CONGRESS AND

18   SOMETHING LIKE 34 MAYBE IN THE LEGISLATURE AND SOMETHING LIKE

19   SEVEN IN THE -- I FORGET HOW MANY, BUT OVER 20, CLOSE TO 30

20   MAYORAL SITUATIONS IN MUNICIPALITIES THAT ARE --

21        THE COURT:   MR. BRADEN, I'M GOING TO ASK THAT YOU

22   SPEAK UP OR USE THE MICROPHONE.  I'M HAVING TROUBLE HEARING

23   YOU, AND I KNOW DR. LICHTMAN HAS ALREADY SAID THAT HE IS A

24   LITTLE BIT -- A LITTLE BIT CHALLENGED IN TERMS OF HIS ABILITY

25   TO HEAR SO...

04:39 1          **MR. BRADEN:**  MY APOLOGIES.

2          **THE COURT:**  THAT'S MUCH BETTER.  THANK YOU.

3          **MR. BRADEN:**  YES.

4     BY MR. BRADEN:

5     Q.   IN THE LAST TWO GUBERNATORIAL ELECTIONS IN LOUISIANA.  DID

6     THE CANDIDATE OF CHOICE OF THE BLACK COMMUNITY WIN?

7     A.   IN WHICH ELECTIONS?

8     Q.   THE LAST TWO GUBERNATORIAL RACES.

9     A.   THE MAYORAL RACES?

10    Q.   THE LAST TWO RACES FOR GOVERNOR OF THE STATE OF LOUISIANA?

11    A.   OH, YES.  OF COURSE, JOHN BEL EDWARDS, YOU KNOW, ONE

12    SWALLOW DOES NOT MAKE A SPRING.

13    Q.   YEAH.

14    A.   AND IS NOT BLACK.

15    Q.   OKAY.  AND YOU TALKED ABOUT RACIAL -- FROM THE 1990'S, THE

16    RUNOFF RACE BETWEEN THE KLAN CANDIDATE AND EDWIN EDWARDS -- AND

17    I GUESS WE COULD COME UP WITH SOME COLORFUL DESCRIPTIONS OF

18    THAT RACE, BUT I WON'T GO THAT WAY.  BUT MY UNDERSTANDING IS,

19    YOU TESTIFIED TO THAT IT SHOWED THE IMPACT OF SLATING.  BUT

20    DIDN'T THE BLACK PREFERRED CANDIDATE WIN IN THAT RACE, TOO?

21    A.   I DID NOT TESTIFY AT ALL ABOUT THAT RACE AS A EXAMPLE OF

22    SLATING.  I SIMPLY SAID IN A DIFFERENT FACTOR, A FACTOR

23    RELATING TO A RUNOFF IN AT-LARGE ELECTIONS.  AND IT WAS FACTOR

24    3, NOT FACTOR 4, BUT THAT WAS AN EXAMPLE OF A RUNOFF ELECTION

25    THAT CAUGHT NATION-WIDE ATTENTION.  THAT WAS WELL BEFORE THE

04:40   1   *FOSTER* DECISION.  I DIDN'T PUT IT IN THE CONTEXT OF SLATING AT
        2   ALL.
        3   **Q.**   OKAY.  AND SO I HEARD YOU SAY THAT BLACK CANDIDATES DON'T
        4   WIN AT-LARGE ELECTIONS.  DO YOU KNOW WHETHER THE MAYOR -- I
        5   DON'T THINK I CAN SEE IT.  I DON'T THINK WE ARE IN EAST BATON
        6   ROUGE.  I THINK WE ARE IN BATON ROUGE PARISH.  I COULD BE WRONG
        7   ABOUT THAT.  BUT MY UNDERSTANDING IS THAT THE MAYOR OF EAST
        8   BATON ROUGE IS BLACK.  DO YOU KNOW THAT?
        9   **A.**   LET ME CHECK.  I MIGHT HAVE THAT INFORMATION.  I'M NOT
       10   SURE.
       11          **THE COURT:**  WE ARE IN EAST BATON ROUGE PARISH, AND
       12   THE MAYOR OF THE BATON ROUGE METROPOLITAN -- GREATER BATON
       13   ROUGE IS AFRICAN AMERICAN.
       14          **THE WITNESS:**  YOU'RE TALKING ABOUT THE MAYOR OF BATON
       15   ROUGE CITY?
       16   **BY MR. BRADEN:**
       17   **Q.**   THE JUDGE GRACIOUSLY ANSWERED THE QUESTION FOR US.
       18          **THE COURT:**  NO, I DIDN'T ANSWER IT.  I JUST WAS
       19   CORRECTING YOU THAT WE ARE NOT IN BATON ROUGE PARISH.
       20          **MR. BRADEN:**  OH.
       21          **THE COURT:**  THERE IS AN EAST BATON ROUGE PARISH AND
       22   THERE IS A WEST BATON ROUGE PARISH, AND THE MISSISSIPPI RIVER
       23   AND ONE BRIDGE CONNECTS THOSE.
       24          **MR. BRADEN:**  OKAY.
       25          **THE COURT:**  ACTUALLY, TWO BRIDGES CONNECT THOSE.

04:41 1   **BY MR. BRADEN:**

2   **Q.**   YEAH.  AND I UNDERSTOOD FROM YOU THAT THE MAYOR --

3   **A.**   I CAN ANSWER.

4   **Q.**   -- OF EAST BATON ROUGE WAS BLACK?  IS THAT YOUR BELIEF?

5   **A.**   YEAH.  BATON ROUGE IS A BLACK CITY AND ELECTED A BLACK

6   MAYOR, SO THAT'S EXACTLY MY POINT.  BLACKS CAN WIN IN BLACK

7   DISTRICTS IN JURISDICTIONS, AND THEY ARE GETTING SHUT OUT

8   STATEWIDE IN WHITE JURISDICTIONS AND WHITE DISTRICTS.

9   **Q.**   IT'S YOUR --

10   **A.**   AND NONE OF THEM ARE -- NONE OF THE BLACKS ARE

11   REPUBLICANS.

12   **Q.**   OKAY.  IS IT YOUR POSITION THAT IT'S A MAJORITY-BLACK

13   PARISH?

14   **A.**   I DIDN'T LOOK AT THE PARISH.  I LOOKED AT THE CITY.

15           **MR. BRADEN:**  OKAY.  NO FURTHER QUESTIONS, YOUR HONOR.

16           **THE COURT:**  OKAY.  IS THERE ANY REDIRECT?

17           **MR. HAWLEY:**  YES.  BRIEFLY, YOUR HONOR.  THANK YOU.

18                          **REDIRECT EXAMINATION**

19   **BY MR. HAWLEY:**

20   **Q.**   DR. LICHTMAN, JUST A FEW MOMENTS AGO MR. BRADEN ASKED YOU

21   ABOUT SOME OF THE PARTICULARS OF YOUR EXPERT TESTIMONY IN THE

22   *HAYS* CASE IN THE '90'S.  DO YOU RECALL THAT?

23   **A.**   I RECALL THE QUESTIONS, YEAH.

24   **Q.**   YES.

25   **A.**   AND IT DID HELP ME A BIT TO REFRESH ON *HAYS*, WHICH I

04:42 1  DIDN'T REMEMBER IN DETAIL.

2  **Q.**    I WILL REPRESENT TO YOU, SINCE WE NO LONGER HAVE IT ON THE

3  SCREEN, THAT THE COURT CHARACTERIZED THE DEFENDANTS' OBJECTIVE

4  IN THAT CASE AS TO, QUOTE, PROVE THAT FACTORS OTHER THAN RACE

5  COULD EXPLAIN DISTRICT 4.

6      MY QUESTION IS:  IS THAT THE INQUIRY YOU WERE ASKED

7  TO UNDERTAKE IN THIS CASE; TO EXPLAIN WHAT FACTORS EXPLAIN A

8  CHALLENGED DISTRICT?

9  **A.**    IF YOU CORRECTLY -- AND I DON'T REMEMBER, BUT I ASSUME YOU

10  CORRECTLY CHARACTERIZED THAT.  MY INQUIRY HERE IS QUITE

11  DIFFERENT.

12  **Q.**    AND WHAT IS YOUR INQUIRY HERE?

13  **A.**    WELL, MY INQUIRY HERE IS TO LOOK AT THE SENATE FACTORS

14  AND, WITH RESPECT TO THE TENUOUSNESS OF THE PLAN, TO DETERMINE

15  WHETHER OR NOT THE FIVE WHITE-MAJORITY DISTRICTS ESTABLISH

16  COMMUNITIES OF INTEREST BETWEEN BLACKS AND WHITES TO ASSESS

17  THE RATIONALE OF MAINTAINING CONTINUITY OF DISTRICTS AND TO

18  ASSESS THE RATIONALE WITH RESPECT TO THE TRADITIONAL

19  REDISTRICTING REQUIREMENT OF COMPACTNESS.  ALL THE OTHER SENATE

20  FACTORS RELATED TO DIFFERENT MATTERS.

21  **Q.**    AND ULTIMATELY THE SENATE FACTOR INQUIRY IS A SET OF

22  CONSIDERATIONS THAT IS THE SAME NO MATTER WHAT THE PARTICULAR

23  LEGAL CLAIM OR THE PARTICULAR DISTRICT AT ISSUE.  IS THAT FAIR

24  TO SAY?

25  **A.**    I DON'T WANT TO GIVE YOU A LEGAL OPINION.  I CAN SAY I

04:44 1 HAVE DONE THE SENATE FACTOR ANALYSES UNDER VERY DIFFERENT CASES

2 AND SITUATIONS.

3 **Q.** THANK YOU, DR. LICHTMAN. NO FURTHER QUESTIONS. THANK

4 YOU.

5 **THE COURT:** OKAY. THANK YOU, DR. LICHTMAN. WE ARE

6 GOING TO LET YOU GO FOR THE AFTERNOON.

7 **THE WITNESS:** THANK YOU, YOUR HONOR.

8 **THE COURT:** THANK YOU, SIR.

9 OKAY. IT'S A QUARTER TO FIVE. HAVE WE GOT ANY

10 OTHER WITNESSES THAT WE CAN GO UNTIL 5:30?

11 **MR. RIZZUTO:** YES, YOUR HONOR.

12 MY NAME IS RYAN RIZZUTO, AND I REPRESENT THE

13 ROBINSON PLAINTIFFS IN TODAY'S CASE. THIS IS MY FIRST

14 APPEARANCE BEFORE THE COURT.

15 **THE COURT:** AND YOUR LAST NAME? SPELL IT, SIR.

16 **MR. RIZZUTO:** R-I-Z-Z-U-T-O.

17 **THE COURT:** OKAY, MR. RIZZUTO. YOUR WITNESS.

18 **MR. RIZZUTO:** PLAINTIFFS CALL DR. R. BLAKESLEE

19 GILPIN.

20 **R. BLAKESLEE GILPIN, PH.D.,**

21 **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

22 **THE DEPUTY CLERK:** AND WOULD YOU PLEASE STATE YOUR

23 NAME AND SPELL IT FOR THE RECORD, PLEASE.

24 **THE WITNESS:** YES. MY NAME IS ROBERT BLAKESLEE

25 GILPIN. IT'S THE STANDARD SPELLING OF ROBERT,

10:32 1  B-L-A-K-E-S-L-E-E, G-I-L-P-I-N.

2          **THE COURT:**  GO AHEAD, COUNSEL.

3                          **VOIR DIRE**

4  BY MR. RIZZUTO:

5  **Q.**  GOOD AFTERNOON, DR. GILPIN.

6          COULD YOU PLEASE INTRODUCE YOURSELF TO THE COURT?

7  **A.**  YES.  MY NAME IS DR. ROBERT BLACKSLEE GILPIN.  I AM AN

8  ASSOCIATE PROFESSOR OF HISTORY AT TULANE UNIVERSITY AND THE

9  DIRECTOR OF GRADUATE STUDIES IN THE HISTORY DEPARTMENT THERE.

10 **Q.**  AND CAN YOU TELL US ABOUT YOUR EDUCATIONAL BACKGROUND?

11 **A.**  YES.  I RECEIVED MY B.A. AND M.A. SIMULTANEOUSLY FROM YALE

12 UNIVERSITY IN 2001 IN AMERICAN HISTORY, AN M.PHIL FROM

13 CAMBRIDGE UNIVERSITY IN 2002 IN BRITISH HISTORY, AND THEN AN

14 M.PHIL AND PH.D. FROM YALE UNIVERSITY IN 2009 IN AMERICAN

15 HISTORY.

16 **Q.**  AND YOU MENTIONED THAT YOU WORK AT TULANE.  COULD YOU

17 SPEAK MORE TO YOUR ROLES THERE?

18 **A.**  YES.  SO I TEACH A VARIETY OF CLASSES ON AMERICAN HISTORY:

19 U.S. HISTORY IN THE LAW, CIVIL WAR AND RECONSTRUCTION, SOUTHERN

20 INTELLECTUAL AND CULTURAL HISTORY, AND MENTOR AND ADVISE

21 UNDERGRADUATE AND GRADUATE STUDENTS.

22 **Q.**  AND DO ANY OF THOSE COURSES YOU JUST MENTIONED COVER

23 LOUISIANA'S HISTORY OF OFFICIAL DISCRIMINATION AGAINST BLACK

24 VOTERS?

25 **A.**  YES.  ALL THE COURSES I JUST MENTIONED TOUCH DIRECTLY ON

04:46 1    THAT SUBJECT.

2    **Q.**   HAVE YOU EVER WRITTEN ANYTHING THAT HAS COVERED THE

3    HISTORY OF VOTER DISCRIMINATION IN LOUISIANA?

4    **A.**   YES.  I'VE WRITTEN CHAPTERS AND EDITED VOLUMES ABOUT THE

5    RECONSTRUCTION PERIOD MOVING INTO THE 20TH CENTURY THAT DEAL

6    DIRECTLY WITH THAT SUBJECT MATTER.

7    **Q.**   PROFESSOR GILPIN, IS THIS YOUR FIRST TIME TESTIFYING AS AN

8    EXPERT WITNESS IN A CASE?

9    **A.**   IT IS INDEED.

10           **MR. RIZZUTO:**  YOUR HONOR, WE WOULD TENDER PROFESSOR

11   GILPIN AS AN EXPERT IN SOUTHERN HISTORY.

12           **THE COURT:**  ANY OBJECTION?

13           **MS. MCKNIGHT:**  YOUR HONOR, NO OBJECTION.

14           **THE COURT:**  DR. GILPIN WILL BE PERMITTED TO GIVE

15   OPINION TESTIMONY ON SOUTHERN HISTORY.

16           **MR. RIZZUTO:**  YOUR HONOR, IF IT PLEASES THE COURT,

17   MAY I APPROACH THE WITNESS --

18           **THE COURT:**  YOU MAY.

19           **MR. RIZZUTO:**  -- WITH WHAT HAS BEEN MARKED AS PR-13

20   AND 88?

21           **THE COURT:**  YOU MAY.

22                         **DIRECT EXAMINATION**

23   **BY MR. RIZZUTO:**

24   **Q.**   NOW, PROFESSOR GILPIN, I JUST HANDED YOU WHAT'S BEEN

25   MARKED AS PR-13 AND PR-88.

04:47 1           DO YOU RECOGNIZE THOSE?

2      **A.**    YES, I DO.

3      **Q.**    NOW, WHAT'S PR-13?

4      **A.**    PR-13 IS THE MAIN REPORT I WAS ASKED TO PRODUCE FOR THIS

5      CASE.

6      **Q.**    AND PR-88?

7      **A.**    IS THE SUPPLEMENTAL REPORT I WAS ASKED TO PRODUCE.

8      **Q.**    LET'S START WITH YOUR FIRST REPORT, PR-13.  CAN YOU SPEAK

9      TO ITS PURPOSE?

10     **A.**    THE PURPOSE OF THE REPORT WAS TO TALK ABOUT THE STATE OF

11     LOUISIANA'S LONG HISTORY OF DISCRIMINATION AGAINST ITS BLACK

12     CITIZENS AND SPECIFICALLY HOW THAT HISTORY FED INTO VOTER

13     DISCRIMINATION, PARTICULARLY AFTER THE FRANCHISE WAS GRANTED IN

14     THE LATE 1860'S.

15     **Q.**    AND WHAT WAS THE SCOPE OF YOUR INQUIRY IN THAT REPORT?

16     **A.**    SO MY REPORT BEGAN IN PRE-AMERICAN LOUISIANA, WHICH IS

17     REALLY WHEN THE RACIAL CATEGORIES THAT ARE GOING TO LATER BE

18     USED BY THE STATE OF LOUISIANA BOTH PRE-SUFFRAGE AND

19     POST-SUFFRAGE WERE CREATED AND SORT OF HONED BY THE STATE AND

20     WERE USED UP UNTIL THE PRESENT DAY.

21     **Q.**    BROADLY SPEAKING, WHAT WERE YOUR CONCLUSIONS?

22     **A.**    SO FROM THE VERY BEGINNING, THE STATE HAS BEEN QUITE

23     SERIOUSLY INVESTED IN CATEGORIZING ITS CITIZENS BY RACE AND

24     SPECIFICALLY TO USE THOSE CATEGORIES TO DISCRIMINATE AGAINST

25     BLACK FREEDOMS AND AFTER THE 1860'S PARTICULARLY OR

04:49 1    SPECIFICALLY AGAINST THE RIGHT TO VOTE.  SO THAT WAS REALLY THE

2    TARGET OF A HUGE NUMBER OF EFFORTS BY THE STATE OF LOUISIANA,

3    PARTICULARLY IN THE POST-1868 PERIOD.

4    Q.    NOW, I'D LIKE TO START AT THE BEGINNING OF THAT HISTORY.

5    DR. GILPIN, CAN YOU SPEAK TO THE HISTORICAL ROOTS OF OFFICIAL

6    DISCRIMINATION IN LOUISIANA?

7    A.    YES.  SO AS I WAS JUST MENTIONING, THAT PROCESS REALLY

8    BEGAN WITH CATEGORIZING ITS CITIZENS, AND IT WAS A -- THERE WAS

9    A PERIOD OF FLUIDITY BEFORE THE STATE BECAME REALLY MUCH MORE

10   RIGID ABOUT DEFINING WHO WAS BLACK AND WHO WAS WHITE.  AND

11   THERE WAS A MIDDLE CATEGORY THAT BASICALLY BEGAN TO BE ERASED

12   IN THE 1840'S AND '50'S WHEN THE STATE BECAME VERY CONCERNED

13   WITH THE INFLUX OF IMMIGRANTS THAT DIDN'T REALLY FIT ANY OF THE

14   CATEGORIES THAT THEY HAD.  AND THAT WAS WHEN THE STATE OF

15   LOUISIANA CREATED A LOT OF THE METHODS AND TOOLS THAT THEY

16   WOULD LATER USE TO DISENFRANCHISE BLACK VOTERS.  SO PROPERTY

17   REQUIREMENTS, POLL TAXES, AND THINGS LIKE THIS LITERACY TEST

18   WERE ACTUALLY DEVELOPED IN THE 1840'S AND '50'S AND THEN

19   REPURPOSED LATER ON.  SO THAT'S REALLY THE ANTEBELLUM ROOTS OF

20   MODERN VOTER DISCRIMINATION IN THE STATE OF LOUISIANA.

21   Q.    WHAT'S THE PURPOSE WITHIN YOUR REPORT OF LAYING OUT THIS

22   ANTEBELLUM HISTORY?

23   A.    WELL, AS I WAS JUST MENTIONING, THE SORT OF CONNECTION

24   BETWEEN THESE THINGS IS OFTEN QUITE CONCRETE.  SO LITERALLY THE

25   WHITE ELITES IN THE POSTBELLUM PERIOD SIMPLY JUST SORT OF WENT

04:50 1  BACK INTO THEIR OWN HISTORY TO FIND THESE TOOLS AND REPURPOSE
2  THEM.  BUT BASICALLY THAT THE FOUNDATION OF BOTH RACIAL
3  CATEGORIZATION AND OF VOTER DISCRIMINATION ITSELF IS REALLY
4  FIRMLY ESTABLISHED IN THE ANTEBELLUM PERIOD AND THEN CARRIED
5  THROUGH VERY INTENTIONALLY IN THE POSTBELLUM PERIOD.
6  **Q.**   NOW, MOVING FORWARD A BIT IN HISTORY TO AFTER THE CIVIL
7  WAR, HOW DID OFFICIAL DISCRIMINATION AGAINST BLACK LOUISIANIANS
8  EVOLVE AFTER THE CIVIL WAR?
9  **A.**   SO IN THE FIRST CONSTITUTIONAL CONVENTION, WHICH ACTUALLY
10  HAPPENS DURING THE MIDDLE OF THE CIVIL WAR, IS THE FIRST EFFORT
11  BY WHITE LOUISIANIANS TO KIND OF REFASHION OLD LAWS AND
12  MAINTAIN SOME OF THE RACIAL HIERARCHIES THAT THEY HAD
13  ESTABLISHED IN THE ANTEBELLUM PERIOD.  THE BLACK CODES THAT ARE
14  WRITTEN IN 1865 ARE THE FIRST EXAMPLE OF THAT AND ARE REALLY
15  QUITE EXPLICITLY UNDERSTOOD AS A WAY OF COBBLING TOGETHER AS
16  MUCH OF SLAVERY'S RULES AS THEY COULD.
17       IT'S NOT UNTIL THE 1890'S THAT THOSE KIND OF TAKE A
18  MUCH MORE EXPLICITLY POLITICAL FORM.  AND THAT IS MOST NOTABLY
19  WITH THE ADOPTION OF THE GRANDFATHER CLAUSE, WHICH IS CREATED
20  BY WHITE LOUISIANIANS IN 1898 THAT ESTABLISHES A RULE WHERE
21  BLACK VOTERS HAVE TO BE ABLE TO TRACE THEIR ANCESTRY OF EITHER
22  A FATHER OR A GRANDFATHER.  THEY HAD TO HAVE VOTED BEFORE
23  JANUARY 1ST OF 1867, WHICH WAS AN ILLOGICAL IMPOSSIBILITY
24  BECAUSE BLACKS IN LOUISIANA COULD NOT VOTE BEFORE THAT DATE.
25  SO IT WAS AN INCREDIBLY EFFECTIVE WAY OF TAKING BLACK

04:52 1   LOUISIANIANS OUT OF POLITICS.

2            AT THE TIME OF THE GRANDFATHER CLAUSE, THEY

3   REPRESENTED ABOUT 44 PERCENT OF THE ELECTORATE IN LOUISIANA,

4   WHICH HAS NEVER BEEN REACHED EVER SINCE THEN.  WITHIN TWO

5   YEARS, THAT WAS BELOW ONE PERCENT BECAUSE OF THE EFFECTIVENESS

6   OF THE GRANDFATHER CLAUSE.  SO IT TOOK BLACK VOTERS FROM ABOUT

7   130,000 DOWN TO ABOUT 5,000 IN TWO -- JUST TWO YEARS.

8   Q.   AND DID TACTICS LIKE THE GRANDFATHER CLAUSE AND THE OTHER

9   TACTICS YOU MENTIONED CONTINUE INTO THE 20TH CENTURY?

10   A.   YES.  SO THE GRANDFATHER CLAUSE ITSELF WAS STRUCK DOWN BY

11   THE SUPREME COURT IN 1915.  BUT THE VARIETY OF TOOLS I

12   MENTIONED THAT LOUISIANIANS HAD DEVELOPED IN THE 1840'S AND

13   '50'S -- LITERACY TESTS, POLL TAXES, UNDERSTANDING CLAUSES, AND

14   REALLY INVESTING A LOT MORE POWER IN WHITE REGISTRARS OF

15   VOTERS -- WAS SOMETHING THAT WAS REALLY -- THE WEIGHT OF THE

16   STATE WAS PUT BEHIND THAT -- SO TO THE DEGREE WHERE YOU COULD

17   HAVE A WHITE REGISTRAR REJECT A BLACK VOTER IF THEY COULD NOT

18   COUNT THE NUMBER OF JELLYBEANS IN A JAR THAT WAS AT THE POLLING

19   STATION.

20   Q.   NOW, MOVING A BIT FARTHER INTO THE 20TH CENTURY, HOW, IF

21   AT ALL, DID VOTING-RELATED DISCRIMINATION IN LOUISIANA CHANGE

22   AFTER THE VOTING RIGHTS ACT WAS PASSED IN 1965?

23   A.   SO IT'S NOT SO MUCH THAT THE DISCRIMINATION CHANGED,

24   ESPECIALLY IN TERMS OF MAGNITUDE OR THE DETERMINATION BY THE

25   STATE OF LOUISIANA TO DISENFRANCHISE ITS BLACK VOTERS.  WHAT

04:53   1    THE VOTING RIGHTS ACT REALLY DID WAS MAKE BOTH CITIZENS AND THE

     2    STATE, THE FEDERAL GOVERNMENT, AWARE OF THESE ATTEMPTS TO

     3    DISENFRANCHISE BLACK VOTERS.  AND THIS IS PARTICULARLY THROUGH

     4    THE PRECLEARANCE CLAUSE THAT MADE IT POSSIBLE FOR THE SORT OF

     5    KIND OF DIZZYING EXTENT OF THESE EFFORTS WERE KIND OF BROUGHT

     6    TO LIGHT.  AND THEN, ALSO, IT GAVE A POSSIBILITY FOR THOSE

     7    EFFORTS TO DISENFRANCHISE BLACK VOTERS TO ACTUALLY BE CONTESTED

     8    IN COURT.

     9    **Q.**   CAN YOU SPEAK ABOUT ANY OF THESE SECTION 2 VIOLATIONS THAT

   10    YOU NOTE IN YOUR REPORT?

   11    **A.**   YES.  SO I THINK THE ONE THAT I FIND MOST COMPELLING IS

   12    THE *CHISOM VERSUS ROEMER* CASE OF 1991 BECAUSE IT BEARS SUCH A

   13    STRONG RESEMBLANCE TO THINGS THAT HAVE HAPPENED IN THE LAST

   14    CALENDAR YEAR IN THE STATE OF LOUISIANA WITH THE WEST MONROE

   15    BOARD OF ALDERMEN.  SO THESE ARE THE EXACT SAME SCHEMES 30

   16    YEARS APART.

   17         THE FIRST ONE WE WERE MADE AWARE OF BECAUSE OF

   18    PRECLEARANCE.  THE SECOND ONE IS JUST THROUGH THE DOGGEDNESS

   19    OF, I'M SURE, SOME OF THE PEOPLE IN THIS ROOM TO ACTUALLY BRING

   20    THOSE KINDS OF THINGS TO LIGHT BECAUSE THE DETERMINATION OF THE

   21    STATE HAS REMAINED BASICALLY UNALTERED.  THE MECHANISM OF

   22    MAKING US AWARE OF THEM HAS DRASTICALLY CHANGED AFTER 2013.

   23    **Q.**   NOW, TURNING TO YOUR SECOND REPORT, PR-88, WHAT WAS THE

   24    PURPOSE OF THAT REPORT?

   25    **A.**   SO THAT REPORT IS -- THE PURPOSE WAS TO TALK ABOUT THE

04:55 1　HISTORY OF RACIAL CLASSIFICATION BY THE STATE OF LOUISIANA,

2　AGAIN, STRETCHING BACK TO THE PRE-AMERICAN LOUISIANA, WHICH IS

3　WHEN THESE RACIAL CATEGORIES STARTED TO BE SORT OF FORMULATED,

4　BUT PARTICULARLY AFTER THE *TREADWAY* CASE OF 1910, WHICH IS

5　WHEN THE STATE OF LOUISIANA ADOPTED THIS ONE-DROP RULE THAT IF

6　ANYONE COULD BE PROVEN TO HAVE ANY BLACK ANCESTRY, THEY WERE

7　GOING TO BE CONSIDERED BLACK BY THE STATE OF LOUISIANA.

8　Q.　HOW LONG WAS THIS ONE-DROP RULE OR AN ANALOG IN PLACE IN

9　LOUISIANA?

10　A.　SO THAT REMAINED IN PLACE UNTIL 1970 WHEN IT WAS REPLACED

11　BY THE ONE THIRTY-SECOND LAW THAT WAS VERY VIGOROUSLY CONTESTED

12　IN THE 1970S, ACTUALLY, BY WHITE LOUISIANIANS OR PEOPLE WHO

13　CONSIDERED THEMSELVES WHITE WHO SUED THE STATE TO TRY AND BE

14　RECLASSIFIED.　THAT LAW WAS CHANGED IN 1983 TO TRY TO LOWER THE

15　STANDARD BY WHICH WHAT THE STATE WOULD ACCEPT; ALTHOUGH DURING

16　THAT CASE, I THINK, QUITE INTERESTINGLY, THE STATE WAS CITING

17　ANCESTRY GOING BACK TO MOBILE, ALABAMA, IN 1760 TO PROVE THAT

18　THE CITIZEN IN QUESTION WAS BLACK, AT LEAST BY THE STANDARDS OF

19　STATE.

20　　　　SO, AGAIN, IT'S REALLY DEMONSTRATING HOW INVESTED THE

21　STATE OF LOUISIANA IS IN THOSE CATEGORIES AND HOW THEY WERE

22　USED QUITE EXPLICITLY THEN TO DISENFRANCHISE BLACK VOTERS.

23　Q.　NOW, STEPPING BACK TO TALK ABOUT YOUR REPORT MORE

24　GENERALLY, WHAT WAS YOUR ULTIMATE CONCLUSION IN YOUR

25　SUPPLEMENTAL REPORT?

04:56 1   **A.**  THAT -- MOST PARTICULARLY, THAT THESE CATEGORIES HAVE BEEN

2   USED OVER -- CERTAINLY OVER THE COURSE OF THE 20TH AND 21ST

3   CENTURIES TO DISENFRANCHISE BLACK VOTERS BUT OVERALL, THAT

4   THERE IS JUST SUCH A BASIC ABSURDITY TO RACIAL CATEGORIZATION

5   BECAUSE THERE IS NO REAL SCIENCE BEHIND IT.  BUT THE STATE

6   REMAINS VERY INVESTED IN MAKING THOSE DISTINGUISHING CATEGORIES

7   SO THAT THEY THEN CAN BE USED IN CASES LIKE THIS.

8   **Q.**  DID YOU FIND ANYTHING RELATED TO HOW THE HISTORY MAY

9   AFFECT THE WAYS THAT MULTIRACIAL LOUISIANIANS MIGHT IDENTIFY

10   TODAY?

11   **A.**  YEAH.  WELL, I THINK ONE OF THE THINGS THAT YOU HAVE TO

12   TAKE INTO CONSIDERATION IS WE'RE TALKING ABOUT OVER 300 YEARS

13   OF HISTORY AND THAT LOUISIANIANS OF ALL COLORS ARE KEENLY AWARE

14   OF THE CONSEQUENCES OF WHAT THEIR CATEGORY IS, BOTH IN TERMS OF

15   THEIR SELF-IDENTIFICATION AND HOW THE STATE IDENTIFIES THEM.

16   AND SO THERE'S JUST -- THERE IS AN ENORMOUS AMOUNT AT STAKE IN

17   TERMS OF WHAT THEY IDENTIFY AS AND WHAT THE STATE IDENTIFIES

18   THEM.  AND THEY ARE VERY AWARE OF THAT, AND THAT SORT OF GUIDES

19   A LOT OF BEHAVIOR GOING FORWARD.

20   **Q.**  AND JUST TO BE CLEAR, DOES THIS HISTORY TIE INTO THE

21   HISTORY YOU'VE DISCUSSED IN YOUR ORIGINAL REPORT?

22   **A.**  YES.  I MEAN, I THINK IT'S -- IT'S PRETTY MUCH -- IT'S A

23   REAL CORNERSTONE OF EVERYTHING THAT'S DISCUSSED IN THE FIRST

24   REPORT IS WHAT I'M DISCUSSING IN THE SECOND REPORT.

25   **Q.**  NOW, DR. GILPIN, HOW WOULD YOU RESPOND TO THE CRITIQUE

04:58   1    THAT YOUR REPORTS DON'T INCLUDE ENOUGH EXAMPLES OF RACE AND

      2    DISCRIMINATION?

      3    **A.**    WELL, I DISAGREE PRETTY FUNDAMENTALLY WITH THAT PREMISE,

      4    MOST PARTICULARLY BECAUSE AFTER THE VOTING RIGHTS ACT WAS

      5    RENEWED IN 1982, TO ME EVERYTHING THAT'S COME SINCE THEN -- AND

      6    WE'RE TALKING ABOUT THE LAST FOUR DECADES I WOULD CALL RECENT

      7    HISTORY.  AND ALSO PARTICULARLY I WOULD CALL IT THAT BECAUSE OF

      8    THE REMARKABLE CONSISTENCY WITH WHICH WHITE LOUISIANIANS HAVE

      9    ATTEMPTED TO DISENFRANCHISE BLACK VOTERS.  THIS IS NOT

   10    SOMETHING THAT SORT OF STOPPED AT ANY GIVEN POINT BUT HAS

   11    REALLY BEEN A THROUGH LINE IN THE ENTIRETY OF THE HISTORY OF

   12    LOUISIANA, EVEN IF WE'RE TALKING ABOUT PRE-SUFFRAGE BUT

   13    PARTICULARLY IF WE'RE TALKING ABOUT POST-1982.  THE STATE HAS

   14    JUST DISPLAYED A REMARKABLE DEGREE OF CONTINUITY, DOGGEDNESS,

   15    DETERMINATION TO STOP BLACK PEOPLE FROM VOTING.

   16    **Q.**    COULD YOU PLEASE OUTLINE FOR THE COURT ONE OF THE EXAMPLES

   17    OF RECENT DISCRIMINATION THAT YOU OUTLINED IN YOUR REPORT?

   18    **A.**    SURE.  I MEAN, I MENTIONED A FEW MINUTES AGO THE WEST

   19    MONROE BOARD OF ALDERMEN, WHICH I THINK IS PROBABLY THE MOST

   20    FREQUENT SCHEME THAT'S BEEN USED BY LOUISIANA AND POLITICIANS

   21    TO TRY AND DISENFRANCHISE BLACK VOTERS.  THAT IS THE METHOD OF

   22    AT-LARGE ELECTIONS IN THIS CASE IN WEST MONROE.

   23         THE *HARDING VERSUS EDWARDS* CASE IS ALSO A VERY, VERY

   24    RECENT EXAMPLE.  WE'RE TALKING ABOUT IN THE LAST CALENDAR YEAR

   25    A VARIETY OF SCHEMES; BASICALLY WHATEVER PEOPLE CAN COME UP

04:59 1   WITH IN ORDER TO DISENFRANCHISE BLACK VOTERS.  LIKE IT'S ALL --

2   THAT'S ALWAYS THE GOAL.  AND IT'S REALLY WHATEVER TOOLS ARE AT

3   THEIR DISPOSAL TO DO THAT THEY WILL TRY TO UTILIZE.

4   **Q.**  DR. GILPIN, IN YOUR VIEW, ARE OFFICIAL DISCRIMINATORY

5   PRACTICES MADE BY -- MADE AGAINST BLACK VOTERS IN LOUISIANA A

6   THING OF THE PAST?

7   **A.**  I WOULD SAY THAT THEY ARE VERY MUCH THE DEFINING

8   CHARACTERISTIC OF LOUISIANA POLITICS, PAST, PRESENT AND

9   CERTAINLY, IT LOOKS LIKE, THE FUTURE.

10   **Q.**  THANK YOU, DR. GILPIN.

11       **MR. RIZZUTO:**  AT THIS TIME WE MOVE PR-13 AND PR-88

12   INTO EVIDENCE.

13         **THE COURT:**  ANY OBJECTIONS?

14         **MS. MCKNIGHT:**  NO OBJECTION, YOUR HONOR.

15         **THE COURT:**  PR-13 AND PR-88 ARE ADMITTED.

16         **MR. RIZZUTO:**  WE HAVE NO FURTHER QUESTIONS FOR DR.

17   GILPIN.

18         **THE COURT:**  ANY CROSS?

19         **MS. MCKNIGHT:**  YES, MA'AM.

20            **CROSS-EXAMINATION**

21   **BY MS. MCKNIGHT:**

22   **Q.**  GOOD AFTERNOON, DR. GILPIN.

23       I'M KATE MCKNIGHT WITH THE LEGISLATIVE INTERVENORS,

24   AND I HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON.

25       PLEASURE TO MEET YOU.

05:00 1   A.   OKAY.

2    Q.   LET'S START WITH PR-13, YOUR REPORT IN THIS CASE.  WE ARE

3    GOING TO START ON PAGE 39.

4              **MS. MCKNIGHT:**  DOES HE NEED TO BE SWITCHED OR --

5              **THE DEPUTY CLERK:**  I'M SORRY.  YES.

6              **MS. MCKNIGHT:**  THANK YOU.

7    **BY MS. MCKNIGHT:**

8    **Q.**   SO, DR. GILPIN, YOU INCLUDE IN YOUR REPORT A SECTION

9    TITLED "VOTING RIGHTS IN LOUISIANA, 1982-2013."

10             DO YOU SEE THAT?

11   **A.**   I DO.

12   **Q.**   OKAY.  AND IN THIS SECTION YOU STUDY CASE LAW DEVELOPMENTS

13   RELATED TO THE VOTING RIGHTS ACT.  RIGHT?

14   **A.**   YEAH.  I THINK THAT'S ONE OF THE THINGS THAT ARE EXAMINED

15   IN THIS SECTION.

16   **Q.**   OKAY.  NOW, DURING THIS TIME PERIOD, FOLLOWING THE 1990

17   CENSUS, LOUISIANA TRIED TO COMPLY WITH THE VOTING RIGHTS ACT BY

18   DRAWING TWO MAJORITY-MINORITY CONGRESSIONAL DISTRICTS.

19   CORRECT?

20   **A.**   I MEAN, I AM AWARE OF THIS.  I AM NOT SURE IT'S DISCUSSED

21   AT ANY LENGTH IN THE REPORT.

22   **Q.**   OKAY.  AND LOUISIANA'S EFFORT TO DRAW A SECOND

23   CONGRESSIONAL DISTRICT AFTER THE 1990 CENSUS WAS STRUCK DOWN BY

24   COURTS AS A RACIAL GERRYMANDER.  CORRECT?

25   **A.**   AGAIN, I'M NOT SURE IF THAT'S IN THE SCOPE OF THIS REPORT.

05:02 1    I AM DIMLY AWARE OF THIS OTHERWISE.

2    **Q.**    OKAY.  SO A VOTING RIGHTS ACT CASE IN THE EARLY 1990'S

3    WOULD NOT BE WITHIN THE SCOPE OF YOUR REPORT WHICH INCLUDES A

4    SECTION TITLED "VOTING RIGHTS IN LOUISIANA, 1982-2013"?

5    **A.**    NO.  I MEAN, IT WOULD FALL UNDER THAT HEADING PERFECTLY

6    COMFORTABLY, BUT IT MAY JUST NOT HAVE BEEN INCLUDED FOR

7    WHATEVER REASON.

8    **Q.**    AND WHAT MIGHT THAT REASON BE?

9    **A.**    POSSIBLY THAT I OVERLOOKED IT, POSSIBLY THAT THE REPORT

10    WAS GETTING QUITE LONG.  I'M NOT ENTIRELY SURE.

11    **Q.**    OKAY.  SO I UNDERSTAND THAT IN YOUR REPORT YOU DO NOT

12    ADDRESS LOUISIANA'S EFFORT TO COMPLY WITH THE VOTING RIGHTS ACT

13    BY CREATING A SECOND MAJORITY-MINORITY DISTRICT FOLLOWING THE

14    1990 CENSUS.  CORRECT?

15    **A.**    I MEAN, IF YOU DIDN'T FIND IT, I'M NOT SURE THAT IT'S IN

16    THERE.

17    **Q.**    OKAY.  AND, IN FACT, YOU DID NOT EVEN -- YOU CITE A LOT OF

18    CASE LAW, BUT YOU DID NOT EVEN CITE ONE OF THE *HAYS* CASES, IN

19    THE *HAYS* LINE OF CASES.  CORRECT?

20    **A.**    NO.  I DON'T BELIEVE THAT I DID CITE ANY OF THE *HAYS*

21    CASES.

22    **Q.**    OKAY.  THANK YOU.

23              LET'S MOVE ON TO PAGE 45 IN YOUR REPORT.  DR. GILPIN,

24    YOU NOTE TOWARD THE END OF THE FOURTH PARAGRAPH -- SO THE ONE

25    THAT STARTS "THE HOTLY CONTESTED."  YOU NOTE, QUOTE, "THE

05:04 1  CHANGES TO THE VRA IN THE WAKE OF *SHELBY COUNTY* MEANT THAT

2  STATES WERE NO LONGER UNDER THE BURDEN OF PROVING THEIR LAWS TO

3  BE NONDISCRIMINATORY."

4      DO YOU SEE THAT?

5  **A.**  YES, I DO.

6  **Q.**  OKAY.  SO BEFORE *SHELBY COUNTY*, WHICH WAS A 2013 SUPREME

7  COURT OPINION, LOUISIANA WAS UNDER A BURDEN OF PROVING ITS

8  VOTING LAWS TO BE NONDISCRIMINATORY.  CORRECT?

9  **A.**  YEAH, THAT'S MY UNDERSTANDING OF SECTION 5 PRECLEARANCE.

10  **Q.**  OKAY.  AND 2011 -- SO BEFORE *SHELBY COUNTY*, LOUISIANA'S

11  CONGRESSIONAL MAP WAS PRECLEARED.  CORRECT?

12  **A.**  I'M NOT SURE THAT I DISCUSS THAT IN THIS REPORT.  I MEAN,

13  I HEARD IT IN THE COURTROOM TODAY.

14  **Q.**  OKAY.  SO YOU UNDERSTAND THAT TO BE TRUE?

15  **A.**  SURE.

16  **Q.**  OKAY.  THANK YOU.  NO FURTHER QUESTIONS, DR. GILPIN.

17      **THE COURT:**  ANY REDIRECT?

18      **MR. RIZZUTO:**  NO REDIRECT, YOUR HONOR.

19      **THE COURT:**  OKAY.  THANK YOU.

20      DR. GILPIN, YOU MAY GO OR YOU ARE RELEASED.

21      NEXT WITNESS.

22      **MR. SAVITT:**  GOOD AFTERNOON, YOUR HONOR.

23      MAKING MY FIRST APPEARANCE, I'M ADAM SAVITT --

24  THAT'S S-A-V-I-T-T -- ON BEHALF OF THE ROBINSON PLAINTIFFS,

25  AND WE'D LIKE TO CALL ASHLEY SHELTON.

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 05:05   | 1  | **ASHLEY SHELTON,** |
|         | 2  | **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:** |
|         | 3  | **THE DEPUTY CLERK:** WOULD YOU PLEASE STATE YOUR NAME |
|         | 4  | AND SPELL IT FOR THE RECORD, PLEASE. |
|         | 5  | **THE WITNESS:** SURE. MY NAME IS ASHLEY SHELTON. |
|         | 6  | A-S-H-L-E-Y, S-H-E-L-T-O-N. |
|         | 7  | **DIRECT EXAMINATION** |
|         | 8  | **BY MR. SAVITT:** |
|         | 9  | **Q.** GOOD AFTERNOON, MS. SHELTON. |
|         | 10 | **A.** GOOD AFTERNOON. |
|         | 11 | **Q.** THANK YOU. |
|         | 12 | **MR. SAVITT:** COULD WE PLEASE PULL UP PR EXHIBIT 11. |
|         | 13 | **BY MR. SAVITT:** |
|         | 14 | **Q.** AND DO YOU RECOGNIZE THIS DOCUMENT, MS. SHELTON? |
|         | 15 | **A.** I DO. |
|         | 16 | **Q.** AND WHAT IS IT? |
|         | 17 | **A.** IT IS MY DECLARATION. |
|         | 18 | **Q.** OKAY. THANK YOU VERY MUCH. |
|         | 19 | **MR. SAVITT:** WE CAN PUT THAT DOWN. |
|         | 20 | **BY MR. SAVITT:** |
|         | 21 | **Q.** MS. SHELTON, WHERE DO YOU LIVE? |
|         | 22 | **A.** IN BATON ROUGE. |
|         | 23 | **Q.** AND HOW LONG HAVE YOU LIVED IN BATON ROUGE? |
|         | 24 | **A.** MY WHOLE LIFE. |
|         | 25 | **Q.** OKAY. THANK YOU. |

05:06 1       AND WHAT IS YOUR CURRENT JOB TITLE?

2    **A.**   I AM THE PRESIDENT AND CEO OF THE POWER COALITION FOR

3    EQUITY AND JUSTICE.

4    **Q.**   AND WHAT DOES THE POWER COALITION DO?

5    **A.**   WE ARE A CIVIC ENGAGEMENT ORGANIZATION.  WE WORK WITH

6    HISTORICALLY DISENFRANCHISED COMMUNITIES THROUGHOUT LOUISIANA,

7    ENGAGING THEM IN HELPING CONNECT THEM BACK TO THEIR VOTE, THEIR

8    VOICE AND THEIR POWER.

9    **Q.**   THANK YOU.

10       AND WOULD YOU SAY THAT YOU FOCUS ON COMMUNITIES OF

11   COLOR IN YOUR WORK WITH POWER COALITION?

12   **A.**   YES.

13   **Q.**   THANKS.

14       AND, MS. SHELTON, WHY ARE YOU HERE TODAY?

15   **A.**   I AM HERE TODAY BECAUSE WE DID A TON OF WORK WORKING WITH

16   COMMUNITIES ACROSS THE STATE OF LOUISIANA.  YOU KNOW, I'VE

17   PARTICIPATED IN REDISTRICTING LAST CYCLE, AND I PROBABLY COULD

18   HAVE SHOT A CANNON THROUGH THE CAPITOL AND NOT HIT ONE PERSON.

19       AND, YOU KNOW, THIS PARTICULAR REDISTRICTING PROCESS,

20   POWER COALITION ITSELF ENGAGED OVER 1,000 CITIZENS ACROSS THE

21   STATE THAT PARTICIPATED IN THIS PROCESS FROM CENSUS ALL THE WAY

22   TO THE ROADSHOWS AND THEN THE SPECIAL SESSION.  AND SO I AM

23   HERE TODAY TO REPRESENT THE FOLKS THAT CONSISTENTLY ASKED FOR A

24   FAIR AND EQUITABLE REDISTRICTING PROCESS AND DID NOT RECEIVE

25   THAT.

05:07 1   **Q.**   THANK YOU, MS. SHELTON.

2            AND YOU MENTIONED THE POWER COALITION WORKS

3   PREDOMINATELY WITH COMMUNITIES OF COLOR.  AND BASED ON YOUR

4   EXPERIENCE WORKING WITH POWER COALITION, DO BLACK VOTERS FACE

5   DISCRIMINATION RELATED TO VOTING?

6   **A.**   YES.

7   **Q.**   AND COULD YOU DESCRIBE THAT DISCRIMINATION?

8   **A.**   SURE.  I MEAN, IT -- YOU KNOW, GOSH, SO FAR -- YOU KNOW,

9   JUST IN OUR OWN EXPERIENCES, WE -- DURING COVID -- SO 70

10  PERCENT OF THE DEATHS FROM COVID EARLY ON WERE AFRICAN AMERICAN

11  PEOPLE.  SO DISPROPORTIONATELY BLACK PEOPLE WERE DYING FROM

12  COVID, AND IN THAT -- YOU KNOW, IN THAT PROCESS OF, YOU KNOW,

13  THE -- THEN -- NO, THE SECRETARY OF STATE THEN PUT INTO PLACE

14  DURING THE PRIMARY SEVERAL REASONS THAT FOLKS COULD -- YOU

15  KNOW, COULD HAVE REQUESTED AN ABSENTEE BALLOT, ESPECIALLY IF

16  THEY HAD UNDERLYING CONDITIONS.  BUT WHEN WE GOT TO THE GENERAL

17  ELECTION, THEY DID NOT WANT THOSE REASONS TO STAND.  AND SO WE

18  ENDED UP HAVING TO ORGANIZE AND SUE THE SECRETARY OF STATE.

19  AND THE GOVERNOR DID STAND WITH US, EVEN THOUGH WE HAD TO NAME

20  HIM IN THAT LAWSUIT.  THAT AT THE END OF THE DAY WITH SO MANY

21  AFRICAN-AMERICAN FOLKS DYING EARLY ON IN THE -- IN COVID WITH

22  THE CONTINUED -- THIS WAS BEFORE VACCINES, BEFORE WE UNDERSTOOD

23  HOW IT WAS GOING TO CONTINUE TO GROW AND CHANGE.  AND WE WERE

24  ABLE TO ENSURE THAT BLACK VOTERS THAT -- WHO DISPROPORTIONATELY

25  HAVE UNDERLYING CONDITIONS HAD ACCESS TO THEIR VOTE.

05:08

1        YOU KNOW, ALSO, THERE WAS AN EXAMPLE IN BAKER, WHICH
2   -- SO BAKER IS RIGHT OUTSIDE OF -- IT'S ONE OF THE MANY
3   UNINCORPORATED AREAS OF BATON ROUGE, OR RIGHT OUTSIDE.  AND,
4   YOU KNOW, DURING THE 2020 ELECTION, THERE WAS A WHITE MAN WHO
5   SAT IN HIS CHAIR WITH A VERY LARGE GUN OUTSIDE OF A -- YOU
6   KNOW,  OUTSIDE OF A BLACK PRECINCT.  HE WAS, YOU KNOW, 600
7   YARDS AWAY -- OR FEET AWAY, WHICH IS THE LAW.  BUT CLEARLY
8   SITTING THERE WITH A LARGE GUN IN PROXIMITY TO A BLACK
9   PRECINCT, YOU KNOW, WAS ALARMING AND VERY SCARY.  THE POLICE
10  WERE CALLED, THE FBI, THE STATE TROOPERS.  I MEAN, EVERYONE WAS
11  THERE, BUT NO ONE, YOU KNOW, TOOK ACTION BECAUSE IT CLEARLY
12  WAS, YOU KNOW, VOTER INTIMIDATION, BUT NOBODY TOOK ACTION ON
13  THAT.  AND SO BASICALLY MULTIPLE -- YOU KNOW, MULTIPLE -- YOU
14  KNOW, POLICE GROUPS JUST KIND OF SAT AND WATCHED HIM, INSTEAD
15  OF REMOVING HIM SO THAT BLACK VOTERS WOULD FEEL COMFORTABLE
16  MAKING THEIR VOTE.
17  **Q.**   THANK YOU.
18        AND WAS POWER COALITION AND ITS CONSTITUENTS PRESENT
19  AT THAT BAKER EVENT?
20  **A.**   YES, WE WERE THERE.  I HAD TWO STAFF MEMBERS THERE AND
21  SEVERAL MEMBERS OF THE COMMUNITY, AND WE HAD TO MOVE THEM BACK
22  SO THAT THEY COULD BE IN A SAFE DISTANCE AS THE POLICE KIND OF
23  WORKED OUT WHAT WAS GOING ON.  BUT, AGAIN, YOU KNOW, HE WAS
24  ABLE TO SIT THERE FOR A GOOD BIT OF THE DAY.
25  **Q.**   AND SO IS IT FAIR TO SAY THAT YOU DIDN'T FEEL LIKE YOUR

05:10 1    NEEDS WERE ADEQUATELY RESPONDED TO BY LOUISIANA STATE

2          OFFICIALS?

3          **A.**   THEY WERE NOT.

4          **Q.**   THANK YOU.

5                IN YOUR EXPERIENCE, ARE THERE GREATER OBSTACLES FOR

6          THE BLACK VOTERS THAN FOR WHITE VOTERS?

7          **A.**   YES.

8          **Q.**   COULD YOU DESCRIBE SOME OF THEM?

9          **A.**   SO IN -- YOU KNOW, IN LOUISIANA WE HAVE TRANSPORTATION

10         ISSUES.  YOU KNOW, IF YOU -- YOU KNOW, LIKE EVEN NEW ORLEANS,

11         WHICH PROBABLY HAS OUR BEST TRANSIT SYSTEM IS STILL, YOU KNOW,

12         LACKING IN MANY WAYS.  BATON ROUGE HAS A SYSTEM THAT IS NOT --

13         YOU KNOW, THAT WORKS BUT IS NOT MEETING THE NEEDS OF OUR ENTIRE

14         CITY.  AND SHREVEPORT HAS EVEN LESS OF A TRANSIT SYSTEM THAN

15         THAT.  AND THOSE ARE OUR THREE LARGEST METROS -- WITH

16         JEFFERSON.  BUT, YOU KNOW, JEFFERSON HAS NONE EITHER.

17                AND SO THE IDEA THAT BLACK VOTERS HAVE TO -- YOU

18         KNOW, LIKE WE PROVIDE RIDES TO THE POLLS SO THAT WE CAN ENSURE

19         THAT BLACK VOTERS CAN ACTUALLY VOTE IN ELECTIONS BECAUSE,

20         AGAIN, YOU KNOW, BLACK VOTERS DISPROPORTIONATELY EXPERIENCE

21         POLL CLOSURES AND POLL CHANGES.  THEY, ALSO, TOO -- WHENEVER

22         THEY HAVE A POLLING  LOCATION, THEY ALSO EXPERIENCE THAT THEIR

23         POLLING LOCATIONS ALSO HAVE ISSUES WITH DISABILITY

24         ACCESSIBILITY.  AND SO FOR US, THE ABILITY TO BE ABLE TO ENGAGE

25         BLACK VOTERS AND ENSURE BLACK AND BROWN VOTERS AND ENSURE THAT

05:11 1   THEY HAVE ACCESS TO, YOU KNOW, THEIR VOICE AND THEIR VOTE IS
2   REALLY CRITICAL FOR US.
3            AND, YOU KNOW, ONE OF THE THINGS I LOVE IS THAT IN
4   NEW ORLEANS WE GET TO WORK WITH A FUNERAL HOME THAT HAS A
5   FLEET OF VEHICLES THAT THEY DONATE TO THE PROCESS -- NOT THE
6   HURSTS.  BUT, I MEAN, YOU KNOW, LIKE SO PEOPLE UNDERSTAND THE
7   IMPORTANCE OF BEING ABLE TO GET PEOPLE TO VOTE.  AND IN THE
8   RURAL COMMUNITIES IT'S EVEN HARDER.  BUT WE DO WORK WITH
9   PARTNERS AND CHURCHES ACROSS THE STATE TO MAKE SURE THAT PEOPLE
10  CAN ACCESS THEIR RIGHT TO VOTE.
11  **Q.**   SO IS IT FAIR TO SAY THAT LACK OF ACCESS TO TRANSPORTATION
12  MAKES IT HARDER FOR BLACK LOUISIANIANS TO PARTICIPATE IN THE
13  POLITICAL PROCESS?
14  **A.**   YES.
15  **Q.**   AND, MS. SHELTON, DOES POWER COALITION WORK TO CONTACT
16  BLACK LOUISIANIANS ABOUT VOTING?
17  **A.**   YES.
18  **Q.**   COULD YOU DESCRIBE SOME OF POWER COALITION'S EFFORTS ON
19  THAT FRONT?
20  **A.**   ABSOLUTELY.  SO WE WORK -- WE BASICALLY BUILD WHAT WE CALL
21  A UNIVERSE; AND USUALLY FOR STATEWIDE ELECTIONS, ABOUT 500,000
22  PEOPLE.  AND WE DO TEXT MESSAGE, PHONE BANKING, PHONE CALLS, AS
23  WELL AS CANVASING WHERE WE ARE DOOR KNOCKING AND TALKING TO
24  COMMUNITIES.  WE ALSO DO, YOU KNOW, CANDIDATE SURVEYS AND
25  CANDIDATE FORMS.

05:12 1    **Q.** AND, MS. SHELTON, DO BLACK VOTERS NEED THIS EXTRA

2    OUTREACH, IN YOUR EXPERIENCE?

3    **A.** YES.

4    **Q.** AND WHY IS THAT?

5    **A.** ONE OF THE THINGS THAT WE FOUND IN OUR WORK IS THAT NOBODY

6    WAS TALKING TO BLACK VOTERS OR BROWN VOTERS OR INDIGENOUS OR

7    API AND THAT THE WORK THAT -- YOU KNOW, WE KNOW THAT OF OUR

8    UNIVERSE OF VOTERS THAT WE ARE REACHING, WHICH ARE, YOU KNOW,

9    HISTORICALLY DISENFRANCHISED COMMUNITIES, THAT WE CAN GET ABOUT

10    60 TO 65 PERCENT OF OUR UNIVERSE TO TURN OUT TO VOTE, WHICH

11    PROVES TO ME THAT NO ONE WAS TALKING TO THEM; NO ONE WAS

12    ADDRESSING THEM; NO ONE WAS INCLUDING THEM IN THE PROCESS.

13    AND, YOU KNOW, A LOT OF OUR WORK IS RECONNECTING PEOPLE TO

14    THEIR AGENCY AS A VOTER.

15    **Q.** THANK YOU.

16        AND IN YOUR EXPERIENCE WORKING WITH POWER COALITION,

17    ARE THERE TECHNOLOGY BARRIERS THAT MAKE IT DIFFICULT TO REACH

18    BLACK VOTERS?

19    **A.** YES. I MEAN, MANY FOLKS HAVE TALKED ABOUT IT, AND IT IS

20    NO SECRET THAT BROADBAND IS AN ISSUE THROUGHOUT OUR RURAL

21    COMMUNITIES. BUT IT'S ALSO AN ISSUE IN OUR URBAN COMMUNITIES.

22    YOU KNOW, WE WORK WITH A VOTER FILE; PHONE NUMBERS CHANGE, YOU

23    KNOW, CONSTANTLY; YOU KNOW, FOLKS ARE DEALING WITH HOUSING AND

24    SECURITY AND OTHER ISSUES. AND SO AGAIN, YOU KNOW, LIKE IT

25    CERTAINLY IS AN ISSUE OF ACCESS AND WHETHER OR NOT -- YOU KNOW,

05:13  1    WHETHER OR NOT THEY CAN AFFORD, YOU KNOW, A CELL PHONE, A HOUSE

2    PHONE OR WHATEVER, SOME OF THOSE OTHER WAYS THAT WE WOULD TRY

3    TO CONTACT THEM.

4    **Q.**   THANK YOU, MS. SHELTON.

5        AND YOU MENTIONED THE IMPACT OF POLL CLOSURES ON THE

6    COMMUNITIES YOU SERVE.  ARE YOU AWARE OF POLL CLOSURES THAT

7    RESULTED FROM A PRECINCT CONSOLIDATION?

8    **A.**   YES.

9    **Q.**   AND COULD YOU SPEAK TO THAT ISSUE?

10   **A.**   SO, I MEAN, WE HAD ONE, YOU KNOW, INSTANCE, YOU KNOW, THAT

11   KIND OF COMES CLEARLY TO MIND.  IN NEW ORLEANS EAST, THEY WERE

12   CLOSING AND CONSOLIDATING A POLLING LOCATION THAT WAS

13   PREDOMINANTLY AFRICAN AMERICAN, AND IN THAT POLLING LOCATION --

14   YOU KNOW, WE TRIED TO WORK WITH THE SECRETARY OF STATE TO MAKE

15   IT MAKE SENSE FOR THE VOTERS THAT WERE CHRONIC VOTERS, MANY OF

16   THEM IN THAT AREA.  AND WHAT ULTIMATELY -- YOU KNOW, THEIR

17   ARGUMENT WAS:  "WELL, WE'RE JUST MOVING IT A COUPLE OF MILES."

18   BUT IN MOVING IT A COUPLE OF MILES MEANT THAT THE COMMUNITY

19   WOULD HAVE TO, YOU KNOW, CROSS A DANGEROUS HIGHWAY.

20       AND SO, AGAIN, ON PAPER IT DOESN'T LOOK LIKE IT IS

21   THIS BIG DEAL, BUT TO THOSE VOTERS THAT ARE TRYING TO ACCESS

22   THEIR VOTE AND WHO USED TO WALK TO THE POLLS CAN NO LONGER DO

23   THAT IN A SAFE WAY IF THEY'VE GOT TO CROSS A MAJOR INTERSTATE

24   TO ACCESS THEIR VOTE.

25   **Q.**   THANK YOU, MS. SHELTON.

05:15 1          I'D LIKE TO SHIFT GEARS.  COULD YOU PLEASE PROVIDE A

2    BRIEF OVERVIEW OF POWER COALITION'S ACTIVITIES RELATED TO THE

3    2020 REDISTRICTING PROCESS?

4    **A.**    YES.  WE STARTED OUR WORK DURING CENSUS, AND WE HAD -- WE

5    WORKED ALL OVER THE STATE TO ENGAGE BLACK AND BROWN COMMUNITIES

6    IN THE POWER OF CENSUS IN BEING COUNTED, TRYING TO, YOU KNOW,

7    ADDRESS SOME OF THE FEAR AND FEAR MONGERING THAT WAS HAPPENING

8    ABOUT WHAT DID IT MEAN TO TAKE THE CENSUS.  AND, YOU KNOW, WHEN

9    WE DID THAT WORK THROUGHOUT THE CENSUS PROCESS AND THEN SHIFTED

10   GEARS, YOU KNOW, SHORTLY THEREAFTER TO START TEACHING PEOPLE

11   WHAT REDISTRICTING WAS.

12          SO WE HELD REDISTRICTING ACADEMIES WHERE WE TAUGHT

13   FOLKS THE LANGUAGE:  CRACKING, PACKING, OTHER DEFINITIONS.  AND

14   THEN WE ALSO, YOU KNOW, WORKED WITH THEM TO ACTUALLY LEARN

15   MAPTITUDE AND LEARN HOW TO DRAW THEIR OWN MAPS.

16          WE ALSO HAD THREE REDISTRICTING FELLOWS THAT ALSO DID

17   TRAININGS ACROSS THE -- YOU KNOW, ACROSS THE STATE.  I THINK

18   THEY DID OVER 43 TRAININGS IN INDIVIDUAL, KIND OF SMALL

19   CLUSTERS IN DIFFERENT PARTS OF THE STATE.  AND I THINK MOST

20   IMPORTANTLY WE SUPPORTED, YOU KNOW, PEOPLE TO PARTICIPATE IN

21   THE ROADSHOWS.  AND SO, I MEAN, AGAIN, THEY WERE AT -- YOU

22   KNOW, ALMOST AT EVERY ROADSHOW, THERE WERE AT LEAST 100 PEOPLE

23   THAT CAME AND TESTIFIED AT EACH STOP.

24          AND OVERWHELMINGLY, THE MAJORITY OF THE TESTIMONY AT

25   EVERY SINGLE ROADSHOW, WHITE AND BLACK, OLD AND YOUNG, WAS THEY

05:16 1    WANTED FAIR AND EQUITABLE MAPS AND THEY WANTED A SECOND

2    MAJORITY-MINORITY DISTRICT.  IT WAS CLEAR.  IT WAS -- YOU KNOW,

3    IT WAS REAL THAT, YOU KNOW, PEOPLE SAID THIS ALL OVER THE STATE

4    OF LOUISIANA, AND THEY WERE IGNORED BY HOUSE GOVERNMENTAL

5    AFFAIRS AND SENATE GOVERNMENTAL AFFAIRS.

6    Q.   THANK YOU, MS. SHELTON.

7         AND AS PART OF POWER COALITION'S EFFORTS, DID IT

8    SUBMIT DISTRICTING MAPS TO THE LEGISLATURE THAT CONTAINED MORE

9    THAN ONE MAJORITY-BLACK DISTRICT?

10   A.   WE DID.

11   Q.   AND WHY WAS IT IMPORTANT TO PROVIDE THOSE MAPS TO THE

12   LEGISLATURE?

13   A.   IT WAS IMPORTANT FOR US TO PROVE THAT IT COULD BE DONE,

14   THAT -- YOU KNOW, AGAIN, WE LOST FIVE PERCENT IN WHITE

15   POPULATION.  WE GAINED ALMOST THREE PERCENT IN BLACK AND OTHER,

16   YOU KNOW, POPULATION.  AND SO FOR US, THIS WAS ABOUT HONORING

17   THE FACT THAT WE HAVE THE SECOND-LARGEST BLACK POPULATION IN

18   THE COUNTRY AND THAT ACTUALLY -- THAT IT COULD BE DRAWN IN MANY

19   DIFFERENT WAYS TO PROVE THAT IT WASN'T JUST AN IDEA OR

20   SOMETHING THAT, YOU KNOW, THAT I WANTED BUT THAT IT ACTUALLY

21   WAS SOMETHING THAT WAS POSSIBLE AND NECESSARY FOR FAIR AND

22   EQUITABLE MAPS IN LOUISIANA.

23   Q.   THANK YOU, MS. SHELTON.

24        AND HOW DID LOUISIANA STATE OFFICIALS TREAT POWER

25   COALITION AND ITS CONSTITUENTS DURING THE ROADSHOWS AND THE

05:17 1  LEGISLATIVE SESSIONS?

2  **A.**   WE WERE TREATED -- I MEAN, IT WAS UNFORTUNATE BECAUSE I

3  THINK FOR MANY OF THE ROADSHOWS YOU COULD SEE HOUSE AND

4  GOVERNMENTAL AFFAIRS AND SENATE GOVERNMENTAL AFFAIRS MEMBERS,

5  YOU KNOW, DOODLING, NOT LOOKING UP, AND PEOPLE ARE TELLING

6  THEIR STORY OF GENERATIONS OF VOTING RIGHTS WORK THAT THEIR

7  FAMILIES HAD DONE TO ENSURE THAT THEY HAD A RIGHT TO VOTE.

8  AND, YOU KNOW, FOLKS ARE LOOKING DOWN.  YOU KNOW, THEY ARE NOT

9  PAYING ATTENTION.

10         AND THEN WE WENT TO THE CAPITOL AND WE ALSO -- YOU

11  KNOW, WE HAD OVER -- YOU KNOW, FOR THE OPENING OF THE

12  REDISTRICTING SESSION, THERE WERE OVER 250, YOU KNOW, PEOPLE OF

13  COLOR, WHITE ALLIES THAT SHOWED UP TO SAY:  *WE ARE HERE.  WE*

14  *ARE WATCHING YO*U.  *AND WE'VE SAID WHAT WE WANTED AND WE ARE*

15  *GOING TO CONTINUE TO SAY WHAT WE WANT,* AND EVEN IN THE

16  LEGISLATIVE COMMITTEE ROOMS, LEGISLATORS WALKING AROUND, NOT

17  PAYING ATTENTION, BASICALLY WAITING TO SEE WHEN ALL THE

18  TESTIMONY WOULD BE DONE SO THAT THEY COULD VOTE.  NOT ONE MAP

19  THAT INCLUDED A SECOND MAJORITY-MINORITY DISTRICT EVEN GOT OUT

20  OF COMMITTEE.  THEY WOULDN'T EVEN ALLOW IT TO BE DISCUSSED ON

21  THE FLOOR.

22  **Q.**   AND, MS. SHELTON, WERE THERE ANY OTHER INSTANCES IN WHICH

23  YOU FELT THAT YOU WERE NOT HEARD BY THE LEGISLATURE DURING

24  THOSE -- DURING THAT TIME?

25  **A.**   YES.  SO ON THE DAY WHEN THEY WERE OVERRIDING THE VETO, WE

05:18 1    WERE ALL AT THE CAPITOL.  WE WERE -- YOU KNOW, THE HOUSE VOTED

2    BEFORE THE SENATE.  YOU KNOW, THE HOUSE VOTE -- I MEAN, IT CAME

3    DOWN TO A COUPLE OF VOTES, RIGHT, AND AT THE END OF THE DAY, WE

4    DIDN'T -- YOU KNOW, THE VETO WAS OVERTURNED.

5              BASICALLY THEY KNEW IN THE HOUSE THAT IT WAS

6    OVERTURNED BECAUSE THEY HAD THE VOTES ON THE SENATE SIDE.  AND

7    ONCE THAT HAPPENED, ONCE THE VOTE WAS MADE, THEY CHEERED.  THEY

8    CELEBRATED.  THE VOTE WAS ALONG RACIAL LINES, AND THEN YOU WALK

9    ACROSS THE HALLWAY TO THE SENATE CHAMBER AND IT IS LIKE A

10   FUNERAL.  IT IS SOMBER.  IT IS QUIET.  THE BLACK SENATORS

11   TESTIFIED AND SAID, "WE KNOW WE CAN'T CHANGE YOUR MINDS, BUT

12   THIS IS THE HISTORICAL NATURE OF WHAT WE ARE TRYING TO DO

13   HERE."  AND, AGAIN, THE VOTE -- OF COURSE, THE GOVERNOR'S VETO

14   WAS OVERTURNED.

15   **Q.**   AND JUST FOR THE RECORD, WHO CHEERED?

16   **A.**   THE CONSERVATIVE MEMBERS OF THE HOUSE AND MEMBERS OF THE

17   SENATE, BECAUSE THEY BOTH CAME TO BOTH SIDES.

18   **Q.**   AND COULD YOU PLEASE DESCRIBE WHAT IF FELT LIKE TO YOU AND

19   POWER COALITION'S CONSTITUENTS WHEN THE LEGISLATURE OVERRODE

20   THE VETO?

21   **A.**   I MEAN, I THINK IT WAS -- YOU KNOW, IT'S DEFLATING AND

22   IT'S ALSO -- YOU KNOW, AGAIN, LIKE A TRUE SIGN OF

23   DISENFRANCHISEMENT.  I MEAN, SO HOW IS IT THAT THOUSANDS OF

24   PEOPLE PARTICIPATE AND THEY SAY SPECIFICALLY TWO VERY KEY

25   MESSAGES -- AND NOT MESSAGES THAT I GAVE THEM BUT MESSAGES THAT

05:20 1  WERE ON THEIR HEART -- THAT WERE MESSAGES THAT HAD -- YOU KNOW,

2  AGAIN, LIKE FAMILIAL FIGHT FOR THEM AROUND HAVING THEIR VOICE

3  AND THEIR VOTE. AND TO THEN, YOU KNOW, ONE, GET ENOUGH

4  COMMUNITY OUTCRY FOR THE GOVERNOR TO VETO AND THEN TO HAVE THAT

5  VETO OVERTURNED, IT JUST BASICALLY TELLS VOTERS THAT WE HAVE

6  WORKED SO HARD TO GIVE AGENCY TO AS A VOTER AND REMIND THEM

7  THAT THEIR VOTE AND THEIR VOICE ACTUALLY HAS POWER, IT JUST

8  BASICALLY SAYS TO THEM IT'S POLITICS AS USUAL. IT DOESN'T

9  MATTER. YOU KNOW, LIKE -- AND THEY DISENGAGE. AND SO IT MAKES

10  OUR WORK DOUBLY HARD.

11  **Q.** AND FOLLOWING UP ON THAT, MS. SHELTON, HOW HAS THE

12  LEGISLATURE'S ENACTED CONGRESSIONAL MAP IMPACTED POWER

13  COALITION'S WORK?

14  **A.** SO FOR POWER COALITION, AGAIN, YOU KNOW, WE'VE GOT

15  MIDTERMS COMING UP IN THE FALL. AND SO THIS CURRENT -- YOU

16  KNOW, LIKE -- AND SO WE DO A LOT OF EDUCATION WORK WITH OUR

17  COMMUNITIES, THE HISTORICALLY DISFRANCHISED COMMUNITIES IN

18  LOUISIANA. AND IN THE PROCESS OF DOING THAT WORK, RIGHT, LIKE

19  WE'VE GOT TO -- YOU KNOW, WE'VE GOT TO EDUCATE THEM ON LIKE

20  WHAT DISTRICT DO THEY LIVE IN, WHAT CHANGES HAVE HAPPENED AND

21  THEN ALSO TO ENGAGE THEM IN, YOU KNOW, THE PROCESS OF

22  UNDERSTANDING, YOU KNOW, WHAT AND WHEN THEY'RE GOING TO VOTE.

23  AND I THINK SPECIFICALLY FOR POWER COALITION, AGAIN,

24  YOU KNOW, WE ARE -- WE'RE DOING TOUCHES, RIGHT. YOU KNOW, LIKE

25  LAST -- LAST YEAR WE DID OVER, I WANT TO SAY, OVER A MILLION

05:21 1    TOUCHES.  AND WHEN YOU TALK ABOUT A MILLION TOUCHES, THAT MEANS
      2    THAT, YOU KNOW, WE'RE TOUCHING VOTERS AT LEAST THREE TIMES:  SO
      3    PHONE CALL, DOOR KNOCK, YOU KNOW, A TEXT MESSAGE OR A WHOLE
      4    BUNCH OF OTHER THINGS.  AND SO THE DIFFERENCE IS ME HAVING TO
      5    DOUBLE WORK BECAUSE I'M DEALING WITH DISENFRANCHISED VOTERS WHO
      6    FEEL LIKE *YOU TOLD ME THAT*, YOU KNOW, LIKE THAT IF WE ENGAGED
      7    AND WE PROVIDED OUR VOICE, THAT IT WOULD BE OKAY.  AND SO
      8    THEY'RE DEFLATED AND DISCONNECTED.
      9         AND SO, AGAIN, DOUBLE WORK, RIGHT, VERSUS WORKING
     10    WITH A POPULATION AND A GROUP OF VOTERS WHO DON'T FEEL
     11    DISENFRANCHISED, WHO FEEL LIKE THEY DO HAVE VOICE AND POWER AND
     12    THAT THEY ARE GOING TO BE ABLE TO ELECT CANDIDATES OF CHOICE.
     13    AND WE KNOW THAT BEING ABLE TO ELECT A CANDIDATE OF CHOICE
     14    DRIVES VOTER INTERESTS AND VOTER EXCITEMENT IN THESE PROCESSES.
     15    AND SO ON -- YOU KNOW, SO, AGAIN, AS THIS MAP THAT IS ENACTED,
     16    I'VE GOT BOTH A DISENFRANCHISED AND A DEFLATED GROUP OF PEOPLE
     17    WHO FEEL LIKE THE SYSTEM DOES NOT WORK.
     18    **Q.**    THANK YOU, MS. SHELTON.
     19         AND SHIFTING GEARS, YOU SAID YOU'VE LIVED IN BATON
     20    ROUGE YOUR WHOLE LIFE?
     21    **A.**    YES.
     22    **Q.**    ARE THERE DIFFERENCES BETWEEN NORTH BATON ROUGE AND SOUTH
     23    BATON ROUGE?
     24    **A.**    YES.
     25    **Q.**    AND COULD YOU SPEAK TO THOSE DIFFERENCES?

05:22 1   **A.**   YES.  I THINK IT'S WELL-DOCUMENTED THAT BATON ROUGE IS A

2   TALE OF TWO CITIES.  YOU KNOW, BASICALLY WE HAVE THE WORST AND

3   THE BEST QUALITY OF LIFE WITHIN A FEW SQUARE MILES OF EACH

4   OTHER, IN THAT, YOU KNOW, NORTH BATON ROUGE BEING PREDOMINANTLY

5   AFRICAN AMERICAN; SOUTH BATON ROUGE BEING PREDOMINANTLY WHITE

6   AND, YOU KNOW, THE INCOME BATCHING.

7           YOU KNOW, CERTAINLY THE NORTH BATON ROUGE COMMUNITY

8   IS POOR IN MODERATE INCOME, AND SOUTH BATON ROUGE IS SO MUCH

9   MORE A WEALTHY COMMUNITY.  AND THEN, YOU KNOW, ALSO TOO

10   POLITICALLY.  IT'S BEEN INTERESTING BECAUSE BASICALLY VOTERS IN

11   THE STATE OF LOUISIANA -- I MEAN, IN THE CITY OF BATON ROUGE,

12   THEY BASICALLY HAVE VOTED TO SECEDE FROM NORTH BATON ROUGE, IS

13   THE BEST WAY I COULD PUT IT.  IT IS CURRENTLY IN COURT.

14   BUT I MEAN, IT GIVES YOU AN IDEA OF HOW POWERFUL THAT

15   DIFFERENCE IS OR THE DIVISION BETWEEN COMMUNITIES IN EAST BATON

16   ROUGE PARISH.

17   **Q.**   THANK YOU.

18           AND YOU MENTIONED THAT NORTH BATON ROUGE WAS

19   PREDOMINANTLY PEOPLE OF COLOR.  WOULD YOU SAY THAT NORTH BATON

20   ROUGE HAS -- OR THE PEOPLE OF NORTH BATON ROUGE HAVE COMMON

21   NEEDS THAT GO BEYOND RACE?

22   **A.**   YES.

23   **Q.**   AND COULD YOU SPEAK TO THOSE NEEDS?

24   **A.**   I MEAN, I THINK THAT, YOU KNOW, WE'VE -- AGAIN, SECOND --

25   YOU KNOW, LIKE WE'RE THE SECOND POOREST STATE, BUT I THINK

05:24 1   AFTER SOME OF THE DATA WE SAW TODAY, MAYBE WE'VE BEAT

2   MISSISSIPPI, UNFORTUNATELY, TO BE THE POOREST STATE.

3        YOU KNOW, IN NORTH BATON ROUGE WE HAVE HOUSING

4   INSECURITY.  WE'VE GOT FOOD INSECURITY.  WE HAVE ABSOLUTELY,

5   YOU KNOW, FOOD DESERTS, AS WELL AS -- YOU KNOW, JUST NOT -- NO

6   OPPORTUNITIES FOR ECONOMIC -- YOU KNOW, ECONOMIC GROWTH, AND,

7   YOU KNOW, AND -- YEAH.

8   **Q.**   THANK YOU, MS. SHELTON.

9        SHIFTING GEARS AGAIN, THE DEFENDANTS ARGUE THAT

10  POLITICAL PARTY RATHER THAN RACE IS RESPONSIBLE FOR VOTING

11  PATTERNS IN LOUISIANA.  IN YOUR EXPERIENCE AS PRESIDENT AND CEO

12  OF POWER COALITION, DO YOU FIND THAT BLACK VOTERS VOTE FOR

13  DEMOCRATS JUST BECAUSE THEY ARE DEMOCRATS?

14  **A.**   NO.  I THINK THAT THEY VOTE FOR -- I MEAN, I THINK THEY

15  VOTE FOR WHO IS GOING TO CARE ABOUT THEIR SELF-INTERESTS.  DOES

16  THAT HAPPEN TO BE DEMOCRATS?  MOST OF THE TIME, MORE THAN

17  LIKELY.  HOWEVER, I THINK IT IS ALSO TRUE THAT I DON'T THINK

18  THAT BLACK COMMUNITIES ARE SERVED WELL BY EITHER SIDE.

19  **Q.**   THANK YOU, MS. SHELTON.

20       AND JUST ONE MORE TOPIC.  WHY IS IT IMPORTANT TO

21  POWER COALITION'S CONSTITUENTS FOR THERE TO BE AN ADDITIONAL

22  MAJORITY-BLACK DISTRICT?

23  **A.**   BECAUSE, AGAIN, I MEAN, I THINK THAT ONE OF THE THINGS

24  THAT WAS SO BEAUTIFUL WAS THAT WHEN WE STARTED THE

25  REDISTRICTING JOURNEY AS AN ORGANIZATION AND TRYING TO ENGAGE

05:25  1   PEOPLE IN VERY DENSE CONTENT, LIKE IT'S NOT LIKE ANYTHING WE'VE

      2   BEEN TALKING ABOUT IS EASY TO UNDERSTAND AND MULTIPLE

      3   DEFINITIONS.  AND SO TO BE ABLE TO ENGAGE THAT MANY PEOPLE IN

      4   THIS PROCESS, TO HAVE THEM SHOW UP AT THE CAPITOL EVERY DAY, TO

      5   HAVE THEM ENGAGED IN FEELING EMPOWERED AND LIKE THEY ARE --

      6   THAT THIS WAS WHAT WAS RIGHT.  I MEAN, THE WAY THAT -- AGAIN,

      7   THERE WERE SEVERAL DIFFERENT WAYS THAT WE -- THEY COULD HAVE

      8   GOTTEN A SECOND DISTRICT, AND THEN TO HAVE THE LEGISLATURE TELL

      9   THEM NO AT EVERY TURN FROM THE ROADSHOW TO THE REDISTRICTING

     10   SPECIAL SESSION TO THE VETO OVERRIDE.

     11          AND SO THE POWER COALITION, YOU KNOW, THIS IS ABOUT

     12   VOICE AND POWER AND ABOUT, YOU KNOW, BLACK PEOPLE BEING ABLE TO

     13   HAVE -- TO BE ABLE TO ELECT CANDIDATES OF CHOICE.  AND BY

     14   PACKING US ALL INTO ONE DISTRICT, YOU BASICALLY MINIMIZE THE

     15   ABILITY OF BLACK VOTERS TO ELECT CANDIDATES OF CHOICE.

     16   **Q.**   THANK YOU, MS. SHELTON.

     17          **MR. SAVITT:**  NO FURTHER QUESTIONS, YOUR HONOR.

     18          **THE COURT:**  OKAY.  I HAVE TWO, JUST BEFORE CROSS, IF

     19   YOU DON'T MIND, MA'AM.

     20          ONE IS YOU MENTIONED THE PRECINCT CONSOLIDATION

     21   IN NEW ORLEANS EAST.  YOU SAID IT MOVED A FEW MILES BUT ACROSS

     22   A DANGEROUS HIGHWAY.  CAN YOU TELL ME WHAT HIGHWAY THAT WAS?

     23          **THE WITNESS:**  I'M PRETTY SURE -- IT'S I-10.  I THINK

     24   IT'S STILL I-10, YES.

     25          **THE COURT:**  IT'S I-10?

05:26  1           **THE WITNESS:**  YEAH.

       2           **THE COURT:**  OKAY.  YOU SAID "HIGHWAY" AND I DIDN'T

       3  KNOW INTERSTATE, HIGHWAY.

       4           **THE WITNESS:**  YES.

       5           **THE COURT:**  OKAY.  MY OTHER QUESTION WAS:  YOU SAID

       6  THAT TWO MESSAGES CAME THROUGH IN THESE ROADSHOWS FROM THE

       7  VARIOUS PEOPLE THAT POWER COALITION ENCOURAGED TO PARTICIPATE

       8  IN THE POLITICAL PROCESS.  YOU DIDN'T SAY WHAT THOSE TWO

       9  MESSAGES WERE.

      10           **THE WITNESS:**  OH, SORRY.  THAT THEY WANTED A FAIR AND

      11  EQUITABLE REDISTRICTING PROCESS AND THAT THEY WANTED A SECOND

      12  MAJORITY-MINORITY DISTRICT TO HONOR THE CHANGE IN POPULATION

      13  AND THE SHIFT IN POPULATION.

      14           **THE COURT:**  OKAY.  THANKS.

      15                THAT MAY HAVE PROVOKED ADDITIONAL QUESTIONS,

      16  WHICH I'M CERTAINLY GOING TO ALLOW COUNSEL TO HAVE.

      17                CROSS.

      18           **MR. WALE:**  THANK YOU, YOUR HONOR.

      19                     **CROSS-EXAMINATION**

      20  BY MR. WALE:

      21  **Q.**  HI, MS. SHELTON.  MY NAME IS JEFFREY WALE.  I'M AN

      22  ATTORNEY FOR THE STATE, AND I'LL BE ASKING YOU A FEW QUESTIONS

      23  THIS AFTERNOON.

      24  **A.**  HI.

      25  **Q.**  HI.

05:27  1          HOW LONG HAS POWER COALITION -- THE FULL NAME IS

       2  POWER COALITION FOR EQUITY AND JUSTICE.  CORRECT?

       3  **A.**   YES.

       4  **Q.**   BUT Y'ALL JUST CALL IT POWER COALITION?

       5  **A.**   YEAH.

       6  **Q.**   IF I COULD REFER TO IT AS POWER COALITION.

       7  **A.**   UH-HUH.

       8  **Q.**   HOW LONG HAS POWER COALITION EXISTED IN THE STATE?

       9  **A.**   GOSH.  SO -- I MEAN, SO SINCE ABOUT 2015.

      10  **Q.**   2015.  OKAY.

      11  **A.**   AND, I MEAN, I THINK THAT, YOU KNOW, THERE'S A LITTLE BIT

      12  OF GRAY BECAUSE WE DID SPIN OUT OF ANOTHER NONPROFIT

      13  ORGANIZATION ONTO OUR OWN.  AND SO -- AND SO -- AND ALSO, TOO,

      14  WE ARE PHYSICALLY SPONSORED BY ANOTHER NONPROFIT.  AND SO,

      15  AGAIN, YOU KNOW, PROBABLY WITHIN THE, YOU KNOW, SECRETARY OF

      16  STATE'S REGISTRY THAT DATE MIGHT BE DIFFERENT.

      17  **Q.**   WHO ARE THAT -- WHAT IS THAT NONPROFIT THAT Y'ALL SPLIT

      18  FROM?

      19  **A.**   IT'S CALLED ONE VOICE.

      20  **Q.**   ONE VOICE?

      21  **A.**   UH-HUH.

      22  **Q.**   AND WHAT'S THE NONPROFIT THAT YOU'RE FINANCIALLY SPONSORED

      23  BY?

      24  **A.**   PUBLIC ALLIES.

      25  **Q.**   PUBLIC ALLIES.

05:28

1          AND SO FROM THAT -- IS THAT THE SOLE SOURCE OF YOUR
2    FUNDING OR DO YOU HAVE OTHER CONTRIBUTORS AND DONORS AND THINGS
3    OF THAT NATURE?
4    **A.**   NO.  THAT IS -- SO THEY ARE JUST OUR PHYSICAL SPONSOR, AND
5    WE RAISE OUR OWN MONEY THROUGH FOUNDATIONS' DONORS AND
6    INDIVIDUALS.
7    **Q.**   OKAY.  DO YOU DISCLOSE OR PUBLICALLY RELEASE YOUR
8    FOUNDATION'S DONORS?
9    **A.**   IT IS RELEASED WITHIN PUBLIC ALLIES WITHIN THEIR 990.
10   AND, I MEAN, THEY HAVE TO STILL REPORT OUR GRANTS AND OUR
11   INFORMATION BECAUSE WE ARE A FISCALLY SPONSORED PROJECT.
12   **Q.**   OKAY.  AND I WAS ABLE TO LOOK AT YOUR WEBSITE, SO I KNOW
13   YOU PARTNER WITH SEVERAL ORGANIZATIONS.  WHAT ARE SOME OF THOSE
14   ORGANIZATIONS THAT YOU PRIMARILY PARTNER WITH?
15   **A.**   YES.  SO POWER COALITION IS ANCHORED BY BASE BUILDING
16   ORGANIZATIONS, BECAUSE IT IS OUR BELIEF THAT IN ORDER TO SERVE
17   PEOPLE AND TO ADDRESS POLICY ADVOCACY ISSUES, YOU HAVE TO
18   ACTUALLY WORK WITH DIRECTLY IMPACTED PEOPLE.  SO VOICE OF THE
19   EXPERIENCED HOLDS -- YOU KNOW, THEY ALL HAVE SPECIFIC CONTENT
20   AREA EXPERTISE.  SO VOTE WORKS AROUND CRIMINAL JUSTICE; THE
21   LOUISIANA HOUSING ALLIANCE AROUND HOUSING.  I'M TRYING TO THINK
22   OF -- LET ME GO AROUND THE TABLE.  VAYLA, THAT WORKS WITHIN THE
23   VIETNAMESE COMMUNITY IN NEW ORLEANS EAST.  AND SO, AGAIN, YOU
24   KNOW, IT'S A BROAD SPECTRUM OF GROUPS THAT HAVE
25   SPECIFIC-ISSUE-AREA CONTEXT EXPERTISE.

05:29 1  **Q.**   AND DID I SEE THE LOUISIANA BUDGET PROJECT MENTIONED ON

2  THAT WEBSITE AS WELL?

3  **A.**   YES.  YES.  AND LOUISIANA PARTNERSHIP FOR CHILDREN AND

4  FAMILIES AS WELL AS THE LOUISIANA POLICY INSTITUTE AND WOMEN

5  WITH A VISION.  SO, YES, THERE ARE SEVERAL -- SEVERAL DIFFERENT

6  GROUPS.

7          AND THE BUDGET PROJECT, ALTHOUGH NOT A BASE-BUILDING

8  GROUP, DOES PROVIDE FOUNDATIONAL EXPERTISE ON BUDGET AND FISCAL

9  ISSUES THAT IMPACT POVERTY-STRICKEN COMMUNITIES ACROSS

10  LOUISIANA.

11  **Q.**   SO IN PARAGRAPH 15 OF YOUR DECLARATION THAT YOU MADE IN

12  THIS CASE, YOU STATE THAT YOUR MEMBER ORGANIZATIONS ARE

13  DIRECTLY IMPACTED BY VOTE DILUTION.

14  **A.**   UH-HUH.

15  **Q.**   AND SO MY QUESTION FOR YOU:  ARE ORGANIZATIONS' VOTERS --

16  IN OTHER WORDS, DO ORGANIZATIONS HAVE THE RIGHT TO VOTE?

17  **A.**   ORGANIZATIONS DO NOT HAVE THE RIGHT TO VOTE.  I THINK WHAT

18  WE ARE SPECIFICALLY TALKING ABOUT IS THAT THESE ORGANIZATIONS

19  REPRESENT A BASE, WHICH MEANS THAT THEY HAVE A MEMBERSHIP.

20          AND SO, FOR EXAMPLE, VOTE HAS SEVERAL HUNDRED MEMBERS

21  IN NEW ORLEANS.  THEY HAVE ABOUT 100 MEMBERS HERE IN BATON

22  ROUGE.  THEY'VE GOT MEMBERS IN SHREVEPORT AND ALL OVER THE

23  STATE.  AND SO, AGAIN, IT'S NOT THE INDIVIDUAL ORGANIZATION.

24  IT IS THE PEOPLE THAT THEY REPRESENT AND THE PEOPLE THAT THEY

25  WORK WITH.

05:30 1 **Q.** SO YOU HAD TESTIFIED THAT YOU WERE ENGAGED IN THE
2 REDISTRICTING PROCESS AND POWER COALITION WAS ENGAGED IN THE
3 REDISTRICTING PROCESS IN THE MOST RECENT --
4 **A.** YES.
5 **Q.** -- LEGISLATIVE SESSION, REDISTRICTING SESSION. CORRECT?
6 **A.** CORRECT.
7 **Q.** AND SO AT THE ROADSHOWS AND AT THE CAPITOL, EVERY MEMBER
8 OF THE POWER COALITION WHO ATTENDED COULD TURN IN A CARD IN
9 SUPPORT OR IN OPPOSITION TO ANY BILL PROPOSED. CORRECT?
10 **A.** CORRECT.
11 **Q.** AND EVERYONE HAD THE OPPORTUNITY TO PROVIDE PUBLIC COMMENT
12 AT THOSE EVENTS?
13 **A.** MOST OF THE TIME. I MEAN, THERE WERE A LOT OF PEOPLE SOME
14 DAYS. AND SO WE COULDN'T -- YOU KNOW, THEY HAD TO BREAK AND
15 WE COULDN'T GET TO EVERYBODY, ESPECIALLY ON THE FIRST DAY, BUT
16 FOR THE MOST PART.
17 **Q.** OKAY. AND DOES THE POWER COALITION TYPICALLY ENGAGE IN
18 THE LEGISLATIVE PROCESS?
19 **A.** WE DO.
20 **Q.** ON MANY DIFFERENT ISSUES?
21 **A.** YES.
22 **Q.** AND AS FAR AS LEGISLATIVE ACTIVITY, WOULD THAT INCLUDE
23 ENCOURAGING THE GOVERNOR TO VETO BILLS THAT YOU ARE IN
24 OPPOSITION TO?
25 **A.** YES. I MEAN, IT'S ADVOCACY. I MEAN, HE HAD THE POWER.

05:31 1   YOU KNOW, WE'RE THE POWER COALITION.  AND SO WE LOOK FOR THE

2   PATH THAT WILL GET PEOPLE WHAT THEY DESERVE AND WHAT THEY NEED.

3   **Q.**   AND IN THE FUTURE YOU WOULD CONTINUE TO FIGHT FOR LAWS OR

4   BILLS THAT YOU SUPPORT OR OPPOSE?  YOU WOULD SUPPORT OR OPPOSE

5   THAT AT THE LEGISLATURE.  CORRECT?

6   **A.**   RESTATE.

7   **Q.**   SO IN THE FUTURE -- LET ME RESTATE THAT.

8          IF THIS ENACT -- IF THE ENACTED MAP GOES FORWARD, THE

9   ENACTED MAP IS ALLOWED, YOU WILL CONTINUE TO FIGHT FOR ISSUES

10   THAT THE POWER COALITION CARES ABOUT.  CORRECT?

11   **A.**   WE WILL.  AND I THINK THE DIFFERENCE, THOUGH, THAT'S VERY

12   IMPORTANT THAT I WANT TO CONTINUE TO MAKE IS THAT AM I WORKING

13   TO, YOU KNOW, MOVE PEOPLE THAT ARE EXCITED AND FEEL LIKE

14   THEY'RE LIVING IN A STATE THAT'S LISTENING TO THEM AND GIVING

15   THEM EQUAL VOICE OR ARE THEY LIVING -- OR, YOU KNOW, ARE THEY

16   ACTUALLY LIVING IN A STATE THAT DOES -- YOU KNOW, LIKE DOES NOT

17   DO THAT?

18          AND SO IT'S, ONE, ABOUT MOVING DISENFRANCHISED FOLKS,

19   WHICH IS THE WORK WE'VE DONE FOR YEARS.  AND SO IT -- YOU KNOW,

20   LIKE, IT UNDERMINES AND FORCES US TO HAVE TO DO THAT DOUBLE

21   WORK BECAUSE WE'VE GOT TO RECONNECT PEOPLE TO THEIR AGENCY AS A

22   VOTER.

23   **Q.**   SO FOR THE PAST DECADE WE'VE HAD THE PREVIOUS

24   CONGRESSIONAL MAP THAT ONLY HAD ONE MAJORITY-MINORITY DISTRICT.

25   CORRECT?

05:32 1   **A.**   CORRECT.

2   **Q.**   AND POWER COALITION WAS ABLE TO ENCOURAGE INDIVIDUALS TO

3   REGISTER TO VOTE UNDER THAT MAP?

4   **A.**   YES.

5   **Q.**   ALL RIGHT.  AND YOU ATTEMPTED -- AS YOU HAD STATED

6   EARLIER, YOU REACHED OUT AND DID TEXT MESSAGES, PHONE CALLS,

7   ENCOURAGING BOTH REGISTRATION AND TURNOUT.  CORRECT?

8   **A.**   UH-HUH.

9   **Q.**   ALL RIGHT.  AND YOU HAD SAID SOMETHING EARLIER ABOUT

10   CANDIDATES OF CHOICE.  YOU SAID THE POWER COALITION MEMBERS DO

11   HAVE CANDIDATES OF CHOICE?

12   **A.**   I MEAN, THE MEMBERS THAT LIVE IN DISTRICT 2.

13   **Q.**   ALL RIGHT.  IN DISTRICT 2 THEY DO?

14   **A.**   I MEAN, IN THIS SENSE THAT -- YES.  I MEAN, IT'S A

15   MAJORITY AFRICAN-AMERICAN DISTRICT IN CONGRESSIONAL DISTRICT 2.

16   BUT I CURRENTLY LIVE IN CONGRESSIONAL 6, AND I DO NOT ACTUALLY

17   HAVE THE OPPORTUNITY TO PICK A CANDIDATE OF CHOICE.

18   **Q.**   SO YOU DON'T HAVE AN OPPORTUNITY TO ELECT A CANDIDATE OF

19   CHOICE IN DISTRICT 6.  THAT'S YOUR TESTIMONY?

20   **A.**   YES.

21   **Q.**   ALL RIGHT.  AND DOES YOUR CANDIDATE OF CHOICE, IS THAT

22   LIMITED TO ANY PARTICULAR POLITICAL PARTY?  IS THAT -- CAN YOU

23   -- STATE IT ANOTHER WAY.

24        CAN YOUR CANDIDATE OF CHOICE BE A CONSERVATIVE

25   REPUBLICAN?

05:33  1    **A.**   MY CANDIDATE OF -- ANYBODY THAT IS GOING TO CENTER THE

       2    ISSUES THAT I CARE ABOUT.  I MEAN, I AM A BLACK MOTHER.  I HAVE

       3    A BEAUTIFUL GOOFY 6'4" SON THAT'S 200 POUNDS.  I MEAN, ANYBODY

       4    THAT'S GOING TO CARE ABOUT THOSE ISSUES.  AND IF YOU LOOK AT

       5    GARRETT GRAVES, MY CURRENT CONGRESSMAN, IF YOU LOOK AT HIS

       6    RECORD, HIS VOTING RECORD DOES NOT VOTE FOR ANYTHING THAT I

       7    CARE ABOUT, INCLUDING THE FACT THAT THE INFRASTRUCTURE BILL

       8    THAT JUST PASSED, HE VOTED AGAINST THAT, AND OUR CITY IS -- I

       9    MEAN, OUR STATE IS CRUMBLING IN TERMS OF INFRASTRUCTURE.  AND

      10    SO, AGAIN, EVEN WHEN IT MAKES SENSE, EVEN WHEN HE MADE

      11    AMENDMENTS TO THAT BILL, HE STILL VOTED AGAINST IT.

      12    **Q.**   BUT YOU WOULD SAY THAT A CANDIDATE OF CHOICE COULD BE

      13    CONSERVATIVE OR COULD BE REPUBLICAN?

      14    **A.**   YES.

      15    **Q.**   AND THEY COULD BE WHITE?

      16    **A.**   I MEAN, IT HAS NOT BEEN MY EXPERIENCE TO DATE.  BUT I

      17    MEAN, I GUESS IT'S POSSIBLE.

      18    **Q.**   ALL RIGHT.  AND I JUST HAVE ONE MORE QUESTION FOR YOU.  ON

      19    DECEMBER 14TH YOU WROTE A LETTER TO THE LEGISLATURE STATING,

      20    "WE CONDUCTED AN ANALYSIS OF RECOMPILED ELECTION RESULTS AND

      21    DETERMINED THAT THE TWO PROPOSED MAJORITY-BLACK OPPORTUNITY

      22    DISTRICTS IN THE COALITION MAPS -- CD2 AND CD5 -- WOULD

      23    RELIABLY PERFORM TO PROVIDE AN OPPORTUNITY FOR A CANDIDATE

      24    PREFERRED BY BLACK VOTERS TO PREVAIL."

      25             DO YOU RECALL THIS LETTER?

05:34  1   **A.**   YES.  I MEAN, I DON'T -- I MEAN, YEAH, IF YOU WANT TO PUT

     2   IT UP.

     3   **Q.**   YES, WE CAN IF YOU WOULD LIKE, WHICH IS LEGISLATIVE

     4   EXHIBIT 9, IF THAT HELPS AT ALL.

     5       BUT MY QUESTION WAS, BASICALLY:  THERE IS MENTIONED

     6   ANALYSIS IN THERE, WHICH IS ON PAGE 2 OF THE LETTER; THERE IS

     7   AN ANALYSIS MENTIONED.

     8   **A.**   UH-HUH.

     9   **Q.**   WHY WAS THIS ANALYSIS NEVER PROVIDED TO THE LEGISLATURE?

   10   **A.**   SO AS WE SAT IN COMMITTEE DAY AFTER DAY THROUGHOUT THE

   11   REDISTRICTING PROCESS, YOU KNOW, REPRESENTATIVE JOHN STEFANSKI,

   12   YOU KNOW, ASKED THAT QUESTION.  AND I THINK THAT PART OF WHAT

   13   -- EVEN IN THAT SPACE -- YOU KNOW, LIKE I THINK IT IS -- THE

   14   WORK IS THERE, RIGHT.  LIKE THE MAPS WERE DRAIN BY A NATIONALLY

   15   RECOGNIZED DEMOGRAPHER, WHOM THIS COURT HAS HAD THE OPPORTUNITY

   16   TO TALK TO.  THE -- YOU KNOW, LIKE AT THE END OF THE DAY, LIKE

   17   WHY DO HAVE TO DO THE STATE'S WORK FOR THEM?  I MEAN, AT THE

   18   END OF THE DAY, WE WERE ABLE TO SHOW WHAT WAS NECESSARY FOR THE

   19   RECORD AND WHAT WAS NECESSARY FOR THEM TO MAKE A DECISION ABOUT

   20   WHETHER OR NOT -- YOU KNOW, WHETHER OR NOT THESE SEVEN MAPS

   21   THAT MET ALL OF THE TRADITIONAL REDISTRICTING PRINCIPLES THAT

   22   SHOWED A SECOND MAJORITY-MINORITY DISTRICT, ALL OF THOSE THINGS

   23   WERE MET.  AND SO --

   24   **Q.**   BUT YOU DIDN'T FEEL THE NEED TO SHOW THAT TO THE

   25   LEGISLATURE?

05:36 1    **A.**   AGAIN, I MEAN, YOU KNOW, WE WORK WITH LOTS OF PARTNERS.

2    AND SO I DON'T WANT TO -- YOU KNOW, I MEAN, IT WASN'T MY

3    DECISION.  BUT I DO THINK THAT AT THE END OF THE DAY I DO AGREE

4    THAT IT'S NOT OUR JOB TO DO EVERY SINGLE PART OF -- I MEAN,

5    LIKE WE'VE DONE EVERY SINGLE PART OF THIS PROCESS FOR THE STATE

6    TO FIGHT FOR AFRICAN-AMERICAN COMMUNITIES TO HAVE VOICE AND THE

7    IDEA THAT, LIKE, I'VE GOT TO ALSO GIVE YOU -- SHOW YOU MY MATH

8    AND SHOW YOU MY HOMEWORK, EVEN THOUGH I DO IN THE SENSE THAT

9    THERE WERE SEVEN MAPS SUBMITTED WITH THAT LETTER THAT SHOWED

10    THAT IT'S POSSIBLE FOR AFRICAN AMERICAN -- FOR A SECOND

11    MAJORITY-MINORITY DISTRICT TO HONOR THE GROWTH IN BLACK

12    POPULATION, WHICH IS THE PURPOSE OF REDISTRICTING, WHICH IS TO

13    HONOR CHANGES IN POPULATION.

14    **Q.**   YOU SAID THE COURT HAD HEARD FROM THAT DEMOGRAPHER WHO

15    DREW THAT FOR YOU.  WHICH ONE WAS THAT?

16    **A.**   WELL, I MEAN, ONE OF THE TWO THAT SPOKE.  I MEAN, EITHER

17    ONE OF THE TWO THAT SPOKE TODAY.

18    **Q.**   OKAY.

19    **A.**   I WANT TO SAY IT WAS TONY FAIRFAX, BUT ONE OF THE TWO THAT

20    WERE HERE TODAY -- WELL, YESTERDAY.

21    **Q.**   AND JUST SHORT -- JUST A COUPLE MORE REALLY QUICK

22    QUESTIONS.  HOW LONG HAVE YOU LIVED IN BATON ROUGE?

23    **A.**   ALL MY LIFE.  I'M 46, SO 46 YEARS.

24    **Q.**   ALL YOUR LIFE?

25    **A.**   YES.

05:37 1    **Q.**   SO YOU WERE HERE WHEN KIP HOLDEN WAS ELECTED?

2    **A.**   YES.

3    **Q.**   AND SHARON BROOME WAS ELECTED, OBVIOUSLY?

4    **A.**   YES.

5    **Q.**   AND THEY WERE ELECTED PARISH-WIDE.  CORRECT?

6    **A.**   YES.

7    **Q.**   AND WAS KIP HOLDEN ELECTED WHEN EAST BATON ROUGE PARISH

8    WAS MAJORITY WHITE?

9    **A.**   I'M NOT SURE.

10   **Q.**   OKAY.  THANK YOU VERY MUCH.  THAT'S ALL THE QUESTIONS I

11   HAVE.  THANK YOU.

12   **A.**   ALL RIGHT.  THANK YOU.

13            **THE COURT:**  ANY REDIRECT?

14            **MR. SAVITT:**  NO REDIRECT.

15            **THE COURT:**  ALL RIGHT.  YOU ARE FREE TO GO.  THANK

16   FOR YOUR HELP, MA'AM.

17                OKAY.  WE WILL ADJOURN.  IT'S ALMOST 5:40.  WE

18   WILL RECONVENE AT 9:30.  BUT BEFORE THAT, CAN YOU GIVE THE

19   COURT A SENSE ON WHEREABOUTS YOU ARE?  IT'S LOOKING LIKE THAT

20   YOU ARE GOING TO MAKE -- BE ABLE TO CLOSE THIS THING OUT ON

21   FRIDAY?  I HAVEN'T COUNTED HEADS.  SO I DON'T HAVE A SENSE IN

22   MY MIND HOW MANY WITNESSES WE ARE INTO YOUR WITNESS LIST.

23            **MS. KHANNA:**  I BELIEVE WE WILL BE FINE TO CLOSE OUT

24   ON FRIDAY, YOUR HONOR.  TOMORROW THE PLAINTIFFS WILL HAVE, I

25   WOULD SAY, NO MORE THAN ONE TO TWO RELATIVELY SHORT WITNESSES,

05:38 1  AND I IMAGINE THAT THE DEFENDANTS WILL BE ABLE TO START PUTTING

2  ON THEIR CASE IN CHIEF IN THE MORNING.

3  **THE COURT:**  OKAY.  GOOD.  THE PLAN FOR TOMORROW IS WE

4  WILL CONVENE AT 9:30.  WE WILL BE ABLE TO CONVENE AT 9:30.  WE

5  WILL BREAK EARLY TOMORROW.  THERE IS A COURT-WIDE FUNCTION THAT

6  I REALLY NEED TO GO TO, BUT I WILL PLAY IT BY EAR.  I CAN GO

7  LATE.  I MEAN MY GOAL WOULD BE TO BREAK AROUND 3:30, BUT IF WE

8  ARE IN A SPOT WHERE WE NEED TO GO UNTIL 4:00 OR A LITTLE AFTER

9  4:00, WE CAN DO THAT.  OKAY.  BUT WE DO NEED TO PLAN TO BREAK A

10  FEW MINUTES EARLY TOMORROW.

11  OKAY.  REST WELL.  SEE YOU IN THE MORNING AT 9:30.

12  **(WHEREUPON, THIS MATTER WAS RECESSED UNTIL MAY 11, 2022,**

13  **AT 9:30 A.M.)**

14  * * *

15  **CERTIFICATE**

16  I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

17  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

18  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

19  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

20  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22  *Shannon Thompson*

23  SHANNON THOMPSON, CCR

24  OFFICIAL COURT REPORTER

25